**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TICKET POLICY FORUM, INC.,
1156 15th Street NW, Suite 500
Washington, D.C. 20005,

SEATGEEK, INC.,
902 Broadway, 10th Floor
New York, NY 10010,

VIVID SEATS LLC,
24 E. Washington Street, Suite 900
Chicago, IL 60602,

GAMETIME UNITED, INC.,
130 Sutter Street
San Francisco, CA 94104,

and

TICKPICK, LLC,
1 Pennsylvania Plaza, Suite 4006
New York, NY 10119,

Plaintiffs,

v.

DISTRICT OF COLUMBIA,
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004,

Defendant.

Case No. 26-cv-__________

**COMPLAINT**

## INTRODUCTION

1. The District of Columbia has enacted a novel price-control law in the market for resale tickets to D.C. events. Under the guise of protecting consumers from deceptive practices, the RESALE Act, D.C. Law 26-181, fixes both the maximum price at which a ticket may be resold and the maximum fee a resale marketplace may charge for its services. But those blunt price controls do nothing to prevent consumer deception. Rather, they force secondary ticket marketplaces to operate at a loss, by dictating the terms of private transactions that occur outside the District while shielding favored local interests from out-of-state competition. Moreover, the law compels secondary ticket marketplaces to publish pricing information—the ticket's original purchase price—that they did not set, do not receive, and generally cannot know. The law violates the Constitution several times over.

2. Plaintiffs are the Ticket Policy Forum, Inc., a trade association, and four of its members: SeatGeek, Inc., Vivid Seats LLC, Gametime United, Inc., and TickPick, LLC. The companies operate secondary ticket marketplaces on which fans can resell tickets to live events. A fan who falls ill the week of a concert can list her ticket in minutes and reach buyers across the country. A fan shut out of a sold-out show can find a seat. Plaintiffs make those resales safe and reliable: they invest in technology, vet sellers, process payments, deliver tickets, assist customers in accessing events, and guarantee a valid ticket or a refund. Those protections are why ticket resale moved from the sidewalks outside the old MCI Center to secure online marketplaces. Plaintiffs can provide those services and guarantees because they charge a service fee that is part of the fully disclosed "all-in" price to the buyer.

3. The Act would upend that market. Beginning January 1, 2027, the Act caps Plaintiffs' service fee at 10% of the ticket's "initial" price. D.C. Code § 28-5506(c) (attached as Exhibit A). That figure has nothing to do with what Plaintiffs' services cost, and is even below

cost for lower-priced tickets. The arithmetic is simple. When a $40 concert ticket resells for $44, the most the Act allows, the Act lets Plaintiffs charge $4. But Plaintiffs incur more in costs than that to complete the transaction. Such sales lose money, and the losses fall hardest on the low-priced tickets the Council said it wanted to protect. And even where the fee cap permits Plaintiffs to recover their costs on a particular transaction, it still sometimes forecloses a reasonable return on investment. The Act also caps the resale price itself at 10% above the ticket's initial price. *Id.* § 28-5506(b). And it requires Plaintiffs to publish that initial price, *id.* § 28-5506(a)(2), even though Plaintiffs took no part in the original sale and usually have no way to learn or verify what the first buyer paid.

4. The Council adopted the Act over warnings from a broad coalition of private and public stakeholders, including the Mayor's office, economists, consumer organizations, and Plaintiffs. They all told the Council the same things. The valuable services Plaintiffs provide have real costs, and the Act's 10% fee cap would force them to facilitate many ticket sales at a loss. A price cap would raise resale prices by driving resale tickets off regulated marketplaces and leaving ticket issuers free to increase prices without competitive checks from secondary marketplaces. And both would increase fraud by pushing fans toward less-regulated channels. After eight months of reviewing that evidence, the committee responsible for the bill agreed and removed the caps. But eight days later, a floor amendment restored them without citing any data that answered the committee's concerns. Councilmembers describing the Act's goals said the quiet part out loud: they sought to "take the dollars from big platform international companies" and put dollars "back into our local economy."

5. As alleged in greater detail below, the Act is unlawful for several independent reasons.

6. *First*, the Act violates the dormant Commerce Clause both because it regulates commerce outside the District and because it was enacted for a protectionist purpose. The District may not "directly regulate[] out-of-state transactions by those with no connection to the State." *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 376 n.1 (2023). The Home Rule Act imposes the same limit. D.C. Code § 1-206.02(a)(3). Yet the Act fixes the price of a ticket sale between an out-of-state seller and an out-of-state buyer on an out-of-state marketplace, simply because the ticketed event takes place in the District. Fewer than 1% of Plaintiffs' covered transactions last year involved both a District seller and a District buyer. This Court has struck down a law like this before, when the District used an in-state destination to fix the price of out-of-state prescription-drug sales. *Pharm. Research & Mfrs. of Am.* v. *District of Columbia*, 406 F. Supp. 2d 56, 67-71 (D.D.C. 2005). The Act's exemptions and the Council's own statements separately confirm that it was designed to move money from out-of-state companies to local interests; that discriminatory purpose is its own constitutional flaw.

7. *Second*, the Act violates due process. The fee cap is confiscatory, and both caps deny fair notice. The government may not set rates so low that they fail to compensate a business for its services. *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307-08 (1989). Nor may it force a business to conduct "even a branch" of its operations at a loss. *Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*, 251 U.S. 396, 399 (1920). Courts have allowed due process challenges to proceed against 15% caps on food-delivery platforms' commissions. The District's 10% fee cap is lower still, and it ignores cost altogether. Both caps also make liability turn on an "initial" price that often is indeterminate because tickets can be given away, priced dynamically, and sold in bundles. Even when that price can be ascertained in theory, Plaintiffs cannot verify it, making it impossible for Plaintiffs to know what resale price and service fee the law permits and prohibits.

8. *Third*, the original-price-disclosure mandate violates the First Amendment. It compels Plaintiffs to publish a price that someone else paid in a transaction in which Plaintiffs had no part. So it must survive intermediate scrutiny, and it cannot. Fully disclosed resale prices are not deceptive. The record contains no evidence that displaying the original price helps buyers understand what they are purchasing. And the Council never considered alternatives that would burden less speech.

9. Those are not the only constitutional violations. The price and fee caps also violate the Takings Clause and equal-protection principles. Section 230 of the Communications Decency Act preempts several of the Act's requirements. And the Act compels Plaintiffs to turn over private business records to the District in violation of the Fourth Amendment.

10. Secondary ticket marketplaces have served millions of D.C. fans for 25 years. Plaintiffs provide important benefits for performers and the public by providing a liquid market for tickets. But those benefits are lost when governments impose price controls that do not reflect true costs and economic realities. Such arbitrary price caps inevitably lead to less competition, less choice, less supply, and more black-market activity. The District thus has no interest in losing the many benefits of the secondary market by imposing these price and fee caps. Nor does it have an interest in regulating transactions occurring outside the District or compelling disclosures of information that is not reasonably knowable.

11. For these reasons and more, this Court should declare the Act unconstitutional and unlawful, and enjoin the District from enforcing it against Plaintiffs and their members. In the meantime, to prevent irreparable harm that will be caused by the Act, Plaintiffs intend to move for a preliminary injunction to preserve the status quo while Plaintiffs' claims are litigated on the merits.

## PARTIES

12. Plaintiff Ticket Policy Forum, Inc. is a 501(c)(6) trade association of the nation's leading online ticket marketplaces. Its members are SeatGeek, Vivid Seats, TickPick, Gametime, StubHub, and Events Ticket Center. The Ticket Policy Forum maintains its principal office in Washington, D.C. The Ticket Policy Forum advocates for its marketplace members, protects fans, and promotes competition in ticketing.

13. Plaintiff SeatGeek, Inc. is a Delaware corporation headquartered in New York, New York. It operates a secondary online marketplace for the resale of tickets to live events.

14. Plaintiff Vivid Seats LLC is a Delaware limited liability company headquartered in Chicago, Illinois. It operates a secondary online marketplace for the resale of tickets to live events.

15. Plaintiff Gametime United, Inc. is a Delaware corporation headquartered in San Francisco, California. It operates a secondary online marketplace for the resale of tickets to live events.

16. Plaintiff TickPick, LLC is a New York limited liability company headquartered in New York, New York. It operates a secondary online marketplace for the resale of tickets to live events.

17. Defendant District of Columbia is a municipal corporation and the local government of the District of Columbia. The District is responsible for the Act's implementation and enforcement.

## JURISDICTION AND VENUE

18. This action arises under the Constitution of the United States; 42 U.S.C. § 1983; 47 U.S.C. § 230; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs' claim under the District of Columbia Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified at D.C. Code § 1-

201.01 *et seq.*), arises under District law and forms part of the same case or controversy as Plaintiffs' federal claims. This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

19. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred in the District.

20. This case is ripe. The Act became law as D.C. Law 26-181 on September 25, 2026, and applies as of January 1, 2027.

21. Each individual Plaintiff has standing. They are the direct objects of the Act's requirements. They rely on the current system of competitively set fees for their services, and they will lose revenue and incur costs to comply with the Act. And they face a credible threat of enforcement by the District if they do not comply.

22. The Ticket Policy Forum has associational standing because (1) at least one of its members would have standing to sue in its own right; (2) the interests the Ticket Policy Forum seeks to protect are germane to its purpose; and (3) neither the claims asserted nor the relief requested requires its members to participate in the lawsuit. The Ticket Policy Forum's members, including each of the individual Plaintiffs, will be injured by the Act for the reasons discussed above and below, *see infra* ¶¶ 76-80. Preventing those injuries is germane to the Ticket Policy Forum's purpose of promoting secondary ticket marketplaces and the services they provide, and of preserving their ability to lower ticket prices for fans. Because this suit raises pure questions of law, no individual member need participate.

23. Plaintiffs' claims are brought under 42 U.S.C. § 1983 because the District is a "person" subject to suit under that provision, and the Act is an official policy of the District. *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690, 694 (1978). In the alternative, Plaintiffs' claims are brought under the Court's equitable authority to enjoin unlawful government action, *Armstrong*

v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015), and under the Declaratory Judgment Act.

24. Plaintiffs challenge the Act both on its face and as applied to Plaintiffs and their members. By their terms, the challenged provisions apply to every secondary ticket exchange and every reseller in every resale of a ticket to a covered District event. *See* D.C. Code § 28-5501(2)-(4). Those provisions are invalid in every such application or, at a minimum, in a substantial number of applications judged in relation to any plainly legitimate sweep. Plaintiffs also challenge the Act as applied to their marketplaces and resale transactions on them.

## FACTUAL ALLEGATIONS

### I. Plaintiffs Operate Secondary Marketplaces That Connect Sellers And Buyers

25. Live-event tickets are issued in the primary market and resold in the secondary market. In the primary market, the performer or venue issues and sells tickets to the public in the first instance—either directly or through a third-party ticketing platform (a "primary marketplace") with which it contracts. Comm. on Pub. Works & Operations, Report on B26-0224 at 3 (June 22, 2026) ("Committee Report").[1] Performers and venues often set those initial prices below what the market would bear for a variety of reasons, including to enable broad fan access or for promotions. *Id.* at 5. Ticket issuers and primary marketplaces charge their own fees on initial ticket sales.

26. After a ticket has been issued, it may be sold and bought again in the secondary market. For example, some individual fans who fall ill or whose plans change may want to sell

[1] Materials in the legislative record of Bill 26-0224—including the Committee Report, the Committee Print, the amendments and accompanying memoranda, the Fiscal Impact Statements, the Racial Equity Impact Assessments, and the written testimony submitted for the October 22, 2025 hearing—are available on the Council's Legislative Information Management System, https://lims.dccouncil.gov/Legislation/B26-0224. Citations to witness testimony are to the written statements in the Committee's hearing record.

their tickets. Some professional brokers may sell multiple tickets at once. Buyers turn to secondary marketplaces because an event has sold out, because they decided to attend at the last minute, or because tickets there are cheaper than the primary seller's.

27. Plaintiffs operate secondary marketplaces for tickets to concerts, theater, comedy shows, and other live events. Ticket Policy Forum Testimony at 1 ("TPF Testimony"). Through their websites and mobile applications, sellers list tickets for resale and buyers purchase them. Sellers, not Plaintiffs, set the price of each listing, and buyers decide whether to pay it. In the resale market for tickets to D.C. events, Plaintiffs do not control ticket supply and are not parties to the initial sale of a ticket.

28. Plaintiffs provide services to both sellers and buyers, neither of whom could obtain similar protections from a classified advertisement or a stranger outside the venue. Take a fan who has a ticket to a concert at Capital One Arena and later cannot attend. She can list the ticket in minutes using Plaintiffs' listing and pricing tools. Because Plaintiffs market listings across their websites, mobile applications, and distribution channels, the seller can reach buyers she could never find on her own. When another fan buys the ticket, Plaintiffs collect the payment, confirm the transfer, and remit the proceeds to the seller—and if the payment proves fraudulent, Plaintiffs absorb the loss rather than charging it back to the seller.

29. For buyers, Plaintiffs vet sellers and screen every transaction for fraud. They also provide venue maps and dynamic, 3D-generated views from seats so that buyers can see where they will be sitting if they purchase a ticket. After a buyer decides to purchase, Plaintiffs process payments securely and deliver tickets electronically. They also provide customer service before and during the event, helping to make sure buyers gain admission with their ticket. And if

something goes wrong, Plaintiffs guarantee delivery of the tickets ordered (or comparable tickets or a refund).

30. It costs money to provide these services and guarantees on a platform that offers fans access to tens of thousands of events nationwide. Plaintiffs charge service and delivery fees so that they, like any business, can both cover those costs and earn a reasonable return. In the ordinary course, their service fees exceed 10% of the seller-selected price by several percentage points. Some costs, such as chargeback costs, scale with the ticket price. Others, such as e-delivery costs, are largely fixed per order regardless of the ticket's price. Because Plaintiffs compete with one another and with other resale marketplaces, market forces keep these fees down.

31. Every term on which Plaintiffs' services are offered is disclosed before purchase. Plaintiffs display the total order amount before a buyer completes a transaction, consistent with the Federal Trade Commission's rule requiring all-in pricing for live-event tickets since May 2025. *See* 90 Fed. Reg. 2066, 2092 (Jan. 10, 2025) (declining to cap fees that are disclosed and not misleading).

32. In the marketplace for resale of D.C. tickets, Plaintiffs do not display the price at which a ticket was originally sold by its issuer to its first purchaser. Plaintiffs were not parties to that transaction. For many listings they have no means of learning or verifying what the first purchaser paid and no ability to compel the issuer to tell them.

33. Plaintiffs' marketplaces are national. Each individual marketplace Plaintiff is headquartered outside the District. Fewer than 1% of covered transactions processed on Plaintiffs' marketplaces in the past year involved both a seller and a buyer located in the District, and approximately 85-90% of Plaintiffs' transactions for tickets to non-sports District events were

between a seller and a buyer both located outside the District. And the buyer in any given resale may never enter the District at all: tickets are often resold again, and some are never used.

## II. The Council Introduces A Bill With A Resale-Only Price And Fee Cap, Prompting A Broad Coalition To Warn That The Law Would Be Counterproductive

34. On April 9, 2025, Councilmember Charles Allen introduced Bill 26-0224. As introduced, the bill would have prohibited any reseller or secondary ticket marketplace from selling a ticket for more than the total price of the initial ticket plus 10%, and would have limited any marketplace fee to 10% of the total price of the initial ticket. B26-0224 § 28-5508 (as introduced). It imposed no cap on primary-market prices or fees, and it exempted tickets to events organized by the District's professional and intercollegiate sports teams and to events organized by professional sporting associations taking place in the District.

35. The Committee on Public Works and Operations held a public hearing on October 22, 2025, and received testimony from more than 200 witnesses. Committee Report at 10-29. Venues and their trade associations supported the price and fee caps. By contrast, a broad coalition of public and private stakeholders—the Mayor's agencies, consumer advocates, civil-rights organizations, economists, competition scholars, individual fans, and Plaintiffs—warned that the caps were misguided and would harm the very consumers they were meant to help. *See* Committee Report at 9-15. Their testimony emphasized four points.

### A. The Fee Cap Ignores The Cost Of The Services Secondary Marketplaces Provide

36. Plaintiffs explained to the Committee that the 10% fee cap misunderstands marketplaces' services and economics. Secondary ticket marketplaces have helped millions of fans buy and sell tickets to D.C. events over the past 25 years. TPF Testimony at 1. Before online marketplaces, fans bought what they hoped was a ticket in a parking lot, with no recourse if it was counterfeit. *Id.* Plaintiffs' online marketplaces changed that dynamic. They provide important

services that help and protect consumers, such as fraud prevention, customer support, order fulfillment, the guarantees that ensure fans get valid tickets or their money back, and product development—among many other services described above. TPF Testimony at 2; SeatGeek Testimony at 4. Those services are why ticket resales have moved from sidewalks to secure online marketplaces. TPF Testimony at 1.

37. But providing these services costs money, and the fees cover those costs. TPF Testimony at 2. The fees are thus "essential to keeping the system safe and fair." *Id.* At the same time, intense competition among resale marketplaces keeps fees down. SeatGeek Testimony at 4.

38. Consumer-advocate organizations agreed, warning that capping fees could reduce competition by making it more difficult for secondary ticket marketplaces to survive. National Consumers League Testimony at 3 ("NCL Testimony").

**B. Price And Fee Caps Increase Fraud And Raise Prices By Pushing Resales To Unregulated Channels**

39. Price and fee caps push transactions to less-regulated channels where fraud thrives. Even the Mayor's own representatives said so. The Office of the Deputy Mayor for Planning and Economic Development and the Department of Licensing and Consumer Protection testified jointly. They identified "unintended consequences associated with the proposed ticket price cap" as one of two "primary issues" with the bill. Testimony of Ryan Nicholas at 2 ("Mayor's Office Testimony"). They explained that "price caps could unintentionally drive more activity to unregulated markets, resulting in higher rates of fraud and greater financial losses for consumers." *Id.* at 3. The agencies therefore "urge[d] the Committee to remove the price cap provisions to allow for a more informed evaluation," and separately warned that the bill's registration and monitoring regime was not practical. *Id.* at 3-4.

40. Consumer organizations agreed. The National Consumers League, for example, explained that price and fee caps create a black market because ticket resales switch to "less regulated platforms." NCL Testimony at 2. An adjunct professor of law at American University expressed similar concerns that ticket resales would move to "unsafe, unregulated websites or back to the scalpers on the streets outside of arenas." Chris Gowen Testimony at 2 ("Gowen Testimony").

41. Evidence supports those concerns. A 2025 study found ticket fraud rates up to four times higher in two foreign jurisdictions that capped prices (Ireland and Victoria, Australia) than in another foreign jurisdiction that had not (United Kingdom). NCL Testimony at 2. In one of those jurisdictions, ticket fraud affected 16% of consumers, Sports Fans Coalition Testimony at 1, and major banks warned regulators that price caps may fuel £100 million in ticket fraud, Testimony of Get Safe Online at 1. The reason is straightforward: "Price caps don't eliminate demand, they merely push consumers from regulated platforms with fraud protections onto unregulated channels." Sports Fans Coalition Testimony at 2. The Southern Christian Leadership Global Policy Initiative, an initiative of the civil-rights organization founded by Dr. Martin Luther King, Jr., thus "agree[d] with Mayor Bowser's administration" that price and fee caps will cause unintended consequences, including "increased fraud" and reduced competition in resale. Testimony of Kevin B. Kimble at 1.

42. The secondary market also makes live events more affordable, while price and fee caps raise prices. Artists and venues "typically price tickets below the level the market would bear," Committee Report at 5, so resale prices rise when demand for a particular event is extraordinary. But demand more often falls short, and when it does, resale prices fall below the original price. The seller—not the artist or venue—absorbs the loss. Testimony of Marianne M.

Jennings at 4 ("Jennings Testimony"). An American Consumer Institute study of 80,000 live events nationwide found that consumers saved more than $414 million in 2024. SeatGeek Testimony at 4-5; Sports Fans Coalition Testimony at 2. The same is true in the District. The Sports Fans Coalition estimated $9.1 million in savings in 2024 for local fans who bought below face value on the secondary market, and the National Association of Ticket Brokers reported that more than $6 million was saved last year by fans who bought tickets on the secondary market for D.C. events. Sports Fans Coalition Testimony at 2; Testimony of NATB at 1. The Committee acknowledged that "a significant share of secondary market transactions involve sellers who need to offload tickets." Committee Report at 5.

43. Anecdotal evidence, including fan testimony, supported those studies. SeatGeek described a "sold-out" Capital One Arena concert the night after the Committee's hearing for which the primary seller's few remaining tickets were priced at $200 to $400 while dozens of resale tickets were available on SeatGeek for as little as $82. SeatGeek Testimony at 6-10. One commenter observed that "almost 90% of events become bargains on the secondary market and sell for way below face value as the events get closer," and that a cap "will eliminate ALL great ticket deals and push people to shady back alley transactions." Anthony Farah Testimony at 1. Another asked: "If you ban the secondary market, won't that actually enable promoters to continue raising prices unchecked, since there would be no competitive market to keep them honest?" Dave K. Testimony at 2-3.

44. Economists made the same point. Professors Marianne Jennings and Stephen Happel of Arizona State University, who have studied ticket markets since 1988, offered their "strongest concerns" about the price cap. Jennings Testimony at 2, 5. "Since the time of Shakespeare," regulators "have, with all the best intentions, attempted to control ticket prices and

resales." *Id.* at 2. But "these efforts have failed," producing "higher ticket prices, greater demand, and the resulting fraud that thrives in markets in which buyers cannot obtain full information and an underground market develops." *Id.* at 2-3.

### C. Caps On Secondary Marketplaces Alone Would Eliminate The Only Competition Ticket Issuers Face

45. Economists and consumer groups also explained that Plaintiffs' marketplaces compete with ticket issuers—such as venues that issue tickets directly, or primary marketplaces that partner with venues—to lower prices, and that a cap reaching only secondary marketplaces would eliminate that competition.

46. The Committee reported that one primary-ticket marketplace, Ticketmaster, controlled more than 80% of primary ticket sales at major venues nationwide and imposed fees as high as 44% of the ticket cost. Committee Report at 3. Plaintiffs compete by providing an alternative marketplace for fans to find tickets, including tickets that have dropped in price since they were first issued. SeatGeek Testimony at 1-5. They compete with one another, and with ticket issuers and primary marketplaces, "by offering better prices, better technology, and better consumer protections." Sports Fans Coalition Testimony at 2. Dr. Diana Moss of the Progressive Policy Institute thus testified that resale caps have been advanced at the behest of venues, artists, and *certain* primary ticketers whose profits depend on "squeezing out competition from the resale market." Testimony of Diana Moss at 2-3. A price and fee cap could force secondary marketplaces out of the market, leaving ticket issuers and primary marketplaces free to raise their prices. Gowen Testimony at 2; The Coalition for Ticket Fairness Testimony at 2.

**D. The "Initial" Ticket Price Is Often Unknowable And Indeterminate**

47. Plaintiffs and other witnesses also explained that the bill's "total price of the initial ticket"—that is, the purported face value plus fees and taxes—is neither knowable to a marketplace nor, in many cases, determinate.

48. Plaintiffs operating secondary marketplaces are not parties to the initial transaction—such as a sale from a venue to a consumer, who is now reselling on Plaintiffs' marketplaces. So Plaintiffs "often do not know" what price the initial purchaser paid. SeatGeek Testimony, Appended Response to Maryland AG at 4.

49. Moreover, an initial ticket price often is indeterminate. The "term 'face value' is increasingly an anachronism" because fans typically do not "receive a physical ticket with a static price printed on the ticket." SeatGeek Testimony, Appended Response to Maryland AG at 4. Instead, ticket issuers often use "dynamic pricing," where the ticket price fluctuates in real time based on changing market conditions. Farah Testimony at 1; *see* Committee Report at 5. And some tickets are initially distributed for free as part of corporate promotions or a venue's desire for a bigger audience, so they have no face value at all. Jennings Testimony at 3. Still others are sold in bundles, subscriptions, or season packages for a single aggregate price, so that no individual ticket has an ascertainable initial price. *Id.*

50. No witness proposed that secondary ticket marketplaces be required to disclose the original purchase price of a ticket.

**III. The Committee Heeds The Warnings And Strikes The Price And Fee Caps**

51. After eight months of study, the Committee marked up the bill and struck the price and fee caps. *See* Committee Print § 28-5507(b) (June 22, 2026). Its report explained that "there are risks in directly legislating a price cap, and only doing so for the secondary market." Committee Report at 7. The economic evidence on how resale price caps affect the ticket market

as a whole remained "uncertain." *Id.* And capping prices in the secondary market alone risked entrenching Ticketmaster, the largest participant in the primary market. *Id.* at 8. In its place, the Committee Print proposed to authorize the Mayor to adopt rules regulating prices and fees in both the primary and secondary markets (rather than only in the secondary resale market)—but only after study, and only if warranted. Committee Report at 9.

52. The Committee Print also added a provision no witness had proposed: a requirement that secondary ticket marketplaces "[d]isclose the original purchase price of the ticket" before any ticket may be resold or offered for resale. Committee Print § 28-5506(a)(2). The Committee provided a one-sentence defense that it would serve "transparency in the secondary market," Committee Report at 6-7, but cited no study, data, or testimony on its efficacy. Nor did it address how a marketplace that was not party to the original sale would obtain or verify the figure. The Council's own Office of Racial Equity had already reported, and repeated verbatim in its assessment of the Committee Print, that "there is no data on the effectiveness" of similar price-disclosure laws and that "[r]esearchers have not found clear evidence that licensing requirements or resale price limits have reduced resale prices." Council Office of Racial Equity, Racial Equity Impact Assessment: Bill 26-0224 at 4 (Dec. 4, 2025); *id.* (Committee Print) at 4 (June 22, 2026). Because the disclosure requirement first appeared eight months after the hearing, no member of the public had an opportunity to testify about it.

53. The Committee retained the exemption for in-District sports events. Committee Report at 7, 19; Committee Print § 28-5501(6).

## IV. The Council Restores The Price And Fee Caps By Floor Amendment

54. The bill came before the full Council for first reading on June 30, 2026. That afternoon, Councilmembers Allen and Henderson circulated Amendment #1, which restored the price and fee caps in substantially the form introduced. Amendment #1 to B26-0224 (June 30,

2026); Office of the Budget Director, Fiscal Impact Statement on Amendment #1 (June 30, 2026). The accompanying memorandum offered a single rationale for the caps: that a 10% markup "allows consumers to resell tickets if their plans change and recoup typical processing fees so consumers can recover what they paid and break even." Amendment #1 Memorandum at 1. It did not explain how a cap measured from the price the *first* purchaser paid would allow a consumer who bought on the secondary market to "break even." It cited no study or data addressing the evidentiary gap the Committee had identified. And it cited no study or data of what it costs a marketplace to facilitate a resale.

55. One Councilmember called the amendment "a good compromise" and described "what's happening here" as "an effort to take the dollars from big platform international companies that are getting large fees" and "bring the dollars back to the venues themselves." June 30 Hr'g at 54:24-56:49 (Councilmember Frumin).[2] Before the vote, the Committee chair acknowledged, "we did move pretty quickly today." *Id.* at 52:59-54:05 (Councilmember Nadeau). The Council adopted the amendment.

56. At second reading on July 14, 2026, the Council struck the Mayor's remaining authority to promulgate rules for primary-market fees. Amendment #2 to B26-0224, Statement at 1 (July 13, 2026). The sponsor said the amendment would put "dollars ... back into our local economy." July 14 Hr'g at 9:11-10:55 (Councilmember Pinto). Her written rationale objected that "[n]o other state or city in the country imposes this kind of open-ended fee-setting authority on the primary ticket market," Amendment #2, Statement at 1—an objection that applied with equal force to the fee cap the Council was imposing on out-of-state marketplaces. Two

[2] Citations to "June 30 Hr'g" and "July 14 Hr'g" refer to the Council's video recordings of its June 30, 2026 and July 14, 2026 legislative meetings, by timestamp. The Council does not publish an official written transcript of its legislative meetings.

Councilmembers objected that the amendment "creates an uneven regulatory framework that only empowers the giants in the primary market." July 14 Hr'g at 11:00-13:44; *see id.* at 13:54-14:03. The exemption for in-District sports events survived, with one Councilmember expressing "gratitude to the Washington Nationals and Monumental Sports for their perspectives and feedback as we move this legislation to make sure it was appropriately targeted"—feedback that never appeared in the public record. July 14 Hr'g at 16:53-19:28 (Councilmember Allen).

57. The Council passed the bill unanimously. After passage, a Councilmember reiterated the hope that the Act would "keep more dollars in our local economy." National Independent Venue Association, *NIVA and Fix The Tix Applaud the DC Council's Final Passage of Nation-Leading Resale Ticketing Bill* (July 14, 2026), https://perma.cc/ZQ87-9QU7. The record on which it relied echoed the same objective: the Committee Report credited testimony that resale marketplaces draw "money out of the local economy in favor of out-of-District companies," Committee Report at 27; *see id.* at 11, and a supporting theater wrote that "[e]very dollar spent on an inflated, out-of-state resale is a dollar that doesn't go toward paying local artists," Testimony of Mark Chalfant, Washington Improv Theater, at 1.

58. The Mayor signed the bill on August 10, 2026. *See* D.C. Act 26-410; 73 D.C. Reg. 11351 (Aug. 14, 2026). The Act became law as D.C. Law 26-181 on September 25, 2026, when the congressional review period prescribed by D.C. Code § 1-206.02(c)(1) expired.

**V. The Act's Requirements**

59. Enacted under the District's general grant of legislative authority, D.C. Code § 1-203.02, the Act purports to protect consumers "from unfair and deceptive practices in live event ticket purchases." Act, preamble. The Act covers tickets to live concerts, theatrical performances, shows, and similar live events. D.C. Code § 28-5501(6). But it exempts tickets to sporting events organized by a "professional or intercollegiate" team "located in the District," sporting events

organized by "professional athletic association[s]" (such as the MLB or NHL) that take place in the District, and movies. *Id.*

60. For covered events, the Act applies to any ticket to a D.C. event regardless of where the marketplace, seller, or buyer is located. The operative definitions contain no geographic limitation: A "secondary ticket exchange" is "an electronic marketplace that enables a person to sell, purchase, and resell tickets"; a "reseller" is "a person engaged in the resale of tickets"; and a "resale" is "the second or subsequent sale of a ticket by any method." D.C. Code § 28-5501(2)-(4).

61. The Act "shall apply as of January 1, 2027." Act § 4. When the Act applies to a ticket resale, Plaintiffs must comply with several different requirements.

**A. The Price And Fee Caps**

62. The Act caps both the sale price of a ticket (the price cap) and the fees a secondary marketplace may charge (the fee cap).

63. The price cap limits the price at which a ticket may be resold. Section 28-5506(b) provides that "a reseller or secondary ticket exchange shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket."

64. The fee cap separately limits what a marketplace may charge for its own services. Section 28-5506(c) permits a marketplace to "charge a fee for the service of providing a marketplace for the resale of a ticket ... provided, that the fee shall not exceed 10% of the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, including all fees and taxes in connection with the initial ticket."

**B. The Original-Price Disclosure**

65. The Act also dictates how Plaintiffs communicate with consumers. As discussed above, Plaintiffs already disclose to buyers the all-in price that they will actually pay for a ticket. But the Act's original-price-disclosure mandate requires Plaintiffs to further disclose the price of the first ticket sale—a separate transaction that might be many steps removed from the current resale. Specifically, before a ticket is "offered to be resold," Plaintiffs must "[d]isclose the original purchase price of the ticket, including all fees and taxes in connection with the initial purchase price of the ticket." D.C. Code § 28-5506(a)(2).

66. The Act does not require the issuer or the seller to furnish information about the ticket's original price to the marketplace. It also does not explain how a marketplace is to obtain or verify the price of a transaction to which it was not a party.

67. The Act separately requires Plaintiffs to disclose the all-in resale price and an itemized list of all fees and taxes at every step of a transaction. D.C. Code § 28-5502(a)-(b).

**C. Verification, Record Inspections, And Other Requirements**

68. The Act outsources some of the District's enforcement and oversight responsibilities to Plaintiffs themselves. For example, Section 28-5506(a)(1) requires a marketplace, before any ticket is resold or offered for resale, to "[v]erify" that the reseller meets all licensure and bonding requirements established in Section 47-2890.02. Under that section, any "reseller that posts 50 or more ticket resale listings in a year" must hold a Department license, and any reseller "that lists 50 or more tickets for resale in a year" must maintain a $25,000 surety bond. D.C. Code § 47-2890.02(a)(1), (d)(1). If a reseller lists a single ticket for resale across multiple secondary ticket marketplaces, the total number of listings for the ticket shall count toward the threshold. *Id.* § 47-2890.02(a)(2). The Act thus conditions each marketplace's compliance on

facts—a seller's aggregate listings across competing marketplaces—that no marketplace can observe and no registry compiles.

69. The Act further requires a marketplace to maintain records for three years of all licensed resellers and all ticket resales for events in the District on its marketplace for inspection by the Department. D.C. Code § 47-2890.04(c). Such records must include the original purchase price and the final resale price of each ticket. *Id.* Moreover, marketplaces must report any unlicensed or non-compliant resellers to the District. *Id.* When the Department demands such records, the Act provides no procedure for precompliance review by a neutral decisionmaker, no limit on the scope or frequency of demands, and no confidentiality protection for the data produced.

70. Beyond recordkeeping and reporting, the Act imposes a variety of other ill-defined requirements. For example, the Act prohibits a reseller or marketplace from selling or offering "speculative tickets," defined to include any ticket not in the reseller's "actual or constructive possession" at the time of listing, "including ... tickets that are under contract to be transferred to the reseller." D.C. Code §§ 28-5501(5), 28-5503. It requires marketplaces, "under the totality of the circumstances," to maintain "reasonable technology" against automated purchasing. *Id.* § 28-5505. And it prohibits a marketplace from using personally identifiable information collected through "electronic surveillance technology," including "device tracking," to "set a price, fee, or discount for a ticket." *Id.* § 28-5509.

71. The Mayor has not proposed any regulations implementing the Act.

**D. Penalties**

72. The Act's penalties are severe. Every violation is a Class 2 civil infraction, D.C. Code § 28-5508(a)—a class reserved for "serious infractions that result from flagrant, fraudulent, or willful conduct," unlicensed activity, or imminent dangers to health and safety, 16 DCMR

§ 3200.1(b). Every violation is also "an unlawful trade practice." D.C. Code § 28-5508(b); *see id.* § 47-2890.05(b). The D.C. Attorney General may seek restitution, civil penalties, and injunctive relief. *Id.* § 28-3909. The Department of Licensing and Consumer Protection may "suspend, revoke, or deny the license of any secondary ticket exchange or reseller" found in violation. *Id.* § 47-2890.05(a).

### E. The Act Contains No Severability Clause And Its Provisions Are Built Around The Caps

73. The Act contains no severability clause.

74. The price and fee caps are the heart of the Act. The bill was introduced as a measure to cap resale prices and fees. Its title—"Restricting Egregious Scalping"—describes the price caps. And the Act's remaining provisions were built around the price and fee caps. The original-price disclosure, as well as the recordkeeping and reporting requirements, exist to capture the "original purchase price" and "final resale price" of each ticket so the Department can police the caps. Similarly, the licensure-verification requirement identifies the resellers whose prices the caps constrain.

75. No version of the bill ever passed the Council without price and fee caps. And nothing in the record suggests the Council would have enacted the Act's licensing, verification, recordkeeping, and reporting machinery (several provisions of which are independently unlawful) as a freestanding regime.

## VI. The Act Will Inflict Serious And Irreparable Harm On Plaintiffs

76. Beginning January 1, 2027, the Act will force Plaintiffs to choose among untenable options: facilitate resales of District-event tickets at a loss or greatly reduced margins; decline to list a large share of those tickets; or risk civil penalties and license revocation.

77. The price and fee caps restrict the ticket prices and marketplace fees permitted on Plaintiffs' secondary marketplaces for covered transactions and, to the extent Plaintiffs continue to facilitate those transactions, will require Plaintiffs to provide their services below cost on a substantial share of tickets. As explained above, to operate their marketplaces, Plaintiffs incur significant costs to provide fraud prevention, order fulfillment, payment processing, buyer guarantees and refunds, and other services. Some of those costs are fixed per order, so they do not decline when the ticket price does. Other costs vary based on the order size. But the 10% fee cap generally will not permit Plaintiffs to recoup the costs required to service and fulfill transactions. On covered tickets for D.C. events, Plaintiffs would lose money on the typical covered ticket—and especially on the low-price transactions that the Council purportedly sought to protect. Consider a concert ticket with an initial price of $40 that resells for $44, as the price cap permits. For each Plaintiff marketplace, the full cost of providing its service on that sale would exceed $4. But the fee cap would limit Plaintiffs to a $4 fee. That means Plaintiffs *lose* money by facilitating that transaction. And even for other transactions when Plaintiffs do not outright lose money, their profit margins will be reduced to a vanishingly thin level that is not a reasonable return on their investment. The Act provides no individualized cost-based exception to the caps. A marketplace facing a shortfall must absorb the loss, cut the services that protect buyers and sellers, decline the transaction, or withdraw from the market.

78. Plaintiffs also must spend substantial resources to prepare to comply. They must re-engineer national marketplaces to impose District-specific rules—and even within the District-specific rules, they will need subrules because of the Act's exemptions for certain sports and movie tickets. Plaintiffs also will need to build systems to solicit, store, and display "original purchase price" information they do not possess. Further, Plaintiffs must develop processes to verify seller

licensure against a cross-marketplace threshold they cannot observe. Back-end engineering alone is expected to take multiple weeks if not months per marketplace, with additional time for consumer-facing changes.

79. The Act also threatens Plaintiffs' customer goodwill. Because the Act will make some covered transactions unprofitable, Plaintiffs may have to withdraw from the D.C.-event market or offer materially less D.C. inventory, causing customers to take their business elsewhere. Moreover, Plaintiffs would have to present different inventory, disclosures, and interfaces depending on jurisdiction and event type, disrupting the consistent experience users expect from a national marketplace. The original-price mandate also may cause consumers to blame Plaintiffs for the markup between an original price Plaintiffs did not set and a resale price Plaintiffs did not set either.

80. Finally, the Act threatens Plaintiffs' business relationships. Plaintiffs have established relationships with ticket-distribution partners. Those long-term partnerships depend on reliable inventory and predictable economics. But the Act will reduce the revenue available for Plaintiffs to share with partners, which likely will prompt some partners to limit D.C. service, renegotiate, or end their relationships.

## CLAIMS FOR RELIEF

### COUNT I
### Commerce Clause, U.S. Const. art. I, § 8, cl. 3
### (42 U.S.C. § 1983)

81. Plaintiffs incorporate the foregoing paragraphs.

82. The Commerce Clause forbids the District, no less than a State, from regulating commerce occurring wholly outside its borders, from discriminating against interstate commerce, and from imposing burdens on interstate commerce clearly excessive in relation to the putative local benefits. *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 364, 369, 374-76 & n.1

(2023); *see Metro. Wash. Chapter, Assoc. Builders & Contractors* v. *District of Columbia*, 62 F.4th 567, 576 (D.C. Cir. 2023) (District legislation and State legislation are subject to the same limits). The Act violates each limit.

83. **<u>Extraterritoriality</u>.** The District cannot "directly regulate[] out-of-state transactions by those with no connection" to the District because doing so would amount to the District imposing its own policy choices on other jurisdictions. *Nat'l Pork Producers*, 598 U.S. at 376 n.1; *Baldwin* v. *G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935); *see Edgar* v. *MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion) (invalidating law that regulated transactions with those "having no connection with" the State). The same limit on extraterritorial regulation inheres in the Constitution's federal structure and the Due Process Clause, under which the District may not "impose its own policy choice on neighboring States" or "regulate and control activities wholly beyond its boundaries." *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 571-72 & n.16 (1996); *Watson* v. *Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954); *see Nat'l Pork Producers*, 598 U.S. at 376 n.1 (noting that extraterritoriality limits may be housed in the dormant Commerce Clause or in horizontal separation-of-powers principles).

84. The Act regulates every resale of a ticket to a covered District event, including resales between an out-of-state seller and an out-of-state buyer processed by an out-of-state marketplace. That transaction—offer, contract, payment, and service—occurs entirely outside the District. Indeed, the buyer in that sale may never enter the District: the ticket may be resold again or never used. And the fact that the ticket may later be presented at a District venue does not permit the District to dictate the terms of the antecedent sale. This Court so held when the District attempted to control the price of prescription drugs sold outside the District but destined for District consumers: the District may not use "an in-state hook" to dictate "out-of-state conduct." *Pharm.*

*Research & Mfrs. of Am.* v. *District of Columbia*, 406 F. Supp. 2d 56, 69 (D.D.C. 2005); *see Ass'n for Accessible Meds.* v. *Frosh*, 887 F.3d 664, 672-74 (4th Cir. 2018); *Ass'n for Accessible Meds.* v. *Ellison*, 140 F.4th 957, 960-61 (8th Cir. 2025). Because the vast majority of Plaintiffs' transactions for covered District events are between an out-of-state seller and an out-of-state buyer, the Act regulates out-of-state commerce "almost exclusively." *Frosh*, 887 F.3d at 671. The Act also exposes Plaintiffs to inconsistent obligations: A single listing could be lawful where the seller sits, lawful where the buyer sits, and unlawful under the District's extraterritorial rules. For these reasons, the Act impermissibly regulates transactions that occur outside the District.

85. **Discrimination.** The dormant Commerce Clause also contains an "antidiscrimination principle": no State may discriminate against "out-of-state economic interests." *Nat'l Pork Producers*, 598 U.S. at 364, 369. Discrimination may be shown by a law's text and structure, by external indicia of intent, including lawmakers' statements and the circumstances of enactment, and by effect. *Quality Brands, Inc.* v. *Barry*, 715 F. Supp. 1138, 1140-41 (D.D.C. 1989); *Bacchus Imports, Ltd.* v. *Dias*, 468 U.S. 263, 270 (1984).

86. The Act contains several discriminatory provisions. For example, the Act exempts every sporting event organized by at least one professional or intercollegiate sports team located in the District and every event in the District organized by a professional athletic association, after Councilmembers received "perspectives and feedback" from local teams. The Act also caps prices and fees only in the secondary market, in which every regulated marketplace is located outside the District, while leaving unregulated the primary market, whose fees generally go to local venues. Thus, in practical effect, the only directly regulated exchanges are Plaintiffs' out-of-state secondary marketplaces. There is no need to "guess at the legislature's motivation" when a law's exemptions are plainly designed to "aid [local] industry." *Bacchus*, 468 U.S. at 271.

87. The legislative history, recounted above, confirms the purpose: to "take the dollars from big platform international companies" and to ensure "that dollars are put back into our local economy." *Supra* ¶¶ 55-57. A legislature that declares its aim to put dollars into the local economy by taking profit from out-of-state companies has "artlessly disclose[d]" a protectionist purpose. *Dean Milk Co.* v. *City of Madison*, 340 U.S. 349, 354 (1951).

88. Because the Act discriminates, "a virtually per se rule of invalidity" applies, *City of Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978), and the District must show that the Act serves a legitimate local purpose that could not be achieved by nondiscriminatory means, *Granholm* v. *Heald*, 544 U.S. 460, 489 (2005). It cannot. The Committee Print addressed every consumer-protection objective the Council recited without a secondary-only price control, and other jurisdictions have addressed the same concerns by less discriminatory and less onerous means. The Council chose the discriminatory and most onerous alternative instead.

89. **Undue burden.** Even if the Act were nondiscriminatory, its burdens on interstate commerce clearly exceed its putative local benefits. *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). It requires national marketplaces to build a District-specific pricing, disclosure, and verification regime. Among other things, national marketplaces will need to develop a methodology for determining the "face value" of tickets for D.C. events, and invest significant time and money in developing a system that verifies that sellers are licensed and bonded in line with the Act's requirements. It imposes District licensure and a $25,000 surety bond on resellers, including those outside the District who either post 50 or more ticket-resale listings or list 50 or more tickets for resale in a year. The Act also suppresses the interstate supply of tickets available to out-of-state fans, who make up the large majority of secondary-market buyers for District events. It drives interstate transactions to unregulated channels where fraud is more pervasive.

And it subjects wholly out-of-state transactions to District penalties. It imposes all of these burdens for benefits that the Council's own record calls "uncertain" and the Mayor's agencies warned could be negative.

**COUNT II**
**Violation Of District Of Columbia Home Rule Act**
**(Ultra Vires Action)**

90. Plaintiffs incorporate the foregoing paragraphs.

91. The Council's legislative power is a delegation from Congress bounded by the Home Rule Act. The Council "shall have no authority to ... [e]nact any act ... which is not restricted in its application exclusively in or to the District," D.C. Code § 1-206.02(a)(3), and its power extends only to "rightful subjects of legislation within the District consistent with the Constitution of the United States," *id.* § 1-203.02. As discussed above, the Act fixes the terms of resale transactions occurring outside the District between non-residents. It is not restricted "exclusively" in or to the District.

92. The Act also violates the Constitution for the reasons alleged in other counts in this Complaint. For that reason too, the Act is beyond the Council's delegated authority.

**COUNT III**
**Fifth Amendment—Due Process**
**(42 U.S.C. § 1983)**

93. Plaintiffs incorporate the foregoing paragraphs.

94. Several provisions of the Act violate the Due Process Clause in three independent ways.

95. First, the Due Process Clause forbids the government from fixing "confiscatory" rates that deny a regulated business sufficient compensation for the service it provides (that is, the cost of service plus a reasonable return on investment) or compelling a business to conduct "even a branch of business at a loss." *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307-08 (1989);

*Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*, 251 U.S. 396, 399 (1920); *DoorDash, Inc.* v. *City of New York*, 692 F. Supp. 3d 268, 298 (S.D.N.Y. 2023) (holding that online platforms adequately pleaded a due process claim arising from confiscatory commission caps). A rate that covers only costs is confiscatory, and a regulator may not require a business to serve a segment of its market below cost merely because its overall revenues are adequate. The fee cap violates these principles in two independent ways.

96. To start, the fee cap forces Plaintiffs to operate at a loss for some substantial portion of their business. The fee cap ties Plaintiffs' permissible revenue to a ticket's initial price rather than to the cost of the marketplace service. On a large share of tickets—including the low-priced tickets the Council said it wanted to protect—the fee cap yields less than Plaintiffs' cost of service. And it provides no cost-based adjustment mechanism or hardship exception.

97. Even where the fee cap permits Plaintiffs to recover their costs on a particular transaction, it forecloses a reasonable return on investment. The fee cap makes no provision for any return at all: it is pegged to the price of a different transaction, not to Plaintiffs' costs or capital. Plaintiffs are for-profit businesses that provide a resale marketplace for tickets to live events. The District has no legitimate interest in dictating that such businesses forgo a profit on marketplace services that customers choose to use.

98. Second, the Due Process Clause prohibits price controls that are "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature" chose to adopt. *Pennell* v. *City of San Jose*, 485 U.S. 1, 11 (1988). The price cap is arbitrary and irrational. Its stated purpose—to let a consumer recover what they paid and break even—is defeated by its own terms. A consumer who lawfully purchased a resale ticket may have paid up to 120% of the initial price

(110% of the initial price plus the 10% fee) but can resell that ticket for no more than 110% of the initial price, and is thus forced to resell the ticket at a loss.

99. Third, the price cap, fee cap, and other provisions of the Act deny fair notice. A law violates due process when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Gen. Elec. Co.* v. *EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) ("ascertainable certainty" required before civil penalties may be imposed).

100. The price cap, fee cap, and the original-price disclosure make liability turn on "the total price of the initial ticket" and "the original purchase price of the ticket." These undefined terms are indeterminate for the reasons alleged above. Tickets issued for free have no initial price at all. Dynamically priced tickets and bundled tickets have no initial price that is ascertainable to Plaintiffs. And because Plaintiffs were not parties to the initial sale, they cannot cure the ambiguity by their own inquiry. Plaintiffs can ask sellers to report a price, but they have no reasonable method to check the number provided. A marketplace's choices are to reject lawful transactions or to risk penalties measured against a benchmark it cannot reasonably ascertain.

101. The licensure-verification requirement also lacks fair notice. D.C. Code § 28-5506(a)(1). That provision requires Plaintiffs to verify compliance with licensing and bonding obligations that use different thresholds: a reseller must obtain a license if it posts 50 or more ticket-resale *listings* in a year, but must maintain a bond if it lists 50 or more *tickets* for resale in a year. *Id.* § 47-2890.02(a)(1), (d)(1). The Act expressly counts separate listings of the same ticket across multiple marketplaces toward the licensing threshold, *id.* § 47-2890.02(a)(2), but does not specify whether a single posting offering multiple tickets constitutes one or multiple ticket-resale

listings. Moreover, a marketplace can observe only the listings on its own platform—competing marketplaces do not share listing data, sellers may use different account names, and no central registry tracks a seller's aggregate listings in real time. Thus, even if the statute were clear, a seller who appears below the applicable threshold to one marketplace may already have crossed it through listings elsewhere, leaving the marketplace unable to determine whether the Act requires that seller to be licensed or bonded.

102. Sections 28-5501(5) and 28-5503 prohibit offering a "speculative ticket," defined by reference to whether the reseller has "actual or constructive possession" of the ticket. But the Act never defines "constructive possession" or explains how that concept can be reconciled with its statement that speculative tickets include tickets merely "under contract to be transferred to the reseller." The Act is therefore vague about when a seller has sufficient rights in a ticket to list it lawfully.

103. These defects are aggravated by an enforcement structure with no scienter requirement, no safe harbor, per-violation penalties, and license revocation. The Act invites enforcement officials to define its standards after the fact.

**COUNT IV**
**First Amendment—Compelled Speech**
**(42 U.S.C. § 1983)**

104. Plaintiffs incorporate the foregoing paragraphs.

105. The First Amendment protects "the right to refrain from speaking at all," *Janus* v. *AFSCME, Council 31*, 585 U.S. 878, 892 (2018), and applies "equally" to compelled "statements of fact," *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995), including in commercial speech, *Va. State Bd. of Pharm.* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). The original-price-disclosure mandate compels Plaintiffs to make, before publishing an offer to resell a ticket to a covered event, a statement that they would not

otherwise make—the original purchase price of the ticket. *See Riley* v. *Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). That disclosed information is a disclosure about the goods and services of third parties in a previous transaction, not information about the terms under which Plaintiffs' services will be offered in the current transaction. The Act thus is a content-based regulation of commercial speech subject to at least intermediate scrutiny. *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571-72 (2011).

106. The mandate fails that scrutiny. To start, it serves no substantial interest. Plaintiffs already disclose the all-in price a buyer will pay, and the Act separately requires disclosure of the total price and itemized charges, D.C. Code § 28-5502(a). Fully disclosed prices are not deceptive, as the Federal Trade Commission concluded in adopting a disclosure rule rather than a price cap for live-event tickets, *see* 90 Fed. Reg. at 2092. Nor does the District have a substantial interest in forcing below-market resale prices: where buyers and sellers have agreed on a price, the government's "generalized interest in unilaterally imposing its notions of fairness" on that bargain is "constitutionally invalid." *Riley*, 487 U.S. at 790. The Act's "arbitrary exemption[s]" for certain sporting events and movies confirm that its asserted interests "either are not pressing or are not the real objects animating the restriction on speech." *Edwards* v. *District of Columbia*, 755 F.3d 996, 1007 (D.C. Cir. 2014). The disclosure's actual function is to facilitate enforcement of the price and fee caps—which is no justification for compelling speech at all.

107. The Act does not directly advance any legitimate interest. The Council had no evidence that disclosing a third party's historical purchase price lowers resale prices or aids consumers who already see the all-in price they will pay, and its own equity office twice reported that no data supports such measures. *See Edenfield* v. *Fane*, 507 U.S. 761, 770-71 (1993); *R.J. Reynolds Tobacco Co.* v. *FDA*, 696 F.3d 1205, 1219 (D.C. Cir. 2012); *Nat'l Ass'n of Mfrs.* v. *SEC*,

800 F.3d 518, 525 (D.C. Cir. 2015) (efficacy "entirely unproven" and resting on "pure speculation"). And the Act is underinclusive: a consumer buying a $300 resale ticket to a concert at Capital One Arena receives the disclosure; a consumer buying a $300 resale ticket to a basketball game in the same building does not. *See Nat'l Inst. of Family & Life Advocates* v. *Becerra*, 585 U.S. 755, 774-75 (2018) ("*NIFLA*"); *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 424-25 (1993).

108. The Act is not narrowly tailored. The District must show that narrower restrictions on speech would not serve its interest as well, and it offered no evidence that less restrictive means would fail. The District could have rested on the Act's existing all-in price disclosures. It could have required the ticket issuer or primary marketplace—the party that creates, knows, and can authenticate the original price, when one is ascertainable—to disclose it or to embed it in transferable electronic ticket data. Or the District could have communicated with District consumers directly. It considered none of these alternatives (or other viable alternatives).

109. Even under the standard announced in *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985), the Act would fail because it is unjustified and unduly burdensome. It addresses a "purely hypothetical" harm, compels a disclosure Plaintiffs cannot verify, and extends far "broader than reasonably necessary." *NIFLA*, 585 U.S. at 776-77. The District provided no evidence either that the disclosure provides meaningful information to consumers or that the disclosure would lower prices. The Act's exception for sporting events organized by professional and intercollegiate sports teams located in the District suggests that the District itself had doubts about the need for such requirements and their efficacy. Moreover, the Act's original-price disclosure requirement burdens far more speech than is "reasonably necessary" to provide consumers with meaningful information. Indeed, the Act separately compels secondary

marketplaces to disclose the information that is logically relevant to consumers: the all-in price of the resold ticket.

**COUNT V**
**Fifth Amendment—Takings Clause**
**(42 U.S.C. § 1983)**

110. Plaintiffs incorporate the foregoing paragraphs.

111. Whether a regulation effects a taking turns on its economic impact, its interference with reasonable investment-backed expectations, and the character of the governmental action. *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 124 (1978). Government rate regulation may effect a taking when the prescribed rate is confiscatory. *See DoorDash, Inc.*, 692 F. Supp. 3d at 298.

112. The price and fee caps effect a taking. The property rights at stake include Plaintiffs' rights to the fees they charge for providing marketplace services, the revenue from listings already posted for covered events, and the goodwill and value of their District businesses.

113. The Act's economic impact is severe. The fee cap limits Plaintiffs' fees without regard to their costs. And the price and fee caps force Plaintiffs to choose between facilitating transactions on economically constrained terms and declining those transactions, materially impairing the value of Plaintiffs' marketplaces, contracts, and goodwill.

114. The Act defeats investment-backed expectations formed over 25 years of operating marketplaces in a District that had never regulated resale prices and amid a nationwide trend of repealing or rejecting such caps.

115. And the Act's character is not a general adjustment of "the benefits and burdens of economic life," *Penn Cent.*, 438 U.S. at 124, but a targeted transfer of value from a handful of out-of-state marketplaces to venues, artists, and consumers—"forcing some people alone to bear public

burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U.S. 40, 49 (1960).

116. The Act provides no compensation for this taking.

117. Plaintiffs are entitled to an injunction against the caps and, in the alternative, to just compensation. *Knick* v. *Township of Scott*, 588 U.S. 180, 194 (2019); *First English Evangelical Lutheran Church* v. *Cnty. of Los Angeles*, 482 U.S. 304, 315 (1987).

**COUNT VI**
**Fifth Amendment—Equal Protection**
**(42 U.S.C. § 1983)**

118. Plaintiffs incorporate the foregoing paragraphs.

119. The equal protection component of the Fifth Amendment, *Bolling* v. *Sharpe*, 347 U.S. 497 (1954), prohibits the District from treating similarly situated persons differently without a rational relationship to a legitimate governmental purpose. Blatant economic protectionism is not a legitimate purpose. *See City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985); *Sanchez* v. *Off. of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022). Promoting local business by discriminating against nonresident competitors is not a legitimate governmental purpose either. *See Metro. Life Ins. Co.* v. *Ward*, 470 U.S. 869, 878, 882 (1985). Here, secondary and primary ticketing marketplaces are similarly situated: both sell tickets to the same events to the same consumers, and both charge service fees. Yet the Act caps fees charged by secondary marketplaces but not by ticket issuers or primary marketplaces. It also regulates resale of tickets to a concert at Capital One Arena but not tickets to a basketball game in the same building the next night. And the Act exempts motion pictures. No legitimate purpose explains those lines, and the Act's legislative history shows that they were drawn to protect local venues, teams, and their ticketing partners at the expense of out-of-state competitors.

**COUNT VII**
**Supremacy Clause—Preemption by 47 U.S.C. § 230**
**(42 U.S.C. § 1983 and Equitable Cause of Action)**

120. Plaintiffs incorporate the foregoing paragraphs.

121. Section 230 of the Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and that "no liability may be imposed under any State or local law that is inconsistent with this section," *id.* § 230(e)(3); *see id.* § 153 ("State" includes the District). Section 230 bars a state-law claim that would impose liability for third-party content even where the marketplace knows the content is false. *Marshall's Locksmith Serv. Inc.* v. *Google, LLC*, 925 F.3d 1263, 1268-69 (D.C. Cir. 2019). And Section 230 bars any state-law claim that would require an online service provider to monitor third-party listings before allowing them to be posted.

122. Plaintiffs' marketplaces are interactive computer services: through their websites and mobile applications, Plaintiffs provide and enable access by multiple users to computer servers on which third-party sellers post listings and buyers view them. *See supra* ¶ 27; 47 U.S.C. § 230(f)(2).

123. The listings on Plaintiffs' marketplaces—including the display of prices and sellers' representations—are information provided and posted online by other information content providers. Sellers, not Plaintiffs, create each listing, select the ticket, and set the price. Plaintiffs' listing and pricing tools are available to every seller on the same terms, and the seller alone decides what price to post. Plaintiffs therefore are not "responsible, in whole or in part, for the creation or development" of that information. 47 U.S.C. § 230(f)(3).

124. The Act treats Plaintiffs as the publisher of third-party content to the extent it imposes liability for: displaying an "offer to sell" a ticket at a price set by a third-party seller, D.C.

Code § 28-5506(b); displaying an "offer to sell or resell" a ticket that a third-party seller does not possess, *id.* § 28-5503; publishing an "original purchase price" supplied by a third-party seller that proves inaccurate, *id.* § 28-5506(a)(2); or publishing a third party's listing without first verifying that third party's compliance with District licensing requirements, *id.* § 28-5506(a)(1). And because § 28-5506(a) applies before a ticket is "offered to be resold"—not merely before a sale is consummated—it regulates the substantive content that a marketplace may publish, not just the processing of transactions. To comply, Plaintiffs would have to review each third-party listing for a covered event before it appears and block, alter, or remove listings whose price exceeds the cap, whose seller cannot show possession, whose original-price figure cannot be verified, or whose seller's licensure cannot be confirmed. Each of these requirements thus impermissibly seeks to create liability for Plaintiffs' monitoring, screening, and deletion of "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

125. Sections 28-5503, 28-5506(a)(1), 28-5506(a)(2), and 28-5506(b) are thus preempted as applied to Plaintiffs' publication of third-party listings, and the District may not enforce them against Plaintiffs on that basis.

## COUNT VIII
## Fourth Amendment—Compelled Production of Business Records
## (42 U.S.C. § 1983)

126. Plaintiffs incorporate the foregoing paragraphs.

127. A statute that requires a business to make its records available for government inspection on demand, without an opportunity to obtain precompliance review before a neutral decisionmaker, violates the Fourth Amendment. *City of Los Angeles* v. *Patel*, 576 U.S. 409, 419-21 (2015).

128. Section 47-2890.04(c)(1) requires Plaintiffs to maintain three years of records of all licensed resellers and all ticket resales in the District on their platforms, including the total

number of tickets sold by each licensed reseller, the original purchase price for each resold ticket, and the final resale price of each resold ticket. Those records must be kept "for inspection and upon request by the Department at least annually." It authorizes the Department to demand them at any time and as often as it wishes. It provides no mechanism for precompliance review. And it backs its demands with civil penalties, consumer-protection liability, and license revocation. This provision constitutes a compelled disclosure of business documents in violation of the Fourth Amendment. *Airbnb, Inc.* v. *City of New York*, 373 F. Supp. 3d 467, 485 (S.D.N.Y. 2019).

129. Plaintiffs have a reasonable expectation of privacy in the records the Act requires them to produce. Plaintiffs consider the information covered by the Act to be confidential business information, they do not publish it, and they maintain it confidentially. Customer-facing businesses "are not expected to disclose" such "commercially sensitive information," and a statute compelling its production on demand implicates the Fourth Amendment. *Airbnb*, 373 F. Supp. 3d at 484-85. And online ticket marketplaces do not fall into the narrow category of closely regulated industries with a history of pervasive inspection—liquor sales, firearm sales, mining, and running an automobile junkyard—such that Plaintiffs would have no reasonable expectation of privacy and the District would be relieved of these requirements. *See Patel*, 576 U.S. at 424.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a. Declare that the Act is unconstitutional and unlawful for any or all of the reasons described above, both on its face and as applied to Plaintiffs and their members;

b. Declare that the Act's unconstitutional and unlawful provisions are not severable and that D.C. Law No. 26-181 is invalid and unenforceable in its entirety;

c. Preliminarily and permanently enjoin the District, its officers, agents, and employees from implementing or enforcing the Act against Plaintiffs and their members;

d. Preliminarily and permanently stay, enjoin, and restrain the Act's effective date as to Plaintiffs and their members;

e. In the alternative to injunctive relief on Count V, award just compensation;

f. Award Plaintiffs their costs and reasonable attorneys' fees under 42 U.S.C. § 1988 and other applicable law; and

g. Grant such other and further relief as the Court deems just and proper.

Dated: October 14, 2026

Respectfully submitted,

/s/ *Lucas C. Townsend*
Lucas C. Townsend (D.C. Bar No. 1000024)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
Morgan L. Ratner (D.C. Bar No. 1026987)
(admission application forthcoming)
Aaron M. Smith (D.C. Bar No. 888314520)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
LTownsend@gibsondunn.com
JLipshutz@gibsondunn.com
MRatner@gibsondunn.com
ASmith3@gibsondunn.com

Michael Holecek (*pro hac vice* forthcoming)
Jonathan N. Soleimani (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7761
MHolecek@gibsondunn.com
JSoleimani@gibsondunn.com

*Attorneys for Plaintiffs*