**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TICKET POLICY FORUM, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-3577 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Lucas C. Townsend (D.C. Bar No. 1000024)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
Morgan L. Ratner (D.C. Bar No. 1026987)
(admission application forthcoming)
Aaron M. Smith (D.C. Bar No. 888314520)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500

Michael Holecek (*pro hac vice* forthcoming)
Jonathan N. Soleimani (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7761

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

BACKGROUND ..... 4

I. Plaintiffs Operate Secondary Ticket Marketplaces That Connect Sellers And Buyers ..... 4

II. The Council Proposes A Resale Price Cap, Prompting Immediate Warnings From A Broad Coalition Of Stakeholders ..... 6

III. The Committee Deletes The Price Cap, But The Council Hastily Restores It For Secondary Marketplaces Only ..... 9

IV. The RESALE Act Imposes A Price Cap, A Fee Cap, And An Original-Price Disclosure, Including For Out-Of-State Transactions ..... 11

ARGUMENT ..... 13

I. Plaintiffs Are Likely To Succeed On The Merits ..... 13

A. The Act Likely Violates The Dormant Commerce Clause, Structural Constitutional Principles, And The Home Rule Act Because It Regulates Extraterritorially For A Discriminatory Purpose ..... 14

1. The Act Impermissibly Regulates Transactions That Occur Outside The District ..... 15

i. The Act Violates The Dormant Commerce Clause And Related Federalism Principles ..... 15

ii. The Act Violates The Home Rule Act ..... 18

2. The Act Unlawfully Discriminates Against Interstate Commerce ..... 19

B. The Price And Fee Caps Likely Violate Due Process Because They Are Confiscatory And Vague ..... 24

1. The Fee Cap Is Confiscatory Because It Forces Plaintiffs To Operate At A Loss Or Below A Reasonable Rate Of Return ..... 24

2. The Price And Fee Caps Deny Fair Notice ..... 28

C. The Original-Price Disclosure Likely Violates The First Amendment ..... 30

1. The Original-Price Disclosure Is Subject To Intermediate Scrutiny Because It Forces Content-Based Speech ..... 30

2. The Original-Price Disclosure Fails Intermediate Scrutiny ..... 32

i. The Original-Price Disclosure Does Not Serve A Substantial Government Interest ..... 33

ii. The Original-Price Disclosure Does Not Directly Advance The Government's Interest In Consumer Protection ........ 34

iii. The Act Is Not Sufficiently Tailored To The Asserted Interests ........ 37

3. Even If *Zauderer* Applies, The Act Is Unconstitutional ........ 40

II. Plaintiffs Will Suffer Irreparable Harm ........ 40

III. The Balance Of Equities And Public Interest Support An Injunction ........ 43

CONCLUSION ........ 44

## TABLE OF AUTHORITIES

Page(s)

### Cases

*44 Liquormart, Inc.* v. *Rhode Island*,
517 U.S. 484 (1996)....34, 36, 39

*Am. Beverage Ass'n* v. *City & Cnty. of San Francisco*,
916 F.3d 749 (9th Cir. 2019)....40

*Am. Council of Life Ins.* v. *District of Columbia*,
645 F. Supp. 84 (D.D.C. 1986)....19

*Am. Meat Inst.* v. *USDA*,
760 F.3d 18 (D.C. Cir. 2014)....31, 34, 35, 37

*Asante* v. *Kennedy*,
133 F.4th 97 (D.C. Cir. 2025)....19

**Ass'n for Accessible Meds.* v. *Ellison*,
140 F.4th 957 (8th Cir. 2025)....16, 18, 41

*Ass'n for Accessible Meds.* v. *Frosh*,
887 F.3d 664 (4th Cir. 2018)....16, 17, 18

**Bacchus Imports, Ltd.* v. *Dias*,
468 U.S. 263 (1984)....20, 21

*Baldwin* v. *G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935)....17

*Beacon Assocs., Inc.* v. *Apprio, Inc.*,
308 F. Supp. 3d 277 (D.D.C. 2018)....42, 43

*BMW of N. Am., Inc.* v. *Gore*,
517 U.S. 559 (1996)....14, 18

**Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*,
251 U.S. 396 (1920)....3, 24

*Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*,
476 U.S. 573 (1986)....17

*Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n*,
447 U.S. 557 (1980)....31, 33

*Chesapeake Climate Action Network* v. *EPA*,
952 F.3d 310 (D.C. Cir. 2020)....13

*Chiste* v. *Hotels.com L.P.*,
756 F. Supp. 2d 382 (S.D.N.Y. 2010)....33

*Cigar Ass'n of Am.* v. *FDA*,
317 F. Supp. 3d 555 (D.D.C. 2018) ....................42

*City of Cincinnati* v. *Discovery Network, Inc.*,
507 U.S. 410 (1993) ....................37

*City of Philadelphia* v. *New Jersey*,
437 U.S. 617 (1978) ....................23

**Connally* v. *Gen. Constr. Co.*,
269 U.S. 385 (1926) ....................29

*CSX Transp., Inc.* v. *Williams*,
2005 WL 902130 (D.D.C. Apr. 18, 2005) ....................19

*Dean Milk Co.* v. *City of Madison*,
340 U.S. 349 (1951) ....................23

*DoorDash, Inc.* v. *City & Cnty. of S.F.*,
2022 WL 867254 (N.D. Cal. Mar. 23, 2022) ....................26

*DoorDash, Inc.* v. *City of New York* ("*DoorDash NY Speech*"),
185 F.4th 1 (2d Cir. 2026) ....................32

**DoorDash, Inc.* v. *City of New York* ("*DoorDash NYC Caps*"),
692 F. Supp. 3d 268 (S.D.N.Y. 2023) ....................22, 26

*Duquesne Light Co.* v. *Barasch*,
488 U.S. 299 (1989) ....................3, 24

*Edenfield* v. *Fane*,
507 U.S. 761 (1993) ....................34, 36

**Edgar* v. *MITE Corp.*,
457 U.S. 624 (1982) ....................14, 15, 17

*Edwards* v. *District of Columbia*,
755 F.3d 996 (D.C. Cir. 2014) ....................34

*Everglades Harvesting & Hauling, Inc.* v. *Scalia*,
427 F. Supp. 3d 101 (D.D.C. 2019) ....................43

*FCC* v. *Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ....................28

*Gen. Elec. Co.* v. *EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ....................28, 30

*Global Tel*Link* v. *FCC*,
866 F.3d 397 (D.C. Cir. 2017) ....................27

*Gordon* v. *Holder*,
721 F.3d 638 (D.C. Cir. 2013) ....................41, 43

*Granholm* v. *Heald*,
544 U.S. 460 (2005)....................23

*Greater New Orleans Broad. Ass'n* v. *United States*,
527 U.S. 173 (1999)....................38

*Guaranty Nat'l Ins. Co.* v. *Gates*,
916 F.2d 508 (9th Cir. 1990)....................24, 26

*Healy* v. *Beer Inst.*,
491 U.S. 324 (1989)....................18

*Hunt* v. *Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................20

*Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....................30

*IESI AR Corp.* v. *Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
433 F.3d 600 (8th Cir. 2006)....................20

*Int'l Dairy Foods Ass'n* v. *Amestoy*,
92 F.3d 67 (2d Cir. 1996)....................35

*Janus* v. *Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
585 U.S. 878 (2018)....................30

*Jersey Cent. Power & Light Co.* v. *FERC*,
810 F.2d 1168 (D.C. Cir. 1987)....................24, 26

*Karem* v. *Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................41

*Kimberly-Clark Corp.* v. *District of Columbia*,
286 F. Supp. 3d 128 (D.D.C. 2017)....................37, 39

*Linmark Assocs., Inc.* v. *Twp. of Willingboro*,
431 U.S. 85 (1977)....................39

*Media Matters for Am.* v. *Paxton*,
138 F.4th 563 (D.C. Cir. 2025)....................43

*Metro. Wash. Chapter, Assoc. Builders & Contractors* v. *District of Columbia*,
62 F.4th 567 (D.C. Cir. 2023)....................14

*Mich. Bell Tel. Co.* v. *Engler*,
257 F.3d 587 (6th Cir. 2001)....................24, 26

*Minnesota* v. *Clover Leaf Creamery Co.*,
449 U.S. 456 (1981)....................21

*Mittleman* v. *U.S. Dep't of Treasury*,
919 F. Supp. 461 (D.D.C. 1995)....................19

*N. Pac. Ry. Co.* v. *North Dakota*,
236 U.S. 585 (1915)....................................................................................................25

*Nat'l Ass'n of Mfrs.* v. *SEC (NAM I)*,
748 F.3d 359 (D.C. Cir. 2014)......................................................................................37

*Nat'l Ass'n of Mfrs.* v. *SEC (NAM II)*,
800 F.3d 518 (D.C. Cir. 2015)................................................................................36, 40

*Nat'l Cable & Telecomm. Ass'n* v. *FCC*,
555 F.3d 996 (D.C. Cir. 2009)......................................................................................37

**Nat'l Inst. of Family & Life Advocates* v. *Becerra*,
585 U.S. 755 (2018)..........................................................................................31, 37, 40

**Nat'l Pork Producers Council* v. *Ross*,
598 U.S. 356 (2023)......................................................................2, 14, 15, 16, 17, 19, 23

*NetChoice, LLC* v. *Skrmetti*,
2026 WL 2546423 (6th Cir. Aug. 28, 2026)..................................................................42

*Nken* v. *Holder*,
556 U.S. 418 (2009)....................................................................................................43

*O'Donnell Constr. Co.* v. *District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992)......................................................................................41

*Ohio* v. *EPA*,
603 U.S. 279 (2024)....................................................................................................42

*Pennell* v. *City of San Jose*,
485 U.S. 1 (1988)........................................................................................................27

*In re Permian Basin Area Rate Cases*,
390 U.S. 747 (1968)....................................................................................................27

**Pharm. Research & Mfrs. of Am.* v. *District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005)...................................................................2, 16, 18

*Pursuing America's Greatness* v. *FEC*,
831 F.3d 500 (D.C. Cir. 2016)......................................................................................41

*Quality Brands, Inc.* v. *Barry*,
715 F. Supp. 1138 (D.D.C. 1989).................................................................................20

*Quezada* v. *Franklin Madison Grp.*,
2020 WL 5819824 (S.D. Cal. Sep. 29, 2020)................................................................33

*R.J. Reynolds Tobacco Co.* v. *FDA*,
696 F.3d 1205 (D.C. Cir. 2012)................................................................................34, 35

*Raymond Motor Transp., Inc.* v. *Rice*,
434 U.S. 429 (1978)....................................................................................................21

*Riley* v. *Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)....................31, 33

*Sorrell* v. *IMS Health Inc.*,
564 U.S. 552 (2011)....................31

*S.D. Farm Bureau, Inc.* v. *Hazeltine*,
340 F.3d 583 (8th Cir. 2003)....................23

*Thomas* v. *Securiguard Inc.*,
412 F. Supp. 3d 62 (D.D.C. 2019)....................19

*Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................30

*Variscite NY Four, LLC* v. *N.Y. State Cannabis Control Bd.*,
152 F.4th 47 (2d Cir. 2025)....................21

*Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)....................29

*Watson* v. *Emps. Liab. Assur. Corp.*,
348 U.S. 66 (1954)....................14, 18

*Wilmer Cutler Pickering Hale & Dorr LLP* v. *Exec. Off. of the President*,
784 F. Supp. 3d 127 (D.D.C. 2025)....................43

*Winter* v. *NRDC*,
555 U.S. 7 (2008)....................13

*Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985)....................31, 32, 40

**Statutes**

D.C. Code § 1-203.02....................11

D.C. Code § 1-206.02(a)(3)....................2, 14, 18, 19

D.C. Code § 28-3909....................13

D.C. Code § 28-5501(2)....................11

D.C. Code § 28-5501(3)....................11

D.C. Code § 28-5501(4)....................11, 32

D.C. Code § 28-5501(6)....................6, 11, 21, 37

D.C. Code § 28-5502....................32, 35, 38, 40

D.C. Code § 28-5502(a)....................33

D.C. Code § 28-5506....................15

D.C. Code § 28-5506(a)(2) ........................................ 1, 10, 12, 24, 30

D.C. Code § 28-5506(b) ........................................ 1, 12, 18, 24, 28

D.C. Code § 28-5506(c) ........................................ 1, 12, 24, 28

D.C. Code § 28-5508 ........................................ 30

D.C. Code § 28-5508(a) ........................................ 12

D.C. Code § 28-5508(b) ........................................ 12

D.C. Code § 28-5502 ........................................ 40

D.C. Code § 47-2890.05 ........................................ 30

D.C. Code § 47-2890.05(a) ........................................ 13

D.C. Code § 47-2890.05(b) ........................................ 12

**Regulations**

16 C.F.R. § 464.2 ........................................ 32

*Trade Regulation Rule on Unfair or Deceptive Fees*, 90 Fed. Reg. 2066 (Jan. 10, 2025) ........................................ 6, 35, 39

**Other Authorities**

*Exclusive,* Black's Law Dictionary 709 (12th ed. 2024) ........................................ 19

*NIVA and Fix The Tix Applaud the DC Council's Final Passage of Nation-Leading Resale Ticketing Bill*, National Independent Venue Association (July 14, 2026), https://perma.cc/ZQ87-9QU7 ........................................ 22

## INTRODUCTION

Plaintiffs are the Ticket Policy Forum and its members SeatGeek, Vivid Seats, Gametime, and TickPick. They operate online marketplaces where ticketholders resell tickets to live events. A fan who falls ill the week of a concert can list her ticket in minutes and reach buyers across the country. A fan shut out of a sold-out show can find a seat. Plaintiffs stand behind both sides of that exchange. They screen for fraud, process payments, absorb chargebacks, deliver tickets securely, answer customer questions through the night of the event, and guarantee a valid ticket or the buyer's money back. Those protections are why ticket resale moved from sidewalks to secure online marketplaces. Plaintiffs can provide those services and guarantees because they charge a service fee that is fully disclosed in the "all-in" price to the buyer.

The RESALE Act, D.C. Act 26-410 (the "Act"), caps that fee at 10% of the ticket's "initial" price. D.C. Code § 28-5506(c). That figure has nothing to do with what Plaintiffs' services cost. The arithmetic is simple. When a $40 concert ticket resells for $44, the most the Act allows, the Act lets Plaintiffs charge $4. But Plaintiffs incur more costs than that to complete the transaction. Every such sale loses money, and the losses fall hardest on the low-priced tickets the Council said it wanted to protect. The Act also caps the resale price itself at 10% above the ticket's initial price. *Id.* § 28-5506(b). And it requires Plaintiffs to publish that initial price on every listing, *id.* § 28-5506(a)(2), even though Plaintiffs took no part in the original sale and usually have no way to learn or verify what the first buyer paid.

The Council was warned that the Act would be counterproductive. The Mayor's office, economists, consumer organizations, and Plaintiffs all told it the same things. A fee cap would force marketplaces to operate at a loss. A price cap would be unenforceable, and would raise prices by driving resale tickets off regulated marketplaces and leaving ticket issuers free to increase prices without competitive checks from secondary marketplaces. And both caps would push fans toward

less-regulated channels where fraud is far more common. After eight months of review, the committee responsible for the bill agreed and struck the caps. But eight days later, a floor amendment restored them without citing any new data. Councilmembers were candid about the goal: to "take the dollars from big platform international companies" and put "dollars . . . back into our local economy."

The Act's problems go beyond *what* it does and include *whom* it regulates. The Act reaches secondary marketplaces, all of them headquartered and doing business outside the District. It regulates transactions between out-of-state buyers and out-of-state sellers on those out-of-state marketplaces. Meanwhile, it leaves ticket issuers' fees uncapped and exempts local sports entirely. A resale ticket to a concert at Capital One Arena is price-controlled. A resale ticket to a Wizards game in the same building is not.

The result is a law that violates the Constitution in three independent ways.

*First*, the Act violates the dormant Commerce Clause both because it regulates commerce outside the District and because it was enacted for a protectionist purpose. A State may not "directly regulate[] out-of-state transactions by those with no connection to the State." *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 376 n.1 (2023). The Home Rule Act imposes the same limit. D.C. Code § 1-206.02(a)(3). Yet the Act fixes the price of an out-of-state sale between an out-of-state seller and an out-of-state buyer on an out-of-state marketplace, simply because the event is in the District. Fewer than 1% of Plaintiffs' covered transactions last year involved both a District seller and a District buyer. This Court has struck down this approach before, when the District used an in-state destination to fix the price of out-of-state prescription-drug sales. *Pharm. Research & Mfrs. of Am.* v. *District of Columbia*, 406 F. Supp. 2d 56, 67-71 (D.D.C. 2005). The Act's exemptions and the Council's own statements separately confirm that it was designed to

move money from out-of-state companies to local interests; that discriminatory purpose is its own constitutional violation.

*Second*, the Act violates due process. The fee cap is confiscatory, and both caps deny fair notice. The government may not set rates so low that they fail to compensate a business for its services or fail to provide a reasonable return on the business's investment. *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307-08 (1989). Nor may it force a business to conduct "even a branch" of its operations at a loss. *Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*, 251 U.S. 396, 399 (1920). Courts have allowed due process challenges to proceed against 15% caps on food-delivery platforms' commissions. The District's cap is lower still, and it ignores cost altogether. Both caps also make liability turn on an "initial" price that often does not exist, because tickets can be given away, can be sold in bundles, and often have dynamic prices that fluctuate in real time based on changing market conditions. Even when that price exists, Plaintiffs cannot verify it, making it impossible for Plaintiffs to know what resale price and service fee the law permits and prohibits.

*Third*, the original-price-disclosure mandate violates the First Amendment. It compels Plaintiffs to publish a price that someone else paid in a transaction Plaintiffs had no part in. So it must survive intermediate scrutiny, and it cannot. Fully disclosed resale prices are not deceptive. The record contains no evidence that displaying the original price helps buyers. And the Council never considered the obvious alternative: requiring ticket issuers, who actually know the price (to the extent it is ascertainable), to transmit it with the ticket.

Relief is needed now. Unless the Act is enjoined before it begins to apply on January 1, 2027, Plaintiffs must re-engineer their national marketplaces for one jurisdiction. They will have to sell tickets at a loss or pull D.C. inventory, and they will suffer lasting damage to customer goodwill and partner relationships. The District has no legitimate interest in enforcing an

unconstitutional law. The public has none in a price-control regime that, as the Mayor's own office warned, will drive fans toward riskier markets. Plaintiffs respectfully request a ruling by [December 10] so that they can pursue timely appellate review, if needed, and make orderly compliance decisions.

## BACKGROUND

### I. Plaintiffs Operate Secondary Ticket Marketplaces That Connect Sellers And Buyers

A ticket to a D.C. event often changes hands more than once. Some performers and venues sell tickets directly, and they often set prices below what the market would bear, either to promote broad fan access or for promotional reasons. Comm. on Pub. Works & Operations, Report on B26-0224 at 5 (June 22, 2026) ("Committee Report") (Ex. A). Other performers and venues contract with third-party ticketing marketplaces to issue and sell tickets to the public in the first instance—known as "primary" marketplaces. *Id.* at 3. Ticketmaster controls 80% of primary-marketplace ticket sales nationwide. *Id.* After a ticket has been issued, however, it may be sold and bought again. For example, a fan who falls ill and cannot attend the event may want to sell her ticket, and a fan shut out of the initial sale may be willing to pay a premium to find a ticket. *Id.* at 3-5.[1] Secondary marketplaces play a critical role in matching this supply and demand.

Plaintiffs serve that market. The Ticket Policy Forum is a trade association of the nation's leading online ticket marketplaces, including Plaintiffs SeatGeek, Vivid Seats, Gametime, and TickPick. These companies operate digital marketplaces, and consumers use their websites and mobile apps to resell and purchase tickets to concerts, theater, comedy shows, and other live events.

---

[1] Cited materials in the legislative record are available on the Council's website and attached as exhibits. *See* B26-0224, https://lims.dccouncil.gov/Legislation/B26-0224. Citations to "June 30 Hr'g" and "July 14 Hr'g" refer to recordings of the Council's legislative meetings, by timestamp. The District's website provides video recordings but not official written transcripts.

Ticket Policy Forum Testimony at 1 ("TPF Testimony") (Ex. B). Sellers, not Plaintiffs, set the asking price, and buyers decide whether to pay it. Ticket Policy Forum Decl. ¶ 5.

Plaintiffs provide important services to both sides of a transaction. Take a fan who buys a ticket to a Bruce Springsteen concert at Capital One Arena and later cannot attend. That fan can list the ticket on Plaintiffs' secondary marketplaces in minutes by using Plaintiffs' listing and pricing tools. *E.g.*, Vivid Seats Decl. ¶ 9. Because Plaintiffs market ticket listings across their websites, mobile apps, and distribution channels, the fan can offer her ticket to buyers she could never reach on her own. *Id.* When another fan buys the ticket, Plaintiffs collect the payment, confirm the transfer, and remit the proceeds to the seller. *Id.* If the payment turns out to be fraudulent, Plaintiffs absorb that loss rather than charging it back to the seller. *Id.* On the other side of that transaction, Plaintiffs provide additional services to the buyer. Buyers can browse and compare listings across sellers and events in one place, with prices and seat locations displayed side by side. SeatGeek Decl. ¶ 9(b), (i); Gametime Decl. ¶ 7; Ex. W. Before the buyer pays for his purchase, Plaintiffs show him the all-in price. TickPick Decl. ¶ 7. When he decides to buy the ticket, he can pay through secure online systems and he will receive the ticket through a secure transfer. TickPick Decl. ¶ 9(c), (f). If he has questions, he can reach customer service before and during the event. SeatGeek Decl. ¶ 9(f); Gametime Decl. ¶ 11(f). And if there is an issue with his ticket, Plaintiffs provide comparable tickets or money back. SeatGeek Decl. ¶¶ 9-10. Neither fan could obtain any of those protections from a classified ad or a stranger outside the venue.

Providing these services and guarantees on a platform that offers fans access to tens of thousands of events nationwide costs money. To cover their costs, Plaintiffs charge service fees on transactions they facilitate. In the ordinary course, their service fees exceed 10% of the seller-selected price by several percentage points. Ticket Policy Forum Decl. ¶ 9; Vivid Seats Decl. ¶¶ 7,

15; SeatGeek Decl. ¶ 15; TickPick Decl. ¶ 16; Gametime Decl. ¶ 9. Some costs scale with the ticket price, such as chargeback costs. Vivid Seats Decl. ¶ 16; SeatGeek Decl. ¶ 16; TickPick Decl. ¶ 17; Gametime Decl. ¶ 10. Others are fixed per order regardless of the ticket's price, such as e-delivery costs. *Id*. Competition among resale marketplaces constrains the amount of fees that they can charge. SeatGeek Testimony at 4 (Ex. C).

Plaintiffs disclose all terms of a resale transaction before the time of purchase. Specifically, they display the total order amount—inclusive of all service and delivery fees, and applicable taxes—before the buyer completes an order. Ticket Policy Forum Decl. ¶ 10. Plaintiffs' "all-in" pricing model is consistent with a Federal Trade Commission rule for live-event tickets, which expressly declined to cap fees that are disclosed and not misleading. *See* 90 Fed. Reg. 2066, 2092 (Jan. 10, 2025). What Plaintiffs do not display, and cannot even ascertain for many listings, is the price at which a ticket was originally sold. *E.g.*, Vivid Seats Decl. ¶¶ 14, 18.

## II. The Council Proposes A Resale Price Cap, Prompting Immediate Warnings From A Broad Coalition Of Stakeholders

Although secondary ticket marketplaces have helped millions of fans in the District buy and sell tickets over the past 25 years, TPF Testimony at 1, Councilmember Charles Allen introduced a proposal to cap ticket resale prices without any regard to the economics of the secondary market, *see* Bill No. B26-0224 (Apr. 9, 2025). Among other requirements, the bill proposed to bar any reseller or marketplace from selling a ticket for more than 10% above the initial ticket's total price, including all fees and taxes, and to limit a marketplace's fees to 10% of that same amount. B26-0224 § 28-5508 (as introduced). The bill did not, however, impose caps on fees or ticket prices in the *primary* market. *See generally* B26-0224. And the bill exempted tickets for events organized by a District sports team or athletic association. B26-0224 § 28-5501(6).

When the Committee on Public Works and Operations held a public hearing later that year, a broad coalition warned that the bill was misguided and would harm the very consumers it meant to help. Committee Report at 9-15. Plaintiffs, the Mayor's representatives, consumer organizations, economists, and individual fans emphasized three points.

First, the 10% fee cap misunderstood how secondary marketplaces operate. TPF Testimony at 2. Plaintiffs provide services that protect consumers, such as fraud prevention, customer support, order fulfillment, and guarantees that ensure fans get valid tickets or their money back. *Id.* at 2. Those services are why ticket resales have moved from the sidewalks outside the old MCI Center to secure, regulated online marketplaces. *Id.* at 1. But providing these services costs money, and the fees cover those costs. *Id.* at 2. Marketplace fees thus are essential to keeping the market safe and fair. *Id.* Consumer-advocate organizations agreed, warning that capping fees could reduce competition by making it more difficult for secondary ticket marketplaces to survive. *E.g.*, National Consumers League Testimony at 3 (Ex. D).

Economists and consumer-interest organizations also explained that the sponsor's concern with high resale prices was misplaced. Artists and venues typically price tickets below the level the market would bear. Committee Report at 5. When there is "unique demand"—for a widely popular Taylor Swift concert, for example—resale prices rise naturally. *Id.* at 4. When demand is lower than expected, resale prices fall, and the reseller—not the artist or venue—absorbs the loss. Prof. Marianne Jennings Testimony at 4 ("Jennings Testimony") (Ex. E). Consumers benefit from those discounts. In the District, secondary markets saved local fans an estimated $9.1 million in 2024. Sports Fans Coalition Testimony at 2 (Ex. F); *accord* Committee Report at 5. By contrast, price caps would *increase* prices by distorting ordinary market forces and stifling competition in resale. Diana Moss, Progressive Policy Institute, Testimony at 2-4 ("Moss Testimony") (Ex. G).

"Since the time of Shakespeare," an economics professor warned, efforts to control resale prices have produced higher ticket prices, not lower ones. Jennings Testimony at 2-3.

Moreover, price caps result in more fraud, harming consumers. Jennings Testimony at 2-3. Consumer-advocate and civil-rights groups cautioned that studies of global ticketing markets found fraud rates to be almost four times higher in jurisdictions with resale caps than in uncapped markets because ticket sales in capped markets move to less-regulated channels. National Consumers League Testimony at 2; *accord* Southern Christian Leadership Global Policy Initiative Testimony at 1 (Ex. H); Get Safe Online Testimony at 1 (Ex. I). In short, price caps are "anti-fan." Sports Fans Coalition Testimony at 1.

Even the Mayor's representatives warned that the cap "could unintentionally drive more activity to unregulated markets, resulting in higher rates of fraud and greater financial losses for consumers." Ryan Nicholas Testimony at 3 ("Mayor's Office Testimony") (Ex. J).[2] They accordingly "urge[d] the Committee to remove the price cap provisions to allow for a more informed evaluation." *Id.* The D.C. Attorney General's Office of Consumer Protection, for its part, endorsed other provisions but was silent about the price cap. Committee Report at 10.

Second, economists and consumer groups explained that Plaintiffs' marketplaces compete with ticket issuers—such as venues that issue tickets directly, or primary marketplaces that partner with venues—to lower prices. Moss Testimony at 1; Committee Report at 3; TPF Testimony at 2; SeatGeek Testimony at 2. The Committee reported that one primary-ticket marketplace, Ticketmaster, controlled 80% of primary ticket sales at major venues nationwide and imposed fees as high as 44% of the ticket cost. Committee Report at 3. Plaintiffs compete by providing an

[2] Ryan Nicholas, the Legislative Director for the Office of the Deputy Mayor for Planning and Economic Development, presented joint testimony with the Legislative Director for the Department of Licensing and Consumer Protection.

alternative marketplace for fans to find tickets, including tickets that have dropped in price since they were first issued. SeatGeek Testimony at 1-5. Commenters warned that a cap applicable only to secondary marketplaces would drive Plaintiffs from the market while leaving ticket issuers and primary marketplaces free to raise their prices. Chris Gowen Testimony at 2 (Ex. K); *accord* National Consumers League Testimony at 3; Coalition for Ticket Fairness Testimony at 2 (Ex. L); Hoagland Testimony at 1-2 (Ex. M); StubHub Testimony at 2-5 (Ex. N); Moss Testimony at 1-3.

Third, Plaintiffs explained that the "initial" ticket price—that is, the purported face value plus fees and taxes—is often both unknowable to a secondary marketplace and indeterminate. Plaintiffs are generally not parties to the initial transaction—such as a sale from a venue to a buyer, who is now reselling on Plaintiffs' marketplaces—so Plaintiffs "often do not know" what price the initial purchaser paid. SeatGeek Testimony, Appended Response to Maryland AG at 4. In fact, an initial ticket price often does not exist. The "term 'face value' is increasingly an anachronism" because fans "typically do not receive a physical ticket with a static price printed on the ticket." *Id.* at 5. Instead, ticket issuers often use "dynamic pricing," where the ticket price fluctuates in real time based on changing market conditions. Anthony Farah Testimony at 1 ("Farah Testimony") (Ex. O). And some tickets are initially distributed for free as part of corporate promotions or a venue's desire for a bigger audience, so they have no face value at all. Jennings Testimony at 3.

## III. The Committee Deletes The Price Cap, But The Council Hastily Restores It For Secondary Marketplaces Only

The Committee heeded the warnings. After eight months of study, the Committee struck the price cap from the bill. Committee Print § 28-5507(b) (Ex. P). In its place, the Committee gave the Mayor authority to regulate prices and fees in both the primary and secondary markets, instead of only in the secondary resale market as the Council initially proposed—but only after further study. *Id.* The Committee explained why "there are risks in directly legislating a price cap,

and only doing so for the secondary market." Committee Report at 7. The economic evidence on how resale price caps affect the ticket market as a whole remained "uncertain." *Id.* at 8. And capping prices in the secondary market alone risked entrenching Ticketmaster, the largest participant in the primary market. *Id.* But the Committee also added a provision that no witness at the October hearing had suggested: a requirement that secondary marketplaces disclose to consumers the "original purchase price" of the ticket. Committee Print § 28-5506(a)(2). The Committee asserted that publishing the initial ticket price would provide transparency, Committee Report at 6-7, but it did not address how a marketplace would obtain that figure.

Eight days later, the Council held the first of two votes on the bill. That afternoon, two Councilmembers circulated an amended bill restoring the price cap, and doing so for resale tickets only. Amendment #1 to B26-0224 at 1 (June 30, 2026) (Ex. Q). The accompanying memorandum cited no study or data addressing the evidentiary gap identified by the Committee. *Id.* The Council voted for the amendment anyway, in what one Councilmember called an "effort to take the dollars from big platform international companies." June 30 Hr'g at 54:24-56:49 (Councilmember Frumin). The Committee chair acknowledged that "we did move pretty quickly today." June 30 Hr'g at 52:59-54:05 (Councilmember Nadeau).

Two weeks later, the Council adopted a further amendment that struck the Mayor's authority to regulate primary-market fees. Amendment #2 to B26-0224 at 1 (July 13, 2026) (Ex. R). The sponsor said the amendment would put "dollars … back into our local economy." July 14 Hr'g at 09:11-10:55 (Councilmember Pinto). Two Councilmembers unsuccessfully opposed the amendment, warning that imposing a price cap on secondary marketplaces while leaving ticket issuers unregulated "creates an uneven regulatory framework that only empowers the giants in the primary market." July 14 Hr'g at 11:00-13:44, 13:54-14:03. The exemption for sports tickets

survived, with the sponsor thanking the Washington Nationals and Monumental Sports for their input—which never appeared in the public record. July 14 Hr'g at 16:53-19:28 (Councilmember Allen).

The Council passed the amended bill—the "RESALE Act"—on July 14, and the Mayor signed it the next month, *see* D.C. Act 26-410.

## IV. The RESALE Act Imposes A Price Cap, A Fee Cap, And An Original-Price Disclosure, Including For Out-Of-State Transactions

The RESALE Act became law on September 25, 2026, when Congress's statutory review period expired. Ex. S (D.C. Law No. L26-181). The Act takes effect on January 1, 2027. Act § 4.

Enacted under the District's general grant of legislative authority, D.C. Code § 1-203.02, the Act amends the District's consumer-protection title and purports to protect consumers "from unfair and deceptive practices in live event ticket purchases." Act, preamble. The Act covers tickets to live concerts, theatrical performances, shows, and similar live events. D.C. Code § 28-5501(6). But it exempts certain sporting events and movies. *Id.* For covered events, the Act applies to any ticket to a D.C. event regardless of where the exchange, seller, or buyer is located, or where the sale takes place. The operative definitions contain no geographic limitation: a "ticket" is "any form of physical, electronic, or other evidence that grants the possessor … license to enter a place of entertainment," *id.* § 28-5501(6); a "[r]eseller" is "a person engaged in the resale of tickets," *id.* § 28-5501(3); a "[r]esale" is "the second or subsequent sale of a ticket by any method," *id.* § 28-5501(2); and a "[s]econdary ticket exchange" is "an electronic marketplace that enables a person to sell, purchase, and resell tickets," *id.* § 28-5501(4). The Act's resulting reach is predominantly extraterritorial: each marketplace Plaintiff resides outside the District and processes transactions on out-of-state systems, and fewer than 1% of their covered transactions in the past

year involved both a District seller and a District buyer. Vivid Seats Decl. ¶¶ 3, 12; SeatGeek Decl. ¶¶ 3, 12; TickPick Decl. ¶¶ 3, 13; Gametime Decl. ¶¶ 3, 14.

When the Act applies to a ticket resale, Plaintiffs must comply with two requirements relevant to this motion.

**The price and fee caps**. The Act caps both the sale price of a ticket (the price cap) and the fees a secondary marketplace may charge (the fee cap). The price cap limits the price at which a ticket may be resold. A "reseller or secondary ticket exchange shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10%" of that same amount. D.C. Code § 28-5506(b). The fee cap separately limits what a marketplace may charge for its own services. A secondary ticket exchange may "charge a fee for the service of providing a marketplace for the resale of a ticket" that "shall not exceed 10% of the total price of the initial ticket, including all fees and taxes in connection with the initial ticket." *Id.* § 28-5506(c).

**The original-price disclosure**. Before a ticket is "offered to be resold," Plaintiffs must "[d]isclose the original purchase price of the ticket, including all fees and taxes in connection with the initial purchase price of the ticket." D.C. Code § 28-5506(a)(2). Yet the Act does not require ticket issuers or sellers to provide that information to Plaintiffs. Nor does it explain how Plaintiffs can verify the price of a transaction to which they were not a party—either the ticket's original price or, one step further removed, the fees and taxes associated with that initial purchase.

The Act's penalties are severe. Every violation is a Class 2 civil infraction, D.C. Code § 28-5508(a)—a class reserved for "serious infractions that result from flagrant, fraudulent, or willful conduct," unlicensed activity, or imminent dangers to health and safety, 16 DCMR § 3200.1(b)—and "an unlawful trade practice," D.C. Code § 28-5508(b); *see id.* § 47-2890.05(b).

The D.C. Attorney General may seek restitution, civil penalties, and injunctive relief. *Id.* § 28-3909. The Department of Licensing and Consumer Protection may "suspend, revoke, or deny the license of any secondary ticket exchange or reseller" found in violation. *Id.* § 47-2890.05(a).

## ARGUMENT

A preliminary injunction is warranted if the plaintiff shows "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter* v. *NRDC*, 555 U.S. 7, 20 (2008). All four factors are met here. Plaintiffs are likely to succeed on at least one of several independent constitutional claims. Without interim relief, they will suffer irreparable harm to their businesses and loss of customer goodwill. And the balance of the equities and public interest also support enjoining a law that is riddled with cherry-picked exceptions and that will steer consumers to unregulated options rather than the established and transparent marketplaces that Plaintiffs run.[3]

### I. Plaintiffs Are Likely To Succeed On The Merits

The Act violates several different constitutional and statutory provisions. First, the Act as a whole violates the dormant Commerce Clause, or parallel extraterritorial limits found in constitutional federalism principles and codified in the Home Rule Act. Second, the price and fee

[3] The Ticket Policy Forum has associational standing because: (1) "at least one of its members would have standing to sue in [its] own right"; (2) "the interest [the Forum] seeks to protect is germane to its purpose"; and (3) "neither the claim asserted nor the relief requested requires" its members "to participate in the lawsuit." *Chesapeake Climate Action Network* v. *EPA*, 952 F.3d 310, 318 (D.C. Cir. 2020) (quotation marks omitted). The Forum's members, including all four Plaintiffs, are harmed because they rely on the current system of fair-market fees for their services, and they will lose revenue and incur costs to comply with the Act. *See* Ticket Policy Forum Decl. ¶ 19; *infra*, at 40-43. Preventing those injuries is germane to the Forum's purpose of promoting secondary ticket marketplaces and the proven services they provide, and to preserving their ability to lower ticket prices for fans. Ticket Policy Forum Decl. ¶ 21. And there is no need for individual members to participate because this suit raises pure questions of law.

caps violate the Fifth Amendment's Due Process Clause. Third, the original-price disclosure violates the First Amendment. Each of these violations is independently sufficient to establish a likelihood of success on the merits. Together, they make clear that Plaintiffs have satisfied this first—and most important—factor.

### A. The Act Likely Violates The Dormant Commerce Clause, Structural Constitutional Principles, And The Home Rule Act Because It Regulates Extraterritorially For A Discriminatory Purpose

When there are disputes about where the sovereignty of one State ends and another begins, the dormant Commerce Clause helps to "mediate [those] competing claims." *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 376 (2023). Courts apply "to local legislation of the District of Columbia the same interstate commerce analysis as [they] would to state laws." *Metro. Wash. Chapter, Assoc. Builders & Contractors* v. *District of Columbia*, 62 F.4th 567, 576 (D.C. Cir. 2023) (cleaned up). As relevant here, those constitutional limits take two forms. First, under the "dormant Commerce Clause," the District cannot "*directly* regulate[] out-of-state transactions by those with *no* connection" to the District because doing so would amount to the District imposing its own policy choices on other jurisdictions. *Nat'l Pork Producers*, 598 U.S. at 376 & n.1 (citing *Edgar* v. *MITE Corp.*, 457 U.S. 624, 641-43 (1982)). Although the Supreme Court has left open the question whether these extraterritorial limitations are better characterized as falling under the dormant Commerce Clause or horizontal separation of powers, these limitations are crucial regardless. *See id.*; *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 571-72 & n.16 (1996) (under related "principles of state sovereignty and comity" reflected in the Constitution's federalist structure and due process, a State cannot "impose its own policy choice[s] on neighboring States"); *Watson* v. *Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (similar). For the District, the Home Rule Act imposes a similar statutory prohibition on extraterritorial regulation. D.C. Code § 1-206.02(a)(3). Second, the dormant Commerce Clause prohibits "discrimination" against "out-of-

state economic interests." *Nat'l Pork Producers*, 598 U.S. at 364, 369. The Act violates both constraints.

#### 1. The Act Impermissibly Regulates Transactions That Occur Outside The District

The Act does not actually regulate events in the District. Instead, it regulates the *resale* of any ticket to a D.C. event, including out-of-state sales between out-of-state buyers and out-of-state sellers facilitated by out-of-state marketplaces. *See* D.C. Code § 28-5506; *supra*, at 11-12. The Act thus imposes a direct price control on commerce that occurs entirely outside of the District, presumably because of perceived downstream effects for D.C. events. That direct extraterritorial price control violates the dormant Commerce Clause (or parallel "horizontal separation of powers" principles) and the Home Rule Act.

##### i. The Act Violates The Dormant Commerce Clause And Related Federalism Principles

The dormant Commerce Clause prohibits statutes that operate extraterritorially by regulating transactions outside the jurisdiction, even if the subject of that transaction will wind up in the regulating state. *Nat'l Pork Producers*, 598 U.S. at 374. The Supreme Court explained that principle in *Edgar* v. *MITE Corp.*, where Illinois securities law required companies to register with the Illinois Secretary of State a tender offer for outstanding shares of target companies, including an Illinois corporation with 10% of its shareholders in Illinois. 457 U.S. at 627. A plurality concluded that the law violated the dormant Commerce Clause because it sought to regulate companies' transactions "not only with [Illinois citizens], but also with those living in other States and having no connection with Illinois." *Id.* at 642. In *National Pork Producers*, the Court recited the *Edgar* plurality's reasoning, repeating the two "conditions" that made the Illinois tender-offer law extraterritorial: it "*directly* regulate[d] out-of-state transactions by those with *no* connection to the State." 598 U.S. at 376 n.1 (emphasis in original). That law sharply contrasted with laws

regulating in-state commerce that have tertiary effects on out-of-state commerce (such as the challenged California law regulating in-state pork sales). *See id.*

Lower courts have enforced the same principles against direct regulation of out-of-state prices. For example, this Court invalidated the District's effort to regulate prices charged for prescription drugs sold outside the District even though the drugs were destined for D.C. consumers. *Pharm. Research & Mfrs. of Am.* v. *District of Columbia* ("*PhRMA*"), 406 F. Supp. 2d 56, 67-71 (D.D.C. 2005), *aff'd*, *Biotechnology Indus. Org.* v. *District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007). The Fourth Circuit reached the same result when Maryland enacted a materially identical statute in *Association for Accessible Medicines* v. *Frosh*, 887 F.3d 664, 673-74 (4th Cir. 2018), which the Supreme Court cited with approval, *Nat'l Pork Producers*, 598 U.S. at 374. And after *National Pork Producers*, the Eighth Circuit affirmed a preliminary injunction against a Minnesota law that similarly controlled the price of transactions between out-of-state manufacturers and out-of-state distributors. *Ass'n for Accessible Meds.* v. *Ellison*, 140 F.4th 957, 960 (8th Cir. 2025). Each case enforced the "classic" principle that a state has "no power to project its legislation into another state." *Id.* (internal quotation marks and alterations omitted).

Here, the Act operates extraterritorially to reach "out-of-state transactions by those with no connection to the [District]." *Nat'l Pork Producers*, 598 U.S. at 376 n.1. It fixes the resale price and marketplace fee when an out-of-state seller offers a ticket to an out-of-state buyer through an out-of-state exchange's marketplace that processes the transaction on out-of-state servers. That transaction occurs entirely outside the District between parties with no connection to the District. The offer is made, the contract is formed, the payment is processed, and the marketplace service is rendered without any of the parties setting foot in the District. Indeed, the buyer may *never* visit the District if he resells the ticket or does not use it. A statute that regulates transactions between

parties "living in other States and having no connection with [the State]" directly restrains interstate commerce. *Edgar*, 457 U.S. at 642. The Act thus "is effectively a price control statute that instructs" exchanges "as to the prices they are permitted to charge in transactions that do not take place in" the District. *Frosh*, 887 F.3d at 672.

Regulating even a handful of out-of-state transactions would be bad enough. *See Edgar*, 457 U.S. at 642-43. But here the constitutional defect is pervasive because the Act "almost exclusively" regulates such out-of-state transactions. *Frosh*, 887 F.3d at 671; *see id.* at 667 (noting the "vast majority" of sales occurred out of state). Approximately 85-90% of Plaintiffs' transactions for covered D.C. events occur between an out-of-state buyer and an out-of-state seller. Vivid Seats Decl. ¶ 12; SeatGeek Decl. ¶ 12; TickPick Decl. ¶ 12; Gametime Decl. ¶ 14; *accord* Committee Report at 12. And 100% of the Plaintiffs' transactions occur on systems located outside the District. SeatGeek Decl. ¶ 12; TickPick Decl. ¶ 13; Gametime Decl. ¶ 14. The Act purports to regulate every one of these transactions. Under the dormant Commerce Clause, it cannot do so—no matter what "legitimate effects the Act may have in [the District]." *Frosh*, 887 F.3d at 672.

To be sure, the law may have been designed to produce downstream effects in the District. But the fact that tickets sold out of state may later be presented at a D.C. venue does not permit the District to regulate the terms of the antecedent, out-of-state transaction. The law in *Edgar* was triggered by a sufficient number of Illinois shareholders. *See* 457 U.S. at 641-42. Similarly, in *Baldwin* v. *G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), the Supreme Court held that a New York law regulating the price at which dealers could sell milk impermissibly regulated the "price to be paid in [another] state"—even though the milk was bound for New York. *Id.* at 521; *see Nat'l Pork Producers*, 598 U.S. at 374 (reaffirming *Baldwin*); *see also Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 575-82 (1986) (holding unconstitutional New York's price-

affirmation statute requiring liquor distributors to certify that their New York prices were no higher than the price they charged in other states). Likewise, the drugs in *PhRMA*, *Frosh*, and *Ellison* were destined for consumers in the District, Maryland, and Minnesota, respectively. 406 F. Supp. 2d at 69; 887 F.3d at 672-73; 140 F.4th at 960-61. But it did not matter that the product "must eventually end up in" the regulating State. *Ellison*, 140 F.4th at 960. The District cannot use "an in-state hook" (the District destination) to directly regulate "out-of-state conduct" (the price of an out-of-state sale). *PhRMA*, 406 F. Supp. 2d at 69.

Finally, the Act presents the risk of "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy* v. *Beer Inst.*, 491 U.S. 324, 336-37 (1989). The District might claim a venue-based nexus, but Virginia could regulate the same listing based on the buyer's location, and Maryland could do the same based on the seller's location. A single listing could thus be lawful where the seller sits and lawful where the buyer sits, but unlawful under the District's extraterritorial rules, with the marketplace liable for having "offer[ed] to sell" at a price the District disapproves. D.C. Code § 28-5506(b). The dormant Commerce Clause prevents one jurisdiction from projecting its pricing regime into another in that way. The same is true if limits on extraterritorial state and D.C. action are better housed in horizontal separation-of-powers principles. Either way, the Constitution prevents the District from "impos[ing] its own policy choice[s] on neighboring States." *BMW*, 517 U.S. at 571-72 & n.16; *see Watson*, 348 U.S. at 70 ("[A] state is without power to exercise extra territorial jurisdiction, that is, to regulate and control activities wholly beyond its boundaries.").

**ii. The Act Violates The Home Rule Act**

In the District, these extraterritoriality limits are also statutory. Under the Home Rule Act, Congress declared that the Council may not enact a law "which is not restricted in its application *exclusively* in or to the District." D.C. Code § 1-206.02(a)(3) (emphasis added). This provision is

"intended to proscribe laws with potential national implication." *Thomas* v. *Securiguard Inc.*, 412 F. Supp. 3d 62, 75 (D.D.C. 2019). Applying the Home Rule Act, courts have held permissible laws governing companies that are actually "doing business in the District of Columbia." *Am. Council of Life Ins.* v. *District of Columbia*, 645 F. Supp. 84, 89 (D.D.C. 1986). By contrast, the provision forbids laws that "direct[ly] regulat[e] external conduct." *CSX Transp., Inc.* v. *Williams*, 2005 WL 902130, at *23 (D.D.C. Apr. 18, 2005), *rev'd on other grounds*, 406 F.3d 667 (D.C. Cir. 2005). The Act here falls in the latter camp. Again, it fixes the terms of resale transactions occurring outside the District between non-residents. So it is not restricted "exclusively" in or to the District. D.C. Code § 1-206.02(a)(3); *see Exclusive*, Black's Law Dictionary 709 (12th ed. 2024) (defining "exclusive" to mean "[l]imited to a particular person, group, entity, or thing"). As a statutory matter just as much as a constitutional one, the District cannot export its price regime to markets it does not govern. And if this Court rules on statutory grounds, it would not need to reach the constitutional question. *See Mittleman* v. *U.S. Dep't of Treasury*, 919 F. Supp. 461, 467 (D.D.C. 1995).

* * *

Given the Act's overwhelming extraterritorial application, the Court should preliminarily enjoin it in its entirety. At the very least, the Court should preliminarily enjoin the Act as applied to ticket sales that occur outside the District.

**2. The Act Unlawfully Discriminates Against Interstate Commerce**

The dormant Commerce Clause also contains an "antidiscrimination principle": no State may discriminate against "out-of-state economic interests." *Nat'l Pork Producers*, 598 U.S. at 364, 369. Discrimination in this context "'simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Asante* v. *Kennedy*, 133 F.4th 97, 102-03 (D.C. Cir. 2025) (quoting *United Haulers Ass'n* v. *Oneida-Herkimer Solid*

*Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007)). A law can discriminate on its face, in effect, or—most relevant here—in its "purpose." *Bacchus Imports, Ltd.* v. *Dias*, 468 U.S. 263, 270 (1984) (citation omitted); *see Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 352-53 (1977). Courts assess discriminatory purpose by examining the statute's text and "[f]acts external to the stated purpose," including statements by lawmakers and the circumstances under which a statute was enacted. *Quality Brands, Inc.* v. *Barry*, 715 F. Supp. 1138, 1140-41 (D.D.C. 1989); *see IESI AR Corp.* v. *Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006). Here, the Council was not shy about its protectionist purpose. The Act on its face is intended to favor local interests, and its legislative history brims with protectionist rhetoric that makes its discriminatory purpose plain.

**Text**. Discriminatory-purpose claims are not always easy to prove because lawmakers typically conceal their intent. But here, the Council embedded its protectionist purpose in the Act's text and structure. Two features of the Act's design are particularly significant: it singles out for regulation secondary marketplaces, all of which are located out of state, while drawing exemptions that favor in-state interests.

First, the Act exempts primary-market sellers from its price and fee caps. Nothing in the Act prevents a venue, promoter, or artist from setting a ticket's face value at any price it chooses or from layering unlimited fees on top. The Council elected not to impose restrictions on primary-market sellers' ability to charge fees after an amendment emphasized that such choice would give "local district venues" an advantage. Amendment #2 at 1-2. This disparate treatment cannot be chalked up to a desire to lower prices for consumers—otherwise, the Act would regulate the prices that a primary-market seller could charge as well. The fact that the Act targets *only* the fees charged

by *out-of-state* marketplaces is significant: protecting local businesses against competition with out-of-state businesses is exactly what the dormant Commerce Clause prohibits.

Second, the Act exempts sporting events organized by teams "located in the District" by excluding such events from its definition of "[t]icket." D.C. Code § 28-5501(6). But the Council never explained why it had an interest in capping prices and fees when a consumer goes to a music concert in the District but not when that consumer goes to a sports game in the District—except for economic protectionism. The Council adopted this carve-out while crediting non-public "perspectives and feedback" from "the Washington Nationals and Monumental Sports." July 14 Hr'g at 16:53-19:28 (Councilmember Allen). In doing so, the Council again shielded favored District actors from the regulatory burden imposed on out-of-state resale marketplaces. There is no need to "guess at the legislature's motivation" when the Act contains an exception plainly designed to "aid [local] industry" and favor certain local actors. *Bacchus*, 468 U.S. at 271; *cf. Raymond Motor Transp., Inc.* v. *Rice*, 434 U.S. 429, 445 (1978) (purported benefits of law undercut by "exemptions").

Taken together, these choices leave the Act's economic burden on out-of-state resale marketplaces while preserving uncapped revenue streams for favored local actors. The Act's text and structure thus make "apparent" its purpose "to favor [District actors] over others." *Variscite NY Four, LLC* v. *N.Y. State Cannabis Control Bd.*, 152 F.4th 47, 64 (2d Cir. 2025).

**Legislative history**. In determining whether the Act has a discriminatory purpose, courts also look to the broader "circumstances," including statements made in the legislative history. *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981). Here, the Council said the quiet part out loud—it sought to burden out-of-state commerce to protect in-state actors.

The record makes that purpose unusually explicit. One Councilmember openly described the Act as "an effort to take the dollars from big platform international companies that are getting large fees." June 30 Hr'g at 54:24-56:49 (Councilmember Frumin). Two weeks later, the bill's sponsor stressed the goal of "taking away significant profits from scalpers"—a label he applied to both individual sellers and resale marketplaces "as well." July 14 Hr'g at 16:53-19:28 (Councilmember Allen). And he was not shy about pointing the finger at the Act's target: "StubHub or SeatGeek or Vivid Seats or any of the dozens of other platforms." *Id.*

Councilmembers paired that out-of-state animus with in-state favoritism. The Councilmember who stripped the Act's regulation of primary-market sellers explained that their fees "generally go to our local venues," so targeting only out-of-state companies in "the secondary market" would ensure that "dollars are put back into our local economy." July 14 Hr'g at 09:11-10:55 (Councilmember Pinto). The Committee Report likewise credited testimony that resales draw "money out of the local economy in favor of out-of-District companies." Committee Report at 27; *accord id.* at 11. After the Council approved the Act, the sponsor reiterated that he hopes the Act will "keep more dollars in our local economy." *NIVA and Fix The Tix Applaud the DC Council's Final Passage of Nation-Leading Resale Ticketing Bill*, National Independent Venue Association (July 14, 2026), https://perma.cc/ZQ87-9QU7.

Courts have long concluded that similar statements, describing an economic objective of shifting revenue from out-of-state (or here, out-of-District) firms to local interests, reveal a discriminatory purpose. A New York district court, for example, observed that New York City councilmembers had justified similar fee caps on out-of-state companies operating digital marketplaces by stating that the caps would keep "a percentage of the sales transaction [from] leaving our city and going to a different state," among other things. *DoorDash, Inc.* v. *City of New*

*York* ("*DoorDash NYC Cap*"), 692 F. Supp. 3d 268, 302 (S.D.N.Y. 2023) (denying motion to dismiss). Similarly, the Eighth Circuit highlighted that South Dakota legislators had prohibited most corporations from owning farmland in the hopes of keeping profits in "local economies" rather than "a few, large corporations" located out of state. *S.D. Farm Bureau, Inc.* v. *Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003) (quotation marks omitted). That statement alone was "brimming with protectionist rhetoric." *Id.* (quotation marks omitted). The same reasoning applies here. A legislature that declares its aim to put dollars into the local economy by taking profit from out-of-state companies has "artlessly disclose[d]" a protectionist purpose. *Dean Milk Co.* v. *City of Madison*, 340 U.S. 349, 354 (1951).

Beyond express statements of protectionism, the Council also turned down obvious alternative laws that would not have disfavored out-of-District interests. For example, the Council could have adopted evenhanded all-in pricing, anti-bot, and speculative-ticket regulations of transactions within the District without any price control at all. *See* Committee Report at 7-9; Committee Print § 28-5507(b). The Council's decision to restore the price and fee caps on exclusively out-of-state secondary marketplaces is a flashing neon sign that it acted with an impermissible aim to burden interstate commerce.

Because the Act discriminates, "a virtually per se rule of invalidity" applies. *City of Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978); *see Nat'l Pork Producers*, 598 U.S. at 364. The District bears the burden of showing that it serves a legitimate local purpose that could not be achieved by nondiscriminatory means. *Granholm* v. *Heald*, 544 U.S. 460, 489, 491 (2005). It cannot. As noted above, the Council had before it a narrower Committee Print that addressed the Council's consumer-protection objectives. Committee Report at 7-9. And many other jurisdictions have addressed similar concerns by less onerous means. For example, California

recently enacted legislation (Assembly Bill 1349) that prohibits the sale of speculative tickets without imposing price caps. But here, the Council chose the discriminatory, and the most onerous, alternative instead. The dormant Commerce Clause does not permit that choice.

### B. The Price And Fee Caps Likely Violate Due Process Because They Are Confiscatory And Vague

The price and fee caps violate due process in two independent ways. First, the fee cap is confiscatory. It operates without regard to the cost of providing the regulated service and forces Plaintiffs to operate a segment of their marketplaces at a loss. Second, the price and fee caps are impermissibly vague. They turn on an "initial" ticket price the Act never adequately defines and Plaintiffs cannot reliably ascertain. D.C. Code § 28-5506(a)(2), (b)-(c).

#### 1. The Fee Cap Is Confiscatory Because It Forces Plaintiffs To Operate At A Loss Or Below A Reasonable Rate Of Return

The constitutional rule is straightforward: the government cannot limit businesses to "confiscatory" rates that do "not afford sufficient compensation" for their services. *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307-08 (1989) (quotation marks omitted). Sufficient compensation means a rate that covers the cost of service *plus* a reasonable return on investment. *See Jersey Cent. Power & Light Co.* v. *FERC*, 810 F.2d 1168, 1175 (D.C. Cir. 1987) (en banc). That is, a law "merely providing for a return which only covers costs," such as a freeze on telephone rates, is "confiscatory" and thus "inadequate under well-established due process standards." *Mich. Bell Tel. Co.* v. *Engler*, 257 F.3d 587, 596 (6th Cir. 2001) (affirming preliminary injunction); *see Guaranty Nat'l Ins. Co.* v. *Gates*, 916 F.2d 508, 509, 512 (9th Cir. 1990) (holding that a state law "mandat[ing] a rollback of rates for motor vehicle liability insurance" was unconstitutionally "confiscatory" because it did not permit insurance companies to receive a "fair and reasonable return"). In addition, a regulator may not compel a party to conduct "even a branch of business at a loss." *Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*, 251 U.S. 396, 399 (1920); *see*

*N. Pac. Ry. Co.* v. *North Dakota*, 236 U.S. 585, 599-600 (1915) (holding that the state could not require a carrier to carry a commodity below cost merely because the revenue "from the entire intrastate business is adequate").

Here, the fee cap is confiscatory because it forces Plaintiffs to operate not just at cost but *at a loss* for significant swaths of their secondary-marketplace businesses. The problem is structural: the Act does not account for Plaintiffs' costs and then limit their rate of return above those costs. Instead, the Act ties Plaintiffs' permissible revenue to the initial ticket price, while ignoring the costs of providing the marketplace services. To operate their marketplaces, Plaintiffs incur significant costs to provide fraud prevention, order fulfillment, payment processing, buyer guarantees and refunds, and other services. TPF Testimony at 2. Some of those costs are fixed per order, so they do not decline when the ticket price does. *E.g.*, SeatGeek Decl. ¶ 16. Other costs vary based on the order size. SeatGeek Decl. ¶ 16; Gametime Decl. ¶¶ 17-18; TickPick Decl. ¶ 17; Vivid Seats Decl. ¶ 16. But the 10% fee cap generally will not permit Plaintiffs to recoup the costs required to service and fulfill a transaction. *Id.* On covered tickets for D.C. events, Plaintiffs would lose money on the typical covered ticket—especially low-dollar ones. *Id.*

An example illustrates the problem. Consider a concert ticket with an initial price of $40 that resells for $44, as the price cap permits. For each Plaintiff marketplace, the full cost of providing its service on that sale would exceed $4. Vivid Seats Decl. ¶ 16; SeatGeek Decl. ¶ 16; TickPick Decl. ¶ 17; Gametime Decl. ¶ 18. But the fee cap would limit Plaintiffs to a $4 fee. That means Plaintiffs *lose* money by facilitating the sale of precisely the kind of low-price ticket that the Council said it wanted to protect. And the Act provides no cost-based adjustment mechanism. A marketplace facing a shortfall must absorb the loss, cut the services that protect buyers and sellers, decline the transaction, or potentially blacklist tickets to D.C. events altogether.

The government cannot force Plaintiffs into that choice, as recent cases involving other marketplaces illustrate. Similar to Plaintiffs' marketplaces, companies like DoorDash, Uber Eats, and Grubhub operate online marketplaces that connect sellers (restaurants) and buyers (consumers), and those companies charge restaurants commissions for access to their platform and related services. *See DoorDash NYC Cap*, 692 F. Supp. 3d at 277; *DoorDash, Inc.* v. *City & Cnty. of S.F.* ("*DoorDash SF Cap*"), 2022 WL 867254, at *3 (N.D. Cal. Mar. 23, 2022). New York City and San Francisco each capped the commissions that those marketplaces could charge at 15%, forcing them to "operate at a loss." *DoorDash NYC Cap*, 692 F. Supp. 3d at 277, 300; *DoorDash SF Cap*, 2022 WL 867254, at *21. In both cases, the courts held that due process prohibits the government from imposing "confiscatory" rates that require companies to provide services without being able to recoup their costs. *DoorDash SF Cap*, 2022 WL 867254, at *21 (denying motion to dismiss); *DoorDash NYC Cap*, 692 F. Supp. 3d at 300 (same). Moreover, the government cannot defeat that claim by pointing to other revenue streams that could purportedly subsidize the losses. *DoorDash NYC Cap*, 692 F. Supp. 3d at 300.

The constitutional defect remains even if the fee cap permits Plaintiffs to break even. Due process requires regulated rates to permit a business to earn a reasonable return on investment—*i.e.*, a profit. *See Jersey Cent.*, 810 F.2d at 1175. Thus, in *Michigan Bell*, the Sixth Circuit affirmed a preliminary injunction against a telephone-rate freeze because a regime that merely permitted recovery of costs, without providing a reasonable return on investment, was unconstitutionally confiscatory. 257 F.3d at 596. Likewise, the Ninth Circuit held that the government cannot require insurance companies to offer insurance rates that fail to provide a "fair and reasonable return" for the companies' services. *Guaranty Nat'l Ins. Co.*, 916 F.2d at 512. The same reasoning applies here. The District has no constitutional right to tell companies organized as for-profit businesses

in other jurisdictions that they cannot make a reasonable return on the investments they have made to serve District fans for years.

By contrast, courts have sustained price controls that actually account for the regulated party's economics. In *Pennell* v. *City of San Jose*, 485 U.S. 1 (1988), for example, the Supreme Court upheld a rent-control regime that considered landlords' costs and other financial evidence and ensured landlords a fair return. *Id.* at 12. And in *Permian Basin Area Rate Cases*, 390 U.S. 747 (1968), the Court sustained natural-gas rates derived from cost data that incorporated a 12% return on investment and allowed producers to seek special relief from generally applicable rates. *Id.* at 808. The Act contains no comparable protections. It ties Plaintiffs' permissible fees to the price of an entirely different transaction to which they were not a party, without regard to the cost of providing marketplace services, and provides no hardship exception or cost-based adjustment mechanism. That violates due process.

The Act's confiscatory fee cap was the byproduct of the Council's hasty foray into price-fixing. The Mayor's Office "urge[d] the Committee to remove the price cap provisions to allow for a more informed evaluation." Mayor's Office Testimony at 3. The Committee that studied the bill for eight months agreed. It concluded that the economic evidence remained "uncertain" and that "there are risks in directly legislating a price cap." Committee Report at 7-8. But eight days later, the cap was restored by floor amendment without new cost data addressing those concerns. Amendment #1 at 1. Despite failing to study Plaintiffs' costs of service, the Council selected a 10% ceiling untethered to those costs. Rate-setting that disregards the relevant costs of providing the regulated service is arbitrary. *See Global Tel*Link* v. *FCC*, 866 F.3d 397, 412-15 (D.C. Cir. 2017) (vacating rate caps because the agency's methodology excluded relevant costs of service). Here, that arbitrary rate-setting produces a constitutional violation, often preventing Plaintiffs from

recovering their basic costs, let alone earning a reasonable rate of return. The Constitution may give regulators economic leeway, but it does not allow such price-fixing.

### 2. The Price And Fee Caps Deny Fair Notice

Independent of their confiscatory nature, the price and fee caps' trigger—the "initial" ticket price—is unconstitutionally vague because the Act leaves Plaintiffs to guess both what benchmark governs and whether their prices comply. A "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A regulated party thus must be able "to identify, with 'ascertainable certainty,' the standards" to which its conduct must conform. *Gen. Elec. Co.* v. *EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). These caps fail that requirement. The Act makes the legality of every resale turn on a single number—the "total price of the initial ticket," D.C. Code § 28-5506(b)-(c)—that is indeterminate for two reasons.

First, the ticket issuer's initial price often yields no usable benchmark. For example, some tickets are issued for "free" as promotions or complimentary gifts. Jennings Testimony at 3; Ticket Policy Forum Decl. ¶ 12; Gametime Decl. ¶ 16. For these tickets, the "total price of the initial ticket," D.C. Code § 28-5506(b)-(c), is zero or undefined. The statute thus provides no guidance on reselling such tickets, unless it means to ban their resale entirely.

Dynamic pricing exacerbates the problem. "[F]ace value" is "increasingly an anachronism" because fans typically do not receive a physical ticket with a static price printed on the ticket, and issuers may adjust prices in real time as demand shifts. SeatGeek Testimony, Appended Response to Maryland AG at 5; *see* Farah Testimony at 1 ("With dynamic pricing, there's literally no such thing as face value."). Two materially identical seats therefore can sell minutes apart at different prices. When the price of an initial ticket is neither static nor even reflected on the ticket itself, Plaintiffs cannot reasonably ascertain the purported benchmark value.

The Act also leaves regulated parties scratching their heads over bundled tickets. Bundled and subscription tickets, including season tickets to theater productions, are usually sold for one aggregate price even though individual events have very different market values, so they have no ascertainable per-ticket initial price at all. Sports Fans Coalition Testimony at 2; Ticket Policy Forum Decl. ¶ 12; Vivid Seats Decl. ¶ 14; Gametime Decl. ¶ 16. But the Act does not explain what portion of the package price constitutes any single ticket's "initial" price.

The Supreme Court held that a similar indeterminacy violated due process in *Connally* v. *General Construction Co.*, 269 U.S. 385 (1926). There, the statute required contractors to pay the "current rate of per diem wages in the locality." *Id.* at 393. Because wages varied from employer to employer and no prescribed geographic area constituted the locality, the statute directed payment of "one of several different amounts, without saying which." *Id.* at 394. The same defect exists here. The "initial" ticket price could mean one of several different amounts depending on when and how a ticket is issued or purchased, but the Act does not say which one Plaintiffs should use.

Second, the "initial ticket price" usually is not even verifiable by Plaintiffs. Due process tolerates some imprecision in economic regulation on the premise that the regulated party "may have the ability to clarify the meaning of the regulation by its own inquiry." *Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). But here, that premise fails. Plaintiffs do not participate in the original sale, tickets often do not physically list an original price (or the actual price paid), and Plaintiffs have no independent way to verify the amount the first purchaser paid. *See* Ticket Policy Forum Decl. ¶¶ 10-11. Each successive resale makes that information more remote. Plaintiffs can ask sellers to provide the information, but have no reasonable method to check the number provided. An exchange's choices are to reject lawful transactions or to risk penalties measured against a benchmark it cannot reasonably ascertain.

For Plaintiffs, the stakes of guessing wrong are severe. The Act imposes no scienter requirement and provides no safe harbor for reasonably relying on seller-provided information. If their listed prices or charged fees exceed the applicable caps, they face civil penalties, consumer-protection liability, and license revocation. *See* D.C. Code §§ 28-5508, 47-2890.05. Due process does not permit the District to make Plaintiffs' liability turn on whether third-party sellers accurately report a price that Plaintiffs neither know nor can independently verify. *See Gen. Elec.*, 53 F.3d at 1328-29.

### C. The Original-Price Disclosure Likely Violates The First Amendment

The Act violates the First Amendment, too. It requires every secondary ticket exchange, "prior to a ticket being resold or offered to be resold," to "[d]isclose the original purchase price" of the ticket. D.C. Code § 28-5506(a)(2). That original-price disclosure triggers and fails intermediate scrutiny under the First Amendment. It compels Plaintiffs to publish an unverifiable and often indiscernible figure about someone else's transaction, and it does not directly advance any substantial interest in a tailored manner.

#### 1. The Original-Price Disclosure Is Subject To Intermediate Scrutiny Because It Forces Content-Based Speech

The First Amendment protects both the right to speak freely "and the right to refrain from speaking at all." *Janus* v. *Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quotation marks omitted). That guarantee applies "equally" to compelled "statements of fact" (as here) and "expressions of value, opinion, or endorsement." *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). And "commercial speech, like other varieties, is protected." *Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976).

As relevant here, a "content-based" law that burdens "commercial speech" is subject at least to intermediate scrutiny. *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571 (2011); *see Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980). The Act is content-based because it "[m]andat[es]" the disclosure of specific information—the original purchase price—that Plaintiffs "would not otherwise" have made. *Riley* v. *Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). The Act is therefore subject to intermediate scrutiny, where the District has the "burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72.

The District might argue for relaxed scrutiny under *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). In *Zauderer*, the Court carved out an exception from the general intermediate-scrutiny rule for commercial-speech laws that compel "purely factual and uncontroversial information about the terms under which … services will be available." *Nat'l Inst. of Family & Life Advocates* v. *Becerra* ("*NIFLA*"), 585 U.S. 755, 768 (2018) (quoting *Zauderer*, 471 U.S. at 651). That standard does not apply here.

*Zauderer* governs only when the law compels disclosing "information about the terms under which [the speaker's] services will be available." *NIFLA*, 585 U.S. at 768. "[T]o match *Zauderer* logically," the compelled disclosure "must relate *to the good or service offered by the regulated party*." *Am. Meat Inst.* v. *USDA*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc) (emphasis added). In *NIFLA*, for example, *Zauderer* did not apply to a notice about *state*-funded services because the notice "in no way relates to the services that [*private*] licensed clinics provide." 585 U.S. at 769.

Here, too, the disclosure of the original sale price "in no way relates to the services" that Plaintiffs provide. *NIFLA*, 585 U.S. at 769. For District events, Plaintiffs provide a secondary

ticket marketplace service: they connect third-party buyers and sellers, process payments, facilitate delivery, and guarantee the transaction for a fee. D.C. Code § 28-5501(4). Every term of *that* service—the resale price, fees, and total price the buyer will pay—is already covered under D.C. Code § 28-5502 and FTC regulations, *see* 16 C.F.R. § 464.2. By contrast, original sales for covered tickets do not occur on Plaintiffs' marketplaces. Plaintiffs' services are therefore two steps removed from the mandated disclosure: (1) the service they offer is *not* the ticket, but merely the marketplace on which buyers and sellers connect; and (2) the original price is irrelevant information about an earlier transaction between the ticket issuer and a prior purchaser, one in which Plaintiffs played no role. That is not a term under which Plaintiffs' service is offered.

The Second Circuit confirmed that distinction when a city compelled disclosures from companies that operate online marketplaces similar to Plaintiffs' marketplaces. *See DoorDash, Inc.* v. *City of New York* ("*DoorDash NYC Speech*"), 185 F.4th 1 (2d Cir. 2026). There, the court held that *Zauderer* did not apply to a requirement that delivery-facilitation marketplaces disclose information about customers who used the marketplaces because the mandate concerned "facts about third parties who use Marketplace, not about Marketplace itself." *Id.* at 7. So too here. The original-price mandate is analogous: it compels Plaintiffs to publish a fact about third parties' earlier transaction rather than a term of Plaintiffs' own marketplace service. *Zauderer* does not apply.

**2. The Original-Price Disclosure Fails Intermediate Scrutiny**

The Act identifies a set of disfavored speakers—ticket resale intermediaries—and marks them for disfavored treatment. It caps the fees they can charge and mandates that they provide information to their marketplace users—indeed, information that they cannot reasonably know—for a subset of live events in the District. This regulation fails all three requirements of intermediate scrutiny because it: (1) does not serve a "substantial government interest"; (2) does

not "directly advance the interest asserted"; and (3) is not "narrowly drawn" and is "more extensive than necessary." *Cent. Hudson*, 447 U.S. at 565-66, 573 (quotation marks omitted).

#### i. The Original-Price Disclosure Does Not Serve A Substantial Government Interest

The Act's preamble asserts an interest in protecting consumers from "deceptive" practices. And the Committee Report (at 4-6) suggests the Act also serves an interest in reducing the price of resale tickets. But neither interest is substantial. To start, the government's abstract interest in preventing consumer deception has no bearing on the original-price disclosure. Plaintiffs already disclose the all-in price of a ticket to their customers—*i.e.*, the price a buyer will actually pay to purchase the ticket. *Supra*, at 5-6. Moreover, the statute separately requires resale marketplaces to disclose the total price, itemized charges, and other information about tickets that are listed for sale. D.C. Code § 28-5502(a)(1)-(2). Because a price cannot be deceptive "[a]s long as the actual price is disclosed"—that is, after all, the information relevant to ticket buyers—the District has no substantial interest in mandating further disclosures about prior ticket sales. *Quezada* v. *Franklin Madison Grp.*, 2020 WL 5819824, at *5 (S.D. Cal. Sep. 29, 2020); *see also Chiste* v. *Hotels.com L.P.*, 756 F. Supp. 2d 382, 404 (S.D.N.Y. 2010) (finding consumer could not be deceived where she was informed of "the exact amount she would pay" and that "the total cost . . . included a service fee."). And to the extent the disclosures are an adjunct to the caps themselves, the District does not have an interest in mandating prices for live-event tickets for non-sporting events in D.C. at below-market prices and at a loss for secondary-ticket marketplaces. *See supra*, at 24-27. Where buyers and sellers have agreed to a price in a free market, the government's "generalized interest in unilaterally imposing its notions of fairness" on that bargain is "constitutionally invalid." *Riley*, 487 U.S. at 792 (holding unlawful a cap on fundraisers' fees).

Moreover, the Act's two massive, "arbitrary exemption[s]"—for sporting events and movies—confirm that the "asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Edwards* v. *District of Columbia*, 755 F.3d 996, 1007 (D.C. Cir. 2014) (quotation marks omitted). Those exceptions make clear that the Act does not advance any legitimate interest in preventing deception or lowering prices. Rather, the Act's compulsion of speech is designed merely to facilitate the arbitrary (and unlawful) price caps. It therefore may not stand.

**ii. The Original-Price Disclosure Does Not Directly Advance The Government's Interest In Consumer Protection**

Even if the District could show that its purported interests are substantial, the disclosure mandate does not directly advance them. It is "'critical'" that a statute directly advance the government's asserted interest "because without [such a requirement], the government 'could [interfere with] commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *R.J. Reynolds Tobacco Co.* v. *FDA*, 696 F.3d 1205, 1219 (D.C. Cir. 2012) (quoting *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 487 (1995)), *overruled on other grounds*, *Am. Meat Inst.*, 760 F.3d 18 (en banc). This burden "is not light." *Id.* at 1218. To directly advance an asserted interest, a statute must "alleviate" the harms it is aimed at "to a material degree," *Edenfield* v. *Fane*, 507 U.S. 761, 771 (1993), rather than offering "only ineffective or remote support for the government's purpose," *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 505 (1996) (plurality) (quotation marks omitted). Nor may the government rely on "mere speculation or conjecture" that a restriction will support its objective. *Edenfield*, 507 U.S. at 770. Legislative determinations must be "validated by" *some* evidence such as "studies, anecdotal evidence, history, consensus, or common sense." *Edwards*, 755 F.3d at 1004. The

original-price disclosure does not meet this demanding standard for either of the two asserted governmental interests.

The Act does not advance any generalized interest in protecting consumers from deception. *See* Committee Report at 6. For one thing, the Act does not give consumers any *meaningful* information. *R.J. Reynolds*, 696 F.3d at 1216 (holding unlawful FDA warning-label requirements that did "not convey *any* warning information at all"). Independent of the original-price disclosure, the Act requires ticket-resale marketplaces to disclose the information relevant to purchasers: the total all-in price the buyer will pay. D.C. Code § 28-5502. And fully disclosed prices—even if they are high—are not deceptive. That was the Federal Trade Commission's conclusion in determining that price disclosures, not price caps, were sufficient to protect consumers from unfair and deceptive practices in live-event tickets. *See* 90 Fed. Reg. at 2092. So disclosing the original price would have "no discernable impact." *Int'l Dairy Foods Ass'n* v. *Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996). Indeed, the Committee's own report indicates (at 5) that disclosing the original price would not provide meaningful information because tickets are often initially priced well below their value for a variety of reasons. Thus, the original-price disclosure would do little more than advance a "purely informational" interest "in 'effective' communication" to the public. *R.J. Reynolds*, 696 F.3d at 1221. But it is "plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information" because "that would be true of any and all disclosure requirements." *Am. Meat Inst.*, 760 F.3d at 31 (Kavanaugh, J., concurring).

Moreover, there are significant practical problems that would prevent the original-price disclosure from serving this interest. As discussed, the original price often will not be known to the secondary marketplaces, and in fact may be indiscernible. *See supra*, at 28-29. And modern dynamic pricing of primary ticket sales could result in actively misleading disclosures. Under

dynamic pricing, two materially identical tickets may have been sold to the original purchaser at very different prices—say, one for $50 and one for $100. A consumer comparing (1) a $60 resale ticket originally bought for $50 with (2) a $70 resale ticket originally bought for $100 could infer that the $70 ticket is the better deal, even though it costs more. A disclosure that can distort rather than clarify the relevant comparison does not directly advance consumer information in a reliable way.

The District's asserted interest in below-market pricing fares no better. To start, the record supplies only "speculation or conjecture" that disclosing the original price would decrease resale prices. *Edenfield*, 507 U.S. at 770. Because the provision first appeared in the Committee's June 2026 markup—eight months after the October 2025 public hearing—the public (including Plaintiffs) had no opportunity to address the point. *See* Ticket Policy Forum Decl. ¶ 17. The Committee Report cited no study or data. *See* Committee Report at 6. And the Act contains no findings. Nor could it have. The one assessment of effectiveness the Council did receive cuts the other way: the Council's own Office of Racial Equity acknowledged that there is "no data on the effectiveness" of comparable price-disclosure laws. *See* Racial Equity Impact Assessment Bill 26-0224 at 4 (Dec. 4, 2025) (Ex. T). Moreover, the Act already *directly* regulates ticket prices, so mandating speech as a tenuous means of enforcing that objective is not permissible. *See 44 Liquormart*, 517 U.S. at 507 (explaining that the state's asserted interest in temperance could have been furthered by "direct regulation" of price "or by increased taxation" rather than speech restrictions). The Act's ability to achieve its price-reducing objective through the original-price disclosure thus faces a "major problem": "it is entirely unproven and rests on pure speculation." *Nat'l Ass'n of Mfrs.* v. *SEC (NAM II)*, 800 F.3d 518, 525 (D.C. Cir. 2015).

Finally, the Act's "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker." *NIFLA*, 585 U.S. at 774 (quotation marks omitted). For example, the First Amendment does not allow a city to prohibit "commercial handbills" to preserve the "safety and attractive appearance" of sidewalks but exempt newspaper stands that are an equal "eyesore." *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 412, 424-25 (1993). Similarly here, the Act exempts tickets to every sporting event organized by a team "in the District." D.C. Code § 28-5501(6). The Council never explained why a consumer considering a $300 *concert* ticket needs the original price but a consumer considering a $300 *sports* ticket in the same arena does not. *See, e.g.*, Sports Fans Coalition Testimony at 1; National Consumers League Testimony at 1-2. To be clear, the Act would have been unlawful even if it applied to all sports and movie tickets. *See supra*, at 33-36. But the Act's underinclusiveness, adopted "without explanation," "demonstrates the disconnect between [its] stated purpose and its actual scope." *NIFLA*, 585 U.S. at 774-75.

**iii. The Act Is Not Sufficiently Tailored To The Asserted Interests**

The original-price disclosure is not sufficiently tailored to serving the District's asserted interests. The government must demonstrate that the regulation is "proportionate to the interests sought to be advanced." *Nat'l Cable & Telecomm. Ass'n* v. *FCC*, 555 F.3d 996, 1002 (D.C. Cir. 2009). The tailoring requirement thus "invalidates regulations for which 'narrower restrictions on expression would serve [the government's] interest as well.'" *Nat'l Ass'n of Mfrs.* v. *SEC (NAM I)*, 748 F.3d 359, 372 (D.C. Cir. 2014), *overruled on other grounds by Am. Meat Inst.*, 760 F.3d at 22-23. The government cannot satisfy the standard if it presents "no evidence that less restrictive means would fail." *Kimberly-Clark Corp.* v. *District of Columbia*, 286 F. Supp. 3d 128, 144 (D.D.C. 2017) (citation modified).

The original-price disclosure goes far beyond any interest in preventing consumer deception because it provides consumers with *no* information, let alone any that would obviate misleading speech. And the disclosure goes far beyond the District's asserted interest in lowering prices for "consumers *in the District*," D.C. Bill 26-0224, pmbl. (emphasis added), because it applies extraterritorially and thus reaches many transactions outside the District, *see supra*, at 15-19.

Here, too, the Act's underinclusiveness prevents it from satisfying the standard. Where a regulation "is so pierced by exemptions and inconsistencies," the government "cannot hope to exonerate" its stated interests. *Greater New Orleans Broad. Ass'n* v. *United States*, 527 U.S. 173, 190 (1999). The Council's unexplained exemption for live sporting events in the District "undermine[s] the asserted justifications" for the statute—both as to pricing and consumer deception. *Id.* at 192. Even if the Act were to bring down prices or prevent deception regarding tickets to concerts or other live events (and it does neither), the Act's carve-outs would leave significant portions of the ticket resale market with the same purported high prices and lack of transparency that the Council bemoaned.

Finally, the District could have achieved its purported end of providing consumers with information through alternatives that would have imposed less burden on speech. For example, the District could have:

- Rested on the Act's *other* provisions requiring disclosure of the total price of the *resold* ticket. *See* D.C. Code § 28-5502. The all-in price was widely identified as the information most relevant to consumers. *See, e.g.*, Kevin Vermillion Testimony at 4 (Ex. U); The Fan Alliance Testimony at 1 (Ex. V).

- Where the original price is knowable, imposed the disclosure obligation on the ticket issuer or primary marketplace—the party that may create and would be best positioned to know and authenticate the original price—rather than compelling a secondary exchange to publish information it may not possess.
- Launched District-run "educational campaigns" to inform consumers of their ability to order directly from venues or ticket issuers. *44 Liquormart*, 517 U.S. at 507 (plurality).
- Required the original price to be embedded in the ticket data when the ticket is issued so that the information is available when a ticket is listed, not merely when it is transferred.
- Provided financial incentives such as funding or tax breaks to secondary-market resale ticket marketplaces that reduce resale prices or disclose initial ticket prices. *See Linmark Assocs., Inc.* v. *Twp. of Willingboro*, 431 U.S. 85, 97 (1977) (noting government could "endeavor to create [financial] inducements" instead of regulating speech).

The Council's failure even to "*consider* whether some alternative might suffice" to achieve its desired ends prevents it from satisfying the "reasonable fit" standard. *Kimberly-Clark*, 286 F. Supp. 3d at 144-45. That failure is underscored by the District's outlier status. Federal law requires the disclosure of the all-in price, and nothing more. *See* 90 Fed. Reg. 2066. And no other State both requires a secondary marketplace to publish the price paid in a transaction to which it was not a party and pegs a fee cap to that price. A mandate that no other jurisdiction has thought necessary cannot be the narrowest means of informing buyers of tickets for events in the District.

### 3. Even If *Zauderer* Applies, The Act Is Unconstitutional

*Zauderer* review is relaxed, but not toothless. The District would bear the burden to show (1) that the disclosure requirement is not "unjustified or unduly burdensome"; (2) that it addresses a harm that is "potentially real, not purely hypothetical"; and (3) that the burden it creates "extend[s] no broader than reasonably necessary." *NIFLA*, 585 U.S. at 776 (citation modified). The District cannot satisfy this standard, for reasons similar to those explained above.

*First*, the original-price disclosure is not aimed at any "real" harm. *NIFLA*, 585 U.S. at 776. "After identifying the governmental interest or objective," a court must "evaluate the effectiveness of the measure in achieving it"; where the efficacy is "unproven," the Act fails under *Zauderer*. *NAM II*, 800 F.3d at 524-25. As discussed above, the District provided no evidence that buyers need the original price or that disclosing it lowers prices; its own equity office reported that none exists. *See supra*, at 35-36. The unexplained sports exemption further undercuts any suggestion that the harm is real. The disclosure mandate thus "remed[ies]" a harm that is, on this record, "purely hypothetical." *NIFLA*, 585 U.S. at 776-77.

*Second*, the disclosure is broader than is "reasonably necessary" to serve the District's purported interests. *NIFLA*, 585 U.S. at 776. A law is overbroad when less burdensome disclosures would still "accomplish [the government's] stated goals." *Am. Beverage Ass'n* v. *City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) (en banc). Consumers already receive the all-in resale price, D.C. Code § 28-5502, and the District had less-burdensome alternatives available that it never showed were inadequate, *see supra*, at 38-39.

## II. Plaintiffs Will Suffer Irreparable Harm

If the Act takes effect on January 1, 2027, without preliminary relief in place, Plaintiffs will suffer several forms of irreparable harm while this litigation is pending.

*First*, a "prospective violation of a constitutional right constitutes irreparable injury." *Karem* v. *Trump*, 960 F.3d 656, 667-68 (D.C. Cir. 2020) (quotation marks omitted). As discussed above, the constitutional violations here are plentiful. The original-price disclosure violates Plaintiffs' First Amendment rights, *see supra*, at 30-40, and the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Pursuing America's Greatness* v. *FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quotation marks omitted). Similarly, the price and fee caps violate Plaintiffs' due process rights, *see supra*, at 24-30, and an imminent due process violation constitutes irreparable injury, *see Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). And the Act violates the dormant Commerce Clause by regulating Plaintiffs' out-of-state transactions for a discriminatory purpose, *see supra*, at 14-24, which also constitutes irreparable harm, *see Ellison*, 140 F.4th at 961-62 (affirming preliminary injunction based on dormant Commerce Clause violation).

*Second*, Plaintiffs will suffer financial harm that cannot be adequately remedied after judgment. The price and fee caps will suppress ticket prices and marketplace fees, and will force Plaintiffs to sell tickets at a loss. Vivid Seats Decl. ¶¶ 16, 26(b); TickPick Decl. ¶¶ 17, 25(c); SeatGeek Decl. ¶¶ 16, 21(c); Gametime Decl. ¶¶ 18, 25(c). A later judgment invalidating the price and fee caps cannot restore transactions forgone or altered while the caps were in force, and quantifying those losses would require reconstructing the prices, transaction volume, and fees that would have been in place absent the price and fee caps. That counterfactual inquiry is "inherently speculative," which "weighs heavily in favor of granting the injunction." *O'Donnell Constr. Co.* v. *District of Columbia*, 963 F.2d 420, 428 (D.C. Cir. 1992).

Plaintiffs must also spend substantial resources now to prepare to build District-specific compliance systems. Their national marketplaces will need different systems and logic not only

for D.C. events but also for covered and exempt events within the District. *E.g.*, Vivid Seats Decl. ¶¶ 25(c), 26(e); SeatGeek Decl. ¶¶ 20(a), 21(b); Gametime Decl. ¶¶ 24(c), 25(b); TickPick Decl. ¶¶ 24(a), 25(b). Back-end engineering alone will take weeks if not months, with additional time for consumer-facing changes. *Id.* The requisite overhaul of Plaintiffs' systems here, and the sunk costs and employee time necessary to do so, are irreparable. *See Ohio* v. *EPA*, 603 U.S. 279, 291 (2024) (citing compliance costs in granting stay); *Cigar Ass'n of Am.* v. *FDA*, 317 F. Supp. 3d 555, 563 (D.D.C. 2018) (finding irreparable harm from unrecoverable costs of "designing and creating new, conforming packaging") (quotation marks omitted); *NetChoice, LLC* v. *Skrmetti*, 2026 WL 2546423, at *6 (6th Cir. Aug. 28, 2026) (similar).

*Third*, the Act threatens lasting harm to Plaintiffs' "reputation" and "customer goodwill." *Beacon Assocs., Inc.* v. *Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (collecting cases) (quotation marks omitted). Because the Act will make many covered transactions unprofitable, Plaintiffs may have to withdraw from the D.C.-ticket market or offer materially less D.C. inventory, causing customers to take their business elsewhere. Vivid Seats Decl. ¶ 26(c); SeatGeek Decl. ¶ 21(d); Gametime Decl. ¶ 25(c), (e); TickPick Decl. ¶¶ 24(a), 25(d). Moreover, Plaintiffs would have to build District-specific disclosures and interfaces—and treat concert and sports tickets differently for events in the District—thereby fragmenting the user experience. SeatGeek Decl. ¶ 21(b); Gametime Decl. ¶ 25(b); Vivid Seats Decl. ¶ 26(e); TickPick Decl. ¶ 25(b). The original-price disclosure also may cause consumers to blame Plaintiffs for the markup between an original price Plaintiffs did not set and a resale price they did not set either. *E.g.*, Vivid Seats Decl. ¶ 26(a); Gametime Decl. ¶ 25(a); TickPick Decl. ¶ 25(a). Those changes threaten trust and repeat business in ways damages cannot readily measure.

*Fourth*, the Act threatens Plaintiffs' established relationships with their business partners. Those long-term partnerships depend on reliable inventory and predictable economics. But the Act will reduce the revenue available for Plaintiffs to share with partners, which likely will prompt some partners to limit D.C. service, renegotiate, or end their relationships. Vivid Seats Decl. ¶¶ 25(b), 26(d); Gametime Decl. ¶ 25(d). Disruption of ongoing contractual and business relationships constitutes irreparable harm where, as here, damages cannot restore the lost relationship or opportunities. *Everglades Harvesting & Hauling, Inc.* v. *Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019); *Beacon*, 308 F. Supp. 3d at 288.

### III. The Balance Of Equities And Public Interest Support An Injunction

When the government is the opposing party, the balance-of-equities and public-interest inquiries "merge." *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). This Court "must 'weigh[] the benefits to [Plaintiffs] from obtaining an injunction against the harms to the government and the public from being enjoined.'" *Media Matters for Am.* v. *Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). Here, that balance tips decisively in Plaintiffs' favor.

Plaintiffs face immediate constitutional, financial, and relationship harms if the Act takes effect. *See supra*, at 41-43. The Act is forcing Plaintiffs to consider whether to leave the D.C.-ticket market entirely, withdraw categories of lower-priced tickets, or reduce their services. The District faces no comparable injury from a temporary injunction. The "'enforcement of an unconstitutional law is always contrary to the public interest.'" *Wilmer Cutler Pickering Hale & Dorr LLP* v. *Exec. Off. of the President*, 784 F. Supp. 3d 127, 173 (D.D.C. 2025) (quoting *Gordon*, 721 F.3d at 653). And the District cannot claim a pressing need to enforce the Act when it has exempted sports events entirely.

The public interest favors preserving the status quo. Secondary ticket marketplaces have served millions of D.C. fans for 25 years. Ticket Policy Forum Decl. ¶ 13. Their exchanges

provide important benefits for performers and the public by providing a liquid market for tickets. But those benefits are lost when governments impose arbitrary price controls that do not reflect true costs and economic realities. Price caps inevitably lead to less competition, less choice, less supply, and more black-market activity. As the Mayor's office warned, the Act "could unintentionally drive more activity to unregulated markets, resulting in higher rates of fraud and greater financial losses for consumers." Mayor's Office Testimony at 3. The public thus has no interest in losing the many benefits of the secondary market, much less regulating transactions occurring outside the District or compelling disclosures of information that is not reasonably knowable or potentially misleading. A preliminary injunction appropriately preserves the status quo while this Court resolves Plaintiffs' claims. The public interest thus squarely favors enjoining the District's flawed experiment with confiscatory price controls, extraterritorial regulation, and compelled speech.

## CONCLUSION

This Court should grant Plaintiffs' motion and preliminarily enjoin the Act.

Dated: October 14, 2026

Respectfully submitted,

/s/ *Lucas C. Townsend*
Lucas C. Townsend (D.C. Bar No. 1000024)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
Morgan L. Ratner (D.C. Bar No. 1026987)
(admission application forthcoming)
Aaron M. Smith (D.C. Bar No. 888314520)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
LTownsend@gibsondunn.com
JLipshutz@gibsondunn.com
MRatner@gibsondunn.com
ASmith3@gibsondunn.com

Michael Holecek (*pro hac vice* forthcoming)
Jonathan N. Soleimani (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7761
MHolecek@gibsondunn.com
JSoleimani@gibsondunn.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Civil Rule 7(m), counsel for Plaintiffs states that this motion is filed concurrently with Plaintiffs' complaint that it was not possible timely to identify counsel for Defendant to meet and confer. Plaintiffs have contacted the Office of the Attorney General at oagserviceofprocess@dc.gov to request a meet-and-confer regarding this motion.

*/s/ Lucas C. Townsend*
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 14, 2026, the foregoing was filed with the Court's electronic filing system, which will send electronic notice of this filing to all counsel of record. I further certify that the foregoing brief was emailed to the Office of the Attorney General at oagserviceofprocess@dc.gov, pursuant to the Office of the Attorney General's instructions setting forth the preferred method for serving the District of Columbia.

*/s/ Lucas C. Townsend*
*Attorney for Plaintiffs*