**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TICKET POLICY FORUM, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-03577 |

**DECLARATION OF DAVE ZARAGOZA**

Pursuant to 28 U.S.C. § 1746, I, Dave Zaragoza, declare as follows:

1. I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

2. I am the Chief Financial Officer of Gametime United, Inc. ("Gametime"), where I have been employed since September 2024. I am responsible for Gametime's finance, accounting, and financial planning and analysis functions, including the transaction, revenue, and cost data on which Gametime's financial reporting is based. I am familiar with the effect that the District of Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "Act") will have on Gametime.

**<u>Gametime and its Marketplace</u>**

3. Gametime is a Delaware corporation founded in 2012 and headquartered in San Francisco, California. Gametime is a privately held company, and is a member of the Ticket Policy Forum.

4. Gametime operates a mobile-first online ticket marketplace, accessible through its mobile applications and website. On that marketplace, consumers buy and sell tickets to live events, including concerts, theater, comedy, sports, and other live entertainment held throughout the United States.

5. Gametime operates a single line of business: a ticket marketplace that allows users to buy and sell tickets and related passes for events. As Gametime's Terms of Service state, "[a]s a marketplace, we do not own tickets sold through the Service." In each sale transaction Gametime acts as the agent of the seller: the seller appoints Gametime as its limited payment collection agent solely for the purpose of accepting funds from buyers on the seller's behalf, and a buyer's payment to Gametime is treated as payment made directly to the seller.

6. For tickets listed on Gametime's marketplace, the seller—not Gametime—sets the economics of the listing: "[i]f your ticket sells, you will receive the payout you specify." Sellers range from individual fans reselling a ticket they can no longer use to high-volume professional sellers. Individual sellers are governed by Gametime's Supplemental Fan Seller Terms. Professional sellers who participate in Gametime's point-of-sale seller program must be "approved and qualified," and are additionally governed by a Seller Handbook.

7. Gametime provides a curated marketplace; it does not present every listing, and instead selects listings based on criteria such as seat location, final cost, and uniqueness, so a seller's listing may not appear at all. Gametime's terms permit a seller to list the same tickets on Gametime and on other sites at the same time.

8. Gametime displays all-in prices: the price shown to a fan while browsing includes all mandatory fees, so that the price the fan sees is the price the fan pays at checkout. Gametime adopted all-in pricing before the Federal Trade Commission's Rule on Unfair or Deceptive Fees

required it for live-event tickets nationwide in May 2025. In Gametime's mobile applications, the components of the all-in price, including Gametime's fee, are itemized for the buyer on the listing page and at checkout; on Gametime's website, they are itemized on the listing page and, in certain jurisdictions, at checkout.

9. Gametime's compensation on a transaction is the margin between the payout the seller specified and the all-in price the buyer pays, exclusive of sales tax. Gametime's pricing systems calculate that margin for each transaction according to factors such as the league or event category, the pricing of competing marketplaces for the particular event, the price of the ticket (the margin rate declines as the price rises), and the time remaining before the event. Gametime does not set different margins for different districts, cities, or states, and its compensation on District transactions is calculated in the same way as its compensation everywhere else. Across its marketplace, Gametime's compensation, net of sales tax, refunds, and chargebacks, averages approximately [redacted] of gross merchandise value.

10. When a ticket sells, the seller receives the payout it specified, and Gametime pays individual sellers 48 hours after the event has occurred, provided the seller's payment information is complete; professional sellers may choose among several payment terms (on confirmation, on fulfillment, on the event date, or after the event), and Gametime pays them weekly.

11. Gametime provides valuable services to both ticket sellers and buyers, including:

a. The Gametime Guarantee, which includes On-Time Ticket Delivery (tickets arrive in time for the event and are valid for entry, or Gametime makes it right), Event Cancellation Protection (an automatic full refund if an event is canceled and not rescheduled), and Job Loss Assurance (a full refund to a buyer who loses his or her job before the event);

b. Its Lowest Price Guarantee, under which a fan who finds the same tickets at a lower price elsewhere shortly after purchase receives 110% of the difference, up to $200, in Gametime credit;

c. Secure payment processing through third-party payment processors, anti-fraud measures, and the chargeback exposure Gametime absorbs;

d. Customer service before, during, and after events through its Fan Happiness team and the referral credits Gametime issues to users;

e. Secure mobile ticket delivery directly to the Gametime app, ticket transfer, and last-minute purchasing through LastCall, which allows fans to buy tickets until 90 minutes after an event begins;

f. Gametime Picks and Exclusives, curated recommendations generated by Gametime's value-scoring technology, which evaluates seat location and view, real-time market pricing, and comparable listings to highlight the best-value tickets for each event;

g. Price-drop and new-inventory alerts for the teams and artists a fan chooses to follow in the app;

h. Seller tools, including Gametime Sell, which lets a fan list and sell tickets from the app in a few taps with real-time Price Guidance based on comparable listings, and guaranteed payout 48 hours after the event;

i. Seller onboarding, verification, and ongoing assessment of sellers' delivery reliability and listing accuracy, which protects buyers from fraudulent or inaccurate listings;

j. Real-time integrations with professional sellers' inventory systems, which give fans access to inventory for more than 120,000 events and give sellers distribution to Gametime's buyers; and

k. Advertising and marketing that generates buyer demand for sellers' listings.

12. All sales on Gametime are final: except for canceled events, or as noted in Gametime's refund program, a buyer does not receive a refund for a completed purchase and cannot change or cancel an order after the sale is complete. Where Gametime cannot provide the tickets ordered because of a seller error, Gametime first seeks comparable replacements; if none can be found, it offers the buyer the choice of a full refund by the original payment method or a Gametime credit equal to 110% of the purchase price. Where a seller cannot fulfill an order, Gametime treats the sale as a "Broken Order" and may charge the seller an amount equal to or greater than 100% of the order value plus the cost of replacement tickets.

**<u>Gametime's Business Involving District of Columbia Events</u>**

13. Gametime operates an electronic marketplace that enables individuals to sell, purchase, and resell tickets. It therefore appears to qualify as a "secondary ticket exchange" within the meaning of the Act. § 28-5501(4). Over the preceding 365 days ending September 16, 2026, Gametime facilitated the sale of approximately [redacted] tickets to events in the District, representing approximately [redacted] in gross sales (including sales tax). Of those, approximately [redacted] tickets and [redacted] in sales were for events other than sporting events, the category of District events the Act reaches.

14. Of tickets to District events other than sporting events sold in the preceding 365 days ending September 16, 2026, 0.02% involved a seller and a buyer both located in the District; 0.13% involved a seller in the District and a buyer outside it; 13.71% involved a seller outside the

District and a buyer in the District; and 86.14% involved a seller and a buyer both located outside the District. Gametime infers a person's location from transaction records rather than asking users directly: buyers by billing address or, failing that, purchase-time IP geolocation, and sellers by the state on their payout-account address used for 1099 reporting or, failing that, the billing address from their earlier purchase of the resold tickets. Gametime processes orders on its marketplace using systems hosted through servers located in the western United States.

**<u>The Fee Cap Is Incompatible With Gametime's Model</u>**

15. The Act provides that a reseller or secondary ticket exchange "shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket." § 28-5506(b). The Act allows a secondary ticket exchange to charge "a fee for the service of providing a marketplace," but that fee "shall not exceed 10%" of the initial ticket price, including fees and taxes. § 28-5506(c). These provisions would harm Gametime and require it to change its business model in several ways.

16. First, Gametime generally cannot identify the "total price of the initial ticket." If the "initial" price means the price at which the ticket issuer first sold the ticket, that figure is generally unknowable to Gametime and becomes more remote with each transfer: tickets are often resold several times before they reach Gametime's marketplace, and if accurate price information is not passed along at any point in that chain, it is not available to Gametime at all. For many tickets, the figure does not exist as a single number. Primary sellers and teams price dynamically, so two buyers of seats in the same section and row for the same event may pay different amounts depending on when, and through what channel, they bought. Season tickets and partial plans are sold at a single price for many games, and the per-game allocation—which may bear little

resemblance to any individual game's price—is rarely disclosed. Group tickets are sold at negotiated discounts that differ from published prices and are often confidential. Suite contracts bundle tickets with catering, parking, and hospitality, making the ticket's value impossible to isolate. And tickets that were gifted, won, or distributed as promotions have no purchase price at all.

17. Second, Gametime's compensation is determined by reference to the resale transaction that Gametime actually facilitates, not by reference to the initial ticket price. Whenever a ticket resells for more than its initial price, compensation at Gametime's ordinary rate will exceed 10% of the initial price and will violate the cap—without Gametime having changed its rate. A representative example illustrates the point. For a ticket with an initial all-in price of $100 that a seller lists for a $200 payout, Gametime's standard pricing logic—a [redacted]—produces an all-in buyer price of approximately [redacted], of which approximately [redacted] is Gametime's compensation, or about [redacted] of the price the buyer pays. Section 28-5506(c) would permit Gametime to earn no more than $10 on that transaction, and § 28-5506(b) would prohibit the sale altogether, because the seller's $200 price exceeds the $110 ceiling. In Ontario, which has imposed resale price restrictions of its own, Gametime already declines to list any ticket whose seller payout alone exceeds the statutory ceiling, because it cannot earn any compensation on the ticket without exceeding the cap; it would have to do the same for District events.

18. Relatedly, a fee capped at 10% of the initial ticket price would not cover Gametime's cost of operating its marketplace in the District. Gametime's direct costs of servicing a sale—payment processing, fraud-technology costs, server expenses, league fees, and the cost of its service teams—are only part of the cost of running the marketplace. Gametime must also employ the engineers, product managers, marketers, and other personnel who build and operate

the platform, and must spend on marketing to generate the order volume that sustains it. Taking all of those costs into account, Gametime's total profit margin is approximately [redacted], or roughly [redacted] of gross sales. On any ticket that resells at or above its initial price, a fee capped at 10% of the initial price is at most 10% of the sale price. On those sales, the cap would therefore cut Gametime's compensation from approximately [redacted] of the sale price to no more than 10%. That reduction of [redacted] Gametime's entire profit margin of roughly [redacted]. Gametime would therefore have to operate its District business at a loss, and would have a strong incentive to stop serving the District events that the Act covers altogether.

19. Section 28-5506(c) caps "a fee for the service of providing a marketplace" at 10% of the initial ticket price. Gametime's pricing systems calculate the buyer-side and seller-side components of its compensation on each transaction. So while Gametime can identify the amount the provision regulates, it cannot identify the figure against which that amount must be measured—10% of an initial price it does not know.

**The Compelled "Original Purchase Price" Disclosure**

20. Gametime's Terms of Service state that ticket prices may exceed the face value of the ticket, and that while Gametime may provide pricing and listing guidance, such guidance is solely informational and without warranty as to accuracy. Gametime further disclaims any guarantee of "the truth or accuracy of the User's content or listings." Gametime requires a seller to provide accurate listing information, including the event description, date, section, row, and seat. But, except where a jurisdiction's law requires it, Gametime does not require the seller to self report what the seller paid for the ticket.

21. A resale ticket may be priced at, above, or below the price at which it was originally sold. Gametime does not possess the "original purchase price, including all fees and taxes," for the tickets listed on its marketplace. For approximately [redacted] of Gametime's District sales over the preceding 365 days ending September 16, 2026, the supplier transmitted a "face value" figure through its inventory integration, but that figure is the supplier's own report and it cannot be verified by Gametime, which was not a party to the initial sale. For the remaining [redacted] of District sales, Gametime has no original-price information of any kind.

22. More than 99% of the tickets sold on Gametime are delivered from seller to buyer without passing through Gametime's systems, so even where a price appears on the ticket itself, Gametime never sees it. Yet the Act requires Gametime to disclose the "original purchase price," including all fees and taxes, for a ticket to be listed. § 28-5506(a)(2). In jurisdictions that already require disclosing some form of an original purchase price, such as New York and Ontario, Gametime displays at checkout the figure the seller supplied; in every case, that figure is the seller's own report, and Gametime has no means of verifying it.

**<u>The Verification Requirement</u>**

23. Section 28-5506(a)(1) requires Gametime to verify, before any listing, that the seller meets the licensing and bonding requirements of § 47-2890.02—which attach at 50 listings per year counted across every platform on which a seller lists. Gametime's own terms expressly contemplate that a seller may list the same tickets on Gametime and on other sites simultaneously, which makes the cross-platform count both more likely to be triggered and impossible for Gametime to compute from its own records. Gametime cannot feasibly comply with this provision. It can count the listings a seller posts on Gametime—in the 365 days ending September 16, 2026, [redacted] sellers posted 50 or more listings on Gametime for District events other than

sporting events—but it has no means of independently verifying whether a seller has crossed the 50-listing threshold because the Act counts listings across every platform, professional sellers list the same inventory on several marketplaces as a matter of course, and Gametime has no access to other platforms' data.

**The Act Will Irreparably Harm Gametime**

24. The Act applies as of January 1, 2027, but will harm Gametime before that date. For example:

a. Gametime is making its 2027 marketing, product, and staffing plans now. If the Act applies, it would reduce Gametime's overall District volume and the margin Gametime earns on the volume it retains, so Gametime expects to cut its marketing spend in the District significantly, because that spend would no longer be economical at the margins the Act permits. It would also have to redirect product and engineering resources to compliance—including audit and enforcement work—and consider hiring for those functions. Between October 2025 and September 2026, Gametime spent approximately [redacted] on marketing in the Washington, D.C. designated market area. Compliance would also require Gametime to dedicate [redacted].

b. Gametime would have to amend its seller agreements and Seller Handbook to impose the Act's requirements on sellers of District inventory and roll those changes out to its existing sellers.

c. To comply by January 1, 2027, Gametime would have to rebuild its pricing and curation models for District events other than sports; change the customer experience in its applications for those events; build a system to compile and report transaction-level data to the Department; establish a process for auditing and spot-checking listings for compliance; and revise its marketing. Gametime estimates that this work would require approximately [redacted] engineering and product hours and would have to begin as soon as possible to be complete by January 1, 2027. Because Gametime would have to redirect existing engineering and product resources on short notice, the work would displace planned work on its supply, pricing, and checkout systems and on core e-commerce growth and supply-foundation projects.

25. The Act will also cause Gametime irreparable harm once it applies on January 1, 2027. For example:

a. Gametime will be compelled to publish an “original purchase price” that it does not possess for most tickets and cannot verify for any, depriving it of its right not to speak, and risking that buyers attribute to Gametime the difference between a disclosed original price and a third-party seller’s resale price.

b. Gametime will be forced to operate separate pricing, curation, and disclosure logic not only for District and non-District events but also for sports and non-sports events within the District, because the Act exempts sporting events organized by District teams while reaching concerts, theater, comedy, and other live entertainment; because sporting events make up the large majority of Gametime’s District business, the carve-out would leave most of that business operating on the

same terms as everywhere else while subjecting the remainder to a separate compliance regime. Doing so will cause technical compliance issues and customer confusion that will harm goodwill.

c. Gametime expects to lose significant sales and market share in the District, and, because the capped fee would not cover its cost of doing business, may cease serving District events that the Act covers altogether. Its experience in Ontario, which recently imposed resale price restrictions of its own, is instructive: after those restrictions took effect, Gametime's market share for core teams such as the Toronto Blue Jays fell by approximately [redacted], and the inventory available for sale on its marketplace for Ontario events fell by approximately [redacted].

d. Gametime expects professional sellers to shift their capital out of the District market, reducing the supply of tickets available to District fans and raising prices on many events. Based on its experience in the industry, Gametime also anticipates that promoters, who follow the economics of a market, may route some shows to nearby venues in Maryland and Virginia, such as MGM National Harbor or Capital One Hall in Tysons, rather than District venues such as The Anthem. Supply that leaves Gametime's District marketplace would return slowly, if at all, were the Act later invalidated, and sellers that returned would likely demand new protections against future disruptions.

e. Cutting marketing in the District would cost Gametime its relationships with non-sports fans in the Washington area, including fans who use Gametime to buy tickets for events outside the District, and a fan who opens Gametime for a District event and finds little or no inventory is likely to conclude that the marketplace is

unreliable and to take her business elsewhere, for District and non-District events alike. Those relationships, once lost, are not easily rebuilt.

26. This Declaration includes confidential and competitively sensitive information. That information includes Gametime's transaction volume and revenue for District events, its fees, its margin rates, its costs of servicing transactions, and its estimates of compliance costs and expected revenue losses under the Act. Gametime does not disclose this information publicly, and it has not appeared in any public filing. Gametime shares it outside the company, if at all, only subject to confidentiality obligations. Moreover, Gametime operates in a highly competitive market. Several marketplaces compete for the same potential ticket buyers, and often for the same tickets, because professional sellers routinely list identical inventory on multiple marketplaces at once. Buyers compare all-in prices across marketplaces, and small differences in fees can determine where a sale occurs. If the information in this declaration were made public, competitors could use Gametime's margins, pricing inputs, and cost structure to set their own prices just below Gametime's. Competitors could also use Gametime's transaction data to gauge the size and composition of its District business and to target its customers and sellers. Sellers and business partners could likewise use Gametime's cost and margin information to demand higher payouts or more favorable terms in negotiations with Gametime. Once disclosed, this information could not be made confidential again, and the resulting competitive harm could not be undone. For these reasons, Gametime has asked that this information be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 13, 2026
Summit, New Jersey

Signed by:
Dave Zaragoza
7C168E223CA94D4...
Dave Zaragoza