**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TICKET POLICY FORUM, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-03577 |

**DECLARATION OF JOHN BRADFORD TACY**

Pursuant to 28 U.S.C. § 1746, I, John Bradford Tacy, declare as follows:

1. I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

2. I am the Chief Financial Officer of SeatGeek, Inc. ("SeatGeek"), where I have been employed since 2015. I am responsible for overseeing the company's financial resources, including oversight and analysis of SeatGeek's strategic investments and partnerships. I am familiar with the effect that the District of Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "Act") will have on SeatGeek.

**<u>SeatGeek and its Marketplace</u>**

3. SeatGeek is a Delaware corporation founded in 2009. Its principal offices are at 902 Broadway, Floor 10, New York, New York. SeatGeek is a privately held company, and is a member of the Ticket Policy Forum.

4. SeatGeek operates an online ticket marketplace, accessible through its website and mobile applications. On that marketplace, consumers buy and sell tickets to live events,

including concerts, theater, comedy, sports, and other live entertainment held throughout the United States.

5. SeatGeek operates two complementary lines of business. First, SeatGeek serves as the primary ticketing partner for certain teams, leagues, venues, and other organizers, each of which SeatGeek may refer to as an "Event Partner." Within the District of Columbia, SeatGeek does not currently serve as the primary ticketing partner for any events covered by the Act.

6. Second, SeatGeek operates an online secondary ticket marketplace that connects buyers with resellers, including other fans, season ticket holders, and professional resellers. For tickets listed by third-party resellers on SeatGeek's secondary marketplace, the reseller sets the price. Resellers range from individual fans reselling a ticket they can no longer use to professional resellers listing in volume. Resellers must satisfy eligibility requirements and are governed by SeatGeek's Supplemental Terms for Sellers. SeatGeek separately designates certain professional sellers as participants in its "Seller Direct Program," which is governed by separate seller terms. An individual fan reseller who opts into SeatGeek's "Smart Pricing" feature may have SeatGeek price the reseller's tickets according to parameters the reseller selects. An individual fan reseller may not list a ticket on another marketplace or channel while that same ticket is listed on SeatGeek. Professional sellers, by contrast, routinely list the same inventory across multiple marketplaces simultaneously through third-party inventory-management services, which remove a ticket from the other marketplaces when it sells on one.

7. SeatGeek displays the total price a buyer will pay, including all mandatory fees, before the buyer completes a purchase. This practice is consistent with the Federal Trade Commission's Rule on Unfair or Deceptive Fees, which has required all-in upfront pricing for live-event tickets nationwide since May 2025. On its secondary marketplace, SeatGeek charges

two fees. A buyer fee is charged to the purchaser. The buyer fee is added to the listing price, and the resulting all-in price is what a buyer sees. A seller fee is deducted from the seller's payout. SeatGeek does not charge an additional fulfillment fee on secondary transactions. A delivery fee is charged only for the rare physical tickets that must be shipped, at the actual cost of shipping.

8. When a ticket is sold on SeatGeek's secondary marketplace, the reseller receives a payout equal to the sale proceeds less the fees, charges, and other amounts due to SeatGeek.

9. SeatGeek provides valuable services to ticket sellers and buyers alike, including:

a. Its Buyer Guarantee, which protects buyers by guaranteeing the delivery of each ticket ordered, and if something goes wrong, a comparable ticket or a refund;

b. Its Deal Score technology, which provides algorithmic guidance regarding seat quality, value, and price;

c. Secure payment processing through third-party payment processors;

d. Seller monitoring and review which protects buyers from fraudulent listings and protects legitimate sellers from competing against them;

e. Absorption of buyer-side fraud and chargeback losses, which SeatGeek bears rather than passing to the seller;

f. Customer service for both sellers and buyers before, during, and after events, including a dedicated team of customer-support specialists who are available every day of the year to help resolve problems with ticket deliveries, assist fans who encounter problems gaining entry at the venue, locate replacement tickets at no cost to the buyer when a seller fails to

deliver, and provide disability-related assistance with buying and selling tickets;

g. Advertising and marketing that generates buyer demand for sellers' listings;

h. Distribution of a seller's listing across SeatGeek's properties and distribution partners, which exposes a single listing to buyers that sellers could not reach individually;

i. Curating images of the view from seats, and collecting and publishing reviews of seats to better inform buyers of their seat experience;

j. Account credits and promotional codes that SeatGeek issues to buyers; and

k. Secure electronic ticket delivery and transfer.

10. SeatGeek stands behind the tickets sold on its marketplace. Where an event is canceled and not rescheduled, the buyer is protected by the Buyer Guarantee. Where a reseller fails to deliver, delivers late, or delivers tickets that do not match the listing description, SeatGeek may cancel the order, withhold the reseller's payout, and charge the reseller for the cost of replacement tickets or other amounts required to compensate the buyer.

**SeatGeek's Business Involving District of Columbia Events**

11. SeatGeek operates an electronic marketplace that enables persons to sell, purchase, and resell tickets. It therefore appears to be a "secondary ticket exchange" within the meaning of the Act. § 28-5501(4). SeatGeek also issues tickets for initial sale as the ticketing partner for its Event Partners, and, to the extent SeatGeek serves as a primary ticketing provider for events covered by the Act, which today it does not, it would appear to be a "ticket issuer"

within the meaning of the Act as well. § 28-5501(7). In the twelve months from September 2025 through August 2026, SeatGeek's secondary marketplace processed approximately [redacted] orders, comprising approximately [redacted] tickets, for non-sports events in the District, with a total order value of approximately [redacted].

12. Of the number of tickets to D.C. events sold in the last twelve months (September 2025 through August 2026), 0.4% involved a seller and a buyer in D.C.; 2.6% involved a seller in D.C. and a buyer outside of D.C.; 9.6% involved a seller outside of D.C. and a buyer in D.C.; and 87.4% involved both a seller and buyer outside of D.C. SeatGeek determines a person's location by certain inputs such as IP address and billing address. SeatGeek processes orders on its secondary marketplace using systems in its New York office and through servers located in Virginia.

**The Fee Cap Is Incompatible With SeatGeek's Model**

13. The Act provides that a reseller or secondary ticket exchange "shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket, including all fees and taxes in connection with the initial ticket." § 28-5506(b). The Act allows a secondary ticket exchange to charge "a fee for the service of providing a marketplace," but that fee "shall not exceed 10%" of the initial ticket price, including fees and taxes. § 28-5506(c). These provisions would harm SeatGeek and require it to change its business model in several ways.

14. First, SeatGeek generally cannot identify the "total price of the initial ticket." If the "initial" price means the face value of the ticket, that figure does not exist for a significant portion of tickets today. Primary sellers often price dynamically, so the amount paid depends on

when and through what channel the ticket was bought. And because tickets are electronic, no price is printed on the ticket itself. Where SeatGeek is facilitating resales on its secondary marketplace, it has no systematic means of learning what a ticket was originally purchased for, because primary ticketing platforms do not make that information available to secondary marketplaces. And the Act demands more than the original price: it requires the fees and taxes paid in connection with the initial purchase, which vary with the purchaser, the channel, and the location, and which even a seller who knows what it paid may be unable to itemize.

15. Second, Section 28-5506(c) caps "a fee for the service of providing a marketplace" at 10% of the initial ticket price. SeatGeek's fees are calculated by reference to the resale transaction that SeatGeek actually facilitates, not by reference to the initial ticket price. Whenever a ticket resells for more than its initial price, a fee charged at SeatGeek's ordinary rate will exceed 10% of the initial price and will violate the cap—without SeatGeek having changed its rate. For example, consider a ticket with an initial price of $80 that a seller lists at $160. Today, SeatGeek adds a buy fee of approximately [redacted] ([redacted] of the $160 listing price), so the buyer pays approximately [redacted]. Under the Act, the seller could list the ticket for no more than $88, and SeatGeek could charge a service fee of no more than $8.00—10% of the $80 initial price.

16. Relatedly, the cap generally will not permit SeatGeek to recoup the costs of servicing a transaction, and would leave SeatGeek operating at a loss on many tickets. SeatGeek's costs of servicing a non-sports District transaction include payment processing (approximately [redacted] of the amount the buyer pays), chargebacks and fraud (approximately [redacted]), discounts and promotional credits (approximately [redacted]), and refunds and replacement tickets net of recoveries from sellers (approximately [redacted]). SeatGeek also incurs

additional costs for those same transactions for customer-support labor (approximately [redacted]), hosting (approximately [redacted]), and customer-acquisition costs, including team sponsorship obligations and other marketing spend (approximately [redacted]). As a result, the cap produces a loss on every covered ticket with an initial price below approximately [redacted], and leaves only a thin margin above that threshold. For example, on the $80 ticket discussed above, SeatGeek would earn $8 in buyer-side fees, [redacted] in seller-side revenue, and incur approximately [redacted] in costs—a loss of approximately [redacted] on the transaction.

**<u>The Compelled "Original Purchase Price" Disclosure</u>**

17. A resale ticket may be priced at, above, or below the original price of a ticket. SeatGeek can supply the original price only where it has that information, either from its own records as the ticketing partner for the original sale, or from the reseller. Resellers also do not know the original price of a ticket, or the fees and taxes associated with the original price of that ticket, if they did not purchase the primary ticket. Where the reseller has access to this information and supplies it, SeatGeek cannot verify it because SeatGeek was not a party to the initial transaction. Yet, the Act requires SeatGeek to disclose the "original purchase price," including all fees and taxes, for a ticket to be listed. § 28-5506(a)(2).

**<u>The Verification Requirement</u>**

18. Section 28-5506(a)(1) requires SeatGeek to verify, before any listing, that the seller meets the licensing and bonding requirements of § 47-2890.02—which attach at 50 listings per year. A license is required of a reseller that posts 50 or more resale listings in a year, counting listings on every platform; and a separate $25,000 surety bond is required of a reseller that lists 50 or more tickets in a year. § 47-2890.02.

19. SeatGeek cannot feasibly comply with this provision. SeatGeek has no means of independently verifying whether a seller has crossed the 50-listing threshold. The Act counts a ticket listed on several platforms as several listings, professional sellers cross-list as a matter of course through inventory-management services, and SeatGeek has no access to other platforms' data.

**The Act Will Irreparably Harm SeatGeek**

20. The Act applies as of January 1, 2027. If the Act is not enjoined by then, SeatGeek will suffer a series of irreparable harms both preparing for implementation and after the effective date while this case is litigated. That will include substantial compliance costs, lost revenues, harm to consumer goodwill, harm to its business relationships, and the deprivation of constitutional rights. For example:

a. To comply with the price and fee caps alone, SeatGeek estimates that it would need [redacted]. A price cap based on the total price of the initial ticket, including all fees and taxes, cannot be implemented with SeatGeek's existing systems. It would require building a new rules engine from scratch that reads the initial ticket price—from whatever source it can be obtained—together with the event location, type of event, and the applicable cap, and then blocks or hides listings that exceed it. Two separate processes will have to be built for both fan and professional sellers. Much of that information would have to come from integrations with primary ticketing providers that, to date, have not been interested in providing any such integration. Even assuming primary ticketing providers would agree to integrations to provide the initial ticket price, those integrations do not exist today and would also have to

be built. Before SeatGeek could even begin this process, SeatGeek would have to depend on the primary ticketing provider to build its end of the integration over which SeatGeek has no control. Extending the engine to fees would add further complexity, depending on how fees are incorporated into the pricing flow, and how fees on in-District and out-of-District transactions are to be treated.

b. Complying with the licensing requirement would be harder still. It would require marketplaces to share listing data with one another and to monitor each seller's cumulative listings on an ongoing basis—arrangements that do not exist, in part because secondary marketplaces are competitors. Even if such arrangements could be created, SeatGeek estimates it will require [redacted] to build a process for sellers to submit license and bond documentation, and to reconfigure its own and its sellers' systems to permit document transmittal (which they do not permit today). Even after doing so, SeatGeek would still need to attempt to build an automated means of reviewing those documents and recording the results, and train its support staff on a requirement that, to SeatGeek's knowledge, no other jurisdiction imposes.

c. Expending time and resources to comply with the Act would divert finite company resources and delay product work that is beneficial to its users, including [redacted].

21. The Act will also cause SeatGeek irreparable harm once it applies on January 1, 2027. For example:

a. SeatGeek will be forced to disclose information that it cannot verify is accurate, such as the initial ticket price, putting SeatGeek in the position of sharing imperfect information, potentially causing confusion or mistrust with its users.

b. SeatGeek will be forced to adopt different procedures not only for transactions in D.C. and outside of D.C., but also for different types of events within D.C. because of the statutory carve-out for certain sporting events organized by District-based teams and athletic associations. Doing so will cause technical compliance issues and customer confusion that will harm goodwill.

c. SeatGeek will lose substantial revenue—[redacted]—because of the cap on sellers' listing prices and the cap on SeatGeek's service fees.

d. SeatGeek expects that professional sellers unable to earn a profit on District inventory likely will leave the District market. SeatGeek's relationships with its District customers would be harmed as professional sellers leave. With little or no inventory available on marketplaces that offer buyer guarantees and customer support, consumers would turn to riskier channels, such as social-media marketplaces and classified listings, that offer neither. Customers who have negative experiences in those channels are likely to attribute them to the resale market as a whole, and SeatGeek would struggle to regain those customers even if the Act were later invalidated.

e. Because SeatGeek also operates as a primary ticketing provider, the Act would impair its ability to compete for primary-ticketing business in the District. Teams and venues generally contract with a single primary ticketer for the exclusive right to ticket their events, including concerts and other non-team events, for terms of five to seven years, so opportunities to win or retain that business arise infrequently. When SeatGeek decides whether to pursue a primary partnership, and on what terms, it accounts for the resale revenue it expects the partnership to generate—directly, from resale of the partner's own tickets, and indirectly, because a primary partnership anchors SeatGeek's presence in a market and leads fans to list and buy tickets to other events there. The Act would reduce both. The commercial terms SeatGeek could offer a District venue or team would therefore be significantly less favorable than before the Act, and SeatGeek would face the choice of declining to compete for that business or competing at a disadvantage. By reducing the ability of companies such as SeatGeek to compete for these primary ticketing partnerships, I believe this law will further entrench existing primary ticketing providers in the District.

22. This Declaration includes confidential and competitively sensitive information. That information includes SeatGeek's transaction volume and revenue for District events, its fees, its margin rates, its costs of servicing transactions, and its estimates of compliance costs and expected revenue losses under the Act. SeatGeek does not disclose this information publicly, and it has not appeared in any public filing. SeatGeek shares it outside the company, if at all,

only subject to confidentiality obligations. Moreover, SeatGeek operates in a highly competitive market. Several marketplaces compete for the same potential ticket buyers, and often for the same tickets, because professional sellers routinely list identical inventory on multiple marketplaces at once. Buyers compare all-in prices across marketplaces, and small differences in fees can determine where a sale occurs. If the information in this declaration were made public, competitors could use SeatGeek's margins, pricing inputs, and cost structure to set their own prices just below SeatGeek's. Competitors could also use SeatGeek's transaction data to gauge the size and composition of its District business and to target its customers and sellers. Sellers and business partners could likewise use SeatGeek's cost and margin information to demand higher payouts or more favorable terms in negotiations with SeatGeek. Once disclosed, this information could not be made confidential again, and the resulting competitive harm could not be undone. For these reasons, SeatGeek has asked that this information be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 13, 2026
New York, NY

DocuSigned by:
13512EC4E9274D8...
_______________________
John Bradford Tacy