**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TICKET POLICY FORUM INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-03577 |

**DECLARATION OF BRIAN BERRY**

Pursuant to 28 U.S.C. § 1746, I, Brian Berry, declare as follows:

1. I am over the age of eighteen and submit this Declaration from personal knowledge and based on information I have reviewed or that is referenced herein, including records of the Ticket Policy Forum, Inc. ("TPF") and the public legislative record of the Council of the District of Columbia (the "Council").

2. I am TPF's Executive Director, a position I have held since TPF's founding in 2025. I direct TPF's strategy and operations and oversee its advocacy before Congress, federal agencies, state legislatures, and local governments. I have worked in live-event ticketing and consumer policy for more than a decade. In my role, I am familiar with TPF's organizational purposes and membership, with how TPF's members operate, and with the impact that the District of Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026, D.C. Act 26-410, 73 D.C. Reg. 11351 (Aug. 14, 2026) (the "Act"), will have on TPF and its members.

**The Ticket Policy Forum**

3. TPF is a nonprofit 501(c)(6) trade association that is headquartered in Washington, D.C. TPF represents the nation's leading online ticket marketplaces. Its members are SeatGeek, Vivid Seats, TickPick, Gametime, StubHub, and Event Tickets Center. Each member pays dues that fund TPF's operations and participates in setting the positions TPF advances on its behalf.

4. TPF was founded to advocate for its members, protect fans, and promote real competition in ticketing. Since TPF's founding in 2025, I or another member of our staff has testified or submitted written positions regarding ticket-resale legislation before the United States Senate Committee on Commerce, Science, and Transportation and before numerous state legislatures and regulators in the United States and Canada, including my own testimony before the Council and the U.S. Senate. TPF has consistently advanced the positions it takes here: that the secondary resale market offers real value to fans and the live-event ecosystem, and that market competition should be protected and fostered; that ticketholders should be free to resell tickets they have purchased at prices they choose; that price controls on resale do not lower prices at the box office and instead push resale into unregulated channels where fraud thrives; and that consumer protections should apply equally to primary and secondary ticket sellers.

**TPF's Members and Their Marketplaces**

5. Each TPF member operates an online secondary marketplace, accessible through websites and mobile applications. On these marketplaces, fans and other ticketholders can resell tickets to live events across the United States, and other fans can purchase those tickets. Several members also compete directly with Ticketmaster in primary ticketing: SeatGeek serves as the primary ticketing provider for certain venues and teams, StubHub offers direct issuance and open distribution for ticket issuers and venues, and TickPick offers a primary ticketing product for smaller venues and festivals.

6. Members compete vigorously with one another for both buyers and sellers, and each has a different business model and fee structure. Members SeatGeek, Vivid Seats, TickPick, and Gametime, which are also Plaintiffs in this lawsuit, have simultaneously filed declarations that describe their businesses in detail. TPF's two other members, StubHub and Event Tickets Center, are not Plaintiffs, but the Act's requirements apply to them in the same way. I discuss here what is common to the members and necessary to understand the Act's effect on TPF and its members more broadly.

7. Secondary ticket marketplaces play a critical role in the financial success of live events: by matching ticket supply with fan demand, they help ensure that no ticket or seat goes to waste. Sellers ranging from individual fans to professional brokers may use members' marketplaces to resell tickets. Sellers, not TPF members, set the asking price (base price) for their tickets. And buyers decide whether they are willing to pay that price. For example, fans who were shut out of the initial sale can still attend by purchasing resale tickets on members' platforms. Because tickets expire, resale prices for events that do not sell out—and Live Nation, Ticketmaster's parent, has disclosed that only 2% of its shows sell out—tend to go down in price as the event approaches and ticketholders become more motivated to sell rather than take a full loss on tickets they cannot use. As a result, fans purchase tickets for less than the original price every day.

8. Members offer secure online experiences by providing valuable services to sellers and buyers on their platforms. For example, members invest in secure payment-processing systems, provide fraud-prevention protections, and offer customer support and guarantees to buyers that ensure they either get valid tickets or their money back. These services distinguish

members' secondary marketplaces from ticket resales that occur in person or in unregulated online spaces.

9. To cover the costs of those services, members earn revenue through fair-market service fees charged on transactions completed on their marketplaces. Members set their own service fees, and each member's specific fee structure varies. As the Plaintiff members describe in their declarations, their fees in the ordinary course range from approximately [redacted] of the sale price. Because the Act caps a marketplace's fee at 10% of the *initial* ticket price, members' ordinary fees exceed what the Act would permit on any ticket that resells at or above its initial price, and the gap widens the further the resale price exceeds it. The cap bites especially hard on inexpensive tickets: on a ticket with an initial price of $20 (and many tickets sell for less), the Act would cap the marketplace's entire fee at $2.

10. For tickets listed on their secondary marketplaces, and consistent with the Federal Trade Commission's rule requiring total, upfront pricing for live-event tickets, TPF members disclose the total order amount—the seller's price, all service and delivery fees, and applicable taxes—before the buyer completes an order. But members do not disclose the price at which a ticket was originally sold. Members do not have that number and, in the ordinary case, cannot obtain it. With limited exceptions, members are not parties to the initial sale of any ticket. Members have no access to the ticket issuer's sales records. Although members can ask sellers to state what they paid, a marketplace cannot realistically check that self-reported figure against the issuer's records to confirm its accuracy. Confirming an original purchase price would instead require interoperability between primary and secondary ticketing systems, and original ticket data to travel with the ticket as it is bought and resold, so that the issuer's system transmits the original price and fee structure to the marketplace. Interoperability of that kind generally is not available

for the events the Act covers. In many cases a ticket can be transferred only through the issuer's proprietary system, which does not disclose the original purchase price or fee structure to third parties, and Ticketmaster, the dominant primary ticketing company for concerts and other live entertainment, does not make that data available to other marketplaces.

11. Moreover, tickets themselves typically do not identify an initial sale price. Today, tickets are almost always digital and carry no printed original price or "face value." Indeed, "face value" has become an obsolete term since the advent of dynamic pricing in primary ticketing, under which ticket issuers such as Ticketmaster adjust ticket prices regularly based on demand and a variety of other factors. Because a given seat's price changes over time, the Act can cap the resale of a ticket at a static amount (10% above what the first buyer paid) even while the issuer continues to sell comparable tickets at a higher price. And because the Act's obligations attach when a ticket is offered for resale, the ticket often is not even in the seller's hands at the relevant time: members report that, in the District, tickets to many events are not delivered to the purchaser until hours before the event, weeks or months after the fan bought them and after most resale listings are posted. Delayed delivery has become increasingly common in primary ticketing, particularly for Ticketmaster-ticketed events. TPF believes tickets should be delivered shortly after purchase.

12. Nor, for many tickets, is there a single initial price at all. Issuers now routinely sell the same seats at different prices, depending on when and under what sales program a ticket is bought: dynamic pricing changes prices in real time as demand rises; "platinum" designations sell an ordinary seat at a multiple of the standard price; presale, fan-club, and promotional pricing vary by sales window and program; package pricing—such as season tickets and subscription series, including theater subscriptions—covers multiple events in a single price, with no stated per-event

price; and complimentary and promotional allocations—such as tickets held back for artists, promoters, and sponsors and given away, or distributed as prizes and promotions—have no purchase price at all.

13. Members have served millions of fans attending District events for more than two decades and have helped to generate significant savings for them.

**TPF's Opposition to the Act**

14. The Act challenged in this lawsuit would force TPF members to change their core business practices in at least two critical respects.

15. First, the Act caps the price of a resale ticket at the total price of the initial ticket plus 10%, and caps members' marketplace fee at 10% of that same initial price. D.C. Code § 28-5506. The Act thus prohibits members from charging marketplace service fees at their current fair-market rates.

16. Second, the Act requires members to disclose the ticket's original purchase price before a ticket may be offered for resale. D.C. Code § 28-5506(a)(2). The Act thus requires members to publish information that they do not currently disclose and, as described above, typically cannot obtain.

17. As part of TPF's mission, I testified before the Council's Committee on Public Works and Operations (the "Committee") and submitted written testimony on October 22, 2025. TPF supported the bill's refund and transparency provisions but urged the Committee, and in turn the Council, not to adopt its price and fee caps.

**Harm to Members**

18. As described in the declarations of the members that are Plaintiffs in this action, and as other members have advised TPF, each TPF member will be harmed by the Act if it applies as scheduled on January 1, 2027. Specifically, members:

a. Will be required to provide their services for compensation capped at 10% of the initial ticket price, which is untethered to—and, in many transactions, below—the cost of the services those fees fund.

b. Will lose the revenue associated with listings for covered District events that sellers or members no longer list because of the price and fee caps.

c. Will be compelled to publish an "original purchase price" they do not currently disclose and that they do not possess. Because they cannot obtain or verify that information, they will face enforcement exposure for noncompliance with a requirement they cannot possibly meet.

d. Must build District-specific pricing, fee, disclosure, verification, recordkeeping, and reporting systems into their platforms before the applicability date, at significant engineering and compliance cost.

e. Will lose seller relationships, customer goodwill, and market share in the District.

f. Must decide well before the Act's January 1, 2027, applicability date whether and how to build District-specific systems, whether to renegotiate seller and partner agreements, and whether to continue carrying covered District listings.

19. These injuries are directly and immediately traceable to the Act and would be redressed by declaratory and injunctive relief barring the Act's enforcement. Each member would have standing to sue in its own right for the reasons stated above and in the Plaintiff members' declarations.

20. By this lawsuit, TPF seeks to protect its members' ability to continue to provide secondary marketplaces to sellers and buyers, to charge fair-market service fees that fund important protections their customers rely on, and to list tickets without being compelled to publish or verify information they do not possess.

21. These interests are germane to TPF's purposes of advocating for its members, protecting fans, and promoting competition in ticketing. If the Act were not enjoined, it would severely hamper members' ability to provide critical marketplace services, which would in turn hurt their customers.

22. TPF brings this suit on its members' behalf and seeks declaratory and injunctive relief against enforcement of the challenged provisions for the benefit of its affected members. TPF does not seek damages for any member.

23. This Declaration includes one item of confidential and competitively sensitive information: the range of the Plaintiff members' service fees stated in paragraph 9, which is drawn from the members' own declarations. The members do not disclose their fee rates publicly, and each has asked that the information be filed under seal for the reasons stated in its declaration. For the same reasons, TPF has asked that this information be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 13, 2026
Washington, D.C.

Signed by:
66592EA588BB415...
Brian Berry
Executive Director, Ticket Policy Forum