**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TICKET POLICY FORUM INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-03577 |

**DECLARATION OF MICHELE RUSNAK**

Pursuant to 28 U.S.C. § 1746, I, Michele Rusnak, declare as follows:

1. I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

2. I am the Chief Financial and Administrative Officer of TickPick, LLC ("TickPick"), where I have been employed since 2019. I am responsible for TickPick's finance and administrative functions. I am familiar with the effect that the District of Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "Act") will have on TickPick.

**<u>TickPick And Its Marketplace</u>**

3. TickPick is a New York company founded in 2011. Its principal offices are at 1 Pennsylvania Plaza, Suite 4006, New York, New York. TickPick is a member of the Ticket Policy Forum.

4. TickPick operates an online ticket marketplace, accessible through its website and mobile application. On that marketplace, consumers buy and sell tickets to live events—concerts, theater, comedy, sports, and other live entertainment—held throughout the United

States. The secondary marketplace is TickPick's principal business. TickPick also operates a smaller primary-ticketing offering for event organizers, and Momento, a service that digitizes ticket stubs as keepsakes.

5. TickPick's platform facilitates ticket transactions between third-party buyers and third-party sellers. In the ordinary course, TickPick does not purchase or provide tickets, or own ticket inventory. There are two limited exceptions. When a seller fails to deliver a valid ticket to a buyer, TickPick may purchase a replacement ticket—usually on its own marketplace—and transfer it to the buyer. And TickPick's sports-team sponsorship partners provide it with a limited quantity of tickets, which TickPick resells on its marketplace.

6. The seller sets the price of a ticket and TickPick sets the all-in price shown to buyers by adding its margin to that amount, as described below. Sellers on the marketplace range from individual fans reselling a ticket they can no longer use to professional sellers listing in volume. In general, sellers are governed by TickPick's Supplemental Terms for Sellers. TickPick also has a "Large Seller program." TickPick does not track the number of listings a seller posts in a year, and it has no means of knowing how many listings a seller posts on other marketplaces.

7. Since TickPick's founding, it has displayed a single all-in price to potential buyers rather than an itemized list of fees—a practice that is consistent with the Federal Trade Commission's rule requiring all-in upfront pricing for live-event tickets nationwide since May 2025. TickPick has never had hidden fees or practiced 'drip pricing.' TickPick thus builds the expenses it incurs and the profit it makes into the single all-in price the consumer sees, which does not change over the course of the transaction. TickPick does not separately state a service fee in the displayed price.

8. When a ticket is sold on TickPick's platform, TickPick retains a margin over the amount it pays the seller. That margin varies by event type and with market conditions, but it typically falls within a consistent range. That margin averages approximately [redacted], and in the ordinary course varies no more than a point or two above or below that figure. For example, if a seller seeks to sell a ticket for [redacted], TickPick will ordinarily list it at approximately [redacted]. TickPick adjusts its margin within that range based on competitors' prices for comparable tickets, the number of days until the event, and inventory levels, with the aim of remaining the low-cost provider without pricing below its costs.

9. TickPick's margin funds the services it provides on both sides of the transaction, including:

a. Its 100% BuyerTrust Guarantee;

b. Its BestPrice Guarantee, under which a buyer who finds a lower final checkout price for the same seats elsewhere within two hours of purchase may claim TickPick Credit, subject to conditions and a $200 cap;

c. Secure payment processing and the chargeback exposure TickPick absorbs;

d. Fraud prevention, on which TickPick spends substantial sums, particularly with respect to individual sellers;

e. Customer service before, during, and after events;

f. Secure electronic ticket delivery and transfer;

g. Advertising and demand generation that brings buyers to sellers' listings;

h. Professional-seller onboarding and vetting;

i. Payout processing and remittance;

j. Collection and remittance of sales tax; and

k. Fulfillment support when an order fails.

10. When an event is canceled, TickPick refunds the purchase price. When a buyer receives tickets that differ from what was purchased and TickPick determines the tickets are not comparable or better, sellers have an opportunity to supply tickets that meet that requirement. If ultimately TickPick determines the tickets are not comparable or better, TickPick will attempt to secure replacement tickets. If comparable replacement tickets are unavailable, a refund of the full purchase price will be processed.

**<u>TickPick's Business Involving District Of Columbia Events</u>**

11. TickPick facilitates transactions on a national marketplace for tickets to D.C. events. TickPick therefore appears to fall within the Act's scope. In the last 12 months, TickPick's marketplace processed approximately [redacted] orders for D.C. events comprising approximately [redacted] tickets, excluding sports events.

12. TickPick determines a buyer's location by the ZIP code associated with the buyer's payment card. For individual sellers, TickPick determines location by the ZIP code associated with the seller's payment card; for professional sellers, TickPick determines location by other information in the seller's account. Of tickets to D.C. events sold in the last 12 months, less than 1 percent involved a seller and a buyer in D.C.; less than 1 percent involved a seller in D.C. and a buyer outside of D.C.; 11 percent involved a seller outside of D.C. and a buyer in D.C.; and 88 percent involved both a seller and buyer located outside of D.C.

13. TickPick processes orders on servers located outside the District of Columbia.

**The Fee Cap Is Incompatible With TickPick's Model**

14. The Act provides that a reseller or secondary ticket exchange "shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket, including all fees and taxes in connection with the initial ticket." § 28-5506(b). The Act allows a secondary ticket exchange to charge "a fee for the service of providing a marketplace," but that fee "shall not exceed 10%" of the initial ticket price, including fees and taxes. § 28-5506(c). These provisions would harm TickPick and require it to change its business model in several ways.

15. First, TickPick cannot identify the "total price of the initial ticket" in general. That figure is generally unknowable to TickPick and becomes more remote with each successive transfer. Determining the price at which a ticket was first sold is not possible for a secondary marketplace unless the primary ticketing platforms open their records to it, which they do not. Even where the current seller is the original purchaser and can retrieve that figure from the primary platform before the event, TickPick has no means of confirming it. TickPick's systems thus are built around the amount a seller wishes to receive, not the amount the seller or anyone else originally paid.

16. Second, TickPick's margin is calculated on the resale price of the transaction TickPick actually facilitates. Whenever a ticket resells for more than its initial price, TickPick's ordinary margin will exceed 10% of the initial price and will violate the cap—without TickPick having changed its rate. The cap also reduces TickPick's compensation twice over, because TickPick's margin is a percentage of the seller's price and the Act compresses that price as well. Assume a seller asks [redacted] for a ticket with an initial price of $100. Today, TickPick would list

that ticket at approximately [redacted] and retain approximately [redacted]. Under the Act, the ticket could not be sold for more than $110, and TickPick could not retain more than $10—even though TickPick's ordinary [redacted] on a $110 ticket would be [redacted]. TickPick thus would lose both the margin on the portion of the price the Act eliminates and a portion of the margin on the price that remains.

17. Relatedly, the capped price restricts most or all of TickPick's ability to recoup the costs required to service a transaction. TickPick operates on thin margins after payment-card processing fees, fraud losses, and its other costs of servicing a transaction, and a fee capped at 10% of the initial ticket price would leave little or nothing after those costs. In the ordinary course, those costs total approximately [redacted] of the sale price: payment-card processing (approximately [redacted]); paid media and marketing (approximately [redacted]); discounts and premiums (approximately [redacted]); fraud prevention and losses (approximately [redacted]); customer and seller support, fulfillment and refunds (approximately [redacted]); and allocated overhead (approximately [redacted]). On a ticket resold at the maximum price the Act permits, TickPick's compensation would be 10.0% of the initial sale price, less than its costs. On those transactions on average, TickPick would lose money.

18. Section 28-5506(c)'s separate fee cap assumes that a marketplace charges an identifiable, separately stated fee. TickPick does not. Its compensation is built into the all-in price rather than added to it. TickPick tracks the amount it pays the seller on each transaction, so its margin on a given transaction can be identified. But that margin is not a "fee" that TickPick charges or presents to anyone.

**<u>The Compelled "Original Purchase Price" Disclosure</u>**

19. TickPick's User Agreement describes how it will disclose ticket prices to consumers. Where face value is provided on the platform in accordance with applicable law, TickPick can provide only the face value the seller supplies, and TickPick cannot assess or guarantee the truthfulness or accuracy of that information. The Act nonetheless requires TickPick to disclose the "original purchase price," including all fees and taxes, before a ticket may be listed—a figure TickPick often does not possess and cannot verify. § 28-5506(a)(2).

20. TickPick does not possess the original all-in price for tickets listed by third-party sellers, regardless of how the seller acquired the ticket. TickPick does not require sellers to provide purchase-price information. And even if a seller were to provide a purported face-value amount, TickPick has no means of verifying that figure. In TickPick's experience, a self-reported face value does not inform buyers, because sellers can and do enter figures that bear no relation to what was paid, and the figure can be used to mislead rather than inform.

**<u>The Verification Requirement</u>**

21. Section 28-5506(a)(1) requires TickPick to verify, before any listing, that the seller meets the licensing and bonding requirements of § 47-2890.02—which attach at 50 listings per year counted across every platform on which a seller lists.

22. TickPick cannot feasibly comply with this provision. TickPick does not track the number of listings a seller posts, and listings on other marketplaces are not visible to it. Sellers commonly operate under different account names on different platforms. There is no central registry of ticket listings that TickPick could consult. And platforms treat a seller's listing activity as valuable, confidential information that they do not disclose to their direct competitors.

**The Act Will Irreparably Harm TickPick**

23. The Act is slated to be applicable as of January 1, 2027. If the Act is not enjoined by then, TickPick will suffer a series of irreparable harms both preparing for implementation and after the effective date while this case is litigated. That will include substantial unrecoverable compliance costs, unrecoverable lost revenues, harm to consumer goodwill, harm to its business relationships, and the deprivation of constitutional rights.

24. The Act is harming TickPick now and will continue to harm it. For example:

a. TickPick must decide before the Act applies whether to continue serving District events at all. Because TickPick's pricing systems are built around the seller's payout rather than a ticket price plus a fee, compliance would require restructuring those systems rather than adjusting them. TickPick is a small company without the staff or technical resources to undertake that restructuring quickly, and it cannot halt its business while it does so. It therefore faces a choice between attempting to comply and accepting the risk of penalties for a benchmark it cannot determine, or turning off District events on its platform entirely. TickPick also would have to revise its terms and conditions and incur legal expense in doing so.

b. The Act requires TickPick to verify that sellers are licensed and bonded. There is no feasible way for a marketplace to do that. Even a system that required sellers to upload documentation and used automated tools to read it could not verify the documentation, because such records can be fabricated. Accordingly, TickPick would have to undertake significant engineering work to come into compliance with the Act. This work would require investing significant employee time and

diverting company resources from other projects—costs that could not be undone or recovered even if the Act were held invalid. TickPick estimates that the Act would impose internal compliance costs that would negate nearly all of the net revenue TickPick could earn from resales to D.C. non-sports events.

25. The Act will also cause TickPick irreparable harm if it goes into effect on January 1, 2027. For example:

a. TickPick will be forced to disclose information that it would prefer not to disclose and has no method to obtain and verify, such as the initial ticket price. Moreover, the disclosure of this information likely will irreparably harm TickPick's customer relationships because customers may mistakenly attribute the difference between the initial ticket price and the resale price to TickPick, rather than to the preceding transactions and prices set by the seller.

b. TickPick will be forced to adopt distinct systems and procedures for transactions involving events in D.C. and events outside of D.C. Doing so will cause technical compliance issues and customer confusion that will harm goodwill. In addition, even for events in D.C., TickPick will be forced to adopt distinct systems and procedures because of the statutory carve-out for live sporting events and motion picture screenings—a capability TickPick's systems do not have and that TickPick would have to build.

c. TickPick will lose revenue on every covered transaction, and not merely the portion of its margin above 10%. Because TickPick's margin is a percentage of the seller's price, capping the seller's price at 110% of the initial price eliminates TickPick's margin on the difference between that cap and the price the seller

would otherwise have set. TickPick operates on thin margins, so that loss falls directly on its bottom line.

d. TickPick expects the Act to drive resale of tickets to District events away from regulated marketplaces and onto unregulated channels such as online classified listings and social media, where fraud is common and buyers have no recourse. TickPick expects the market for legitimate resale of District tickets to contract sharply as a result.

26. This Declaration includes information that is confidential and competitively sensitive. That information includes TickPick's transaction volume and revenue for District events, fees, margin rates, costs of servicing transactions, and estimates of compliance costs and expected revenue losses under the Act. TickPick does not disclose this information publicly, and it has not appeared in any public filing. TickPick shares it outside the company, if at all, only subject to confidentiality obligations. Moreover, TickPick operates in a highly competitive market. Several marketplaces compete for the same potential ticket buyers, and often for the same tickets, because sellers routinely list identical inventory on multiple marketplaces at once. Buyers compare all-in prices across marketplaces, and small differences in fees can determine where a sale occurs. If the information in this declaration were made public, competitors could use TickPick's margins, pricing inputs, and cost structure to set their own prices just below TickPick's and to target its customers and sellers. Sellers and business partners could likewise use TickPick's cost and margin information to demand higher payouts or more favorable terms in negotiations with TickPick. Once disclosed, this information could not be made confidential again, and the resulting competitive harm could not be undone. For these reasons, TickPick has asked that this information be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2026
New York, NY

DocuSigned by:
Michele Rusnak
21A65B80A9864EA...
Michele Rusnak