**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TICKET POLICY FORUM INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-03577 |

**DECLARATION OF JENNIFER JACKSON**

Pursuant to 28 U.S.C. § 1746, I, Jennifer Jackson, declare as follows:

1. I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

2. I am the Vice President of Financial Planning and Analysis at Vivid Seats LLC ("Vivid Seats"), where I have been employed since 2016. I am responsible for budgeting, forecasting, and financial planning. I am familiar with the effect that the District of Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "Act") will have on Vivid Seats.

**<u>Vivid Seats and its Marketplace</u>**

3. Vivid Seats is a Delaware limited liability company founded in 2001. Its principal offices are at 24 East Washington Street, Suite 900, Chicago, Illinois. Vivid Seats LLC is a wholly owned subsidiary of Vivid Seats Inc., whose Class A common stock is listed on the Nasdaq Stock Market under the symbol "SEAT." Vivid Seats is a member of the Ticket Policy Forum.

4. Vivid Seats operates an online ticket marketplace, accessible through its website and mobile app, on which consumers buy and sell tickets to live events, including concerts, theater, comedy, sports, and other forms of live entertainment.

5. Vivid Seats operates its business in two segments: Marketplace and Resale. In its Marketplace segment, Vivid Seats primarily acts as an intermediary between ticket buyers, sellers, and partners. Vivid Seats earns revenue from processing ticket sales for live events through owned properties, including the Vivid Seats mobile app and website, as well as its private label offering, which consists of numerous distribution partners. In its Marketplace segment, Vivid Seats is not the ticket seller, does not list tickets on behalf of any venue, promoter, team, league, or organizing group, and does not hold inventory. In its Resale segment, Vivid Seats primarily acquires tickets to resell on secondary ticket marketplaces, including its own. Vivid Seats has already purchased more than [redacted] tickets for non-sports D.C. events that will take place on or after January 1, 2027. By the end of 2026, Vivid Seats expects to purchase more than [redacted] additional tickets for non-sports D.C. events that will take place on or after January 1, 2027.

6. For tickets listed by third-party sellers on Vivid Seats' marketplace, secondary-resale ticket prices are set by the seller, not Vivid Seats. Sellers on the marketplace range from individual fans reselling a ticket they can no longer use to professional resellers listing in volume. Every seller must apply and be approved before listing inventory. Sellers are governed by Vivid Seats' Seller Terms and Conditions. During the 12-month period that ended on August 31, 2026, more than [redacted] sellers listed at least one ticket for a non-sports D.C. event on Vivid Seats' marketplace, and more than [redacted] of those sellers posted 50 or more such listings. During the same period, more than [redacted] sellers completed at least one order (which comprises the sale of at

least one ticket) to a non-sports D.C. event on Vivid Seats' marketplace, and more than [redacted] of those sellers completed 50 or more such orders.

7. When a ticket is sold on Vivid Seats' marketplace, the seller sets the price at which it wishes to sell the ticket, which reflects the seller's own margin. Vivid Seats charges service fees to buyers, which fees are derived from the price at which the seller wishes to sell the ticket, and delivery fees. In the ordinary course, Vivid Seats' take rate is approximately [redacted] of the gross order value. Vivid Seats sets its service fees based on a number of inputs, including the platform used (web or mobile app), the characteristics of the event, the time remaining until the event, seller economics, partner economics, the cost of Vivid Seats' guarantee and loyalty programs, and transaction, fulfillment, and customer service costs. Vivid Seats separately charges a delivery fee, which is a fixed fee for electronic tickets and approximates the actual shipment cost for physical tickets.

8. Vivid Seats displays the total order amount, including all service and delivery fees and any applicable taxes, before a buyer completes a purchase—a practice that is consistent with the Federal Trade Commission's Rule on Unfair or Deceptive Fees, which has required all-in upfront pricing for live-event tickets nationwide since May 2025. Where required, Vivid Seats distinguishes the ticket price from service fees when it displays pricing to a buyer, but it does not further distinguish among those fees. Vivid Seats has told the Federal Trade Commission that it supports greater pricing transparency, including all-in pricing, provided that any rule applies equally across the live-events ticketing industry.

9. Vivid Seats' fees fund the services it provides on both sides of the marketplace transaction, including:

a. Its 100% Buyer Guarantee, which includes customer refunds and the cost of sourcing replacement tickets when a seller is unable to fulfill an order;

b. Its Lowest Price Guarantee, which is designed to ensure that it provides the most competitively priced tickets among its competitors;

c. Its rewards loyalty program, through which it reinvests fees into value redeemable by repeat purchasers;

d. Secure payment processing, anti-fraud measures and protection, and the absorption of buyer-side fraud and chargeback losses, which it absorbs rather than passing to the seller;

e. Customer service before, during, and after events;

f. Secure electronic ticket delivery and transfer;

g. Advertising and marketing that generates buyer demand for sellers' listings because more than half of Vivid Seats' orders are derived through paid or performance-based marketing channels;

h. Distribution of a seller's listing across its properties and distribution partners, which exposes listings to buyers that sellers could not reach individually;

i. Listing, pricing, and inventory-management tools and guidance;

j. Seller vetting and approval, which protects buyers from fraudulent listings and protects legitimate sellers from competing against them;

k. Collection of payment from the buyer and transfer of the proceeds to the seller; and

l. Order-fulfillment support.

1. Subject to applicable law, where an event is canceled with no rescheduled date, Vivid Seats refunds the purchase price or issues a credit for use on a future purchase. If the exact tickets ordered are no longer available, an order may be filled with comparable or upgraded tickets. Vivid Seats' 100% Buyer Guarantee provides that the tickets a buyer receives will be identical, comparable, or better than those ordered, or the buyer will get their money back.

**Vivid Seats' Business Involving D.C. Events**

2. Vivid Seats operates an electronic marketplace that enables persons to sell, purchase, and resell live event tickets. It therefore appears to be a "secondary ticket exchange" within the meaning of the Act. § 28-5501(4). Through its Resale segment, Vivid Seats also acquires tickets and resells them on secondary ticket marketplaces, including its own. It therefore appears to be a "reseller" within the meaning of the Act. § 28-5501(3). In the 12-month period that ended on August 31, 2026, Vivid Seats' marketplace processed approximately [redacted] orders (comprising approximately [redacted] tickets) for non-sports D.C. events.

3. Vivid Seats determines a seller's location through the contact information in their seller account and a buyer's location through their billing address. Of tickets to non-sports D.C. events sold on Vivid Seats' marketplace in the 12-month period that ended on August 31, 2026, less than 1% involved a D.C. buyer and a D.C. seller; less than 1% involved a non-D.C. buyer and a D.C. seller; approximately 10.4% involved a D.C. buyer and a non-D.C. seller; and approximately 89.6% involved both a non-D.C. buyer and a non-D.C. seller.

**The Fee Cap Is Incompatible With Vivid Seats' Model**

4. The Act provides that a reseller or secondary ticket exchange "shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket, including

all fees and taxes in connection with the initial ticket." § 28-5506(b). The Act allows a secondary ticket exchange to charge "a fee for the service of providing a marketplace," but that fee "shall not exceed 10%" of the initial ticket price, including fees and taxes. § 28-5506(c). These provisions would harm Vivid Seats and require it to change its business model in several ways.

5. First, Vivid Seats cannot identify or verify the "total price of the initial ticket" in general. If the "initial" price is the price at which the ticket issuer first sold the ticket, that figure is generally unknowable to Vivid Seats and becomes more remote with each successive transfer. For an increasing number of events, "face value" is an elusive concept because tickets are sold at dynamic prices that fluctuate in real time based on changing market conditions. The "total price" of a ticket is more elusive still: it includes all fees and taxes paid in connection with the original purchase, and those amounts can turn on facts specific to the original purchaser, such as that purchaser's location. Therefore, two otherwise identical tickets to the same event may have different initial ticket prices depending on who bought them and when and where they were purchased. In practice, the only parties who can prove a ticket's initial price are the original seller and the purchaser. The problem is more acute for bundled and subscription tickets, such as season tickets, which frequently have no separately ascertainable per-ticket face value at all.

6. Second, Vivid Seats' fees are calculated by reference to the resale transaction that Vivid Seats actually facilitates, not by reference to any form of the initial ticket price. As noted above, Vivid Seats' take rate is approximately [redacted] of the gross order value. This means that whenever a ticket resells for more than its initial price, a fee charged at Vivid Seats' ordinary rate would exceed 10% of the initial price and would violate the fee cap—without Vivid Seats having changed its rate. For example, on a ticket with an initial all-in price of $100 that resells for $200, Vivid Seats' ordinary [redacted] take rate yields approximately [redacted] in revenue before any associated

costs ([redacted] of $200), but § 28-5506(c) would permit Vivid Seats to charge no more than $10 in service fees.

7. Importantly, the fee cap will generally not permit Vivid Seats to recoup the costs required for it to service and fulfill a transaction. Each order is associated with costs incurred by Vivid Seats, which costs are generally tied to the order value. Based on costs incurred divided by gross order value, Vivid Seats' costs include, for example: rewards-loyalty program costs (approximately [redacted] of the average order value), chargeback- or fraud-related costs (approximately [redacted] of the average order value), customer-service costs (approximately [redacted] of the average order value), information-technology costs (approximately [redacted] of the average order value), Buyer-Guarantee costs (approximately [redacted] of the average order value), payment-processing costs (approximately [redacted] of the average order value, which is set by third-party payment processors outside of Vivid Seats' control), and customer acquisition costs (approximately [redacted] of the average order value). As a result, the fee cap would generally force Vivid Seats to operate at a loss. For example, on a ticket with an initial price of $40 that resells for $44 (the maximum amount permitted under the price cap), the buyer would pay $48 (the $44 ticket price plus a $4 service fee). Vivid Seats would incur approximately [redacted] in costs—[redacted] in rewards-loyalty program costs, [redacted] in chargeback- or fraud-related costs, [redacted] in customer-service costs, [redacted] in information-technology costs, [redacted] in Buyer-Guarantee costs, [redacted] in payment-processing costs, and [redacted] in customer acquisition costs. But § 28-5506(c) of the Act would permit Vivid Seats to charge only $4 in fees—a [redacted] loss. And this example relies on conservative figures: it does not reflect the costs of shipping physical tickets or of complying with the Act itself.

8. This problem is compounded by § 28-5506(c)'s ambiguity with respect to what fees are subject to its cap. As discussed above, Vivid Seats charges two separately stated fees—a service fee and a delivery fee. The Act does not specify whether the 10% fee cap applies to each fee separately, to both in the aggregate, or whether a delivery fee is a fee "for the service of providing a marketplace" at all. If the fee cap applies to the delivery fee for physical tickets, Vivid Seats would generally be unable to cover even its actual delivery costs, particularly for lower-value orders.

**The Compelled "Original Purchase Price" Disclosure**

9. When a seller lists a ticket on the marketplace, the seller may—but is not required to—identify the ticket's "face value." A ticket's listed resale price may be higher or lower than the ticket's "face value," and Vivid Seats does not and cannot guarantee the accuracy of any information provided by sellers on its marketplace. Vivid Seats requires a seller to provide the event, seat location, price, possession, and delivery information for each listing, but does not require the seller to identify or provide proof of the ticket's face value.

10. The Act nonetheless requires Vivid Seats to disclose the "original purchase price," including all fees and taxes, before a ticket may be listed—a figure known only to the initial seller and buyer of a ticket and a figure that Vivid Seats often does not possess and cannot verify. § 28-5506(a)(2).

**The Verification Requirement**

11. § 28-5506(a)(1) provides that a secondary ticket exchange "shall," before a ticket is resold, "[v]erify" that the seller meets the licensing and bonding requirements of § 47-2890.02. In turn, the licensing and bonding provisions require a reseller "that posts 50 or more ticket resale listings in a year" to obtain a license and a surety bond. § 47-2890.02(a)-(d). If a reseller lists one

ticket for sale across "multiple secondary ticket exchange platforms, the total number of listings for the ticket shall count toward" the 50-listing threshold. *Id.* § 47-2890.02(a)(2).

12. Vivid Seats cannot feasibly comply with this provision. A seller's listings on *other* marketplaces count toward the 50-listing threshold that triggers Vivid Seats' obligation to confirm the seller meets licensing and bonding requirements. But listings on other marketplaces are not visible to Vivid Seats. Sellers commonly operate under different account names on different platforms, and there is no central registry of ticket listings that Vivid Seats could consult. And platforms generally treat a seller's listing activity as valuable, confidential information that they do not disclose to their direct competitors.

13. Nor could Vivid Seats feasibly comply by consulting the public list of licensed resellers that the Act directs the Department to maintain. § 47-2890.04(a). That list would show which sellers hold licenses. It would not show which sellers have posted 50 or more listings across all platforms and therefore require a license—which is the fact that Vivid Seats is required to verify before it can allow a listing. Further, the list is also updated only quarterly, so Vivid Seats could not rely on it to be an accurate list of licensed sellers at the specific time of any particular seller verification. § 47-2890.04(a)(2).

14. The District's decision to impose a verification duty on marketplaces—rather than exercise its own enforcement and verification authority—is unprecedented, to Vivid Seats' knowledge. No other jurisdiction imposes this kind of verification duty on marketplaces. Vivid Seats thus has never developed (nor been required to develop) a system to verify sellers' licensing and bonding status, and is unaware of any other ticketing marketplace that has developed such a system.

**The Act Will Irreparably Harm Vivid Seats**

15. The Act is slated to be applicable as of January 1, 2027. If the Act is not enjoined by then, Vivid Seats will suffer a series of irreparable harms both preparing for implementation and after the effective date while this case is litigated. That will include substantial unrecoverable compliance costs, unrecoverable lost revenues, harm to consumer goodwill, harm to its business relationships, and the deprivation of constitutional rights.

16. The Act is harming Vivid Seats now and will continue to harm it. For example:

a. Vivid Seats must make a series of business decisions in advance of the applicability date. Vivid Seats must determine whether, in light of the fee cap and the likelihood that it would operate at a loss with respect to many tickets, continuing to sell tickets for D.C. events is economically viable or whether Vivid Seats should leave the market. Vivid Seats also must determine how to comply with the Act's requirements discussed above, many of which would require building new systems. And Vivid Seats must decide how to carry each of these requirements forward to Vivid Seats' distribution partners, many of whom likely would need to build corresponding systems of their own.

b. The Act will materially reduce Vivid Seats' sales and the revenue it earns on every covered D.C. transaction. That reduction in revenue will affect Vivid Seats' agreements with business partners. For example, Vivid Seats compensates white-label and distribution partners by sharing the revenue Vivid Seats earns on transactions that take place on those partners' platforms. Because § 28-5506(c) would cap that revenue below Vivid Seats' current rates, the amount of service fees available for partner compensation shrinks on every

covered transaction. As a result, Vivid Seats likely will need to renegotiate agreements to account for the changed economics under the Act and the Act's other requirements.

c. Vivid Seats would have to undertake significant engineering work to come into compliance with the Act. The work would require a new multi-key settings data model; a new grid user interface; and a new system process for resolving the effective fee cap applicable to a given listing. The work would touch Vivid Seats' pricing, catalog, and listing services, making it a cross-service change rather than a change to a single system, and it would add another set of bespoke configurations to maintain. Vivid Seats expects that it would need to spend [redacted] to build or modify back-end systems, and additional time to build or modify consumer-facing front-end systems. This work would require investing significant employee time and diverting company resources from other projects—costs that could not be undone or recovered even if the Act were held invalid.

17. The Act will also continue to cause Vivid Seats irreparable harm after it applies on January 1, 2027. For example:

a. Vivid Seats will be forced to disclose information that it would prefer not to disclose and has no method to obtain and verify, such as the initial ticket price. Vivid Seats thus will be deprived of its First Amendment right not to speak. Moreover, the disclosure of this information likely will irreparably harm Vivid Seats' customer relationships because customers may mistakenly attribute the

difference between the initial ticket price and the resale price to Vivid Seats, rather than to the preceding transactions and prices set by the seller.

b. As discussed above, Vivid Seats may need to operate at a loss with respect to at least some ticket listings and orders or otherwise stop allowing such listings on its marketplace.

c. Vivid Seats would lose customer goodwill. Vivid Seats operates a national marketplace, and its customers often purchase tickets to events both in D.C. and other markets. A buyer who searches for a D.C. event and finds that Vivid Seats has no inventory (because it has withdrawn from the market) or that its inventory is materially thinner than it historically has been (because fewer sellers are listing D.C event tickets on the marketplace and because fewer D.C. event tickets are profitable for Vivid Seats to list) likely will believe that Vivid Seats is not a reliable place to look for tickets. Vivid Seats expects that some of those buyers would search elsewhere for tickets, including for events in markets the Act does not reach.

d. Vivid Seats also will lose goodwill with its business partners. For example, the Act will damage Vivid Seats' relationships with its white-label and distribution partners. Those relationships are contractual and long-term, and they depend on Vivid Seats supplying reliable inventory and economics. The Act would require Vivid Seats to tell each partner that D.C. inventory will carry different pricing, different disclosures, and different listing requirements than inventory everywhere else. Vivid Seats will also have to tell its partners that the service fees available to be shared on covered D.C. transactions will shrink

to 10% of the initial ticket price. Some partners likely will restrict or discontinue D.C. inventory. Others likely will seek to renegotiate the commercial terms of the relationship, or to terminate it, because of the new economics of selling tickets in D.C. And partner agreements are negotiated at intervals, so once they are repriced or lost, they would not be easily recovered even if the Act is later held invalid.

e. Vivid Seats will be forced to adopt distinct systems and procedures for transactions involving events in D.C. and events outside of D.C. Doing so will cause technical compliance issues and customer confusion that will harm goodwill. In addition, even for events in D.C., Vivid Seats will be forced to adopt distinct systems and procedures because of the statutory carve-out for live sporting events and motion picture screenings. Vivid Seats' regional-configuration settings currently permit one value per region. The Act would require Vivid Seats to develop a multi-dimensional regional configuration capable of defining both consumer-facing disclosures and back-end processing by region, event category (a selection Vivid Seats' system currently does not have), price basis, and fee cap percentage. Customers who buy tickets for a music event at Capital One Arena would experience a different interface, with different disclosures, than when those same customers buy tickets for a sporting event at the same venue, causing confusion and irreparable harm to the customer experience.

f. The Act will drive ticket resales away from safe, regulated marketplaces such as Vivid Seats and toward less-regulated channels where fraud is more

common. If sellers' margins on D.C. inventory are limited to 10%, Vivid Seats expects that some sellers will stop reselling tickets to D.C. events on regulated marketplaces, and instead will sell tickets in unregulated forums—places like Craigslist, social-media meetups, or the sidewalk outside the venue. Those unregulated forums are where consumers get scammed and hurt. And Vivid Seats will suffer competitive injury because it will be more difficult to compete with unregulated marketplaces or sellers who do not comply with the Act.

18. This Declaration includes information that is confidential and competitively sensitive. That information includes Vivid Seats's transaction volume and revenue for District events, fees, margin rates, costs of servicing transactions, and estimates of compliance costs and expected revenue losses under the Act. Vivid Seats does not disclose this information publicly, and it has not appeared in any public filing. Vivid Seats shares it outside the company, if at all, only subject to confidentiality obligations. Moreover, Vivid Seats operates in a highly competitive market. Several marketplaces compete for the same potential ticket buyers, and often for the same tickets, because sellers routinely list identical inventory on multiple marketplaces at once. Buyers compare all-in prices across marketplaces, and small differences in fees can determine where a sale occurs. If the information in this declaration were made public, competitors could use Vivid Seats's margins, pricing inputs, and cost structure to set their own prices just below Vivid Seats's and to target its customers and sellers. Sellers and business partners could likewise use Vivid Seats's cost and margin information to demand higher payouts or more favorable terms in negotiations with Vivid Seats. Once disclosed, this information could not be made confidential again, and the resulting competitive harm could not be undone. For these reasons, Vivid Seats has asked that this information be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 13, 2026
Chicago, Illinois

Jennifer Jackson

Jennifer Jackson