# Exhibit A

**Council of the District of Columbia**
**COMMITTEE ON PUBLIC WORKS AND OPERATIONS**
**COMMITTEE REPORT**
1350 Pennsylvania Avenue, NW, Washington, D.C. 20004

| | |
|---|---|
| **TO:** | Members of the Council of the District of Columbia |
| **FROM:** | Councilmember Brianne K. Nadeau *Brianne K. Nadeau*<br>Chairperson, Committee on Public Works and Operations |
| **DATE:** | June 22, 2026 |
| **RE:** | Report on B26-0224, the "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026" |

The Committee on Public Works & Operations, to which Bill 26-0224 was referred, reports **favorably** thereon, and recommends approval by the Council of the District of the Columbia.

**TABLE OF CONTENTS**


I. Statement of Purpose and Effect ........ 1
II. Background ........ 2
III. Committee print changes ........ 6
IV. Legislative Chronology ........ 9
V. Position of the Executive ........ 9
VI. Resolutions by Advisory Neighborhood Commissions ........ 10
VII. Summary of Testimony ........ 10
VIII. Impact on Existing Law ........ 29
IX. Fiscal Impact ........ 29
X. Racial Equity Impact ........ 30
XI. Section-by-Section Analysis ........ 30
XII. Committee Action ........ 31
XIII. Attachments ........ 31


## I. STATEMENT OF PURPOSE AND EFFECT

Bill 26-0224, the "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026", was introduced on April 9, 2025 by Councilmember Charles Allen alongside Committee Chairperson Brianne K. Nadeau and Councilmembers Kenyan R. McDuffie, Matthew Frumin, Christina Henderson, Janeese Lewis George, Robert C. White, Jr. and Zachary Parker. The bill was referred to the Committee on Public Works and Operations on April 22, 2025, and the Committee held a public hearing on October 22, 2025.

The Committee Print establishes a new chapter of the commercial instruments and transactions title of the D.C. Official Code to govern the sale and resale of tickets to live entertainment events such as concerts and theatrical performances. It establishes a new portion within an existing subchapter regarding business license categories, to require those who operate secondary ticket exchange platforms or who resell more than 50 tickets per year to obtain licenses.

## II. BACKGROUND

The District of Columbia has a vibrant and exceptional live entertainment scene. The District's venue landscape spans from Capital One Arena, which seats more than 20,000, to I.M.P.'s 9:30 Club, which has been named the number one nightclub by Rolling Stone, Billboard, and Pollstar more times than any other venue, as well as dozens of small clubs, theaters, outdoor stages, and stadiums. Live events support thousands of jobs and contribute substantially to the District's tourism economy and cultural identity.

***"It's always got to be for all people. Music is for all people."*** [1]

It's hard to rock when you can't see the band.

The D.C. music scene and our local entertainment venues have deeply-ingrained principles of inclusivity – more than anywhere else in the country. The harDCore scene and the 9:30 Club in particular are largely responsible for establishing the tradition of all-ages venues, exemplified by the practice of marking the hands of fans under legal drinking age with X's.[2]

Go-go, the official music of D.C., is also a highly-democratized genre, with much of its talent emerging from local schools, community events, and other public facilities.[3]

The culture of both genres has shown that broad access to shows and events is essential to having a thriving arts and music scene in the first place.

A decade ago, these all-ages venues were threatened by Council action, when legislation was proposed restricting anyone under 21 from D.C. music venues.[4] This was met with a united front of opposition from venues, artists, and fans.

While the District's music and arts scenes continue to carry on this spirit of inclusivity, it is increasingly threatened not by government age restrictions but by a crisis in affordability driven by the private market. It is widely known that the ticket-buying experience, for events big and small, has deteriorated for consumers and venues. On average, ticket prices have risen 80.5 percent since 2021, and 428.7 percent since 1996.[5] More and more, people are being shut out by scalping bots, speculative ticket sales, and more unfair trade practices.

---

[1] Quote from Ian MacKaye. "'It's hard to rock when you can't see the band:' How D.C. punks opened shows to all ages", March 24, 2024, available at: https://gwradio.com/its-hard-to-rock-when-you-cant-see-the-band-how-all-ages-venues-catalyzed-the-punk-scene-in-d-c/

[2] *Ibid.*

[3] https://www.washingtonpost.com/dc-md-va/2025/11/23/dc-youth-go-go-music/

[4] https://www.punknews.org/article/22668/washington-city-paper-details-battle-over-all-ages-ban-in-dc

[5] https://www.couponbirds.com/research/concert-ticket-price-inflation?ref=hypebot.com

***Background on the live event ticket market***

The live event ticket market has two distinct segments: the primary and secondary markets. The primary market is where tickets are initially sold by the ticket issuer, which has increasingly become a third-party ticket marketplace rather than directly by the venue or performer. The secondary market is where tickets are resold after their initial purchase, typically an online platform that facilitates these transactions. Each market has a distinct role and contributes in different ways to the increased cost of tickets and worsening consumer experience.

***Issues in the primary market: monopolization of the market and deceptive practices***

One of the most glaring issues with ticket industry in the US today is that 80 percent of primary tickets sales at major venues in the country are controlled by a single platform[6]. Ticketmaster, which has been a subsidiary of Live Nation Entertainment since the two companies merged in 2010, has been the focus of significant enforcement action in the District, in other states, and at the federal level. The D.C. region was a major stage for the early consolidation of Ticketmaster's market power, when it acquired Ticketron, a Maryland-based competitor, in 1991.[7] OAG data shows the District has higher per capita Ticketmaster ticket sales than any other state.[8]

In September 2025, the Federal Trade Commission (FTC) and seven states, including D.C., sued Live Nation and Ticketmaster for violations of the FTC Act and the Better Online Ticket Sales (BOTS) Act. The complaint alleges that Ticketmaster worked directly with brokers to facilitate bulk ticket sales to these brokers who then resold tickets at inflated prices on Ticketmaster's own secondary market platform. Ticketmaster earned $3.7 billion in resale fees between 2019 and 2024. The complaint also alleges that Ticketmaster hid mandatory fees until the end of a transaction, which are as high as 44% of the cost of the ticket and totaled $16.4 billion in hidden fees paid between 2019 and 2024.[9] Live Nation contested these allegations, arguing that scalpers and independent brokers are the primary problem.[10]

The US Department of Justice and a bipartisan coalition of 30 state attorneys general, including the District's, filed an antitrust suit in May 2024 alleging Live Nation illegally monopolized the

---

[6] The CommLaw Group, "FTC and State AGs Sue Live Nation/Ticketmaster for Deceptive Pricing and Ticket Broker Coordination" (Sept. 19, 2025), available at https://commlawgroup.com/2025/ftc-and-state-ags-sue-live-nation-ticketmaster-for-deceptive-pricing/.

[7] "COMPETITOR TO ACQUIRE TICKETRON; POLLIN, PARTNERS END TICKETMASTER RIVALRY", February 27, 1991, available at: https://www.washingtonpost.com/archive/business/1991/02/28/competitor-to-acquire-ticketron/a9a6cb20-465a-4e1b-b218-79605e933ada/

[8] Attorney General Schwalb Issues Statement Following Win in Live Nation Antitrust Lawsuit, DC OAG (Apr. 15, 2026), available at https://oag.dc.gov/release/attorney-general-schwalb-issues-statement.

[9] FTC Press Release, "FTC Sues Live Nation and Ticketmaster for Engaging in Illegal Ticket Resale Tactics" (Sept. 18, 2025), available at https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-sues-live-nation-ticketmaster-engaging-illegal-ticket-resale-tactics-deceiving-artists-consumers.

[10] Economy Insights, "FTC Sues Ticketmaster, Live Nation for Illegal Ticket Resales and Deceptive Pricing" (Sept. 22, 2025) (noting Live Nation "rejected the allegations, arguing that bots and independent brokers are the real problem, and that the company supports 'all-in pricing'"), available at https://www.economyinsights.com/p/ftc-sues-ticketmaster-live-nation-for-illegal-ticket-resales-and-deceptive-pricing.

live entertainment industry by using its power in concert promotion and venue management to lock out competing ticketing platforms.[11] In April 2026, a federal jury in Manhattan found that Live Nation holds an illegal monopoly, but the DOJ chose to settle the case, ending it mid-trial.[12] DC and other states have decided to continue their antitrust case after what AG Schwalb called an "inadequate" federal settlement.[13] The trial highlighted how Ticketmaster uses its monopolization of the industry to crowd out competition and maintain market control. This includes forcing venues into exclusivity contracts by restricting major artists from playing at venues that do not sign these agreements and requiring artists that play at these venues to use Ticketmaster services.[14]

In addition to its role as the major primary ticket seller, Ticketmaster has its own secondary platform where tickets are resold. There is a concern that Ticketmaster aims to use its existing market power in the venue and primary ticket sale spaces to capture the secondary market as well.

***Issues in the secondary market: scalping, bots, and speculative tickets***

The secondary market presents its own threats to consumer protection. Much of the state and local legislation governing secondary ticket sales is stuck in the era of paper-ticket scalping, with rules governing or banning secondary sales of tickets within a certain proximity of a venue.

Today, professional ticket scalpers use bot software to create multiple fake accounts, bypass security measures, and purchase tickets in bulk the instant they go on sale. The technology is increasingly AI-powered, making it harder to detect. The scale of this activity is substantial. In one documented case, a single Maryland-based reseller, Key Investment Group, purchased at least 379,776 event tickets over a single year. This results in high prices for tickets on the secondary market. For Taylor Swift's 2022 Eras Tour, a frequently-used example, tickets originally priced between $49 and $449 resold on the secondary market at average prices exceeding $1,000, with some reaching 70 times face value. However, it is important to note that this event was widely popular, and the unique demand drove ticket resale prices to record highs.

The harms from scalping fall on multiple parties. Fans who cannot afford or will not pay secondary market prices are priced out of events entirely. Those who pay inflated prices subsidize a reseller who provided no value to the artist, the venue, or the event. Artists lose control over who can attend their shows and at what price, and venues may suffer reputational damage at no fault of their own when fans feel cheated. The higher prices consumers pay to resellers on the secondary market do not benefit the artist, the venue, or the local economy.

---

[11] Attorney General Schwalb Joins Federal Antitrust Lawsuit Against Live Nation, DC OAG (May 2024), available at https://oag.dc.gov/release/attorney-general-schwalb-joins-federal-antitrust.

[12] https://www.nytimes.com/2026/06/03/arts/music/whats-next-now-that-live-nation-has-been-found-to-act-as-a-monopoly.html

[13] Attorney General Schwalb Joins State Attorneys General to Continue Live Nation Lawsuit, DC OAG (Mar. 9, 2026), available at https://oag.dc.gov/release/attorney-general-schwalb-joins-state-attorneys.

[14] https://www.nytimes.com/2026/06/03/arts/music/whats-next-now-that-live-nation-has-been-found-to-act-as-a-monopoly.html

Speculative ticket sales compound these harms. A speculative ticket is one that is not yet in the reseller's possession at the time of listing, meaning the reseller is selling a promise to acquire a ticket rather than the ticket itself. This is often done without the consumer's full knowledge or understanding that they have not purchased a ticket, paying a high premium only to be shut out of the event entirely.

B26-0224 bans the practice of speculative sales entirely.

The secondary market does serve a legitimate function. Fans who purchase tickets legitimately and later cannot attend have a genuine need to resell, as primary ticket sellers often do not offer ticket refunds. Research by the American Consumer Institute found that consumers saved over $414 million in 2024 on below-face-value tickets on the secondary market — meaning a significant share of secondary market transactions involve sellers who need to offload tickets, not scalpers who are extracting profit.

***The relationship between the primary and secondary market***

The distinction between primary and secondary market is crucial to crafting strong and resilient consumer protections; although they may require different policy responses, the two markets are not cleanly separable.

The FTC's complaint makes this point clearly as it alleges Ticketmaster facilitated broker bulk purchasing in the primary market, then profited from the elevated resale prices those brokers generated on Ticketmaster's own secondary market platform. From the consumer's perspective, this means the platform they used to buy a ticket at face value was simultaneously enabling the reseller who drove that face value ticket to the secondary market at five or ten times the price. In this instance, Ticketmaster and scalpers operate as business partners.

Dynamic pricing, or the practice of adjusting primary market prices based on real-time demand, adds another layer of complexity. Proponents argue it captures secondary market value for the artist and venue rather than for scalpers, closing the arbitrage gap that makes scalping profitable. Critics argue that dynamic pricing simply transfers price gouging from the scalper to the platform, producing similarly high prices while routing the profit differently. Ticketmaster has stated that it does not itself use dynamic pricing, and that pricing strategy is set by artists and promoters.

Economists note that the secondary market's existence reflects a fundamental characteristic of primary market pricing: artists and venues typically price tickets below the level the market would bear, sometimes out of genuine desire for broad fan access, sometimes for promotional or relationship reasons. This gap between face value and market value is what creates the scalping opportunity.

***Regulation in other jurisdictions***

The live event ticketing regulatory landscape has evolved significantly over the last few years, driven by growing bipartisan recognition of consumer harm in both primary and secondary markets.

At the federal level, the Better Online Ticket Sales (BOTS) Act of 2016 bans bot-driven circumvention of ticket purchase limits but has been enforced only once in eight years. President Trump's March 2025 executive order directed more aggressive BOTS Act enforcement and called on the FTC to address price transparency and deceptive practices across the ticket market. The TICKET Act, passed by the House in 2024 and again in 2025, would require all-in pricing and ban speculative ticket sales, but it has not been passed by the Senate. The FTC's Junk Fees Rule, effective May 2025, addresses "drip pricing" across consumer transactions and was one of the regulatory drivers of Live Nation's adoption of all-in pricing.

At the state level, regulation of ticket resale is all over the map. Just a few examples: Maryland banned speculative ticket sales in 2024 and required full price disclosure; Kentucky makes it illegal to resell above face value *unless the seller is an official ticket agent or licensed ticket broker*; Vermont prohibits resales above face value unless the event sponsor or venue permits it; New Jersey's secondary-market resale caps were repealed in 2008.

***Consumers vs. Industry (or Industries)***

Public testimony, private meetings, and external lobbying around B26-0224 have included much discussion of whether District action may – purposefully or inadvertently – be taking a side in the private-sector dispute between large multinational corporations.

This is not the first time that consumers have been dropped in the middle of a "proxy war" between primary and secondary market ticket platforms. In the early 2010s, StubHub and Live Nation/Ticketmaster reportedly founded competing (and similarly-named) astroturf groups pushing for state legislation on "paperless tickets" that would generally benefit one industry or the other.[15] [16]

The use of the term "fan" in this discourse taps into emotional connections and memories that all of us have with our favorite artists and performers. Ultimately, a ticket-buyer is a consumer, and regulations on the ticketing market are consumer protections. It is important to recognize the ways in which this market behaves differently from others, without treating it as wholly exceptional.

A summary of B26-0224 and accompanying narrative can be found in the statement of introduction included in Attachment A.

## III. COMMITTEE PRINT CHANGES

***Disclosure of Initial Purchase Price; Surety bond***

Amendatory section 28-5506 of the Committee Print adds a new requirement for a secondary ticket exchange to disclose the original purchase price of the ticket listed for resale. This is information that is already required to be maintained by the bill (§ 47-2890.04), and the Committee sees this

---

[15] https://www.starnewsonline.com/story/news/2011/07/20/scalping-battle-putting-fans-in-the-middle/30866325007/

[16] https://www.nashvillescene.com/news/cp-ticketmaster-vs-stubhub-proxy-war-comes-to-tennessee/article_c1ea8d52-c41e-59f6-ac90-9a00b8bf9e99.html

disclosure to consumers as a crucial means of transparency in the secondary market. This provision mirrors legislation recently passed in Maryland.

Compared to the bill as introduced, the Print increases the surety bond requirement from $10,000 to $25,000. This is a requirement of any reseller that lists 50 or more tickets for resale in a year, meant to "ensure compensation to consumers in cases where the reseller fails to deliver purchased tickets or engages in fraudulent activities".

***Definition of Speculative Ticket***

The Committee Print also incorporates a technical change to the definition of "speculative ticket". In the introduced version of the bill, "speculative ticket" was defined as a "ticket that is not in the actual or constructive possession of a reseller at the time of listing, sale, or advertisement, including tickets that are not owned by the reseller or **not under contract** to be transferred to the reseller". The Committee Print amends the definition of "speculative ticket" to include tickets that **are under contract** to be transferred to the reseller. This technical change addresses an unintentional drafting error in the introduced version of the bill to accurately reflect the existence of "concierge services", which commonly rely on bots. The Committee agrees should be included in the definition of "speculative tickets" and prohibited.

***Regulatory Authority on Ticket Prices and Fees***

The Print adds a new provision (§ 28-5507(b)) granting the Mayor broad regulatory powers to address high costs in <u>both</u> the primary and secondary markets, including – but not limited to – the authority to limit:

> *"(1) The maximum ticket sale fees that may be charged;*
>
> *"(2) The use of dynamic pricing; and*
>
> *"(3) The total resale price of a ticket, expressed in a percentage of the total purchase price of the initial ticket."*

This supplants a provision in the bill as introduced that prescribed a cap on the price of resale tickets at 110% of the total price of the initial ticket.[17]

While the Committee supports cost controls to ensure affordability for consumers, there are risks in directly legislating a price cap, and only doing so for the secondary market.

The Committee Print's rulemaking provision achieves the following:

1. Maximizes the power and flexibility of the District to respond to a dynamic market;
2. Safeguards consumer trust in price controls; and

[17] B26-0224 Introduction, ln. 196

3. Addresses the entire ticket market, not just resale.

*Maximizes the power and flexibility of District government to respond to a dynamic market*

As discussed in Section II of this report, the ticket sale and resale industry is experiencing seismic shifts as a result of pending legal action and national policy dynamics. Even without those factors at play, event ticketing's capture by the tech sector means that it is subject to rapidly-changing strategies and business models.

The jurisdiction of the Committee on Public Works & Operations includes regulation of for-hire services like Uber, Lyft, Waymo, and DoorDash; short-term rental companies like Airbnb and VRBO; cryptocurrency markets like Bitcoin and Ethereum; and generative AI companies like OpenAI and Anthropic. In each of those industries, the Committee has encountered laws of the District that are woefully out-of-date and inadequate for strong consumer protections or a justly-regulated and competitive market – even if those laws were passed only a few years ago.

It is a known strategy of these industries to push for specificity in law while strongly opposing open-ended regulatory authority. This is done with the knowledge that business will be able to adapt and evolve faster than legislative action can ever hope to be. To enshrine a resale price cap in statute risks it being made obsolete very quickly, with no recourse other than passing another amendatory law. It is important for this law to be resilient and stand the test of time, regardless of how the industry evolves.

*Safeguards consumer trust in price controls*

Implementation is just as important as policy, and the real-world experience of a law's impact can make or break even the most well-founded proposals.

Especially when it comes to consumer protection, it is important for the public to have a clear understanding of the law. Including a specific price cap in law without it being in effect – and with the true effective date remaining uncertain – is likely to create confusion and uncertainty for consumers.

The enactment of a price cap or other price controls should come with an immediate material improvement to people's lives. Executive action can achieve this in a way that legislative action cannot.

*Addresses the entire ticket market, not just resale*

The microeconomic evidence on the impact of resale price caps *on the entire ticket market* is still uncertain. A price cap on resale tickets does not address price and supply manipulation practices in the primary ticket market; it is possible that regulating prices in the secondary market would have the effect of further consolidating monopoly power in the primary market. Establishing a statutory cap on resale prices while leaving primary market pricing largely unregulated on the local level may result in price gouging practices simply moving elsewhere in the market, especially given emergent practices of dynamic and algorithmic pricing.

It would be inadvisable to directly address primary market price regulations in B26-0224, as it might jeopardize active litigation by the D.C. Attorney general and on the federal level against Ticketmaster and Live Nation's monopolistic practices. However, not including any mention of the primary market in this legislation would not allow the District to respond to potential outcomes of these antitrust deliberations.

A broad and flexible regulatory mandate in both the secondary *and* primary markets will allow the District to address the consumer ticket-buying experience as a whole, rather than having to play price-gouging whack-a-mole.

## IV. LEGISLATIVE CHRONOLOGY

| | |
|---|---|
| April 9, 2025 | B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025, introduced |
| April 18, 2025 | Notice of Intent to Act on B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025, published in D.C. Register |
| April 22, 2025 | B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025, referred to the Committee on Public Works and Operations |
| October 3, 2025 | Notice of Public Hearing on B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025, published in D.C. Register |
| October 10, 2025 | Revised Notice of Public Hearing on B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025, published in D.C. Register |
| October 22, 2025 | Public Hearing on B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025, |
| June 22, 2026 | Committee on Public Works and Operations mark-up of B26-0224, Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025 |

## V. POSITION OF THE EXECUTIVE

The Committee received testimony at its October 22, 2025 public hearing on B26-0224 from representatives of the Mayor and the Attorney General, as follows:

***Ryan Nicholas, Legislative Director, Office of the Deputy Mayor for Planning and Economic Development***, delivered testimony jointly with ***April Randall, Legislative Director, Department of Licensing and Consumer Protection***. DMPED and DLCP's testimony expressed support for the intent of B26-224 while recommending policy adjustments, including removal of price cap provisions and providing for enforcement primarily through the establishment of a private cause

of action and criminal penalties rather than direct government monitoring and enforcement by an administrative agency.

***Kevin Vermillion, Director of Consumer Protection, Office of the Attorney General***, testified in support of B26-0224. OAG argued that the bill's transparency and anti-speculation provisions would align with their consumer protection efforts.

## VI. RESOLUTIONS BY ADVISORY NEIGHBORHOOD COMMISSIONS

***Advisory Neighborhood Commission 6B*** adopted a resolution on May 27, 2025, urging the Council to enact B26-0224 at the earliest opportunity. In its resolution, ANC 6B noted that entertainment ticket prices already exceed the budget of many DC residents and that passing B26-0224 would protect District theatergoers and concertgoers from predatory pricing by resellers.

## VII. SUMMARY OF TESTIMONY

On Wednesday, October 22, 2025, the Committee held a public hearing on B26-0224. A video recording of the hearing can be viewed at https://entertainment.dc.gov/node/1800906. The following witnesses testified at the hearing or submitted written testimony to the Committee:

***Audrey Fix Schaefer, Director of Communications, I.M.P.***, testified in support of the bill. She spoke about how I.M.P.'s independent venues are part of the District's economic infrastructure, supporting tourism, restaurants, and Metro ridership. She highlighted data from I.M.P. showing that as of October 2025, 61,000 tickets to I.M.P. venues in the District were resold at double face value or higher, totaling $60 million. She provided an example of a real-time speculative ticket example. She also spoke about the importance of a price cap to remove incentives to use bots and opined that a resale price cap will protect fans, artists, and venues.

***Ron Gubitz, Executive Director, Music Arts Coalition***, testified in support of the bill. He spoke about how artists invest their time, energy, and creative talents into their live performances. He talked about how when a ticket is resold on the secondary marketplace, an artist and their crew will never see the profit. He opined that when artists go on tour, they want diverse audiences, not just those with the deepest pockets. He expressed his support for a price cap on resold tickets and a ban on speculative ticketing as ways to protect artists.

***Jean Homza, Community Liaison, 9:30 Club***, testified in support of the legislation. She described how the ticketing industry has changed in the past few decades and the impact that these changes have had on consumers. Specifically, she highlighted consumers' experience as the 9:30 Club's community liaison with respect to the purchase of counterfeit tickets and the overall experience of competing with bots for initial tickets offered at face value. She opined that the bill would protect consumers in the District and promote fairness in the marketplace for concert tickets.

***Catherine Ferrando, Vice President of Circle I Productions, Inc. dba Black Cat***, testified in support of the legislation. She spoke about how ticket scalpers have long been a problem, but the advent of new technologies has made the problem more acute. She provided specific examples of how tickets to shows at Black Cat would be sold on the resale market on platforms like Seat Geek

and Vivid Seats for substantially more than what the artists want the tickets to be sold for. She recommended that the Committee revisit language in the bill that would require registered resellers and secondary platforms to submit reports of resale activity every 6 months. She opined that such a requirement would be unduly burdensome for both the government and small resellers.

***Adam Webb, Campaign Manager, FanFair Alliance,*** testified in support of the bill. He provided an overview of the United Kingdom's recent efforts to combat scalping via the resale market. He characterized the imposition of a price cap as a solution to the problems that are plaguing the United Kingdom's concert industry, in addition to other measures, and pointed to Ireland and Australia's recent implementation of a resale price cap as successful examples.

***Jess Scheer, 9:30 Club***, testified in support of B26-0224. She told an anecdote from a concert where she assisted a mother and daughter had bought tickets from a third-party site. The face value was $49.50 each, but they paid over $1500 a ticket only to find out they were fake. She explained that then the workers had to spend their time and energy trying to solve this issue when it was the reseller's fault. She noted scalpers only have to worry about buying and reselling, which makes it hard to compete with people who also have to focus on running a venue, putting shows on sale, and helping fans get in the door every night.

***Jake Diamond, Marketing Director, Union Stage Presents***, testified in support of B26-0224. From his experience working in the live industry, he told an example of Union Stage had a show and resellers are listing tickets as high as 2,484 dollars with an additional 611 dollars in fees. He noted those tickets were originally listed as $25. He echoed that this wastes venue staff time when reseller tickets have issues. He gave another example where original tickets were $44.77 and were resold for $359. He echoed fake tickets wastes venue staff time when reseller tickets have issues and overcharged tickets negatively affects attendance for shows.

***David Cooper, Venue Manager, The Hamilton Live***, testified in support of B26-0224. He commented on the huge profit's resellers are making and the mess of operational issues they are leaving behind. He expressed frustration that businesses have to spend extra time combating/adapting to this so that the resellers can take money out of DCs economy. He concluded by noting the huge amount of money resellers spend on advertising.

***Stephen Parker, Executive Director, National Independent Venue Association***, testified in support of B26-0224. He began by reminding the Committee that Live Nation have been opening their "digital backdoor" to scalpers and getting tickets prior to any sale, ignoring ticket limits. By ignoring the rules, the Live Nation has made 5 billion dollars. He stated this bill could take care of both Live Nation as well as third party resellers. He explained the effectiveness of price caps. He concluded by stating without action businesses will close, and artists will move away.

***Kokayi Walker, The Recording Academy***, testified in support of B26-0224. He mentioned when buying tickets hit with processing fees, delivery fees, convenience fees which is deceptive and creates the illusion that the artists are the ones getting the money. He argued "resellers are playing with love". Stating love the customers have for the artists and love the artists have for the fans. He concluded his testimony by reminding the Committee that our neighbors in Maryland have already passed a similar bill.

***Kevin Erikson, Director, Future of Music Coalition***, began his testimony stating that too often these policy debates are framed as a false choice with the Live Nation on one side and the resale industry on the other. He explained how he sees the effort to fix ticketing as two distinct pieces which add up to a holistic public policy approach: market regulation and structural, competition issues. He noted that when resellers talk about consumers saving money, they only count tickets where fans spent less, and don't count the tickets where fans spent more.

***Rohin Ghosh, Organizer, American Federation of Musicians Local 161-710***, testified in support of B26-0224, arguing resellers create a threat to the overall music community in DC. He stated AFM members are struggling with patterns of fraud.

***Kendall Gilvar, Fix the Tix Coalition***, testified in support of B26-0224. He expressed the 10% cap doesn't block resale but blocks exploitation. He noted how Maine just passed a similar legislation capping ticket prices at no more than 10%. He argued StubHub is scared to be held accountable in other states the way Maine has.

***Kevin Callahan, Head of North America Government Relations, StubHub***, testified in opposition to the bill as introduced. He argued that Stub Hub does not set ticket prices or control ticket supply, instead provide a market place connecting fans who want to attend live events with those who have extra tickets. He gave statistics showing how StubHub connected more than 20k DC residents and over 150k visitors to live events in DC. He argued against the claims of high resale prices stating 40% of concert tickets sold for under 50 dollars, and 80% priced under 100 dollars. He criticized price caps, arguing they would make ticketing less safe and less transparent. He provided research supported by Irish police authorities, banks in Ireland, and the UK suggesting price caps increased fraud. He concluded his testimony stating this act does not protect consumer rights to transfer tickets because it allows primary sellers to restrict transfer if disclosed at the time of sale.

***Chelsi Bennett, Head of Eastern US State Government Relations, StubHub***, testified in opposition to the bill as introduced. She acknowledged the importance of safe, secure, regulated sites, noting that less than 0.2% of fans have an issue at the door. She requested guaranteed transferability, arguing fans should have the freedom to use, give away or resell tickets they buy. She noted it should be disclosed to fans how tickets will be allocated for sale to the general public and transparency for how tickets will be priced. That allows consumers to make informed purchasing decisions. She supported fraud detection, stopping bots and stopping speculative ticketing. She suggested the Committee implement a provision that requires ticket issuers to report incidents of known bot usage. She concluded by also suggesting the Committee adopt right of entry protection.

***Joe Freeman, Vice President of Government Relations, Seat Geek***, testified in opposition to the bill as introduced. He criticized the idea of price caps, noting many other states declined to pursue this approach and citing data suggesting fraud would increase. He affirmed that Seat Geek is very invested in the DMV area and are an official partner with the University of Maryland. Mr. Freeman explained Seat Geek has a wide range of prices, giving consumers a choice.

***Brian Berry, Executive Director, Ticket Policy Forum***, testified in support of portions of the bill. He stated his support for refund requirements and transparency provisions. He disagreed with transferability provisions arguing this would give unchecked powers to venues and artists to strip

fans of their current rights to use, give away, and resell tickets. He also argued price caps will not work, explaining they will distort the market, and create enforcement problems in the district. He noted resale tickets can be sold for higher than their original price, but argued just as often they are sold for less than their original price. He agreed that speculative ticketing and deceptive websites should end.

***Brian Hess, Executive Director, Sports Fan Coalition***, testified in support of portions of the bill as introduced. He began his testimony by supporting many parts of the bill including all in pricing, refund guarantees and the ban on speculative ticketing. He had concerns about how the all-in pricing language would interact with federal regulations or the Federal Ticket Act. He suggested an amendment to include sports, noting sports tickets are also subjected to a higher tax rate than other entertainment tickets. His second concern is regarding the price cap. He argued price caps would eliminate that safe marketplace where lower priced tickets are available. He concluded his testimony summarizing his amendments to include sports, remove the price cap provision, harmonize the all-in pricing language with the FTC rule, add transferability protections that would enhance consumer rights and encourage the Committee to review the ticket buyer bill of rights.

***Eden Iscil, Senior Public Policy Manager, National Consumers League***, expressed support for all in pricing requirements, ban on speculative ticketing and refund protections. He requested an amendment stating tickets should be fully refundable until the day of the event if transferability is restricted and carveout for sporting events should be removed. He suggested the district should examine how it will realistically enforce price caps.

***Aden Hizkias, Policy Manager, Chamber of Progress***, testified in opposition to the bill. Ms. Hizkias testified on behalf of Chamber of Progress. She argued that if you purchase a ticket, you own it and should be able to decide what you do with it. She later stated consumers benefit from a wide array of resell options. She suggested that rather than a ban of speculative tickets, she wants to make an amendment so there is a disclosure of speculative tickets. Ms. Hizkias later echoed price c

***Collin Mortimer, Washington, DC New Liberals***, testified in opposition to the bill. He argued regulations make buying tickets more “sketchy and expensive.” To support this, he gave an example of Australia’s increase in organized crime as a result of the restrictions. He suggested these measures will limit fans' ability to buy tickets, not expand it. In closing he argued scalping would increase rather than decrease.

***Dustin Brighton, Director of Government Relations, Coalition for Ticket Fairness***, testified in opposition to the bill. He spoke about Ticketmaster’s anti-trust care and how they pressured artists and venues into exclusive contracts reducing consumer choice, inflating price, and enforcing their monopolistic power. Mr. Brighton stated B26-0024 will do nothing to reduce Ticketmaster’s market power but will risk segmenting this power. He argues price caps will allow Ticketmaster to add more fees on top of the original price.

***Sidy Toure*** testified in support for B26-0224. Mr. Toure sees it as a good opportunity to target organizations that have participated in market manipulation, price gouging. He used a personal example from 2018 when he bought a ticket for $6 and the processing fee was $12.70.

***Bill Speeler, Owner, DC9 Nightclub***, testified in support for B26-0224. Speeler began his testimony with an anecdote about a mom and daughter who purchased tickets on StubHub, they then to get their tickets downloaded with no luck. Mr. Speeler also shared concern about the high prices of tickets causing fans to not buy artist merchandise or support venues.

***Will Eastman, U Street Music Hall Presents***, testified in support of B26-0224. He began by sharing that the value of US live ticket sales is estimated to be 6 billion dollars. StubHub's current market capitalization is 6.6 billion dollars; their annual sales for 2024 were 8 billion dollars. He also argued that StubHub's money for marketing overpowers smaller promoters. He explained the fanbase turns to an "elitest environment". He concluded by echoing concerns regarding resellers stealing equity from artists, venues, and promoters.

***Alesha Edmonson, Songbyrd DC***, testified in support of B26-0224. She explained how reselling creates a fake sense of scarcity. She then stated that around 25% of venues in DC sell to Ticketmaster, most are independent. She concluded her testimony by sharing how the app Tixer places reselling restrictions including a cap and is still surviving.

***Karim Karefa, The Lincoln Theater***, testified in support of B26-0224. He explained how Lincoln Theater is a seated theater but so when duplicate tickets are sold, but there's only a certain number of seats this causes major issues. He stated issues with fake or duplicate tickets can happen to 5-10 people a night.

***Sam Myers, Association of Performing Arts Professionals (APAP)***, testified in "strong support" of B26-0224. He used anecdotes from DC and California of fans only finding tickets from third party resellers when they use Google, with direct access to venues' ticket pages buried below.

***Sharron Tapper, Executive Director, Music Managers Forum – US***, testified in support of B26-0224. She noted fans are suffering from these third party resellers, unregulated scalpers, and bots. She also pointed out the illegal use of the name, and image of the artist.

***Donald Cohen, Executive Director, Fan Alliance***, testified in support of B26-0224, stating "ticketing reform is urgently needed" He noted the repetitive issues and stories with ticket resellers makes it clear there need to be enforceable rules. He concluded his testimony stating that it's a myth that fans want choice.

***Dr. Diana L. Moss, Vice President and Director of Competition Policy, Progressive Policy Institute***, testified in opposition to the bill. She stated her support for price transparency and a ban on speculative ticketing and bots. She expressed concern about price caps and conditional ticket transfer provisions arguing the proposed legislation does not protect consumers. She argued resale is the last frontier of competition and price caps will disrupt the operation of the resale market, reducing participation. She also stated conditional transferability gives consumers no additional power. She concluded her testimony stating how this will interfere with the DOJ's antitrust case.

***Bruce Morris, Director of Government Affairs, TicketNetwork Inc.***, testified in opposition to aspects of the bill. Mr. Morris began his testimony by expressing his support for all in pricing, clear refund rights, technology to combat bots. He agreed that depopulative speculative listings should be prohibited but argued a better solution is to follow the model in the Ticket Act requiring

clear labeling and guaranteeing refunds. He then argued against a 10 percent price cap, resulting in less competition and higher total cost.

***Jason Webb, Co-founder, Tixel***, testified in support of B26-0224. He spoke about Tixel, a ticket reselling app using price caps, ban speculative listings, require all in pricing. He noted that these provisions have worked in Australia. He argued resellers need to register, holding them accountable. He noted this bill would make for more fans through the doors, more shows for the fan, overall better economy helping everyone.

***Stephen Happel*** testified in opposition to the price cap provision of the bill. Happel began his testimony by explaining his expertise in the field as a professor studying price caps for years. He argued against price caps nothing the fundamental reason there are ticket issues today is because ticket prices are too low, they want to be fair. He questions "Who's to determine what's fair?". Mr. Happel then proposed an alternative option of the Dutch auction, where you start at high prices then go down. He noted one complaint is that only the rich can go to the event; as a solution, he proposed to let people line up any time before the event.

***Marianne Jennings*** testified in opposition to the price cap provision of the bill. Ms. Jennings argued price controls don't work, arguing regulators do not know the market supply. People think price controls will take care of things, but do not know the number of tickets that are out there. Jennings argued for more transparency with supply, who is selling, and whether sellers are registered, to allow for an open, free, fair market.

***Scott Freedman*** testified in opposition to the price cap provision of the bill, stating everyone will be forced to go on the black market and StubHub and Seat Geek will go out of business, Ticketmaster will be a full-blown monopoly, and fans will pay more for their tickets. He concluded by expressing his support for getting rid of ticket purchasing bots.

***Randy Nichols*** testified in support of B26-0224. He began by claiming that not one person associated with artists, venues, and fans is against this bill. While not a fan of Ticketmaster, today, the scalpers and lobbyists lied and stated they don't have speculative tickets on their platform. StubHub calls this zone seating, this means there is not a real ticket available. StubHub spent more money on marketing than operations last year. The rock band, The Cure, on a recent tour ensured they had affordable tickets, with these restrictions only 20 tickets were sold on StubHub for their LA show. In NY where it is illegal to do that, there were 3,875 tickets sold on StubHub. In Maryland where there are protections, only 3 tickets were sold.

***Eric Fuller*** testified in opposition to the bill. Mr. Fuller argued that this is a "false problem" using the 9:30 Club as an example. He stated consumers do not need the government to tell them how to make decisions. He also noted beers in these clubs are 20 dollars, but there does not seem to be any stress to fix those prices. He closed by arguing "scalping" is the wrong word to use.

***Robert Crain*** testified in full support for B26-0224. He also noted that IMP conducted a ticket lottery when they opened The Atlantis.

***Aaron Retzioff*** provided written testimony in support of the bill.

***Aashish Parkh*** provided written testimony in support of the bill.

***Addy Long*** provided written testimony raising concerns with Ticketmaster policies.

***Aditi Hardikar*** provided written testimony in support of the bill.

***AJ Palemine*** provided written testimony raising concerns with ticket pricing and sale practices, calling for change.

***Al Kirsch*** provided written testimony in support of the bill.

***Alex Remington*** provided written testimony in support of the bill.

***Alexander Robinson*** provided written testimony in support of the bill.

***Alexandra Hurlman*** provided written testimony in support of the bill.

***Alexis Dickson***, a resident of Alabama, provided written testimony in support of the bill.

***Ali Gorban*** provided written testimony in support of the bill.

***Alicia Kover*** provided written testimony arguing that ticket resale platforms are unfair to people who need to change their plans and cautioned against helping Ticketmaster.

***Alish Edmondson*** provided written testimony in support of the bill. As a venue operator, Edmondson explained current market dynamics and predicted that a resale price cap would be beneficial.

***Allyson Jaffe, Owner/Comedy School Principal, DC Improv Comedy Club***, provided written testimony in strong support of the bill.

***Alyssa Stiles*** provided written testimony calling for protection for concert-goers.

***Amber Lance*** provided written testimony in opposition to the bill, arguing that it would help venues but not fans who need to resell tickets.

***Amy Austin, President & CEO, Theatre Washington*** and ***Katherine O. Ross, Advancement Manager, Theatre Washington***, provided written testimony in support of the bill.

***Andrei Busuioceanu, Member, RDGLDGRN***, provided written testimony in support of the bill.

***Andrew Little, Chief Operating Officer, Get Safe Online***, provided written testimony in opposition to the bill.

***Andrew Lund*** provided written testimony in support of the bill.

***Andrew McMahon*** provided written testimony in support of the bill based on experience as a long-time touring musician.

***Andrew Morrissett*** provided written testimony in support of the bill.

***Andrew Mudd*** provided written testimony in support of the bill.

***Andrew Puplis*** provided written testimony in support of the bill.

***Andrew Roulette*** provided written testimony in support of the bill.

***Andrew Santorelli*** provided written testimony in support of the bill.

***Angela Amoroso*** provided written testimony in support of the bill.

***Angela Gieras, Executive Director, Shakespeare Theatre Company***, provided written testimony in support of the bill.

***Anne Patrone*** provided written testimony in support of the bill.

***Annelise Alt*** provided written testimony in support of the bill.

An ***anonymous public witness*** provided written testimony in support of the bill.

***Anthony Farah*** provided written testimony in opposition to the bill.

***Anthony Lyons*** provided written testimony in opposition to the bill.

***Arthur Lewis*** provided written testimony in opposition to the bill.

***Ashlee Hoagland*** provided written testimony in opposition to resale price caps and in support of other provisions of the bill.

***Ashley Ortiz*** provided written testimony in support of the bill.

***Ashley Pontius*** provided written testimony in support of the bill.

***Ayla Hurley*** provided written testimony in support of the bill.

***Beates Moke*** provided written testimony in opposition to the bill.

***Benjamin Feinsilver*** provided written testimony in support of the bill.

***Bill Hoidas*** provided written testimony in opposition to the bill.

***Bill Nighton*** provided written testimony in opposition to the bill.

***Bob Boilen*** provided written testimony in support of the bill.

***Brandi McGee*** provided written testimony in support of interventions against price gouging.

***Brandy Stoffregen*** provided written testimony in support of the bill.

***Brandon Bryn*** provided written testimony in support of the bill.

***Brandon Figaro*** provided written testimony in support of the bill.

***Brendan Colee*** provided written testimony in support of the bill.

***Brendan Gillespy*** provided written testimony in support of the bill.

***Briana Flesch*** provided written testimony in support of the bill.

***Bruce Morris, Director of Government Affairs, TicketNetwork,*** provided written testimony in support of aspects of the bill and opposition to the price cap provision.

***Bruno Casu*** provided written testimony in support of the bill.

***Bryan Pulsinelli*** provided written testimony in opposition to the bill.

***Bryan Vana*** provided written testimony in support of the bill.

***Bartees Cox*** provided written testimony in support of the bill.

***Caitlyn Milliken*** provided written testimony in support of the bill.

***Carly Harvey*** provided written testimony in support of the bill.

***Caroyn Chiappa*** provided written testimony in support of the bill.

***Casey Parker*** provided written testimony in support of the bill.

***Cassandra Diamond*** provided written testimony in support of the bill.

***Cate Pittelli*** provided written testimony in support of the bill.

***Cathy DiToro*** provided written testimony in support of the bill.

***Charles Mante*** provided written testimony in opposition to the bill.

***Charles Schoening*** provided written testimony in support of the bill.

***Charles Smalls*** provided written testimony in support of the bill.

***Cherise Rhyns*** provided written testimony in support of the bill.

***Chris Gowen, Esq., Adjunct Professor of Law, American University Washington College of Law and University of Baltimore School of Law***, provided written testimony in opposition to the bill's price cap provision.

***Christie Smith*** provided written testimony in support of the bill.

***Christopher Anderson*** provided written testimony in opposition to the bill.

***Claire Tran*** provided written testimony in support of the bill.

***Conall Rubin-Thomas*** provided written testimony in support of the bill.

***Corina McClure*** provided written testimony in support of the bill.

***Corinne Rucker*** provided written testimony in support of the bill.

***Cory Chester*** provided written testimony raising concerns with Ticketmaster policies.

***Cynthia Johnson, Oh He Dead***, provided written testimony in support of the bill.

***Cynthia Tillman*** provided written testimony in support of the bill.

***Dan Millheim*** provided written testimony arguing in favor of ticket transferability and raising concerns with Ticketmaster pricing practices.

***Dave K.*** provided written testimony in opposition to the bill, including a detailed example of an event with lower resale prices than Ticketmaster prices.

***David Lowenstein*** provided written testimony in support of the bill.

***David Sheppard*** provided written testimony in support of the bill.

***Diana Hood*** provided written testimony in support of the bill and argued for a lower resale price cap.

***Domi Brown*** provided written testimony in opposition to the bill.

***Doug Murdoch, Executive Director, Mid-Atlantic NATO***, provided written testimony urging the Council to exclude movie theatres from the bill.

***Drew Walston*** provided written testimony in opposition to the bill, while noting support for certain provisions.

***Dylan Garvin*** provided written testimony in support of the bill.

***Dylan Vititoe*** provided written testimony in support of the bill.

***Edgar Dobie, Executive Producer, Arena Stage***, provided written testimony in support of the bill.

***Elizabeth Dolcimascolo*** provided written testimony in support of the bill.

***Elizabeth McCarthy*** provided written testimony in support of the bill.

***Ellie Eberts*** provided written testimony in support of the bill.

***Elliot Pourdavoud*** provided written testimony in opposition to the bill.

***Em Conley*** provided written testimony in opposition to the bill.

***Embury Russell*** provided written testimony in support of the bill.

***Emilio Tar Elo*** provided written testimony praising ticket resales.

***Emily McCreary*** provided written testimony in support of the bill.

***Emma Heidenry*** provided written testimony criticizing Ticketmaster's policies.

***Eric Hilton, Co-Founder, Thievery Corporation and H2 Collective***, provided written testimony in support of the bill.

***Erica Stanley*** provided written testimony in support of the bill.

***Erin Craig*** provided written testimony in support of the bill.

***Ethan Bensman*** provided written testimony raising concerns regarding ticket resale prices.

***Fred Logue*** provided written testimony in support of the bill.

***Gary Adler, Executive Director and Counsel, National Association of Ticket Brokers***, provided written testimony in opposition to the bill, especially the price cap provision.

***Gary Rego*** provided written testimony in opposition to the bill.

***Gary Sherwood*** provided written testimony in support of the bill.

***Gena Lamberti*** provided written testimony in opposition to the bill.

***George Moran*** provided written testimony in opposition to the bill.

***George Phelps*** provided written testimony in support of the bill.

***The Georgetown University Student Association*** submitted a written statement endorsing the bill.

***Hailey Williams*** provided written testimony in support of the bill.

***Halk Walter*** provided written testimony raising concerns with Ticketmaster transfer restrictions.

***Hannah Johnson*** provided written testimony in support of the bill.

***Haroon Popal*** provided written testimony in support of the bill.

***Heath Anthony*** provided written testimony in opposition to the bill.

***Heather Laffey*** provided written testimony in support of the bill. (The testimony suggests that the legislation would govern New Jersey venues' ticket sales.)

***Helen Daly*** provided written testimony in support of the bill.

***Ian Black*** provided written testimony in support of the bill.

***Ian Tacket*** provided written testimony in opposition to the bill.

***Ike Tiker*** provided written testimony in opposition to the bill.

***Isaih Leem*** provided written testimony in opposition to the bill.

***Isicac Lame*** provided written testimony in opposition to the bill.

***Jack Hampton*** provided written testimony in opposition to the bill.

***Jacki and Julianna Amato*** provided written testimony in support of the bill.

***Jacob Berg*** provided written testimony in support of the bill.

***Jaime Cordes*** provided written testimony in support of the bill.

***James Connor*** provided written testimony in opposition to the bill.

***James Kirschner*** provided written testimony in opposition to the bill.

***James Smith*** provided written testimony in support of the bill.

***Jamia Lewis*** provided written testimony in support of the bill.

***Jan Hall*** provided written testimony in opposition to the bill.

***Jared Oppenheim, The Gradient Perspective Records LLC***, provided written testimony in support of the bill.

***Jason Albert*** provided written testimony in support of the bill.

***Jason Berger*** provided written testimony in opposition to the bill.

***Jason Cooper*** provided written testimony in support of the bill.

***Jason Huffnagle*** provided written testimony in support of the bill.

***Jason Tipton*** provided written testimony in support of the bill.

***Jeff Hancock*** provided written testimony in support of the bill.

***Jen Pekkinen*** provided written testimony in support of the bill.

***Jennifer Cowsen*** provided written testimony in support of the bill.

***Jennifer Garlich*** provided written testimony in support of the bill.

***Jennifer Larsen*** provided written testimony in support of the bill.

***Jennifer Milewski*** provided written testimony in support of the bill.

***Jennifer Taylor*** provided written testimony raising concerns about Ticketmaster and Live Nation ticket purchase prices.

***Jennifer Zwilling, Chief Executive Officer***, and ***David Lloyd Olson, Managing Director, Theater J of the Edlavitch DC Jewish Community Center***, provided written testimony in support of the bill.

***Jenny Roque Martinez*** provided written testimony in support of the bill.

***Jenny Thomas*** provided written testimony in support of the bill and provided responses to arguments in opposition.

***Jess Fitzgerald*** provided written testimony in support of the bill.

***Jessica Kaur*** provided written testimony in support of the bill.

***Jill Shesol*** provided written testimony in support of the bill.

***Jim McGowan*** provided written testimony in support of the bill.

***Joana Lopes*** provided written testimony in support of the bill.

***Jobie Nehring*** provided written testimony in opposition to the bill, emphasizing problems with giving total control to primary sellers.

***John-Paul Moraca*** provided written testimony in support of the bill.

***Joe Lowther*** provided written testimony raising concerns with Ticketmaster pricing practices.

***Joel Green*** provided written testimony in support of the bill.

***John Aloszka*** provided written testimony in support of the bill.

***John Breyault, Vice President, Public Policy, Telecommunications, and Fraud, National Consumers League***, provided written testimony and attachments contesting various arguments in favor of the bill that had been raised during the hearing.

***John Liptak*** provided written testimony in opposition to the bill.

***John L. Simson, Program Director Emeritus, Business & Entertainment, American University***, provided written testimony in support of the bill.

***John Thompson*** provided written testimony in support of the bill.

***John Weiss*** provided written testimony in support of the bill.

***Jon Lewchenko, JL Entertainment***, provided written testimony in support of the bill.

***Jonathan Heinold*** provided written testimony in support of the bill.

***Joseph Feeley*** provided written testimony in support of the bill.

***Joseph Fitzgerald*** provided written testimony in support of the bill.

***Josh Lee*** provided written testimony in support of the bill.

***Joshua Dee*** provided written testimony in support of the bill.

***Joshua Keilholtz*** provided written testimony in support of the bill.

***Juan Anchante*** provided written testimony in support of the bill.

***Justin Benning*** provided written testimony in support of the bill.

***Justin Kantor, CEO, VenuePilot***, provided written testimony in support of the bill.

***Justin Rizzi*** provided written testimony in support of the bill.

***Karmela Harlow*** provided written testimony in support of the bill.

***Karyn Cassella*** provided written testimony in support of the bill.

***Katy Waters*** provided written testimony in opposition to the bill.

***Kayleigh Crandell*** provided written testimony in support of the bill.

***Kennedy James*** provided written testimony in support of the bill.

***Kennedy Levinson*** provided written testimony in support of the bill.

***Kerri Wood Einertson, Screen Actors Guild – American Federation of Television and Radio Artists***, provided written testimony in support of the bill.

***Kevin Castillo*** provided written testimony sharing concerns with existing ticket resale practices.

***Kevin Erickson, Director, Future of Music Coalition***, provided written testimony in support of the bill, including detailed responses to various arguments against price caps and other provisions.

***Kevin B. Kimble, Esq., Executive Director, Southern Christian Leadership Global Policy Initiative***, provided written testimony in support of the bill, except the price cap provision.

***Kevin M Shannon*** provided written testimony in opposition to the bill.

***Kevin Hawke*** provided written testimony in support of the bill.

***Kevin Winters*** provided written testimony in support of the bill.

***Kristin Johnston*** provided written testimony in support of the bill.

***Kyle McLaughlin*** provided written testimony in support of the bill.

***Kyle Neering*** provided written testimony in support of the bill.

***Larry Ball*** provided written testimony raising concerns with Ticketmaster's current ticket transfer practices.

***Larry Long*** provided written testimony in opposition to economic regulation.

***Lauren Guzowski*** provided written testimony in support of the bill.

***Lauren Sharrock*** provided written testimony in support of the bill.

***Lauren Wayne*** provided written testimony in support of the bill based on experience with Maine's ticket reform legislation.

***Leroy Richardson*** provided written testimony in support of the bill.

***Leslie Miller*** provided written testimony in support of the bill.

***Liam Hill*** provided written testimony in support of the bill.

***Lilly Tape*** provided written testimony criticizing Ticketmaster and appreciating secondary sellers.

***Lindsay Primrose*** provided written testimony in support of the bill.

***Lindsey Bechtold*** provided written testimony in support of the bill.

***Lisa Higgins*** provided written testimony in support of the bill.

***Lydia Barker*** provided written testimony in support of the bill.

***Lyle Teska*** provided written testimony in support of the bill.

***Madeline Halpern*** provided written testimony in support of the bill.

***Marco Nicoli*** provided written testimony in support of the bill.

***Mark Chalfant, Artistic + Executive Director, Washington Improv Theater***, provided written testimony in support of the bill.

***Mark Miano*** provided written testimony in support of the bill.

***Mary Harrigan*** provided written testimony in support of the bill.

***Matt Hayden*** provided written testimony in opposition to the bill.

***Matthew Bosch*** provided written testimony in support of the bill.

***Matthew Lawrence*** provided written testimony in support of the bill.

***Max Freedman*** provided written testimony in support of the bill.

***Melissa Colee*** provided written testimony in support of the bill.

***Melissa Rajaram*** provided written testimony in support of the bill.

***Melissa Schroeder*** provided written testimony in support of the bill.

***Melody Zimmer*** provided written testimony in support of the bill.

***Meredith Bronder*** provided written testimony in support of the bill.

***Michael Bracy, Adjunct Lecturer, Georgetown University, Co-Founder, Music Policy Forum***, provided written testimony in support of the bill.

***Michael Gau*** provided written testimony urging a focus on Ticketmaster's practices.

***Michael King*** provided written testimony in support of the bill.

***Michael Tierney*** provided written testimony in opposition to the bill.

***Michael Ukoha*** provided written testimony in support of the bill.

***Michael Uy*** provided written testimony in support of the bill.

***Michele Hau*** provided written testimony in support of the bill.

***Michell Fisher*** provided written testimony in support of the bill.

***Michelle Cerruti*** provided written testimony in support of the bill.

***Mikey Jacobs*** provided written testimony in support of regulations to protect against unfair resale practices.

***Miranda Vinson*** provided written testimony in support of the bill.

***Molly Dondero*** provided written testimony in support of the bill.

***Morgane Bennett*** provided written testimony in support of the bill.

***Nachum Sternbuch*** provided written testimony in opposition to the bill's price cap provision, with a focus on sports teams.

***Nick Scarci*** provided written testimony in support of the bill.

***Nicole Armstrong*** provided written testimony in support of the bill.

***Nicole Curtner*** provided written testimony in opposition to the bill.

***Nicole Geldart*** provided written testimony in support of the bill.

***Nina Rosso*** provided written testimony in support of the bill.

***Obber Top*** provided written testimony expressing objections to Ticketmaster and support for resellers.

***Olivia Ung*** provided written testimony in support of the bill.

***Paddock Grank*** provided written testimony in opposition to the bill.

***Paul Pecard*** provided written testimony in opposition to economic regulation.

***Paul R. Tetrault, Director, Ford's Theatre***, provided written testimony in support of the bill and recommended clear and strong enforcement mechanisms.

***Paula Marchesini*** provided written testimony in support of the bill.

***Payton Rangel*** provided written testimony in opposition to price minimums.

***Pete Marz*** provided written testimony in support of the bill.

***Peter Coatings*** provided written testimony in opposition to the bill.

***Quy Pham*** provided written testimony in support of the bill.

***Rachel M*** provided written testimony in support of the bill.

***Rachel Ramirez*** provided written testimony in support of the bill.

***Randy Howell*** provided a written submission raising rhetorical questions that suggest opposition to the bill.

***Raul Cantlin*** provided written testimony in opposition to the bill.

***Raylene Dufresne*** provided written testimony in support of the bill.

***Ray Brown*** provided written testimony in support of the bill.

***Rebecca Lichtenberg, Executive Director, Studio Theatre***, provided written testimony in support of the bill. Lichtenberg recommended a clear delineation of responsibility for enforcement.

***Rebecca Randolph*** provided written testimony in support of the bill.

***Regina Petersen Daniels*** provided written testimony in support of resale price caps.

***Renee Ralphton*** provided written testimony in opposition to the bill.

***Rich Shapiro*** provided written testimony in opposition to the bill.

***Rob D*** provided written testimony in support of the bill.

***Robert Klosowski*** provided written testimony in support of the bill.

***Robert Manzitti*** provided written testimony in support of the bill.

***Robin Lollar*** provided written testimony in support of the bill.

***Rod Balknight*** provided written testimony in opposition to economic regulation.

***Roman Ponos*** provided written testimony in support of the bill.

***Ryan Compton*** provided written testimony in support of the bill.

***Ryan Little*** provided written testimony in support of the bill.

***Sam Myers, Association of Performing Arts Professionals***, provided written testimony in support of the bill.

***Samuel Grantz*** provided written testimony in support of the bill.

***Sarah King*** provided written testimony in support of the bill.

***Sarah Moore*** provided written testimony in support of the bill.

***Sarah Snoots*** provided written testimony in support of the bill.

***Scott Breen*** provided written testimony in support of the bill.

***Scott Friedman*** provided written testimony in opposition to price caps.

***Seamus Pugh*** provided written testimony in support of the bill.

***Sharon Tapper, Executive Director, Music Managers Forum-US***, provided written testimony in support of the bill.

***Shawn Delp*** provided written testimony in opposition to the bill.

***Shawn Townsend, President and CEO, Restaurant Association of Metropolitan Washington***, provided written testimony in support of the bill. RAMW argued that ticket pricing practices that price consumers out of live events have spillover effects on other businesses including restaurants, drawing money out of the local economy in favor of out-of-District companies.

***Shawn Traylor*** provided written testimony in support of the bill.

***Sharon Tapper, Executive Director, Music Managers Forum-US***, provided written testimony in support of the bill.

***Shelby Dupont*** provided written testimony in support of the bill.

***Simon Favorete*** provided written testimony in opposition to Ticketmaster.

***Stephen Heise*** provided written testimony in support of the bill.

***Stephen F. Lintner*** provided written testimony in support of the bill.

***Steve Expert*** provided written testimony raising concerns with Ticketmaster's pricing practices.

***Steve Marshall*** provided written testimony in opposition to price caps.

***Sunny Stone / Sunny Reviews*** provided written testimony in opposition to the bill, arguing that it benefits Ticketmaster.

***Tano'e Brown*** provided written testimony in support of the bill.

***Tawny Elgatian*** provided written testimony in support of the bill.

***Taylor Hartley*** provided written testimony in support of the bill.

***Terina Mann*** provided written testimony in support of the bill.

***Terry Villa*** provided written testimony raising concerns with Ticketmaster and sharing appreciation for secondary market platforms.

***Thomas Rea*** provided written testimony in support of the bill.

***Tim Kincer*** provided written testimony in support of the bill.

***Toni Genberg*** provided written testimony in support of the bill.

***Tony Moore*** provided written testimony in support of the bill.

***Traise Rawlings*** provided written testimony in support of the bill.

***Trinity Diaz*** provided written testimony in support of the bill.

***Vanessa Salazar*** provided written testimony in support of the bill.

***Vic Plant*** provided written testimony in opposition to the bill.

***Virginia Miller*** provided written testimony in support of the bill.

***Walker Mitten*** provided written testimony in opposition to the bill.

***Wendy Sharrett*** provided written testimony in support of the bill.

***Will Eastman, U Street Music Hall Presents,*** provided written testimony in support of the bill.

***Will N*** provided written testimony in opposition to the bill.

***William Morrissey*** provided written testimony in support of the bill.

***William Smink*** provided written testimony in support of the bill.

***William Ward*** provided written testimony in support of the bill.

***Zachary Miller*** provided written testimony in support of the bill.

***Zachary Wood*** provided written testimony in support of the bill.

***ZiZi B*** provided written testimony in support of the bill.

## VIII. IMPACT ON EXISTING LAW

As detailed further in parts I-III and VIII of this report, B26-0224 would:

(1) Establish a new chapter of D.C. Official Code Title 28,[18] which governs "Commercial Instruments and Transactions"; and

(2) Establish a new part of D.C. Official Code Title 47, Chapter 28, Subchapter IV, which contains licensure requirements for miscellaneous regulated businesses.

A comparative print is not required for this legislation under Council Rule 803(e)(7), which states that "when a new section, or greater part is being added, such as a new chapter or title, a comparative print shall not be required but a reference to the new section or part shall be included in the committee report."

## IX. FISCAL IMPACT

The Office of the Chief Financial Officer determined that funds are not sufficient in the proposed budget and financial plan to implement B26-224. As detailed further in the attached fiscal impact statement, DLCP and OAH cumulatively would require $150,000 in Fiscal Year 2026 and $3.1 million through Fiscal Year 2030.

---

[18] Unlike many District laws, Title 28 is an "enacted" title, meaning that the Code is the primary source of law rather than an "unenacted" codification of various underlying bills. For further discussion, see Council of the District of Columbia Legislative Drafting Manual, 2019 Edition, part 2.5, https://dccouncil.gov/wp-content/uploads/2019/02/Legislative-Drafting-Manual-2019-Edition-FINAL.pdf.

## X. RACIAL EQUITY IMPACT

The Council Office of Racial Equity determined that the consumer protection provisions of B26-0224 will "likely improve access to live events, concerts, and entertainment for Black consumers who attend ticketed events in the District," while the racial equity impact of the bill's civil fine enforcement procedures is inconclusive. Refer to Attachment C for more.

## XI. SECTION-BY-SECTION ANALYSIS

Section 1 Contains the long and short titles of the legislation.

Section 2 Establishes a new chapter 55 of D.C. Official Code Title 28 ("Commercial Instruments and Transactions") to, among other things:

Provide definitions for terms such as "ticket," "secondary ticket exchange," and "speculative ticket";

Require transparent pricing in ticket sale listings and require refunds in certain scenarios such as cancelled events;

Prohibit the sale of speculative tickets by resellers and secondary exchanges;

Require clear disclosure of any limitations on transfer of tickets;

Require ticket issuers (such as concert venues) and secondary ticket exchanges to implement technological protections against unauthorized bulk purchases;

Require secondary ticket exchanges to verify resellers' qualifications and disclose original prices;

Direct the executive to issue rules, which may include ticket price restrictions; and

Provide for enforcement of this new body of law through civil fines and consumer protection litigation.

Section 3 Establishes a new Part H within D.C. Official Code Title 47, Chapter 28, Subchapter IV ("Other Licenses") to, among other things:

Require a ticket reseller license for anyone attempting to resell 50 or more tickets per year, and establish the requirements for such a license, including a surety bond to protect consumers;

Require a basic business license to operate a secondary ticket exchange; and

Direct DLCP to maintain a public list of licensed resellers.

Section 4 Makes certain provisions subject to appropriations.

Section 5 Summarizes the fiscal impact.

Section 6 Establishes the effective date.

## XII. COMMITTEE ACTION

On June 22, 2026, the Committee on Public Works & Operations held an additional meeting to consider various measures including B26-224. After ascertaining a quorum with Councilmember Wendell Felder and Council Chairman Phil Mendelson, Chairperson Nadeau provided remarks on the legislation. She then opened the floor for discussion and moved for approval of the committee print and this report. The Committee members voted as follows:

YES: Councilmember Brianne K. Nadeau, Chairman Phil Mendelson, and Councilmember Wendell Felder

NO: *none*

PRESENT: *none*

ABSENT: Councilmembers Robert C. White, Jr., and Janeese Lewis George

## XIII. ATTACHMENTS

- B26-0224 as Introduced
- Referral Memo
- Racial Equity Impact Assessment
- Fiscal Impact Statement
- Legal Sufficiency Determination
- Committee Print

**COUNCIL OF THE DISTRICT OF COLUMBIA**
**THE JOHN A. WILSON BUILDING**
**1350 PENNSYLVANIA AVENUE, NW, SUITE 110**
**WASHINGTON, DC 20004**

**Charles Allen**
Councilmember, Ward 6
Chair, Committee on Transportation and the Environment

**Committee Member**
Business and Economic Development
Health
Judiciary and Public Safety

April 9, 2025

Nyasha Howard
Secretary to the Council
Council of the District of Columbia
1350 Pennsylvania Avenue, NW
Washington, D.C. 20004

Dear Secretary Howard:

Today, I am introducing the ***"Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025"***, along with Councilmembers Brianne K. Nadeau, Kenyan R. McDuffie, Matthew Frumin, Christina Henderson, Janeese Lewis George, Robert C. White, Jr., and Zachary Parker. Please find enclosed a signed copy of the legislation.

The District is home to world-class arts and live entertainment venues. Unfortunately, the experience of buying a ticket to see an artist or musician at a concert here in the District is unfair, deceptive, and frustrating for concertgoers. Once a show is announced and tickets are released, scalpers, using bots and other technology, will typically flood the venue's ticketing platform and buy up most of the tickets to immediately resell them on secondary ticketing platforms like Stubhub, Vivid Seats, and SeatGeek, at an egregiously higher price. As a result, not only are concertgoers fleeced and price gouged, but they are denied a fair price and a fair opportunity to get initial tickets at face value. The higher prices that concertgoers pay for a ticket on the secondary market never go to the artist or venue, and instead exclusively benefit the scalper. Additionally, when a concertgoer buys a ticket on the secondary market, the exact seat number or section of the venue is typically not disclosed until the ticket has been transferred. A ticket for the same or similar seat can also have its price vary dramatically across different platforms.

Another opaque practice used by scalpers that harms concertgoers is the offer of "speculative tickets" – i.e., tickets that are not yet in their physical possession. For example, on March 28, 2025, the Sex Pistols announced a show in the District this coming September. On the very same day, the secondary market was offering $335 tickets for the show, even though tickets had not been released. When tickets are released, the initial price will be $60. Not only is this practice deceptive, as scalpers are offering to sell something that they do not actually have, it denies musicians the opportunity to set prices for their own shows.

The RESALE Amendment Act of 2025 will protect artists, venues, and consumers in the District from unfair and deceptive practices in the live event ticket market by:

- Capping the price of tickets sold on a secondary ticket platform at the total price of the initial ticket plus up to 10% of the total price of the initial ticket;
- Banning the sale of "speculative tickets";
- Requiring a reseller that sells or offers to sell 50 or more tickets a year to register annually with the Department of Licensing and Consumer Protection and to require that registered resellers provide certain information to the Department and maintain a surety bond of no less than $10,000;
- Requiring "all-in" pricing and clarifying the existing Consumer Protection Procedures Act obligation with language specifying that ticket issuers, resellers, and secondary ticket exchanges must clearly and conspicuously disclose upfront certain information regarding ticket pricing;
- Laying out when refunds must be provided to consumers;
- Prohibiting a ticket issuer from restricting the transferability of a ticket unless the terms and conditions on transferability are clearly disclosed to the consumer prior to purchase;
- Allowing ticket issuers to maintain and enforce policies and conditions or requirements for ticket purchase with respect to conduct, behavior, public health and safety, or age at the venue or event, and establish limits on the amount of tickets that can be purchased;
- Requiring a ticket issuer or secondary ticket platform to maintain reasonable technology to prevent any machine, device, computer program, or computer software, with or without human assistance, from bypassing security measures or access control systems designed to limit the number of tickets that can be purchased by a person on a marketplace for initial purchase or secondary ticket exchange;
- Imposing responsibilities on secondary ticket exchanges to ensure fair practices in the secondary market;
- Requiring the Mayor to issue rules to implement provisions governing the registration of resellers; and
- Providing for civil penalties of $5,000 for the first violation and $10,000 for the second and subsequent violations.

This legislation is supported by I.M.P., which owns the 9:30 Club, The Anthem, The Atlantis, and manages the Lincoln Theatre, 30 local venues and music organizations, including the National Independent Venue Association, and the Office of the Attorney General.

Please feel free to reach out to me or my Legislative Director, Antonio Nunes, with any questions or for additional information.

Sincerely,

Councilmember Charles Allen, Ward 6
Chairperson, Committee on Transportation & the Environment

| | |
|---|---|
| Councilmember Brianne K. Nadeau | Councilmember Charles Allen |
| Councilmember Kenyan R. McDuffie | Councilmember Matthew Frumin |
| Councilmember Christina Henderson | Councilmember Janeese Lewis George |
| Councilmember Robert C. White, Jr. | Councilmember Zachary Parker |

A BILL

________

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

__________________

To amend Title 28 of the District of Columbia Official Code to protect artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases by clarifying a ticket issuer, reseller, or secondary ticket exchange's existing obligation under the Consumer Protection Procedures Act, like in all industries, to clearly and conspicuously disclose upfront certain information regarding ticket pricing, to prescribe procedures governing the provision of refunds, to prohibit the sale of speculative tickets, to prohibit a ticket issuer from restricting the transferability of a ticket unless the terms and conditions on transferability are clearly disclosed to the consumer prior to purchase, to permit ticket issuers to maintain and enforce policies and conditions or requirements for ticket purchase with respect to conduct, behavior, public health and safety, or age at the venue or event, and establish limits on the amount of tickets that can be purchased, to require a ticket issuer or secondary ticket exchange to maintain reasonable technology to prevent any machine, device, computer program, or computer software, with or without human assistance, from bypassing security measures or access control systems designed to limit the number of tickets that can be purchased by a person on a marketplace for initial purchase or secondary ticket exchange, to require a reseller that sells or offers to sell 50 or more tickets a year to register annually with the Department of Licensing and Consumer Protection and to require that registered resellers provide certain information to the Department and maintain a surety bond of no less than $10,000, to impose responsibilities on secondary ticket exchanges, to prohibit the price of

tickets sold on a secondary ticket exchange from exceeding the total price of the initial ticket plus up to 10% of the total price of the initial ticket, to require the Mayor to issue rules to implement provisions governing the registration of resellers, and to provide for civil penalties of $5,000 for the first violation and $10,000 for the second and subsequent violations of this chapter.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025".

Sec. 2. Title 28 of the District of Columbia Official Code is amended as follows:

(a) The table of contents is amended by adding a new chapter designation to read as follows:

"55. Sale and Resale of Event Tickets.".

(b) A new Chapter 55 is added to read as follows:

"CHAPTER 55. SALE AND RESALE OF EVENT TICKETS.

"28-5501. Definitions.

"28-5502. Ticket disclosure and refund requirements.

"28-5503. Prohibition on the sale or offer to sell of speculative tickets.

"28-5504. Transferability of tickets.

"28-5505. Requirement of reasonable technology for a ticket issuer and secondary ticket exchange.

"28-5506. Reseller registration and reporting requirements.

"28-5507. Secondary ticket exchange responsibilities.

"28-5508. Price cap for tickets on secondary ticket exchange.

"28-5509. Rules.

"28-5510. Penalties and enforcement.

"§ 28-5501. Definitions.

"For the purposes of this chapter, the term:

"(1) "Department" means the Department of Licensing and Consumer Protection.

"(2) "Resale" means the second or subsequent sale of a ticket by any method, including in-person transactions, telephone, mail, e-mail, facsimile, or electronic means through a website or mobile application.

"(3) "Reseller" means a person engaged in the resale of tickets.

"(4) "Secondary ticket exchange" means an electronic marketplace that enables a person to sell, purchase, and resell tickets.

"(5) "Speculative ticket" means a ticket that is not in the actual or constructive possession of a reseller at the time of listing, sale, or advertisement, including tickets that are not owned by the reseller or not under contract to be transferred to the reseller.

"(6) "Ticket" means any form of physical, electronic, or other evidence that grants the possessor of the evidence license to enter a place of entertainment for one or more events at a specified date and time; provided, that the event is not organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District.

"(7) "Ticket issuer" means a person or their agent who issues tickets for initial sale, including musicians, venues, promoters, theater companies, and marketplaces for initial purchases.

"§ 28-5502. Ticket disclosure and refund requirements.

"(a) The listing for a ticket and each step of a transaction to purchase a ticket shall clearly and conspicuously disclose:

"(1) The total price of the ticket, including all fees and taxes other than shipping costs that are not determinable at a step in the transaction;

"(2) An itemized listing of all charges that comprise the total price of the ticket, including all fees and taxes; and

"(3) The seat number, zone, and section, to the extent applicable to the seat and venue.

"(b)(1) The total price of a ticket disclosed pursuant to subsection (a) of this section may be increased in a noninitial step of a transaction by the amount of reasonable shipping costs for physically delivered tickets.

"(2) The shipping costs allowed under paragraph (1) of this subsection may vary with the consumer's location relative to the shipment's location of origin and the delivery method selected by the consumer.

"(3) The total price of the ticket, including all fees, taxes, and shipping costs, shall be clearly and conspicuously disclosed prior to final purchase of the ticket.

"(c)(1) A ticket issuer, secondary ticket exchange, or reseller directly engaged in a transaction with a consumer shall provide a full refund, including all fees and taxes, if:

"(A) The ticket is counterfeit;

"(B) The event is canceled; or

"(C) The ticket does not conform to the description provided at the time of purchase.

"(2) Refunds shall be issued within 10 days of the event's cancellation or discovery of non-conformance.

"§ 28-5503. Prohibition on the sale or offer to sell of speculative tickets.

"A reseller or a secondary ticket exchange shall not sell or offer to sell speculative tickets, as defined in § 28-5501(4).

"§ 28-5504. Transferability of tickets.

"(a) A ticket issuer shall not restrict the transferability of a ticket sold unless the terms and conditions on transferability are clearly and conspicuously disclosed to the consumer prior to purchase and the consumer acknowledges receipt of such disclosure prior to purchase.

"(b) A ticket issuer may, subject to applicable District or federal law:

"(1) Maintain and enforce policies and conditions or requirements for ticket purchase with respect to conduct, behavior, public health and safety, or age at the venue or event; and

"(2) Establish limits on the quantity of tickets that may be purchased.

"§ 28-5505. Requirement of reasonable technology for a ticket issuer and secondary ticket exchange.

"A ticket issuer, to the extent applicable, and secondary ticket exchange shall implement and maintain reasonable technology to prevent any machine, device, computer program, or computer software, with or without human assistance, from bypassing security measures or access control systems designed to limit the number of tickets that can be purchased by a person on a primary or secondary ticket exchange.

"§ 28-5506. Reseller registration and reporting requirements.

"(a)(1) A reseller that sells or offers to sell 50 or more tickets in a year shall register annually with the Department before conducting any ticket resale activity.

"(2) If a reseller lists a single ticket across multiple platforms, the total number of listings for the ticket shall count toward the registration threshold provided in paragraph (1) of this subsection.

"(b) A reseller subject to the requirement imposed in subsection (a) of this section shall provide the following information to the Department at the time of registration:

"(1) Full legal name and any aliases or usernames used in the resale of tickets;

"(2) Contact information, including a physical street address, email address, and phone number;

"(3) Social security number and employer identification number ("EIN") and contact information for any employer, if applicable;

"(4) All associated entities involved in the resale of tickets; and

"(5) Any additional information required by the Department.

"(c) All entities under common ownership or control of a person shall be considered one reseller for the purposes of the registration requirements imposed under this section.

"(d) A registered reseller shall submit a report every 6 months to the Department containing:

"(1) The total number of tickets sold by the reseller;

"(2) The original purchase price of each ticket purchased by the reseller; and

"(3) The final resale price of each ticket sold by the reseller.

"(e)(1) A registered reseller shall maintain a surety bond of no less than $10,000 to ensure compensation to consumers in cases where the reseller fails to deliver purchased tickets or engages in fraudulent activities.

"(2) The surety bond shall cover compensation for lost funds by the consumer, including travel expenses incurred by the consumer if the reseller fails to deliver the purchased tickets.

"(3) The Department may adjust the surety bond amount for a registered reseller based on the reseller's sales volume and consumer complaint history.

"(4) A registered reseller shall submit evidence of the surety bond to a secondary ticket exchange prior to listing any ticket for resale.

"(f) The Department may revoke the registration of any registered reseller found to be in violation of this chapter for a period of at least 1 year and not more than 5 years.

"(g)(1) The Department shall maintain a list of registered resellers and make the list available to the public via the Department's website.

"(2) The list required pursuant to paragraph (1) of this subsection shall be updated at least once every 30 days and include information on any violations of this chapter within the past 5 years.

"(3) The Department shall not publicly disclose information provided by a registered reseller pursuant to subsection (b)(3) of this section.

"§ 28-5507. Secondary ticket exchange responsibilities.

"(a) A secondary ticket exchange shall maintain records of all registered resellers in the District using its platform and verify that each reseller meets the registration and bonding requirements laid out in § 28-5506.

"(b) A secondary ticket exchange shall report any unregistered or non-compliant resellers selling or offering to sell tickets to an event being held in the District to the Department.

"(c) A secondary ticket exchange shall:

"(1) Be responsible for maintaining records of ticket sales on its platform, including the number tickets sold and resale prices; and

"(2) Submit a report to the Department every 6 months containing:

"(A) The total number of tickets sold by a registered reseller on its platform;

"(B) The original purchase price of each ticket purchased by a registered reseller; and

"(C) The final resale price of each ticket sold by a registered reseller.

"§ 28-5508. Price cap for tickets on secondary ticket exchange.

"(a) A reseller or secondary ticket exchange shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket.

"(b) A secondary ticket exchange may charge a fee for the service of providing a marketplace for the resale of a ticket; provided, that the fee shall not exceed 10% of the total price of the initial ticket.

"§ 28-5509. Rules.

"The Mayor, pursuant to Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), shall issue rules to implement § 28-5506.

"§ 28-5510. Penalties and enforcement.

"(a)(1) A reseller or secondary ticket exchange that violates § 28-5503 or § 28-5508 shall be assessed a civil penalty of:

"(A) $5,000 per ticket for the first violation; and

"(B) $10,000 per ticket for the second and any subsequent violations.

"(2) Any person, where applicable, who violates §§ 28-5502, 28-5504, 28-5505, 28-5506, 28-5507, shall be assessed a civil penalty of:

"(A) $5,000 for the first violation; and

"(B) $10,000 for the second and any subsequent violations.

"(b) The civil penalty imposed pursuant to subsection (a) of this section shall be in addition to the remedies available to the Attorney General pursuant to § 28-3909.".

Sec. 3. Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 4a of the General Legislative Procedures Act of 1975, approved October 16, 2006 (120 Stat. 2038; D.C. Official Code § 1-301.47a).

Sec. 4. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)).

# COUNCIL OF THE DISTRICT OF COLUMBIA
## 1350 Pennsylvania Avenue, N.W.
## Washington D.C. 20004

Memorandum

| | |
|---|---|
| To : | Members of the Council |
| From : | Nyasha Smith, Secretary to the Council |
| Date : | Monday, April 14, 2025 |
| Subject : | Referral of Proposed Legislation |

Notice is given that the attached proposed legislation was introduced in the Office of the Secretary on Wednesday, April 09, 2025. Copies are available in Room 10, the Legislative Services Division.

TITLE: "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025", B26-0224

INTRODUCED BY: Councilmembers Allen, Frumin, Lewis George, Parker, Nadeau, McDuffie, Henderson, and R. White

The Chairman is referring this legislation to the Committee on Public Works and Operations.

Attachment
cc: General Counsel
Budget Director
Legislative Services

CORE COUNCIL OFFICE OF RACIAL EQUITY

# BILL 26-0224 – COMMITTEE PRINT

# RACIAL EQUITY IMPACT ASSESSMENT

## RESTRICTING EGREGIOUS SCLAPING AGATINST LIVE ENTERTAINMENT AMDENDMENT ACT OF 2025

| | |
|---|---|
| **TO:** | The Honorable Phil Mendelson, Chairman, Council of the District of Columbia |
| **FROM:** | Milika Robbins, Director, Council Office of Racial Equity |
| **LEAD ANALYST:** | Victoria Price Husher, Policy Analyst |
| **DATE:** | June 22, 2026 |

## COMMITTEE

Committee on Public Works and Operations

## BILL SUMMARY

Bill 26-0224 establishes clear rules for ticket sellers, resellers, and websites where tickets are resold, to ensure that buyers see fair ticket prices, honest information, and legitimate tickets.

## CONCLUSIONS

- Bill 26-0224's provision to cap ticket resale prices at 10% above the original ticket price will likely improve access to live events, concerts, and entertainment for Black consumers who attend ticketed events in the District.
- Bill 26-0224's provision for ticket refunds will likely improve economic outcomes for Black residents in the District.
- The racial equity impact of Bill 26-0224's civil fine enforcement is inconclusive.

## FURTHER CONSIDERATION

It is important to note the potential impacts of bypassing a "fix-not-fine" approach to enforcement—especially with individual, smaller scale sellers.

---

**Content Warning:** The following content touches on racism, racism, fraud, and economic exploitation Some or all of these issues may trigger a strong emotional response. We encourage you to use this knowledge in the way that is most helpful to you.

**Document Overview:** The document you are about to read is a Racial Equity Impact Assessment, a careful and organized examination of how Bill 26-0224 will affect different racial and ethnic groups. In other words, this assessment answers the question, "If Bill 26-0224 passes, how will it impact Black, Indigenous, and residents of color in the District of Columbia?"

During Council Period 26 (from 2025-2026), the Council Office of Racial Equity can write up to two Racial Equity Impact Assessments (REIAs) while the Council is considering a bill.

First, we can write a REIA that analyzes the introduced version (first draft) of the bill. We published a REIA on the introduced version of Bill 26-0224 on December 4, 2025. The second REIA we can publish analyzes the

bill's committee print (the updated draft of a bill after receiving feedback)—this is the REIA you are reading now. For an in-depth explanation of the REIA process, see CORE's website.

## BILL SUMMARY

*The following content summarizes Bill 26-0224 in plain language for the purposes of discussion. This explanation is not a substitute for reading the bill, or if passed, the law. Mentions of "bill" throughout this REIA refer to the committee print unless otherwise stated.*

Bill 26-0224 sets clear rules for anyone selling tickets in the District, including ticket sellers, resellers, and resale websites, to make ticket buying fair and transparent. For all types of ticket sellers, the bill requires all-in pricing, which means sellers must clearly show the full ticket price before purchase, including all fees and taxes. They must also disclose the seat number, section, and zone of a ticket before purchase. Under the bill, if a ticket is fake, an event is canceled, or the ticket does not match its description**, ticket sellers, ticket resellers, and ticket resale websites must provide a full refund within 10 days.** Then, the bill outlines various requirements for each group.

**Requirements for ticket sellers.** Ticket sellers must clearly explain any restrictions on ticket transfers.[1] The bill also allows ticket sellers to enforce rules about behavior, public health and safety, age limits at the venue, and limits on how many tickets each person may buy. The bill requires ticket sellers to use technology that blocks automated tools (like bots) that bypass ticket purchase limits.

**Requirements for ticket resellers and resale websites**. Bill 26-0224 caps resale prices; it prohibits ticket resales at prices more than 10% of the original ticket's total price, and it limits service fees on resale websites to no more than 10% of the original ticket price. It also bans the sale of speculative tickets, which are tickets that are sold by the reseller before the reseller has the tickets in their possession.

Under the bill, ticket resellers must be registered businesses in the District. Resellers who sell or offer to sell 50 or more tickets a year must register annually with the Department of Licensing and Consumer Protection (DLCP). They must provide their contact information, usernames, and identification numbers, and maintain a surety bond[2] of at least $25,000.[3] Ticket resellers must maintain records for at least three years documenting the number of tickets resold, the original purchase price of each ticket, and the final resale price. Secondary ticket exchanges must also maintain records of ticket resales and provide those records to the Department of Licensing and Consumer Protection upon request.[4]

**Penalties and fines.** The bill imposes civil penalties for violations of these laws. Ticket sellers, ticket resellers, and ticket resale websites will be issued a civil penalty of $1,000 for a first violation, $2,000 for a second violation, $4,000 for a third violation, and $8,000 for a fourth or subsequent violation.[5] These penalties apply to violations of the requirements listed above for ticket sellers, ticket resellers, and resale websites. Ticket sellers and resellers may also be penalized for failing to provide timely refunds when a ticket is fake, not as described, or the event is canceled. Resale websites may also be penalized for allowing unlicensed resellers to use their platforms, failing to verify licensure and bonding requirements, failing to keep required records, or failing to report noncompliant resellers to the DLCP.

---

[1] Ticket sellers can restrict transfers only when the buyer sees and accepts the terms of restricting transfers before purchasing a ticket.

[2] A surety bond is money held by a third party to make sure a business keeps its promises. If the business does not keep its promise, then the bond is used to pay the customer back. Legal Information Institute. "Surety Bond." Accessed November 2025.

[3] The bill requires resale websites to verify that resellers on their platforms are properly registered and bonded.

[4] The bill also requires original ticket resellers to keep detailed records of ticket sales, report unregistered or noncompliant resellers to DLCP, and file their own six-month reports.

[5] District of Columbia Municipal Regulations. Class 2 Civil Infractions.

## BACKGROUND

To analyze the racial equity impacts of this bill, it is critical to understand the context surrounding the issue as well as data on current racial inequities. Below, we summarize research on ticket sales, fraud, and income.

### Ticket Resale Marketplace

Ticket reselling, often called ticket scalping, happens when someone buys tickets at their original price and resells them—usually online—for a higher amount.[6] Research shows that most large scale ticket reselling is not done by regular fans.[7] It is done by professional ticket sellers who buy tickets in bulk and then resell them. Many of these sellers use automated bots and special software to buy large numbers of tickets when they go on sale, which leaves fewer tickets for the general public.[8] Some also create many fake accounts and use multiple credit cards to get around ticket purchase limits.[9]

Research also shows that a small number of powerful companies—including Ticketmaster and Live Nation—control large portions of event ticketing and can use this market power to raise prices, add hidden fees, and limit consumer choice.[10] Large ticket resale websites like StubHub, SeatGeek, and Vivid Seats do not usually buy tickets themselves. Instead, they act as online marketplaces where people can resell tickets and take a fee from every sale. Because they earn money from each resale, these websites also benefit when tickets are sold at very high prices. As a result, professional ticket sellers and resale websites together shape most of the resale market. Notably, no data indicates how many people resell on a small individual level or offline. Most data reports total resale activity without separating individual resellers from large scale resellers.

While some resale activity is legal, the practice becomes harmful when resellers inflate prices far above the original value, use automated bots to purchase tickets in bulk before the general public has a fair chance to buy them, or fail to provide transparent information about fees and seat locations.[11] These practices make it harder for people to access events at fair prices and can disproportionately affect residents with lower incomes who already face barriers to participating in cultural and entertainment opportunities.[12] Federal and state governments have attempted to regulate ticket resale practices, but buyers are still at risk.

Data shows significant consumer risk and financial harm associated with ticket scalping. One study estimates that 70% of resale website consumers worry about being scammed or overcharged, and 35% say they have already experienced problems with tickets bought on a resale website.[13] Resale tickets sell for more than double their face value, with average resale markups reaching 203%.[14] In the District, venues operated by I.M.P. reported that 61,000 tickets were resold at double face value or more, and some events

[6] Noah Walton. "Ticketmaster's Dominant and (Theoretical) Innocence." 2023.
[7] U.S. Government Accountability Office. "Event Ticket Sales: Market Characteristics and Consumer Protection Issues." May 14, 2018.
[8] Federal Trade Commission. "FTC Takes Action Against Ticket Resellers for Using Illegal Tactics." August 18, 2025.
[9] U.S. Government Accountability Office. "Event Ticket Sales: Market Characteristics and Consumer Protection Issues." May 14, 2018.
[10] Scott D. Simon. "New York's Scalping Law." Fordham Law Review. Accessed November 2025; United States Department of Justice "Justice Department Sues Live Nation-Ticketmaster for Monopolizing." May 22, 2024; Investopedia. "Ticketmaster Monopoly: Analyzing Its Market Dominance and Criticisms." November 18, 2025.
[11] Ibid.
[12] Ibid.
[13] Andrew Gallant. "Consumer Confidence in Resale Ticket Purchases Is Low Amid Busy Live Event Season." Civic Science. June 13, 2023.
[14] National Independent Talent Organization "Ticket Resale Study." Accessed November 2025.

saw resale markups as high as 38 times the original price.[15] At one venue in the District, the average face-value ticket price was $37, and the average resale price reached $395.[16]

## Regulation and Enforcement

In the US, ticket resale laws are established by each state. However, at the federal level, the Better Online Ticket Sales Act (BOTS) prohibits the use of automated software that bypasses ticket purchase limits—and authorizes the Federal Trade Commission (FTC) to act against sellers who obtain or sell tickets through bots.[17] Data on the effectiveness of ticket resale laws in preventing or reducing ticket scalping is limited. One study found that US anti-scalping laws "do little to accomplish what they were originally set out to do: protect consumers."[18] Research attributes this limited impact to weak enforcement, rapid changes in resale technology, and the rise of large, coordinated resale operations.[19]

There are notable ticket resale regulations in the US. In California, the Ticket Sales and Distribution Act mandates that ticket resellers register and obtain a license.[20] This measure not only regulates ticket sales but also promotes accountability among resellers.[21] In New York, ticket resale laws require sellers to disclose the original ticket price and prohibit excessive price markups.[22] This legislative approach has become a blueprint for other states.[23]

Notably, there is no data on the effectiveness of California's licensing system or New York's price-disclosure and price markup laws. Researchers have not found clear evidence that licensing requirements or resale price limits have reduced resale prices or limited bot activity. Researchers note this lack of evidence and emphasize that while these states have some of the strongest statutory frameworks in the US, policymakers still do not have reliable metrics on how effective these laws have been in practice.[24]

Other countries have also crafted ticket sale laws. Ireland and several Australian states have adopted price caps, bans on speculative tickets, and platform enforcement duties.[25,26] These models show that disclosure requirements, price ceilings, and mandatory platform compliance can reduce extreme resale markups and improve transparency.[27]

## Consumer Impact

Residents earning a lower income face a significant barrier to attending popular ticketed events because of high resale ticket prices. Research shows that resellers often set ticket prices much higher than the original amount; therefore, people with higher incomes are more likely to afford them.[28] As a result, buyers with a lower income are pushed out of the market while higher income buyers can continue to participate.[29]

---

[15] Capital News Service. "DC Bill Seeks to Cap Ticket Resale Prices amid Steep Costs." Baltimore Fishbowl. November 3, 2025.
[16] "D.C. Council Proposes Bill to Cap Resale Prices for Concert Tickets." Capital Bop. October 29, 2025.
[17] U.S. Senate Committee on Commerce, Science, & Transportation. "Examining the Better Online Ticket Sales Act of 2016." September 13, 2016.
[18] Drayer Joris. "Examining the Effectiveness of Anti-Scalping Laws in a United States Market." Sport Management Review. August 14, 2011.
[19] Scott D. Simon. "New York's Scalping Law." Fordham Law Review. Accessed November 2025.
[20] Squire Patton Boggs. Guide to US Ticket Resale Regulations Fifth Edition. August 2024.
[21] Ibid.
[22] Ibid.
[23] Ibid.
[24] Ibid.
[25] Noah Walton. "Ticketmaster's Dominant and (Theoretical) Innocence." 2023.
[26] Scott D. Simon. "New York's Scalping Law." Fordham Law Review. Accessed November 2025.
[27] Noah Walton. "Ticketmaster's Dominant and (Theoretical) Innocence." 2023.
[28] U. S. Government Accountability Office. "Event Ticket Sales: Market Characteristics and Consumer Protection Issues." May 14, 2018.
[29] Phillip Leslie and Alan Sorensen. "The Welfare Effects of Ticket Resale." National Bureau of Economic Research. November 2009.

Research finds that in some instances, fans pay four times the original ticket price or lose the chance to attend altogether. National spending data also shows that people in higher income households spend far more money on entertainment than people in lower income households, even when entertainment makes up a similar share of each group's budget. When resale prices are double or triple the original price, people with higher incomes can absorb the cost, while people with lower incomes often cannot. This ultimately limits who can attend concerts, sports games, and other live events, and it reduces access to cultural experiences for people with smaller budgets.

It is important to consider that Black residents in the District are overrepresented in the lowest income brackets, which limits their access to event and entertainment tickets when resale prices climb to two or three times the original price. In the District, three out of four residents experiencing poverty are Black. The median income for a four person Black family ($60,089) in the District is about one-third of the median income for a four person white family ($166,774). This difference of more than $100,000 in median income highlights racial inequities in economic outcomes and limits the ability to recover from financial harm. Because of these long-standing income gaps, Black residents—who have lower median household incomes—experience greater financial barriers when resale prices rise far above face value. As a result, ticket scalping places the heaviest burdens on residents with the least financial flexibility and the highest risk of financial loss. Research also shows that high resale markups increase existing inequities by reducing access to musical, sporting, and cultural events that build community and social connection.

## RACIAL EQUITY IMPACTS

**Bill 26-0224's provision to cap ticket resale prices at 10% above the original ticket price will likely improve access to live events, concerts, and entertainment for Black consumers who attend ticketed events in the District.** Bill 26-0224 requires ticket resellers and resale websites to sell tickets at no more than 10% above the total original price. The bill also bans the sale of speculative tickets, requires all-in pricing and upfront seat and fee disclosures, and requires high volume resellers to register with the District.

Residents with lower incomes face the greatest barriers to obtaining resale tickets because high resale prices make many events too expensive to attend. When resellers double or triple the price of a ticket, access shifts toward buyers with higher incomes and away from those with smaller budgets. Increased ticket resale prices prevent people who cannot afford to pay from attending events, which results in unequal access to cultural and community experiences.

CORE did not uncover data highlighting the impact of ticket scalping across different racial groups. However, longstanding income gaps in the District indicate that Black residents—who are overrepresented in the lowest income brackets—are likely to experience greater barriers to obtaining tickets when resale prices rise far above face value. Because ticket scalping often increases the price, these inflated prices create a barrier for consumers who have lower incomes.

**Bill 26-0224's provision for ticket refunds will likely improve economic outcomes for Black residents in the District.** Bill 26-0224's provision for ticket refunds will likely improve economic outcomes for Black residents in the District. Bill 26-0224 requires ticket sellers, ticket resellers, and resale websites to provide a full ticket refund within 10 days if a ticket is fake, an event is canceled, or the ticket does not match its description.

National research confirms that Black, Latine, and Indigenous communities experience higher rates of fraud, scams, and deceptive financial practices. These communities are overrepresented in the District's lowest income brackets. Consumers with lower median incomes face outsized harm when businesses refuse or delay refunds because they have less capacity to absorb an additional expense.

The bill's refund requirement reduces the financial risk associated with ticket purchases and ensures that residents can recover lost funds quickly. Therefore, this provision will likely improve economic outcomes for consumers who seek to recover their money after purchasing a ticket or who have had to wait weeks or months for a ticket refund.

**The racial equity impact of Bill 26-0224's civil fine enforcement is inconclusive.** The bill imposes civil fines for any violation of the proposed ticketing regulation laws. The fines are of $1,000 for a first offense, $2,000 for a second offense, $4,000 for a third offense, and $8,000 for a fourth or subsequent offense.[30] These fines may be imposed on ticket sellers, resellers, and resale websites. CORE emphasizes the importance of consumer protection regulations. However, it is unclear if fines achieve the goal of ensuring that ticket sellers, resellers, and resale websites adhere to the outlined guidelines in the bill.

As mentioned previously, New York and California have implemented provisions similar to those in Bill 26-0244. New York's provisions include a fine, focusing on reseller licensing and the use of bot software.[31] Unfortunately, CORE did not uncover research analyzing the effectiveness of civil fines in ensuring adherence. Aside from the effectiveness of fines, the degree to which the fine provision will impact racial equity and outcomes in the District depends on nuanced information.

For example, if an individual or smaller scale ticket (re)seller is fined, especially if owned by Black residents, the fine would likely negatively impact their economic outcomes given the size of the business and the experiences that Black people face in owning a small business. On the other hand, if a larger scale ticket (re)seller with a firmer economic standing (such as Ticketmaster or StubHub) is fined, it's possible that the fine may have a minor impact on their economic outcomes. In this scenario, those owners may have capital to absorb the penalty of violating the bill's provisions, which would make the fine ineffective. Overall, the impact of the bill's fine enforcement provision is highly nuanced and would rely on data regarding the effectiveness of fines in achieving adherence to the bill's provisions.

## FURTHER CONSIDERATION

**It is important to note the potential impacts of bypassing a "fix-not-fine" approach to enforcement—especially with individual, smaller scale sellers.** The "fix-not-fine" approach, highlighted by the Beloved Community Incubator, is "a principle that commits city regulators to provide people with training and resources to fix regulatory issues rather than simply fining people who are not in compliance." Minneapolis provides an example of this approach in practice, though in the realm of traffic tickets.

CORE notes the bill may approach its intended goal with aspects of a "fix-not-fine" approach. However, the bill also allows fine enforcement as an avenue to address how ticket platforms have harmed consumers. This is important to note given that individual, smaller scale sellers face potential fine amounts similar to larger corporations and platforms. The Council Office of Racial Equity has written at length about the regressive nature and rippling effects of a flat fine on Black, Indigenous, Latine, and residents of color in the District.

Notably, CORE did not uncover data regarding how many individuals in the District participate in ticket reselling (compared to large companies). However, the limited information available suggests that most high volume resale activity is concentrated among large ticketing platforms rather than individual ticket resellers.

This distinction matters. Individual, smaller scale sellers may benefit from a "fix-not-fine" model that provides guidance, education, and support on how to comply with new resale rules, rather than facing

[30] District of Columbia Municipal Regulations. Class 2 Civil Infractions.
[31] "New York Ticket Scalping Laws and Reseller Regulations." LegalClarity, February 1, 2025.

immediate civil penalties and fines that may potentially surpass the cost of the initial incident. Without an educational approach, these penalties could disproportionately burden individual or low volume sellers who may be unfamiliar with the new legal requirements, while larger companies with greater resources may be better positioned to absorb fines or navigate compliance processes.

## ASSESSMENT LIMITATIONS

**We generally do not provide policy solutions or alternatives to address our racial equity concerns.** While Council Period 26 Rules allow our office to make policy recommendations, we focus on our role as policy analysts—we are not elected policymakers or committee staff. In addition, and more importantly, racially equitable policymaking takes time. We would need more time to ensure comprehensive research and thorough community engagement to inform our recommendations.

**Assessing legislation's potential racial equity impacts is a rigorous, analytical, and organized undertaking—but it is also an exercise with constraints.** Our assessment is a summary of relevant background information and our most educated hypothesis of the bill's racial equity impacts. Of course, we have not captured all relevant information related to these topics. We encourage you to dive further into the research on your own or by using the linked footnotes as a starting point.

**Regardless of the Council Office of Racial Equity's final assessment, the legislation can still pass.** Though if a REIA is issued for a bill, committees must summarize and respond to the assessment in their committee report (a public document contextualizing the legislation). Committee reports can be found via the Legislative Information Management System (LIMS) after a bill's markup.

If a REIA identifies a negative impact on racial equity, the bill may be placed on the non-consent agenda at the next legislative meeting. However, a REIA is not binding.

**This assessment aims to be accurate and useful, but it is unlikely that we will raise *all* relevant racial equity issues present in a bill.** An omission from our assessment should not: 1) be interpreted as a provision having no racial equity impact or 2) invalidate another party's racial equity concern.

While we have reviewed both the introduced version and the committee print on the bill, we may not highlight *all* changes between the two documents. Our comparative analysis is for the purpose of this assessment.

Government of the District of Columbia
Office of the Chief Financial Officer

**Glen Lee**
Chief Financial Officer

**MEMORANDUM**

| | |
|---|---|
| **TO:** | **The Honorable Phil Mendelson**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | **Glen Lee**<br>**Chief Financial Officer** |
| **DATE:** | **June 18, 2026** |
| **SUBJECT:** | **Fiscal Impact Statement – Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026** |
| **REFERENCE:** | **Bill 26-0224, Draft Committee Print as provided to the Office of Revenue Analysis on June 16, 2026** |

## Conclusion

Funds are not sufficient in the proposed revised fiscal year 2026 and proposed fiscal year 2027 through fiscal year 2030 budget and financial plan to implement the bill. The bill costs $150,000 in fiscal year 2026 and $3.1 million through fiscal year 2030.

## Background

The bill establishes a new chapter of code governing the sale and resale[1] of live event tickets in the District. The bill requires that ticket issuers[2], secondary ticket exchanges[3], and resellers[4] to conspicuously disclose the total ticket[5] price, including all associated taxes, fees, and seat information

[1] Defined as the second or subsequent sale of a ticket by any method, including in-person transactions, telephone, mail, e-mail, facsimile, or electronic means through a website or mobile application.
[2] Defined as a person or their agent who issues tickets for initial sale, including musicians, venues, promoters, theater companies, and marketplaces for initial purchases.
[3] Defined as an electronic marketplace that enables a person to sell, purchase, and resell tickets.
[4] Means a person engaged in the resale of tickets.
[5] Defined as any form of physical, electronic, or other evidence that grants the possessor of the evidence license to enter a place of entertainment for one or more events, including live concerts, theatrical performances, shows, or similarly scheduled live activities, at a specified date and time; provided, that the event is not organized by a professional or intercollegiate sports team located in the District or professional

at each step of a transaction. The bill mandates that the final total price, in an itemized manner, inclusive of shipping for physically delivered tickets, must be disclosed prior to purchase. The bill entitles consumers to refunds[6], including taxes and fees, if a ticket is counterfeit, an event is canceled, or the ticket does not match its description.

The bill prohibits resellers and secondary ticket exchanges from selling or offering speculative tickets[7] and ticket issuers are restricted from limiting the transfer of tickets unless terms are clearly disclosed before purchase and acknowledged by the consumer. Issuers may still impose conduct, safety, age, and quantity restrictions.

The bill requires ticket issuers and secondary ticket exchanges to implement reasonable technology to block automated tools designed to circumvent ticket purchase limits. The bill requires secondary ticket exchanges to ensure that resellers are properly licensed and bonded[8] and that resellers comply with conspicuous ticket price disclosure requirements. The bill authorizes the Mayor to establish limits on ticket resale prices.[9]

Violations are Class II civil infractions[10], subject to fines[11], and constitute unlawful trade practices under District law.[12] The Mayor must issue implementing rules.

The bill requires resellers that list 50 or more[13] tickets per year to obtain a license[14] and secondary ticket exchanges to obtain a basic business license[15] through the Department of Licensing and Consumer Protection ("DLCP"). Licensed resellers must maintain a $25,000 surety bond[16] to compensate consumers for ticket delivery failures or fraud, including related travel costs. The bill mandates that DLCP maintain a public list of licensed resellers and violations. Resellers and secondary ticket exchanges must retain detailed[17] transaction records for three years and provide

athletic association with an event located in the District; provided further, that the event is not a motion picture screening.

[6] Refunds must be issued within 10 days, though nonprofits organized under Chapter 4 of Title 29 may allow consumers to donate the cost instead.

[7] Defined as a ticket that is not in the actual or constructive possession of a reseller at the time of listing, sale, resale, or advertisement, including tickets that are not owned by the reseller or not under contract to be transferred to the reseller.

[8] Pursuant to D.C. Official Code § 47-2890.02.

[9] Expressed in a percentage of the total price of the initial ticket.

[10] Penalties are in addition to existing remedies available to the Attorney General pursuant to D.C. Official Code § 28-3909.

[11] Pursuant to section 3201 of Title 16 of the District of Columbia Municipal Regulations (16 DCMR § 3201).

[12] Pursuant to D.C. Official Code § 28-3904.

[13] Duplicate listings across platforms count toward the threshold.

[14] Applicants must provide their full legal name and any aliases or usernames used in the resale of tickets; contact information, including a physical street address, email address, and phone number; all associated entities involved in the resale of tickets; proof of current surety bond; and any additional information required by DLCP. All entities under common ownership or control of a person are considered one reseller for the purposes of licensure.

[15] D.C. Official Code § 47-2851.02.

[16] DLCP may adjust bond requirements by rule.

[17] Licensed ticket resellers must keep records of: the total number of tickets they resold during the previous year; the original purchase price of each ticket; the final resale price of each ticket sold. Secondary ticket exchanges must keep record of: information on all licensed resellers using the platform; and details of all

them upon request, and exchanges must report unlicensed or non-compliant resellers. DLCP may suspend, revoke, or deny licenses for violations and non-compliance is deemed an unlawful trade practice.

**Financial Plan Impact**

Funds are not sufficient in the proposed revised fiscal year 2026 and proposed fiscal year 2027 through fiscal year 2030 budget and financial plan to implement the bill. The bill costs $150,000 in fiscal year 2026 and $3.1 million through fiscal year 2030.

| Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026<br>Fiscal Year 2026 – Fiscal Year 2030<br>(thousands $) | | | | | | |
|---|---|---|---|---|---|---|
| | **FY 2026** | **FY 2027** | **FY 2028** | **FY 2029** | **FY 2030** | **Total** |
| Department of Licensing and Consumer Protection | $150 | $685 | $317 | $323 | $330 | $1,806 |
| Office of Administrative Hearings | $0 | $333 | $340 | $347 | $354 | $1,374 |
| **TOTAL** | **$150** | **$1,019** | **$657** | **$670** | **$684** | **$3,180** |

Department of Licensing and Consumer Protection

DLCP needs a total of $150,000 in fiscal year 2026 and $1.8 million over the financial plan to implement the bill. To administer the bill, DLCP will need to hire additional personnel—consisting of one Attorney Advisor and one Data Scientist—that will cost $259,942 in fiscal year 2027 and $1 million through fiscal year 2030.

The bill requires resellers that meet ticket thresholds and secondary ticket exchanges to be licensed through DLCP. The bill requires DLCP to take enforcement action against ticket resellers and third-party platforms that fail to comply with the new licensing requirements through the imposition of civil fines or license suspension or revocation. Furthermore, the bill makes it an actionable offense if a reseller does not adhere to the price and refund requirements, resulting in an anticipated uptick in complaints filed by consumers. Enforcement action initiated by DLCP will produce an increase in appeals handled by DLCP's Office of the General Counsel (OGC). To maintain even caseload distribution and turnaround time for appeals, DLCP requires an additional Attorney Advisor. This attorney costs $145,933 in fiscal year 2027 and $1 million through fiscal year 2030.

DLCP also requires staffing and technological equipment to monitor activity the bill makes illegal. DLCP requires a Data Scientist position, which would assist with bot and fraud detection; scrape and monitor secondary market prices in near real time to ensure resellers are not overcharging

ticket resales for events in the District, including the number of tickets resold, each ticket's original purchase price, and each ticket's final resale price.

consumers; track hidden fees; run controlled tests[18] to detect discriminatory or exploitative patterns; assist with responding to complaints by aiding DLCP investigators in gathering information; model counterfactual markets[19], estimate consumer harm from hidden fees, and build the statistical exhibits that support court cases; and assess the impact of the law by measuring whether all-in pricing mandates actually changed consumer behavior or just shifted where hidden fees appear. This Data Scientist costs $114,010 in fiscal year 2027 and $470,355 through fiscal year 2030. DLCP expects technology upgrades will be necessary to adequately track and monitor online ticket sales and maintain a public list of licensed resellers and violations. The Data Scientist will be responsible for implementing the new system. DLCP requires $125,000 in fiscal year 2026 and $603,040 through fiscal year 2030 for information technology enhancements and ongoing maintenance.

DLCP requires $25,000 in FY 2026 and $130,101 through fiscal year 2030 for annual training regarding the newly imposed monitoring and compliance requirements for ticket issuers, resellers, and secondary ticket exchanges for DLCP's Business Licensing Division, OGC, and investigators; and to update DLCP's communication materials, including its online FAQs and Advisory Notices.

e

**DLCP Costs**
**Fiscal Year 2026 – Fiscal Year 2030**
**(thousands $)**

| | FY 2026[(a)] | FY 2027[(b)] | FY 2028 | FY 2029 | FY 2030 | Total |
|---|---|---|---|---|---|---|
| Salary[(c)] | $0 | $212 | $216 | $221 | $225 | $875 |
| Fringe[(d)] | $0 | $48 | $49 | $50 | $51 | $198 |
| Staff Training | $25 | $26 | $26 | $27 | $27 | $130 |
| IT Systems Initial Configuration and Maintenance[(e)] | $125 | $400 | $26 | $26 | $27 | $603 |
| **TOTAL** | **$150** | **$685** | **$317** | **$323** | **$330** | **$1,806** |

Table Notes:

(a) Fiscal year 2026 accounts for all training costs for existing DLCP staff and three months of costs for procurement and/or initial configuration of the IT system.
(b) Fiscal year 2027 assumes all employees are hired and subsequent related costs are realized.
(c) One Grade 13, Step 1 Attorney Advisor and one Grade 13, Step 1 Data Scientist. Assumes annual 2 percent growth.
(d) Fringe rate of 22.5 percent. Assumes 2.35 percent annual growth.
(e) Fiscal year 2026 and fiscal year 2027 include one-time costs.

Office of Administrative Hearings (OAH)

OAH needs a total of $333,202 in fiscal year 2027 and $1.3 million over the financial plan to implement the bill.

---

[18] Buying tickets with varied browser profiles, locations, and purchase histories.
[19] What prices would look like without monopoly power.

The bill requires DLCP to take enforcement action against ticket resellers and third-party platforms that fail to comply with the new licensing requirements and consumer protection requirements of the bill. . OAH anticipates an increased caseload tied to the likelihood that a license holder will contest a suspension or revocation of a license under the proposed legislation.

To manage the expected increase in caseload, OAH anticipates needing an additional Administrative Law Judge and a Legal Assistant. These positions will cost $283,202 in fiscal year 2027 and $1.1 million through fiscal year 2030. The Administrative Law Judge will conduct proceedings (including evidentiary hearings and status conferences), and draft orders based on the factual and legal merits of a case. The Legal Assistant will support case intake; perform data entry; manage scheduling; process and serve orders; and handle the administrative aspects of case record management.

.

OAH additionally requires $50,000 in fiscal year 2027 and $206,000 through fiscal year 2030 to cover the cost of training, equipment and licenses, and supplies for the two new employees.

| **OAH Costs<br>Fiscal Year 2027 – Fiscal Year 2030<br>(thousands $)** | | | | | |
|---|---|---|---|---|---|
| | **FY 2027** | **FY 2028** | **FY 2029** | **FY 2030** | **Total** |
| Salary[(a)] | $233 | $237 | $242 | $247 | $958 |
| Fringe[(b)] | $51 | $52 | $53 | $54 | $210 |
| Equipment and Training | $50 | $51 | $52 | $53 | $206 |
| **TOTAL** | **$333** | **$340** | **$347** | **$354** | **$1,374** |

Table Notes:

(a) One Administrative Law Judge and one Grade 5, Step 6 Legal Assistant. Assumes annual 2 percent growth.
(b) Fiscal year 2027 fringe rate of 21.8 percent. Assumes annual 2.35 percent growth.

OFFICE OF THE GENERAL COUNSEL
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

**<u>MEMORANDUM</u>**

**TO:** **Councilmember Brianne Nadeau**

**FROM:** **Nicole L. Streeter, General Counsel** NLS

**DATE:** **June 22, 2026**

**RE:** **Legal sufficiency determination for Bill 26-224, the Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026**

---

This measure is legally and technically sufficient for Council consideration.

This measure would create a new chapter in Title 28 of the District of Columbia Official Code to govern the sale and resale of event tickets. The new chapter would:

- Require ticket issuers and resellers to conspicuously disclose the total price of a ticket including fees and to issue refunds under certain circumstances;
- Prohibit the sale or resale of a speculative ticket;
- Require a ticket issuer or secondary ticket exchange to implement and maintain reasonable technology to prevent resellers from bypassing security measures;
- Require secondary ticket exchanges to verify that resellers meet any applicable licensure and bonding requirements and to disclose the original price of the ticket;
- Authorizes the Mayor to issue rules pursuant to this section; and
- Designates violation of this chapter as an unfair trade practice with attendant penalties.

Additionally, the measure would amend Title 47 of the District of Columbia Official Code to require:

- Resellers who re-sell more than 50 tickets in a year to obtain a basic business license and maintain a surety bond of $25,000 to protect against the need to issue refunds;
- Secondary ticket exchanges to obtain a basic business license;
- The Department of Licensing and Consumer Protection to maintain a list of licensed resellers on its website;
- Resellers and secondary ticket exchanges to maintain data about transactions for 3 years; and would
- Designate violation of these provisions to be an unfair trade practice with attendant penalties.

I am available if you have any questions.

**Committee Print**
**Committee on Public Works and Operations**
**B26-0224**
**June 22, 2026**

A BILL

---

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

---

To amend Title 28 of the District of Columbia Official Code to protect artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases by clarifying a ticket issuer, reseller, or secondary ticket exchange's existing obligation under the Consumer Protection Procedures Act, like in all industries, to clearly and conspicuously disclose upfront certain information regarding ticket pricing, to prescribe procedures governing the provision of refunds, to prohibit the sale of speculative tickets, to prohibit a ticket issuer from restricting the transferability of a ticket unless the terms and conditions on transferability are clearly disclosed to the consumer prior to purchase, to permit ticket issuers to maintain and enforce policies and conditions or requirements for ticket purchase with respect to conduct, behavior, public health and safety, or age at the venue or event, and establish limits on the amount of tickets that can be purchased, to require a ticket issuer or secondary ticket exchange to maintain reasonable technology to prevent any machine, device, computer program, or computer software, with or without human assistance, from bypassing security measures or access control systems designed to limit the number of tickets that can be purchased by a person on a marketplace for initial purchase or secondary ticket exchange, to require the Mayor to issue rules, to authorize the Mayor to establish regulations governing the price and fee structure for the primary and secondary ticket markets, and to provide for civil penalties for violations of this chapter; and to amend Chapter 28 of Title 47 of the District of Columbia Official Code to require a reseller that resells or offers to resell 50 or more tickets a year to obtain a license and maintain a surety bond of $25,000, to clarify that secondary ticket exchanges shall obtain a basic business license, and to outline licensing and reporting requirements for the Department of Licensing and Consumer Protection, resellers, and secondary ticket exchanges.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026".

Sec. 2. Title 28 of the District of Columbia Official Code is amended as follows:

(a) The table of contents is amended by adding a new chapter designation to read as follows:

"55. Sale and Resale of Live Event Tickets.".

(b) A new Chapter 55 is added to read as follows:

"Chapter 55. Sale and Resale of Live Event Tickets.

"28-5501. Definitions.

"28-5502. Ticket disclosure and refund requirements.

"28-5503. Prohibition on the sale or resell of speculative tickets.

"28-5504. Transferability of tickets.

"28-5505. Requirement of reasonable technology for a ticket issuer and secondary ticket exchange.

"28-5506. Requirements for resale of tickets.

"28-5507. Rules.

"28-5508. Penalties and enforcement.

"§ 28-5501. Definitions.

"For the purposes of this chapter, the term:

"(1) "Department" means the Department of Licensing and Consumer Protection.

"(2) "Resale" means the second or subsequent sale of a ticket by any method,

including in-person transactions, telephone, mail, e-mail, facsimile, or electronic means through a website or mobile application.

"(3) "Reseller" means a person engaged in the resale of tickets.

"(4) "Secondary ticket exchange" means an electronic marketplace that enables a person to sell, purchase, and resell tickets.

"(5) "Speculative ticket" means a ticket that is not in the actual or constructive possession of a reseller at the time of listing, sale, resale, or advertisement, including tickets that are not owned by the reseller and ticket that are under contract to be transferred to the reseller.

"(6) "Ticket" means any form of physical, electronic, or other evidence that grants the possessor of the evidence license to enter a place of entertainment for one or more events, including live concerts, theatrical performances, shows, or similarly scheduled live activities, at a specified date and time; provided, that the event is not a sporting event organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District; provided further, that the event is not a motion picture screening.

"(7) "Ticket issuer" means a person or their agent who issues tickets for initial sale, including musicians, venues, promoters, theater companies, and marketplaces for initial purchases.

"§ 28-5502. Ticket disclosure and refund requirements.

"(a) The listing for a ticket and each step of a transaction to purchase a ticket shall clearly and conspicuously disclose:

"(1) The total price of the ticket, including all fees and taxes other than shipping costs that are not determinable at a step in the transaction;

"(2) An itemized listing of all charges that comprise the total price of the ticket, including all fees and taxes; and

"(3) The seat number, zone, and section, to the extent applicable to the seat and venue.

"(b)(1) The total price of a ticket disclosed pursuant to subsection (a) of this section may be increased in a noninitial step of a transaction by the amount of reasonable shipping costs for physically delivered tickets.

"(2) The shipping costs allowed under paragraph (1) of this subsection may vary with the consumer's location relative to the shipment's location of origin and the delivery method selected by the consumer.

"(3) The total price of the ticket, including all fees, taxes, and shipping costs, shall be clearly and conspicuously disclosed prior to final purchase of the ticket.

"(c)(1) A ticket issuer, secondary ticket exchange, or reseller directly engaged in a transaction with a consumer shall provide a full refund, including all fees and taxes, if:

"(A) The ticket is counterfeit;

"(B) The event is canceled; or

"(C) The ticket does not conform to the description provided at the time of purchase.

"(2) Refunds shall be issued within 10 days of the event's cancellation or discovery of non-conformance.

"(3) Notwithstanding paragraphs (1) and (2) of this subsection, a nonprofit corporation organized under Chapter 4 of Title 29 of the District of Columbia Official Code shall not be required to provide a refund if a consumer elects to donate the cost of their ticket.

"§ 28-5503. Prohibition on the sale or resale of speculative tickets.

"A reseller or a secondary ticket exchange shall not sell, resell, or offer to sell or offer to resell speculative tickets.

"§ 28-5504. Transferability of tickets.

"(a) A ticket issuer shall not restrict the transferability of a ticket sold unless the terms and conditions on transferability are clearly and conspicuously disclosed to the consumer prior to purchase and the consumer acknowledges receipt of such disclosure prior to purchase.

"(b) A ticket issuer may, subject to applicable District or federal law:

"(1) Maintain and enforce policies and conditions or requirements for ticket purchase with respect to conduct, behavior, public health and safety, or age at the venue or event; and

"(2) Establish limits on the quantity of tickets that may be purchased.

"§ 28-5505. Requirement of reasonable technology for a ticket issuer and secondary ticket exchange.

"A ticket issuer and secondary ticket exchange, to the extent applicable and under the totality of the circumstances, shall implement and maintain reasonable technology to prevent any machine, device, computer program, or computer software, with or without human assistance, from bypassing security measures or access control systems designed to limit the number of tickets that can be purchased by a person on a primary or secondary ticket exchange.

"§ 28-5506. Requirements for resale of tickets.

"(a) A secondary ticket exchange shall, prior to a ticket being resold or offered to be resold:

"(1) Verify that the reseller meets all licensure and bonding requirements established in § 47-2890.02; and

"(2) Disclose the original purchase price of the ticket, including all fees and taxes in connection with the initial purchase price of the ticket.2

"§ 28-5507. Rules.

"(a) The Mayor, pursuant to Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 et seq.), shall issue rules to implement the provisions of this chapter.

"(b) Notwithstanding subsection (a) and § 28-5506(b), the Mayor is authorized to promulgate rules governing the price and fee structure for the primary and secondary market sale of tickets covered under this chapter, including establishing limitations on:

"(1) The maximum ticket sale fees that may be charged;

"(2) The use of dynamic pricing; and

"(3) The total resale price of a ticket, expressed in a percentage of the total purchase price of the initial ticket.

"§ 28-5508. Penalties and enforcement.

"(a) A violation of this chapter shall be a Class 2 civil infraction and subject to fines pursuant to section 3201 of Title 16 of the District of Columbia Municipal Regulations (16 DCMR § 3201).

"(b) Failure to comply with the requirements of this chapter shall be an unlawful trade practice under § 28-3904.".

"(c) The civil penalty imposed pursuant to subsection (a) of this section shall be in addition to the remedies available to the Attorney General pursuant to § 28-3909.

Sec. 3. Subchapter IV of Chapter 28 of Title 47 of the District of Columbia Official Code is amended as follows:

(a) The table of contents is amended by adding the following after "47-2889.08. Relation to Electronic Signatures in Global and National Commerce Act.":

"Part H. Ticket Resellers and Secondary Ticket Exchanges.".

(b) A new Part H is added to read as follows:

"Part H. Ticket Resellers and Secondary Ticket Exchanges.

"§ 47-2890.01 Definitions.

"For the purposes of this chapter, terms shall have the same meaning as set forth in § 28-5501.

"§ 47-2890.02 Ticket resellers.

"(a)(1) No reseller that posts 50 or more ticket resale listings in a year shall operate in the District without obtaining a license from the Department.

"(2) If a reseller lists a single ticket for resale across multiple secondary ticket exchange platforms, the total number of listings for the ticket shall count toward the threshold provided in paragraph (1) of this subsection.

"(b) An applicant for licensure shall provide the following information to the Department:

"(1) Full legal name and any aliases or usernames used in the resale of tickets;

"(2) Contact information, including a physical street address, email address, and phone number;

"(3) All associated entities involved in the resale of tickets;

"(4) Proof of current surety bond as required by subsection (d) of this section;

"(5) And any additional information required by the Department.

"(c) All entities under common ownership or control of a person shall be considered one reseller for the purposes of the license requirements imposed under this section.

"(d)(1) A reseller that lists 50 or more tickets for resale in a year shall maintain a surety bond of $25,000 to ensure compensation to consumers in cases where the reseller fails to deliver purchased tickets or engages in fraudulent activities.

"(2) The surety bond shall cover compensation for lost funds by the consumer, including travel expenses incurred by the consumer if the reseller fails to deliver the purchased tickets.

"(3) The Department may adjust the surety bond requirements by rulemaking.

"§ 47-2890.03 Secondary ticket exchanges.

"A secondary ticket exchange shall obtain a basic business license to operate in the District in accordance with D.C. Official Code § 47-2851.02.

"§ 47-2890.04 Reporting requirements.

"(a) The Department shall maintain a list of licensed resellers and make the list available to the public via the Department's website. The list shall:

"(1) Include the legal name, aliases, and associated entities of all registered resellers; and

"(2) Be updated at least quarterly; and

"(3) Include information on any violations of this part and Chapter 55 of Title 28 of the District of Columbia Official Code within the past 5 years.

"(b) A licensed reseller shall retain for 3 years:

"(1) The total number of tickets resold by the licensed reseller ;

"(2) The original purchase price of each ticket purchased by the licensed reseller within the previous year; and

"(3) The final resale price of each ticket resold by the licensed reseller.

"(c) A secondary ticket exchange shall:

"(1) Maintain records for 3 years of all licensed resellers and all tickets resales in the District on its platform for inspection and upon request by the Department at least annually, including:

"(A) The total number of tickets resold by a licensed reseller on its platform;

"(B) The original purchase price of each ticket resold by a licensed reseller; and

"(C) The final resale price of each ticket resold by a licensed reseller.

"(2) Report any unlicensed or non-compliant resellers that sell, offer to sale, or list tickets to an event being held in the District to the Department.

"§ 47-2890.05 Penalties and enforcement.

"(a) The Department may suspend, revoke, or deny the license of any secondary ticket exchange or reseller found to be in violation of this part and Chapter 55 of Title 28 of the District of Columbia Official Code.

"(b) Failure to comply with the requirements of this part shall be an unlawful trade practice under § 28-3904.".

Sec. 4. Applicability.

(a) This act shall apply as of January 1, 2027.

(b)(1) Amendatory section 28-5506 within section 2 and section 3 shall apply upon the date of inclusion of their fiscal effect in an approved budget and financial plan.

(2) The Chief Financial Officer shall certify the date of the inclusion of the fiscal effect in an approved budget and financial plan and provide notice to the Budget Director of the Council of the certification.

(3)(A) The Budget Director shall cause the notice of the certification to be published in the District of Columbia Register.

(B) The date of publication of the notice of the certification shall not affect the applicability of this act.

Sec. 5. Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 4a of the General Legislative Procedures Act of 1975, approved October 16, 2006 (120 Stat. 2038; D.C. Official Code § 1-301.47a).

Sec. 6. Effective date.

This act shall take effect after approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto) and a 30-day period of congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)).