# Exhibit G

ppi radically pragmatic

1919 M St NW, Ste 300
Washington, DC 20036
Tel: 202-525-3926
Fax: 202-525-3941
info@ppionline.org

**Council of the District of Columbia**
**Committee on Public Works and Operations**
**Councilmember Brianne Nadeau, Chairperson**

**B26-0224, "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025"**

**October 22, 2025**

**Testimony of Dr. Diana L. Moss**
**Vice President & Director of Competition Policy**
**Progressive Policy Institute**

The Progressive Policy Institute (PPI) hereby submits testimony opposing proposed B26-0224: Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025.[1] PPI's testimony focuses on two provisions of the proposed legislation that would regulate or otherwise debilitate the competitive secondary ("resale") ticketing market, while the anticompetitive primary ticketing market, which is monopolized by Live Nation-Ticketmaster, is allowed to operate unfettered. PPI respectfully suggests that the DC Council oppose "consumer protection" legislation that is, in reality, intended to stifle competition, to the detriment of consumers and artists.

One provision in B26-0224 imposes price caps on the resale of live events tickets. A second provision allows a ticket issuer to restrict the transferability of tickets for sale in the resale market. Both of these provisions will stifle competition in resale, handing the live events monopolist, Live Nation-Ticketmaster, even more market power. This would be an indisputable win for Live Nation-Ticketmaster and a crushing loss for consumers and artists.

To protect competition in resale — which is indisputably the only source of competition in ticketing — PPI respectfully urges the DC Council to remove the price cap provision and amend the ticket transferability provision in B26-0224 to ensure unconditional ticket transferability. At the same time, PPI commends the drafters for including a provision to promote ticket price transparency. All-in pricing fosters consumer choice by providing the information necessary for consumers to make informed ticket-buying decisions. This will protect consumers, at the same time it spurs badly needed competition in ticketing, almost all of which comes from the resale market.

---

[1] The Progressive Policy Institute (PPI) is a catalyst for policy innovation and political reform based in Washington, D.C., with offices in Brussels, the U.K., and Kiev. PPI is home to a center on competition advocacy with the goal of promoting competitive markets for the benefit of consumers and workers.

**Price Controls Are an Invasive Form of Regulation That Will Distort Resale Ticket Markets and Stifle Competition**

PPI has urged numerous state lawmakers to consider that price controls — which are an invasive and distortionary form of market regulation — work to stifle competition in resale ticketing. This will deprive fans of a critical alternative for buying tickets outside the Live Nation-Ticketmaster monopoly that dominates ticket sales and controls the entire live events supply chain. It is especially perverse that B26-0224 *contemplates no regulation* of the monopolized primary ticketing market, yet seeks to impose invasive regulation on the competitive resale ticket market.

Price controls on resale tickets are guaranteed to have several harmful effects. Specifically, price controls will:

- De-incentivize ticket sellers and buyers from participating in the resale market because prices do not reflect the actual value they place on a ticket.
- Create imbalances in supply and demand that will inject enormous inefficiencies and inequities into the resale market.
- Drive consumers back to fraudulent shadow markets where they were regularly scammed before the advent of online marketplaces. Experience with regulation of the resale ticket market in Ireland and Australia shows that price caps drive fraud and abuse.

Fans badly need competitive, fully functional resale markets as an alternative to the Live Nation-Ticketmaster monopoly. Resale empowers fans to resell their tickets for any number of reasons, including illness, family obligations, and work schedules. Resale is economically efficient because it matches more fans up with more artists, thereby driving higher demand for live events.

Legislation that seeks to regulate resale directly aids Live Nation-Ticketmaster in retaining its grip on monopoly power. Instead of passing legislation that will guarantee these adverse outcomes, PPI respectfully suggests that the DC Council reject price controls on resale and keep ticket resale unregulated.

**Regulating Resale Ticket Prices Perpetuates Monopoly Profits for Select Stakeholders But Universally Harms Consumers**

Proposals to regulate prices in the resale ticketing market in other states have failed. At the behest of three distinct groups — venues, artists, and Live Nation-Ticketmaster — a number of other states have introduced legislation that is styled as "consumer protection" to regulate resale prices. But these proposals decidedly do not protect consumers. Instead, they work to stifle competition in resale.

Proposals to regulate the resale ticketing market are based on a deeply flawed rationale that promotes the interests of market participants that profit from the Live Nation-Ticketmaster

monopoly, at the expense of consumers. Supporting monopoly profit-sharing for select stakeholders should not be the basis of legislation that purports to protect consumers.

Live Nation-Ticketmaster profits enormously by interfering with competition in the resale ticket market because consumers are forced back to Ticketmaster's monopoly ticketing platform. The company does this, for example, through the use of exclusive contracts with venues that force venues to use the Ticketmaster platform in exchange for access to Live Nation talent.

As the U.S. Department of Justice (DOJ) monopolization case against Live Nation-Ticketmaster details, venues that do not comply with Live Nation-Ticketmaster's demands suffer with fewer or less desirable shows and schedules. When venues comply with this system, they enjoy a close profit-sharing relationship with Live Nation-Ticketmaster. But maintaining profits depends critically on squeezing out competition from the resale market and steering fans back to Ticketmaster.

Exclusive contracts also hurt artists because Live Nation-Ticketmaster's strongest leverage is restricting venues' access to talent if they do not agree to use Ticketmaster. Yet some artists support regulation of the resale market because they do not get a "cut" of the ticket sale when a ticket is resold. Artists have perversely taken this position, even though: (1) the resale market puts more fans in seats, often at lower prices, filling up venues so that they can grow their fan base; and (2) it is impossible to identify any other resale market where the original seller continues to profit in the resale market.

Fans are the ultimate victims of Live Nation-Ticketmaster's exclusive contracts, which are not addressed *at all* in B26-0224. Indeed, these contracts have allowed Live Nation-Ticketmaster to amass the enormous market power that generates its sky-high ticket fees, poor quality service and a glitchy ticketing platform, and breaches of ticket buyers' data privacy and security. Competition from resellers provides consumers with an important alternative to this dismal monopoly scenario, yet B26-0224 would knee-cap that competition.

**Restricting Ticket Transferability Simply Steers Consumers Back to Live Nation-Ticketmaster's Monopoly Safe Tix Platform**

Proposed B26-0224 provides that a ticket issuer may limit ticket transferability after the buyer has purchased a ticket "unless the terms and conditions on transferability are clearly and conspicuously disclosed to the consumer prior to purchase and the consumer acknowledges receipt of such disclosure prior to purchase." This provision also hands more market power to Live Nation-Ticketmaster, for two major reasons.

First, the 75% of venues that Live Nation controls through exclusive contracts means that the majority of venues can limit ticket transferability, thus harming an enormous swath of fans and artists. Second, the "ticket issuer" is almost always going to be the Ticketmaster monopoly, which accounts for "80% or more of major concert venues' primary ticketing for concerts and a growing share of ticket resales in the secondary market."

Fans who want to transfer their tickets must do so on Ticketmaster's Safe Tix platform. Regardless of whether they are informed about, and acknowledge, transfer terms and conditions, fans have no choice but to agree to a transfer restriction because, as a monopoly, Ticketmaster is the only game in town. The transferability restriction in B26-0224 will, therefore, enshrine Ticketmaster's Safe Tix monopoly platform, stifling competition in resale and reinforcing Ticketmaster's monopoly. PPI urges the DC Council to reject any provisions for conditional transferability and give fans the power to transfer and resell their tickets as they see fit.

**Ticketing Legislation is Likely to Interfere With Antitrust Enforcement, Which is Designed to Protect Consumers**

PPI respectfully suggests that a patchwork of different state and District of Columbia regulations that target resale is not good public policy. Antitrust enforcement against Live Nation-Ticketmaster's anticompetitive, monopolistic conduct that has stifled competition and harmed fans and artists is a better approach.

PPI has been the leading voice in advocating for the DOJ's monopolization case against Live Nation-Ticketmaster, to which the District of Columbia and numerous other states have signed on. Price controls and other regulatory restraints on resale ticketing would interfere with this landmark antitrust enforcement effort. This interference ranges from thwarting antitrust analysis of markets because outcomes are distorted by controls, to creating immunity from antitrust liability.

PPI further urges the DC Council and state lawmakers to hit the pause button on legislation regarding ticket resale during the pendency and outcome of the DOJ's antitrust case. PPI appreciates the opportunity to share our analysis and perspective on B26-9224. We are happy to engage in further discussion with the DC Council on this issue.

Respectfully submitted,



Diana L. Moss, Ph.D.
Vice President and Director of Competition Policy
Progressive Policy Institute
E-mail | dmoss@ppionline.org | LinkedIn