# Exhibit T

CORE COUNCIL OFFICE OF RACIAL EQUITY

# BILL 26-0224 – AS INTRODUCED

# RACIAL EQUITY IMPACT ASSESSMENT

## RESTRICTING EGREGIOUS SCALPING AGAINST LIVE ENTERTAINMENT AMENDMENT ACT OF 2025

**TO:** The Honorable Phil Mendelson, Chairman, Council of the District of Columbia
**FROM:** Milika Robbins, Director, Council Office of Racial Equity
**LEAD ANALYST:** Victoria Price Husher, Policy Analyst
**DATE:** December 4, 2025

## COMMITTEE

Committee on Public Works

## BILL SUMMARY

Bill 26-0224 establishes clear rules for ticket sellers, resellers, and websites where tickets are resold, to ensure that buyers see fair ticket prices, honest information, and legitimate tickets.

## CONCLUSIONS

- Bill 26-0224's provision to cap ticket resale prices at 10% above the original ticket price will likely improve access to live events, concerts, and entertainment for Black consumers who attend ticketed events in the District.
- Bill 26-0224's provision for ticket refunds will likely improve economic outcomes for Black residents in the District.
- The racial equity impact of Bill 26-0224's civil fine enforcement is inconclusive.

## FURTHER CONSIDERATION

It is important to note the potential impacts of bypassing a "fix-not-fine" approach to enforcement—especially with individual, smaller scale sellers.

---

**Content Warning:** The following content touches on racism, fraud, and economic exploitation. Some or all of these issues may trigger a strong emotional response. We encourage you to use this knowledge in the way that is most helpful to you.

**Document Overview:** The document you are about to read is a Racial Equity Impact Assessment, a careful and organized examination of how Bill 26-0224 will affect different racial and ethnic groups. In other words, this assessment answers the question, "If Bill 26-0224 passes, how will it impact Black, Indigenous, and residents of color in the District of Columbia?"

During Council Period 26 (from 2025-2026), the Council Office of Racial Equity can write up to two Racial Equity Impact Assessments (REIAs) while the Council is considering a bill. This REIA analyzes the introduced version (first draft) of the bill. If published, the second REIA will analyze the committee print (the updated draft of a bill after receiving feedback). The REIA on the committee print is published ahead of the

committee vote (called the markup). To see if we have published a second REIA on this bill, please review our REIA database. For an in-depth explanation of the REIA process, see CORE's website.

## BILL SUMMARY

*The following content describes Bill 26-0224 in plain language for the purposes of discussion. This explanation is not a substitute for the bill, or if passed, the law. Mentions of "bill" throughout this REIA refer to the introduced version.*

Bill 26-0224 sets clear rules for anyone selling tickets in the District, including ticket sellers, resellers, and resale websites, to make ticket buying fair and transparent. For all types of ticket sellers, the bill requires all-in pricing, which means sellers must clearly show the full ticket price before purchase, including all fees and taxes. They must also disclose the seat number, section, and zone of a ticket before purchase. Under the bill, if a ticket is fake, an event is canceled, or the ticket does not match its description**, ticket sellers, ticket resellers, and ticket resale websites must provide a full refund within 10 days.** Then, the bill outlines various requirements for each group.

**Requirements for ticket sellers.** Ticket sellers must clearly explain any restrictions on ticket transfers.[1] The bill also allows ticket sellers to enforce rules about behavior, public health and safety, age limits at the venue, and limits on how many tickets each person may buy. The bill requires ticket sellers to use technology that blocks automated tools (like bots) that bypass ticket purchase limits.

**Requirements for ticket resellers and resale websites**. Bill 26-0224 caps resale prices; it prohibits ticket resales at prices more than 10% above the original ticket's total price, and it limits service fees on resale websites to no more than 10% of the original ticket price. It also bans the sale of speculative tickets, which are tickets that are sold by the reseller before the reseller has the tickets in their possession.

Under the bill, ticket resellers must be registered businesses in the District. Resellers who sell or offer to sell 50 or more tickets a year must register annually with the Department of Licensing and Consumer Protection (DLCP). They must provide their contact information, usernames, and identification numbers, and maintain a surety bond[2] of at least $10,000.[3] Ticket resellers must also submit a report every six months detailing the number of tickets sold, the original purchase price, and the final resale price.[4]

**Penalties and fines.** The bill imposes penalties for violations of these laws. Both individual resellers and ticket resale websites will be issued a civil penalty with a $5,000 fine for the first violation and a $10,000 fine for every additional violation. These penalties apply to violations of *all* the requirements listed above for ticket sellers, ticket resellers, and resale websites. Ticket sellers and resellers may also be fined for failing to provide timely refunds when a ticket is fake, not as described, or the event is canceled. Resale websites may also be penalized for allowing unregistered resellers to use their platforms, failing to verify registration and bonding, failing to keep required records, or failing to report noncompliant resellers to the DLCP.

**Requirements for the Mayor**. The bill requires the Mayor to issue rules to implement the reseller registration system.

---

[1] Ticket sellers can restrict transfers only when the buyer sees and accepts the terms of restricting transfers before purchasing a ticket.

[2] A surety bond is money held by a third party to make sure a business keeps its promises. If the business does not keep its promise, then the bond is used to pay the customer back. Legal Information Institute. "Surety Bond." Accessed November 2025.

[3] The bill requires resale websites to verify that resellers on their platforms are properly registered and bonded.

[4] The bill also requires original ticket resellers to keep detailed records of ticket sales, report unregistered or noncompliant resellers to DLCP, and file their own six-month reports.

## BACKGROUND

To analyze the racial equity impacts of this bill, it is critical to understand the context surrounding the issue as well as data on current racial inequities. Below, we summarize research on ticket sales, fraud, and income.

### Ticket Resale Marketplace

Ticket reselling, often called ticket scalping, happens when someone buys tickets at their original price and resells them—usually online—for a higher amount.[5] Research shows that most large scale ticket reselling is not done by regular fans.[6] It is done by professional ticket sellers who buy tickets in bulk and then resell them. Many of these sellers use automated bots and special software to buy large numbers of tickets when they go on sale, which leaves fewer tickets for the general public.[7] Some also create many fake accounts and use multiple credit cards to get around ticket purchase limits.[8]

Research also shows that a small number of powerful companies—including Ticketmaster and Live Nation—control large portions of event ticketing and can use this market power to raise prices, add hidden fees, and limit consumer choice.[9] Large ticket resale websites like StubHub, SeatGeek, and Vivid Seats do not usually buy tickets themselves. Instead, they act as online marketplaces where people can resell tickets and take a fee from every sale. Because they earn money from each resale, these websites also benefit when tickets are sold at very high prices. As a result, professional ticket sellers and resale websites together shape most of the resale market. Notably, no data indicates how many people resell on a small individual level or offline. Most data reports total resale activity without separating individual resellers from large scale resellers.

While some resale activity is legal, the practice becomes harmful when resellers inflate prices far above the original value, use automated bots to purchase tickets in bulk before the general public has a fair chance to buy them, or fail to provide transparent information about fees and seat locations.[10] These practices make it harder for people to access events at fair prices and can disproportionately affect residents with lower incomes who already face barriers to participating in cultural and entertainment opportunities.[11] Federal and state governments have attempted to regulate ticket resale practices, but buyers are still at risk.

Data shows significant consumer risk and financial harm associated with ticket scalping. One study estimates that 70% of resale website consumers worry about being scammed or overcharged, and 35% say they have already experienced problems with tickets bought on a resale website.[12] Resale tickets sell for more than double their face value, with average resale markups reaching 203%.[13] In the District, venues operated by I.M.P. reported that 61,000 tickets were resold at double face value or more, and some events

---

[5] Walton, Noah. "Ticketmaster's Dominant and (Theoretical) Innocence." 2023.
[6] U.S. Government Accountability Office. "Event Ticket Sales: Market Characteristics and Consumer Protection Issues." May 14, 2018.
[7] Federal Trade Commission. "FTC Takes Action Against Ticket Resellers for Using Illegal Tactics." August 18, 2025.
[8] U.S. Government Accountability Office. "Event Ticket Sales: Market Characteristics and Consumer Protection Issues." May 14, 2018.
[9] Simon, Scott D. "New York's Scalping Law." Fordham Law Review. Accessed November 2025; United States Department of Justice "Justice Department Sues Live Nation-Ticketmaster for Monopolizing." May 22, 2024; Investopedia. "Ticketmaster Monopoly: Analyzing Its Market Dominance and Criticisms." November 18, 2025.
[10] Ibid.
[11] Ibid.
[12] Gallant, Andrew. "Consumer Confidence in Resale Ticket Purchases Is Low Amid Busy Live Event Season." Civic Science. June 13, 2023.
[13] National Independent Talent Organization "Ticket Resale Study." Accessed November 2025.

saw resale markups as high as 38 times the original price.[14] At one venue in the District, the average face-value ticket price was $37, and the average resale price reached $395.[15]

## Regulation and Enforcement

In the US, ticket resale laws are established by each state. However, at the federal level, the Better Online Ticket Sales Act (BOTS) prohibits the use of automated software that bypasses ticket purchase limits—and authorizes the Federal Trade Commission (FTC) to act against sellers who obtain or sell tickets through bots.[16] Data on the effectiveness of ticket resale laws in preventing or reducing ticket scalping is limited. One study found that US anti-scalping laws "do little to accomplish what they were originally set out to do: protect consumers."[17] Research attributes this limited impact to weak enforcement, rapid changes in resale technology, and the rise of large, coordinated resale operations.[18]

There are notable ticket resale regulations in the US. In California, the Ticket Sales and Distribution Act mandates that ticket resellers register and obtain a license.[19] This measure not only regulates ticket sales but also promotes accountability among resellers.[20] In New York, ticket resale laws require sellers to disclose the original ticket price and prohibit excessive price markups.[21] This legislative approach has become a blueprint for other states.[22]

Notably, there is no data on the effectiveness of California's licensing system or New York's price-disclosure and price markup laws. Researchers have not found clear evidence that licensing requirements or resale price limits have reduced resale prices or limited bot activity. Researchers note this lack of evidence and emphasize that while these states have some of the strongest statutory frameworks in the US, policymakers still do not have reliable metrics on how effective these laws have been in practice.[23]

Other countries have also crafted ticket sale laws. Ireland and several Australian states have adopted price caps, bans on speculative tickets, and platform enforcement duties.[24,25] These models show that disclosure requirements, price ceilings, and mandatory platform compliance can reduce extreme resale markups and improve transparency.[26]

## Consumer Impact

Residents earning a lower income face a significant barrier to attending popular ticketed events because of high resale ticket prices. Research shows that resellers often set ticket prices much higher than the original amount; therefore, people with higher incomes are more likely to afford them.[27] As a result, buyers with a lower income are pushed out of the market while higher income buyers can continue to participate.[28]

---

[14] Service, Capital News. "DC Bill Seeks to Cap Ticket Resale Prices amid Steep Costs." Baltimore Fishbowl. November 3, 2025.
[15] "D.C. Council Proposes Bill to Cap Resale Prices for Concert Tickets." Capital Bop. October 29, 2025.
[16] U.S. Senate Committee on Commerce, Science, & Transportation. "Examining the Better Online Ticket Sales Act of 2016." September 13, 2016.
[17] Joris, Drayer. "Examining the Effectiveness of Anti-Scalping Laws in a United States Market." Sport Management Review. August 14, 2011.
[18] Simon, Scott D. "New York's Scalping Law." Fordham Law Review. Accessed November 2025.
[19] Boggs, Squire Patton. Guide to US Ticket Resale Regulations Fifth Edition. August 2024.
[20] Ibid.
[21] Ibid.
[22] Ibid.
[23] Ibid.
[24] Walton, Noah. "Ticketmaster's Dominant and (Theoretical) Innocence." 2023.
[25] Simon, Scott D. "New York's Scalping Law." Fordham Law Review. Accessed November 2025.
[26] Walton, Noah. "Ticketmaster's Dominant and (Theoretical) Innocence." 2023.
[27] U. S. Government Accountability Office. "Event Ticket Sales: Market Characteristics and Consumer Protection Issues." May 14, 2018.
[28] Leslie, Phillip, and Alan Sorensen. "The Welfare Effects of Ticket Resale." National Bureau of Economic Research. November 2009.

Research finds that in some instances, fans pay four times the original ticket price or lose the chance to attend altogether.[29] National spending data also shows that people in higher income households spend far more money on entertainment than people in lower income households, even when entertainment makes up a similar share of each group's budget.[30] When resale prices are double or triple the original price, people with higher incomes can absorb the cost, while people with lower incomes often cannot.[31] This ultimately limits who can attend concerts, sports games, and other live events, and it reduces access to cultural experiences for people with smaller budgets.

It is important to consider that Black residents in the District are overrepresented in the lowest income brackets, which limits their access to event and entertainment tickets when resale prices climb to two or three times the original price. In the District, three out of four residents experiencing poverty are Black.[32] The median income for a four person Black family ($60,089) in the District is about one-third of the median income for a four person white family ($166,774).[33] This difference of more than $100,000 in median income highlights racial inequities in economic outcomes and limits the ability to recover from financial harm. Because of these long-standing income gaps, Black residents—who have lower median household incomes—experience greater financial barriers when resale prices rise far above face value. As a result, ticket scalping places the heaviest burdens on residents with the least financial flexibility and the highest risk of financial loss. Research also shows that high resale markups increase existing inequities by reducing access to musical, sporting, and cultural events that build community and social connection.[34]

## RACIAL EQUITY IMPACTS

**Bill 26-0224's provision to cap ticket resale prices at 10% above the original ticket price will likely improve access to live events, concerts, and entertainment for Black consumers who attend ticketed events in the District.** Bill 26-0224 requires ticket resellers and resale websites to sell tickets at no more than 10% above the total original price. The bill also bans the sale of speculative tickets, requires all-in pricing and upfront seat and fee disclosures, and requires high volume resellers to register with the District.

Residents with lower incomes face the greatest barriers to obtaining resale tickets because high resale prices make many events too expensive to attend. When resellers double or triple the price of a ticket, access shifts toward buyers with higher incomes and away from those with smaller budgets.[35] Increased ticket resale prices prevent people who cannot afford to pay from attending events, which results in unequal access to cultural and community experiences.[36]

CORE did not uncover data highlighting the impact of ticket scalping across different racial groups. However, longstanding income gaps in the District indicate that Black residents—who are overrepresented in the lowest income brackets—are likely to experience greater barriers to obtaining tickets when resale prices rise far above face value. Because ticket scalping often increases the price, these inflated prices create a barrier for consumers who have lower incomes.

---

[29] Park, Gina. "Ticket Reselling Needs to Be Regulated to Preserve Future Events." Opinions. Eastside, November 2, 2025.
[30] Ibid.
[31] Bureau of Labor Statistics. "Demographic Tables." Accessed November 2025.
[32] Mitchell, Tazra. "Poverty Reduction Stalled While Racial and Income Inequality Persisted in 2023." DC Fiscal Policy Institute. September 16, 2024.
[33] "Washington, DC Median Household Income By Race." Neilsberg Research. March 2025.
[34] Leslie, Phillip, and Alan Sorensen. "The Welfare Effects of Ticket Resale." National Bureau of Economic Research. November 2009.
[35] Ibid.
[36] Park, Gina. "Ticket Reselling Needs to Be Regulated to Preserve Future Events." Eastside. November 2, 2025.

Bill 26-0224's restrictions will likely prevent the use of unfair ticket resale practices that raise costs for residents with limited disposable income. Therefore, the bill will likely improve access to concerts, sports events, and other live entertainment for Black residents in the District of Columbia.

**Bill 26-0224's provision for ticket refunds will likely improve economic outcomes for Black residents in the District.** Bill 26-0224 requires ticket sellers, ticket resellers, and resale websites to provide a full ticket refund within 10 days if a ticket is fake, an event is canceled, or the ticket does not match its description.

National research confirms that Black, Latine, and Indigenous communities experience higher rates of fraud, scams, and deceptive financial practices.[37] These communities are overrepresented in the District's lowest income brackets.[38] Consumers with lower median incomes face outsized harm when businesses refuse or delay refunds because they have less capacity to absorb an additional expense.

The bill's refund requirement reduces the financial risk associated with ticket purchases and ensures that residents can recover lost funds quickly. Therefore, this provision will likely improve economic outcomes for consumers who seek to recover their money after purchasing a ticket or who have had to wait weeks or months for a ticket refund.

**The racial equity impact of Bill 26-0224's civil fine enforcement is inconclusive.** The bill imposes civil fines for any violation of the proposed ticketing regulation laws. The fines are $5,000 for the first violation and $10,000 fine for every additional violation. These fines may be imposed on ticket sellers, resellers, and resale websites. CORE emphasizes the importance of consumer protection regulations. However, it is unclear if fines achieve the goal of ensuring that ticket sellers, resellers, and resale websites adhere to the outlined guidelines in the bill.

As mentioned previously, New York and California have implemented provisions similar to those in Bill 26-0244. New York's provisions include a fine, focusing on reseller licensing and the use of bot software.[39] Unfortunately, CORE did not uncover research analyzing the effectiveness of civil fines in ensuring adherence. Aside from the effectiveness of fines, the degree to which the fine provision will impact racial equity and outcomes in the District depends on nuanced information.

For example, if an individual or smaller scale ticket (re)seller is fined, especially if owned by Black residents, the fine would likely negatively impact their economic outcomes given the size of the business and the experiences that Black people face in owning a small business. On the other hand, if a larger scale ticket (re)seller with a firmer economic standing (such as Ticketmaster or StubHub) is fined, it's possible that the fine may have a minor impact on their economic outcomes. In this scenario, those owners may have capital to absorb the penalty of violating the bill's provisions, which would make the fine ineffective.Overall, the impact of the bill's fine enforcement provision is highly nuanced and would rely on data regarding the effectiveness of fines in achieving adherence to the bill's provisions.

## FURTHER CONSIDERATION

**It is important to note the potential impacts of bypassing a "fix-not-fine" approach to enforcement—especially with individual, smaller scale sellers.** The "fix-not-fine" approach, highlighted by the Beloved Community Incubator, is "a principle that commits city regulators to provide people with training and

[37] "Serving Communities of Color." Federal Trade Commission. October 2021.
[38] "Washington, DC Median Household Income By Race." Neilsberg Research. March 2025.
[39] "New York Ticket Scalping Laws and Reseller Regulations." LegalClarity, February 1, 2025.

resources to fix regulatory issues rather than simply fining people who are not in compliance."[40] Minneapolis provides an example of this approach in practice, though in the realm of traffic tickets.[41]

CORE notes the bill may approach its intended goal with aspects of a "fix-not-fine" approach. However, the bill also allows fine enforcement as an avenue to address how ticket platforms have harmed consumers. This is important to note given that individual, smaller scale sellers face potential fine amounts similar to larger corporations and platforms. The Council Office of Racial Equity has written at length about the regressive nature and rippling effects of a flat fine on Black, Indigenous, Latine, and residents of color in the District.[42]

Notably, CORE did not uncover data regarding how many individuals in the District participate in ticket reselling (compared to large companies). However, the limited information available suggests that most high volume resale activity is concentrated among large ticketing platforms rather than individual ticket resellers.

This distinction matters. Individual, smaller scale sellers may benefit from a "fix-not-fine" model that provides guidance, education, and support on how to comply with new resale rules, rather than facing immediate civil penalties and fines that may potentially surpass the cost of the initial incident. Without an educational approach, these penalties could disproportionately burden individual or low volume sellers who may be unfamiliar with the new legal requirements, while larger companies with greater resources may be better positioned to absorb fines or navigate compliance processes.

## ASSESSMENT LIMITATIONS

**We generally do not provide policy solutions or alternatives to address our racial equity concerns.** While Council Period 26 Rules allow our office to make policy recommendations, we focus on our role as policy analysts—we are not elected policymakers or committee staff. In addition, and more importantly, racially equitable policymaking takes time. We would need more time to ensure comprehensive research and thorough community engagement inform our recommendations.

**Assessing legislation's potential racial equity impacts is a rigorous, analytical, and organized undertaking—but it is also an exercise with constraints.** Our assessment is a summary of relevant background information and our most educated hypothesis of the bill's racial equity impacts. Of course, we have not captured all relevant information related to these topics. We encourage you to dive further into the research on your own or by using the linked footnotes as a starting point.

**Regardless of the Council Office of Racial Equity's final assessment, the legislation can still pass.** Though if a REIA is issued for a bill, committees must summarize and respond to the assessment in their committee report (a public document contextualizing the legislation). Committee reports can be found via the Legislative Information Management System (LIMS) after a bill's markup.

If a REIA identifies a negative impact on racial equity, the bill may be placed on the non-consent agenda at the next legislative meeting. However, a REIA is not binding.

---

[40] Vendors United and Beloved Community Incubator. "Where the Sidewalk Ends - Part II."

[41] "Lights On! – Together We Replace Tickets with Vouchers, Stabilizing Communities and Building Trust." Lights On!, 2022.

[42] The racial equity impact of fines and fees is a recurring theme in our Racial Equity Impact Assessments (REIAs). For additional reference, please see our discussion of the topic in REIAs for: Bill 24-0096 (on fairness in renting), Bill 24-0111 (on motor vehicle accident prevention), Bill 24-0236 (on the Child Trust Fund program), Bill 24-0020 (on banning the sale of flavored tobacco), Bill 24-0302 (on removing abandoned vehicles), Bill 24-0511 (on extending DMV deadlines), Bill 24-0066 (on traffic safety infrastructure), and Bill 25-0068 (on street vending licenses).

**This assessment aims to be accurate and useful, but it is unlikely that we will raise *all* relevant racial equity issues present in a bill.** In addition, an omission from our assessment should not: 1) be interpreted as a provision having no racial equity impact or 2) invalidate another party's racial equity concern.