# Exhibit U

**Statement of Kevin Vermillion**
**Director, Office of Consumer Protection**
**Office of the Attorney General for the District of Columbia**

**Before the Committee on Public Works and Operations**
**Chairperson Brianne Nadeau**

**Public Hearing on**

**B26-0174, The "Enhancing Consumer Protection Procedures Amendment Act of 2025"**

**B26-0224, The "Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025"**

**B26-0287, The "Housing With Integrity Amendment Act of 2025"**

**October 22, 2025**

## Introduction

Good morning, Chairperson Nadeau and councilmembers. My name is Kevin Vermillion, and I serve as the Director of the Office of Consumer Protection at the Office of the Attorney General for the District of Columbia (OAG). I am here today to express OAG's strong support for Bill 26-174, Enhancing Consumer Protection Procedures Amendment Act of 2025 or, what I will call the CPPA Amendments. These amendments would modernize, strengthen, and clarify the District's consumer protection framework, ensuring our laws keep pace with today's marketplace, provide clarity for District businesses, and allow our office to more efficiently protect District residents from unfair, deceptive, and abusive practices. While the majority of my testimony will focus on the CPPA Amendments, I want to state OAG's support for the other two bills that are before this committee—Bill 26-224, Restricting Egregious Scalping Against Live Entertainment Amendment Act of 2025 (RESALE Act) and Bill 26-287, Housing with Integrity Amendment Act of 2025. The RESALE Act would help ensure transparency in the live event ticketing industry so that District consumers know exactly what they are purchasing and how much they will pay. The Housing with Integrity Amendment Act would hold landlords accountable for failing to provide basic services to tenants.

## I. Enhancing Consumer Protection Procedures Amendment Act of 2025

### The CPPA Amendments Would Enhance and Modernize the District's Existing Consumer Protection Laws

The CPPA amendments would enhance and modernize the District's existing consumer protection laws. OAG enforces the Consumer Protection Procedures Act (CPPA) to protect District consumers from unfair and deceptive practices, enforce tenants' rights to safe and affordable housing, ensure gig-economy workers are fairly compensated, and protect the health and safety of District residents, among other things. Since 2023, OAG's CPPA enforcement has secured tens of millions of dollars in restitution, penalties, and remediation funds. This enforcement has had a direct impact on the lives of District residents—from combatting predatory lenders that charge usurious interest rates and trap consumers in cycles of debt, to obtaining rent refunds for tenants who have been forced to live in terrible housing conditions.

The CPPA, while a powerful tool, has not had a comprehensive update in over ten years. This bill provides this much-needed update. Over the last two years, a working group that included relevant District agencies, legal service providers, and key stakeholders, drafted the core provisions of this bill. These provisions would help OAG continue to do its work more effectively, while also giving District businesses clearer guidance and expectations. I am happy to answer questions about any of the bill's provisions, but I would like to highlight a few specific provisions and give examples of how they will assist OAG in this important work.

### The CPPA Amendment's Prohibition on "Abusive" Practices Would Align the District With Other States' Laws and Keep Up with Consumer Protection Trends

First, this bill would add a prohibition on "abusive" practices, which are practices that materially interfere with a consumer's ability to understand a transaction or take unreasonable advantage of

a consumer's lack of knowledge or understanding of a product or transaction. This provision would align the CPPA with other state consumer protection laws that have added similar prohibitions, as well as the federal Consumer Financial Protection Act. It would also ensure that the CPPA adapts to the changing ways consumers interact with businesses. For example, as more transactions occur online or through apps, consumers increasingly encounter the use of digital dark patterns—design tricks used to manipulate and confuse users. A prohibition on abusive practices would make it easier for OAG to combat these manipulative practices, including practices that trick consumers into signing up for unwanted services or that make it nearly impossible to cancel subscriptions.

In addition, an abusiveness prohibition could protect against financial products that set consumers up to fail, which is one of the reasons it was included in the Consumer Financial Protection Act passed after the 2008 Financial Crisis. As consumers see increasingly more aspects of their lives financialized, tools that can effectively combat predatory financial products are becoming even more important.

An important distinction between abusive practices and unfair practices—which are already prohibited under the CPPA—is that abusiveness requires no showing of substantial injury to establish liability, and it does not allow businesses to defend harmful practices as being otherwise beneficial to consumers or competition. This acknowledges that obscuring important features of a product or service or taking unreasonable advantage of consumers are presumed to be harmful in and of themselves and allows for more efficient enforcement to stop these practices.

**The CPPA Amendments Would Provide More Effective Tools for Enforcement for OAG and the Department of Licensing and Consumer Protection**

Second, this bill would make OAG's investigations of potential CPPA violations more efficient for both OAG and the subjects of those investigations. One way the bill does this is by allowing OAG to include interrogatories in its investigatory subpoenas which require the recipient of the subpoena to answer questions under oath. This is a less time- and resource-intensive approach for both OAG and any business answering the questions, as it allows for the target of an investigation to answer a question instead of requiring OAG and the business to spend resources collecting, transmitting, and reviewing voluminous documents to find what could be a simple answer. For example, there are many questions that can narrow or focus an investigation, such as how many District customers a business has or how much money those customers have spent. Answering that question through production of documents is often burdensome on a business who may have to query multiple databases to ascertain that information, compile that information into a useable format, transmit that information to OAG, and then OAG must review what is likely a large spreadsheet to find the answer. On the other hand, it would be much less burdensome for a business to simply answer in writing how many District customers it has and how much they paid, allowing both parties to focus resources on producing and reviewing documents that go beyond simple questions. While some businesses will provide this information voluntarily, not all businesses agree to do so, and this bill would ensure that OAG can get information in the format that most efficiently advances the investigation.

Other provisions of the bill would strengthen OAG's ability to enforce subpoenas in court, thereby incentivizing compliance. Investigations into harmful conduct can often drag out for too long

because there is little incentive for bad actors to comply with a subpoena. Giving OAG more tools to enforce subpoenas will allow our office to conserve resources and move investigations forward without undue delay by disincentivizing bad actors from obstructing an investigation.

This bill would not only make OAG's enforcement of the CPPA more efficient, but also grant the Department of Licensing and Consumer Protection (DLCP) updated administrative tools, allowing the agency to be more agile in its enforcement of the CPPA. For example, it would strengthen DLCP's ability to issue cease and desist orders and summarily suspend licenses when businesses put the public at risk of immediate and irreparable harm. Providing these types of tools to DLCP complements OAG's investigatory and litigation work, which is not always well-suited to isolated problems or those needing immediate resolution.

In summary, this bill would adapt the CPPA to address modern consumer protection issues while allowing OAG and DLCP to use our limited resources to more nimbly and efficiently protect District residents from unfair, deceptive, and abusive business practices.

## II. RESALE Act

### The RESALE Act Would End Deceptive Practices for Concert Ticketing

The RESALE Act would enhance transparency in the live entertainment ticketing industry, enabling consumers to know exactly what they are buying and how much they are paying for it. Much of OAG's work focuses on protecting consumers from deceptive practices, and the RESALE Act has two provisions that would end misleading practices in the ticketing industry: a requirement for all-in pricing and a ban on speculative ticket sales.

### The RESALE Act Would Require Clear and Conspicuous Disclosures of the Total Ticket Price, Enabling Consumers to Know Exactly How Much They Are Paying

OAG supports the RESALE Act's requirement that ticket listings clearly and conspicuously disclose the total price of the ticket, including all fees and taxes. The advertised ticket price should be what consumers pay. Consumers should not be lured in by a deceptively low price and then have to navigate a burdensome purchase process only to be told at the end that large, unpredictable, and mandatory fees have been added on. This bill's requirement for all-in pricing means that when a District consumer finds a ticket they want to buy, the price of that ticket is not going to skyrocket at the very last step of the purchase process.

### The RESALE Act Would Prohibit Speculative Ticket Selling, Protecting Consumers from Dishonest Ticket Resellers

The Act's prohibition on speculative ticket sales would also protect consumers from unscrupulous ticket resellers. Speculative ticket sales have led to consumers paying inflated prices for tickets that may never show up or that turn out to be fake. Even when the tickets do show up later, consumers often were never told they were buying a ticket that did not exist yet. The RESALE Act's prohibition on speculative ticket sales means that when a consumer buys a ticket, they know the seller has a ticket to give them.

These two provisions together would help ensure that a consumer purchasing a ticket is not unknowingly misled by the ticket reseller.

**Conclusion**

In sum, we are grateful for this Committee's dedication to advance the amendments to the CPPA. We are proud of the work undertaken by the intergovernmental and public working group to garner consensus and think through these issues. I am available to answer questions.