**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TICKET POLICY FORUM, INC., *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>**Defendant.** | **No. 1:26-cv-03577-CJN** |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ... iii

INTRODUCTION ... 1

BACKGROUND ... 2

I. The Live-Entertainment Ticket Market ... 2

II. The RESALE Act ... 4

III. Procedural History ... 6

LEGAL STANDARD ... 7

ARGUMENT ... 7

I. Plaintiffs Fail to Establish a Likelihood of Success on the Merits. ... 7

A. Plaintiffs Are Unlikely to Succeed on Their Claim That the RESALE Act Violates the Dormant Commerce Clause by Regulating Extraterritorially. ... 8

B. Plaintiffs Are Unlikely to Succeed on Their Home Rule Act Claim. ... 12

C. Plaintiffs Are Unlikely to Succeed on Their Claim That the RESALE Act Violates the Dormant Commerce Clause by Discriminating Against Out-of-District Commerce. ... 14

D. Plaintiffs Are Unlikely to Succeed on Their Due Process Claims. ... 17

1. Plaintiffs' "Confiscatory" Theory Is Legally Wrong ... 17

2. The Price and Fee Caps Are Not Vague. ... 20

E. Plaintiffs Are Unlikely to Succeed on Their First Amendment Claim. ... 24

1. *Zauderer* Applies to the Price Disclosure. ... 25

2. The Price Disclosure Satisfies *Zauderer*. ... 27

3. Regardless, the Price Disclosure Satisfies *Central Hudson*. ... 29

a. The Price Disclosure Is Supported by Substantial Interests. ....30

b. The Price Disclosure Directly Advances the District's Interests....30

c. There Is a Reasonable Fit Between the Price Disclosure's Means and Ends. ....33

II. Plaintiffs Fail to Establish Irreparable Harm in the Absence of an Injunction....34

III. The Balance of Harms and Public Interest Alone Support Denying an Injunction....41

IV. Plaintiffs Are Not Entitled to a Preliminary Injunction Enjoining the Entire Act. ....45

CONCLUSION....45

# TABLE OF AUTHORITIES

## Cases

*335-7 LLC v. City of New York*,
No. 21-823, 2023 WL 2291511 (2d Cir. Mar. 1, 2023) ........ 18

*Act Now to Stop War & End Racism Coal. v. District of Columbia,*
846 F.3d 391 (D.C. Cir. 2017) ........ 20, 30, 31

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ........ 45

*Am. Council of Life Ins. v. District of Columbia*,
645 F. Supp. 84 (D.D.C. 1986) ........ 13

*Am. Foreign Serv. Ass'n v. Trump*,
768 F. Supp. 3d 6 (D.D.C. 2025) ........ 45

*Am. Hosp. Ass'n v. Azar*,
468 F. Supp. 3d 372 (D.D.C. 2020) ........ 25, 27, 28, 29, 30, 33, 34

*Am. Hosp. Ass'n v. Azar*,
983 F.3d 528 (D.C. Cir. 2020) ........ 25, 28, 29

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) ........ 25, 26, 28, 29, 30, 33

*Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*,
123 F.4th 27 (1st Cir. 2024) ........ 15

*Ams. for Prosperity Found. v. Albence*,
191 F.4th 169 (3d Cir. 2026) ........ 7, 40

*Appalachian Voices v. FERC*,
139 F.4th 903 (D.C. Cir. 2025) ........ 44

*Araya v. JP Morgan Chase Bank, N.A.*,
775 F.3d 409 (D.C. Cir. 2014) ........ 13

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) ........ 11, 37

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) ........ 11

*Ass'n for Accessible Meds. v. Raoul*,
805 F. Supp. 3d 854 (N.D. Ill. 2025) ........ 9, 11

*Ayele v. District of Columbia*,
704 F. Supp. 3d 231 (D.D.C. 2023) ........ 37, 39

*Baldwin v. G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935) ........ 11

*Banks v. Hoffman*,
346 A.3d 665 (D.C. 2025) ........ 13

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021) ........ 24

*Benisek v. Lamone*,
585 U.S. 155 (2018) ........ 36, 41, 42, 43

*Blount v. SEC*,
61 F.3d 938 (D.C. Cir. 1995) ........ 32

*Brown v. Chote*,
411 U.S. 452 (1973) ........ 44

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986) ........ 11

*Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) ........ 24, 30

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........ 34, 35, 37

*Chevron USA Inc. v. Plaquemines Parish*,
608 U.S. 1 (2026) ........ 26

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) ........ 34, 38, 39, 44

*Coal. for Humane Immigrant Rts. v. Mullin*,
185 F.4th 1275 (D.C. Cir. 2026) ........ 35

*Cmty. Oncology All. v. Becerra*,
No. 23-cv-2168, 2023 WL 9692027 (D.D.C. Dec. 21, 2023) ........ 38, 40, 41, 45

*Comptroller of the Treas. of Md. v. Wynne*,
575 U.S. 542 (2015) ........ 15

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) ........ 24

*Corewell Health William Beaumont Univ. Hosp. v. Kennedy*,
No. 26-cv-3111, 2026 WL 3257581 (D.D.C. Oct. 29, 2026) ....................39, 40

*Crooks v. Mabus*,
845 F.3d 412 (D.C. Cir. 2016).................................................. 21

*Cytline, LLC v. Pub. Util. Dist. No. 2*,
849 F. App'x 656 (9th Cir. 2021).................................................. 18

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024)..........................................35, 38, 43

*Diego v. HHS*,
No. 26-cv-577, 2026 WL 1179706 (D.D.C. Apr. 30, 2026)........................ 45

*Dirks v. SEC*,
802 F.2d 1468 (D.C. Cir. 1986)..........................................22, 23

*D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*,
930 F.3d 487 (D.C. Cir. 2019).................................................. 12

*District of Columbia v. Greater Wash. Cent. Lab. Council, AFL-CIO*,
442 A.2d 110 (D.C. 1982).................................................. 13

*Doe v. Burlew*,
165 F.4th 525 (6th Cir. 2026).................................................. 8

*DoorDash, Inc. v. City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023)..................................17, 18, 19

*DoorDash, Inc. v. City of New York*,
789 F. Supp. 3d 337 (S.D.N.Y. 2025).................................................. 26

*DoorDash, Inc. v. City of New York*,
185 F.4th 1 (2d Cir. 2026).................................................. 27

*DoorDash, Inc. v. City & Cnty. of San Francisco*,
No. 21-cv-5502, 2022 WL 867254 (N.D. Cal. Mar. 23, 2022)....................19, 20

*Dotson v. District of Columbia*,
No. 24-cv-1864, 2024 WL 5046282 (D.D.C. Dec. 9, 2024)........................ 35

*Douglas v. NPS*,
835 F. Supp. 3d 159 (D.D.C. 2026).................................................. 41

*Duquesne Light Co. v. Barasch*,
488 U.S. 299 (1989).................................................. 18

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975)........................................................................................ 15

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982).......................................................................................... 9

*Edwards v. District of Columbia*,
755 F.3d 996 (D.C. Cir. 2014)........................................................................ 27

*Electrolert Corp. v. Barry*,
737 F.2d 110 (D.C. Cir. 1984)........................................................................ 14

*Exxon Corp. v. Governor of Md.*,
437 U.S. 117 (1978)........................................................................................ 11

*Fla. Bar v. Went For It, Inc.*,
515 U.S. 618 (1995)........................................................................................ 30

*Flemming v. Nestor*,
363 U.S. 603 (1960).......................................................................................... 7

*Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*,
187 F.4th 616 (D.C. Cir. 2026) ........................................................................ 7

*Garelick v. Sullivan*,
987 F.2d 913 (2d Cir. 1993)............................................................................ 18

*GE v. Jackson*,
610 F.3d 110 (D.C. Cir. 2010)........................................................................ 19

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997)...................................................................................14, 15

*George Washington Univ. v. District of Columbia*,
318 F.3d 203 (D.C. Cir. 2003)........................................................................ 19

*Global Tel*Link v. FCC*,
866 F.3d 397 (D.C. Cir. 2017)........................................................................ 20

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
512 F.3d 1112 (9th Cir. 2008) ........................................................................ 44

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)........................................................................ 37

*Guaranty Nat'l Ins. Co. v. Gates*,
916 F.2d 508 (9th Cir. 1990) .......................................................................... 18

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........................................................... 35, 37, 41, 43

*Healthcare Distrib. All. v. Boughton*,
No. 25-3216, 2026 WL 3135340 (2d Cir. Oct. 20, 2026)................................................ 10

*Healy v. Beer Inst.*,
491 U.S. 324 (1989)........................................................................................................ 11

*Hines Immigr. L., PLLC v. Exec. Off. for Immigr. Rev.*,
No. 26-cv-1018, 2026 WL 969020 (D.D.C. Apr. 10, 2026)............................................. 38

*Hooks v. United States*,
191 A.3d 1141 (D.C. 2018)............................................................................................. 45

*In re Nat'l Football League's "Sunday Ticket" Antitrust Litig.*,
--- F.4th ----, No. 24-5493, 2026 WL 3266788 (9th Cir. Oct. 30, 2026)........................... 39

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017)........................................................................................ 42

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024)......................................................................................11, 15

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020).......................................................................................... 37

*Kim v. Fin. Indus. Regul. Auth., Inc.*,
698 F. Supp. 3d 147 (D.D.C. 2023).................................................................................. 41

*L.W. by & through Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023).........................................................................................42, 43

*Labrador v. Poe by & through Poe*,
144 S. Ct. 921 (2024)....................................................................................................... 41

*Leavitt v. Jane L.*,
518 U.S. 137 (1996)......................................................................................................... 45

*Maplebear Inc. v. City of New York*,
No. 25-cv-9979, 2026 WL 181637 (S.D.N.Y. Jan. 22, 2026) ........................................... 16

*Mass. State Grange v. Benton*,
272 U.S. 525 (1926)......................................................................................................... 42

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)........................................................................................................... 7

*Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*,
62 F.4th 567 (D.C. Cir. 2023) ....................14, 16

*Mich. Bell Tel. Co. v. Engler*,
257 F.3d 587 (6th Cir. 2001) .................... 18

*Miller v. Gruenberg*,
No. 21-cv-3035, 2022 WL 20699638 (D.D.C. Aug. 24, 2022) .................... 40

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .................... 8

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) .................... 29

*Nat'l Ass'n of Mfrs. v. Taylor*,
549 F. Supp. 2d 68 (D.D.C. 2008) ....................7, 44

*Nat'l Ass'n of Mfrs. v. Taylor*,
582 F.3d 1 (D.C. Cir. 2009) ....................32, 33, 34

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
555 F.3d 996 (D.C. Cir. 2009) ....................30, 34

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*,
456 F. Supp. 3d 16 (D.D.C. 2020) ....................37, 45

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018) ....................26, 29

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ....................8, 9, 11, 23

*Nat'l Treasury Emps. Union v. United States*,
927 F.2d 1253 (D.C. Cir. 1991) .................... 37

*Navistar, Inc. v. EPA*,
No. 11-cv-449, 2011 WL 3743732 (D.D.C. Aug. 25, 2011) .................... 36

*Neb. Dep't of Health & Hum. Servs. v. HHS*,
435 F.3d 326 (D.C. Cir. 2006) .................... 45

*Newman v. Moore*,
151 F.4th 472 (D.C. Cir. 2025) .................... 8

*Pennell v. City of San Jose*,
485 U.S. 1 (1988) ....................19, 20

*Petroleum Expl. v. Pub. Serv. Comm'n*,
304 U.S. 209 (1938)........................................................................................... 38

*Pharm. Research & Mfrs. of Am. v. District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005).......................................................................... 11

*Pheenix Ush LLC v. Dist. Dep't of Transp.*,
No. 25-7060, 2025 WL 3013527 (D.C. Cir. Oct. 24, 2025) ................................................ 13

*Price v. Bd. of Ethics & Gov't Accountability*,
284 A.3d 1019 (D.C. 2022)..................................................................................... 22

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016)................................................................................. 37

*Real Est. Bd. of N.Y., Inc. v. City of New York*,
182 F.4th 140 (2d Cir. 2026).................................................................................. 27

*Recht v. Morrisey*,
32 F.4th 398 (4th Cir. 2022)................................................................................... 32

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026) .............................................................................9, 10

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.*,
No. 25-cv-2214, 2025 WL 2996157 (D.D.C. Oct. 24, 2025) ............................................ 40

*Screws v. United States*,
325 U.S. 91 (1945)............................................................................................. 21

*SEC v. Musk*,
826 F. Supp. 3d 35 (D.D.C. 2026).......................................................................... 33

*Sierra Club v. U.S. Dep't of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011)........................................................................ 36

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) .................................................................................. 44

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
340 F.3d 583 (8th Cir. 2003).................................................................................. 17

*South Dakota v. Wayfair, Inc.*,
585 U.S. 162 (2018)...........................................................................................8, 10

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007)................................................................................... 10

*Spirit Airlines, Inc. v. DOT*,
687 F.3d 403 (D.C. Cir. 2012)....................24, 25, 27, 28, 29, 30

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026) .................... 44

*TCF Nat'l Bank v. Bernanke*,
643 F.3d 1158 (8th Cir. 2011)....................19, 20

*Time Warner Ent. Co. v. FCC*,
56 F.3d 151 (D.C. Cir. 1995) .................... 27

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) .................... 7

*Turner Broad. Sys., Inc. v. FCC*,
507 U.S. 1301 (1993)....................35, 44

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997).................... 32

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007).................... 14

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017)....................21, 22

*United States v. Griffith*,
No. 21-cv-244, 2023 WL 1778192 (D.D.C. Feb. 6, 2023) .................... 21

*United States v. McHugh*,
583 F. Supp. 3d 1 (D.D.C. 2022).................... 21

*United States v. Nat'l Dairy Prods. Corp.*,
372 U.S. 29 (1963).................... 21

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009).................... 24

*United States v. Philip Morris USA Inc.*,
855 F.3d 321 (D.C. Cir. 2017)....................24, 25, 27

*United States v. Skrmetti*,
605 U.S. 495 (2025).................... 42

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976).................... 27

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)....................21, 23, 24

*Walters v. Nat'l Ass'n of Radiation Survivors*,
468 U.S. 1323 (1984).................... 7

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).................... 31

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008)....................14, 31, 41

*Washington v. Glucksberg*,
521 U.S. 702 (1997).................... 42

*Whalen v. Roe*,
429 U.S. 589 (1977).................... 43

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021).................... 36

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015).................... 31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................7, 41

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)....................38, 39

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) .................... 13

*Wonderful Nurseries LLC v. Agric. Lab. Rels. Bd.*,
789 F. Supp. 3d 855 (E.D. Cal. 2025).................... 19

*Zauderer v. Off. of Disciplinary Counsel*,
471 U.S. 626 (1985)....................25, 38

**Statutes**

D.C. Code § 1-206.02(a) .................... 12

D.C. Code § 1-206.02(a)(3)....................6, 12, 13

D.C. Code § 2-1802.01.................... 6

D.C. Code § 28-3905(k)(1) .................... 5

D.C. Code § 28-3909 ........ 6

D.C. Code § 28-5501(4) ........ 4

D.C. Code § 28-5501(6) ........ 4, 9

D.C. Code §§ 28-5502–28-5506 ........ 4

D.C. Code § 28-5506 ........ 24

D.C. Code § 28-5506(a)(2) ........ 5, 22

D.C. Code § 28-5506(b) ........ 5, 22

D.C. Code § 28-5506(c) ........ 5, 22

D.C. Code § 28-5507 ........ 5, 20

D.C. Code § 28-5507(b) ........ 5

D.C. Code § 28-5508(a) ........ 6

D.C. Code § 28-5508(b) ........ 5, 36

D.C. Code § 45-201(a) ........ 45

D.C. Code § 47-2890.01 ........ 4

D.C. Code §§ 47-2890.01–47-2890.05 ........ 4, 5

D.C. Code § 47-2890.05(a) ........ 6

D.C. Code § 47-2890.05(b) ........ 5, 36

8 Me. Rev. Stat. Ann. § 1301(2-A)(G) ........ 4

5 R.I. Gen. Laws Ann. § 5-22-26 ........ 4

28 U.S.C. § 1367(c)(1) ........ 13

9 Vt. Stat. Ann. § 2479f(c) ........ 4

**Rules**

Fed. R. Civ. P. 65(d)(2) ........ 36

## Other Authorities

James Chen, *Understanding the Scarcity Principle: Definition, Importance, and Examples*, Investopedia (Mar. 2, 2026) ........ 33

Council of the Dist. of Columbia, *B26-0224*, Legis. Info. Mgmt. Sys. ........ 5

Exec. Order No. 14254 ........ 3

Bruce Houghton, *CA, NC, DC, VT, ME Laws Limit Ticket Resale as Feds Fail to Act*, Hypebot (July 7, 2026) ........ 4

*Price*, Merriam-Webster Dictionary ........ 22

RESALE Act, pmbl., 73 D.C. Reg. 11,351 (Aug. 14, 2026) ........ 4, 10, 16, 27, 41

## INTRODUCTION

When fans go to buy tickets to a concert, they often find that tickets sold out in milliseconds. Fans are then left to scour secondary ticket marketplaces (think StubHub) where tickets are resold for several times above the original price. All the while, the marketplaces profit off inflated ticket prices—the higher the markup, the more money the marketplace makes.

The people of the District of Columbia (District) became fed up with soaring ticket prices. So, through their elected representatives, they enacted the Restricting Egregious Scalping Against Live Entertainment Amendment Act of 2026 (RESALE Act or Act), D.C. Law 26-0181. The Act contains several measures to protect consumers, artists, and venues. As relevant here, the Act (1) caps resale prices, (2) caps fees associated with resales, and (3) requires that secondary ticket marketplaces disclose the original ticket price when advertising a resale.

Plaintiffs disagree with these policy choices. Plaintiffs are four secondary ticket marketplaces (SeatGeek, Vivid Seats, Gametime United, and TickPick) and a trade association that lobbies for them (Ticket Policy Forum). Plaintiffs lobbied against the Act, but they failed to persuade a single councilmember, congressperson, or senator. The D.C. Council voted unanimously to approve the Act, which was then signed by the Mayor and sailed through congressional review. Striking out with the democratic process, Plaintiffs dressed their policy objections up in constitutional garb and turned to this Court for a judicial veto. And they now seek a preliminary injunction preventing the District from enforcing the Act.

That is an extraordinary remedy requiring a clear showing on several factors, but Plaintiffs fail to carry their burden on even one. Plaintiffs fail to show a likelihood of success on the merits because they ignore or misconstrue dispositive precedents and instead rely on made-up constitutional rules. Plaintiffs fail to show irreparable harm warranting immediate relief because they will have to comply with the Act regardless of whether the Court issues a

preliminary injunction, and all their alleged harms from compliance are quintessentially reparable. And Plaintiffs fail to show that the equities or public interest weigh in their favor because the equities counsel against nullifying the will of the people unless and until the Court is sure, on a full record, that the Act is unconstitutional. Any one of those failures is fatal, so the Court should deny Plaintiffs' Motion for a Preliminary Injunction [10].

## BACKGROUND

### I. The Live-Entertainment Ticket Market

There is no denying that ticket prices for live-entertainment events are a real problem. "On average, ticket prices have risen 80.5 percent since 2021, and 428.7 percent since 1996." Pls.' Ex. A [10-8], Comm. Rep. at 2. Not only have prices skyrocketed, but it is "widely known that the ticket-buying experience . . . has deteriorated for consumers and venues" due to "scalping bots, speculative ticket sales, and more unfair trade practices." *Id.* High prices and harmful practices have "shut out" consumers from events. *Id.* Less access to events is concerning for "the District's music and arts scenes," which are unique in their offerings and "contribute substantially to the District's tourism economy and cultural identity." *Id.*

The "increased cost of tickets and worsening consumer experience" are attributable to business practices in the ticket market. *Id.* at 3. That market "has two distinct segments: the primary and secondary markets." *Id.* "The primary market is where tickets are initially sold by the ticket issuer, which has increasingly become a third-party ticket marketplace rather than directly by the venue or performer." *Id.* Ticketmaster, for example, operates a primary ticket market. *Id.* "The secondary market is where tickets are resold after their initial purchase, typically an online platform that facilitates these transactions." *Id.* StubHub, for example, operates a secondary market. *See* Decl. of Brian Berry (TPF Decl.) [10-4] ¶ 6. Most resales on the major secondary ticket marketplaces are professional resellers (*i.e.*, scalpers) trying to make a

profit, not ordinary people trying to recoup money for an event they can no longer attend. Def.'s Ex. 1, GAO Rep. at 12.

Each market "contributes in different ways to" worsening consumer experiences. Comm. Rep. at 3. One of the biggest problems with secondary markets is that they profit off high resale prices. Instead of charging a flat fee for each resale, online secondary marketplaces take a percentage of the resale ticket price from buyers and/or sellers. GAO Rep. at 17–18; Def.'s Ex. 2, CRS Rep. at 2. Obviously then, the higher the ticket price, the more money the secondary marketplace makes. Indeed, studies have shown that the average ticket resale prices are higher than the face-value price. GAO Rep. at 13–14. Although secondary marketplaces claim that these fees cover the costs of the services they provide and a reasonable profit, those claims are hotly disputed and hard to credit, as secondary marketplaces keep their finances hidden (as evidenced by Plaintiffs' Motion to Seal). *See* Def.'s Ex. 5, Future of Music Coal. Testimony at 11; Def.'s Ex. 3, Vanderbilt Pol'y Accelerator, *How to Save Audiences $11 Billion on Live Events* (Vanderbilt Rep.) at 18, 20–21. StubHub's recent IPO, however, revealed that it spent more than half of its $1.7 billion revenue in 2025 on sales and marketing—not costs associated with facilitating resales or customer services. Vanderbilt Rep. at 21–22.

These high prices and anti-consumer practices have caught the attention of the elected branches from the White House to the statehouse. President Trump issued an executive order directing his administration to take action against the problem of "unscrupulous middlemen who sit at the intersection between artists and fans and impose egregious fees while providing minimal value." Exec. Order No. 14254 § 1(a), tinyurl.com/429j655x. For its part, Congress has held hearings, debated legislation, and passed bills related to the ticket industry. CRS Rep. at 1. And at the state-level, legislatures across the country have enacted or are considering legislation

providing a variety of reforms to the ticketing industry. *See, e.g.*, Comm. Rep. at 6; Bruce Houghton, *CA, NC, DC, VT, ME Laws Limit Ticket Resale as Feds Fail to Act*, Hypebot (July 7, 2026), tinyurl.com/354hkrkv; 8 Me. Rev. Stat. Ann. § 1301(2-A)(G); 5 R.I. Gen. Laws Ann. § 5-22-26; 9 Vt. Stat. Ann. § 2479f(c).

## II. The RESALE Act

The District's elected representatives likewise took up the mantle and recently enacted the RESALE Act to "protect artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases." RESALE Act, pmbl., 73 D.C. Reg. 11,351 (Aug. 14, 2026). The Act has two main components. First, the Act requires that ticket resellers with 50 or more ticket resale listings a year and "secondary ticket exchanges" obtain business licenses from the Department of Licensing and Consumer Protection (Department) to operate in the District and imposes requirements on them. D.C. Code §§ 47-2890.01–47-2890.05. A "secondary ticket exchange" is "an electronic marketplace that enables a person to sell, purchase, and resell tickets." *Id.* § 28-5501(4); *see id.* § 47-2890.01. Second, the Act contains several measures regulating ticket sales and resales. *See id.* §§ 28-5502–28-5506. The Act applies to "tickets," which are defined as "any form of physical, electronic, or other evidence that grants the possessor . . . license to enter a place of entertainment for one or more events, including live concerts, theatrical performances, shows, or similarly scheduled live activities." *Id.* § 28-5501(6). But the Act does not apply to tickets for "a sporting event organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District" or "a motion picture screening." *Id.*

Only three of the Act's measures are at issue in Plaintiffs' motion. First, the Act caps the price of resale tickets (price cap) by providing that "a reseller or secondary ticket exchange shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees

and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket," inclusive of taxes and fees. *Id.* § 28-5506(b). Second, the Act caps the fees that secondary ticket exchanges can charge for resales (fee cap) by providing that, "in addition to any fees described in subsection (b)," "[a] secondary ticket exchange may charge a fee for the service of providing a marketplace for the resale of a ticket . . . provided, that the fee shall not exceed 10% of the total price of the initial ticket, including all fees and taxes." *Id.* § 28-5506(c). Third, the Act requires that secondary ticket exchanges post the original ticket price (the price disclosure) by providing that "[a] secondary ticket exchange shall, prior to a ticket being resold or offered to be resold . . . [d]isclose the original purchase price of the ticket, including all fees and taxes in connection with the initial purchase price." *Id.* § 28-5506(a)(2).

The Council unanimously passed the RESALE Act on July 14, 2026, after two legislative meetings, a committee markup, and a public hearing consisting of over nine hours of oral testimony and almost 800 pages of written testimony. *See* Council of the Dist. of Columbia, *B26-0224*, Legis. Info. Mgmt. Sys., tinyurl.com/y3adpryu. The Mayor signed the Act on August 10. *Id.* Following congressional review, the Act became effective on September 25. *Id.* The Act's requirements are applicable to regulated parties on January 1, 2027. RESALE Act § 4.

Implementation and enforcement of the Act are multifold. The Act gives rulemaking authority to the Mayor, which will be exercised by the Department. D.C. Code § 28-5507; Def.'s Ex. 4, Decl. of Shakira Richardson (DLCP Decl.) ¶ 4. That authority allows the Department to adjust the price and fee caps, subject to certain limitations. D.C. Code § 28-5507(b). As to enforcement, the Act provides that a violation of its provisions is an "unlawful trade practice." *Id.* §§ 28-5508(b), 47-2890.05(b). District law grants a private right of action to seek relief from unlawful trade practices. *Id.* § 28-3905(k)(1). The Attorney

General of the District of Columbia may also bring an action to stop and remedy unlawful trade practices. *Id.* § 28-3909. Next, the Act makes a violation a civil infraction, which is enforceable by the Department. *Id.* §§ 28-5508(a), 2-1802.01; DLCP Decl. ¶ 8. Finally, the Act provides that "[t]he Department may suspend, revoke, or deny the license of any secondary ticket exchange or reseller found to be in violation" of the Act. D.C. Code § 47-2890.05(a).

## III. <u>Procedural History</u>

Nearly three weeks after the RESALE Act became law, Plaintiffs brought this case. *See* Compl. [1]. Plaintiffs include Ticket Policy Forum, a trade association that purports to represent "online ticket marketplaces," *id.* ¶ 12, and four secondary ticket exchanges, SeatGeek, Vivid Seats, Gametime United, and TickPick, *id.* ¶¶ 13–16. The Complaint challenges various parts of the RESALE Act and brings eight claims under constitutional provisions or the Home Rule Act, D.C. Code § 1-206.02(a)(3). *Id.* ¶¶ 81–129. Plaintiffs seek declaratory and injunctive relief, just compensation, and attorney's fees and costs. *Id.*, Prayer.

With their Complaint, Plaintiffs moved for a preliminary injunction on a subset of their claims. *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. (Pls.' Mot.) [10-1] at 2–3. Plaintiffs' motion argues that: (1) the Act violates the dormant Commerce Clause and Home Rule Act by regulating extraterritorially, *id.* at 13–19; (2) the Act violates the dormant Commerce Clause also by discriminating against interstate commerce, *id.* at 20–24; (3) the price and fee caps violate due process, *id.* at 24–30; and (4) the price disclosure violates the First Amendment, *id.* at 30–40.[1]

---

[1] Two days after Plaintiffs filed their motion, two professional resellers and a trade group for resellers filed a case challenging only the price cap. Compl. [1], *Nat'l Ass'n of Ticketing Professionals v. District of Columbia*, No. 1:26-cv-03620-CJN (D.D.C. Oct. 16, 2026). Like Plaintiffs here, the reseller plaintiffs allege that the price cap violates the dormant Commerce Clause, the Home Rule Act, equal protection, and due process, to the extent the term "initial" ticket price is vague. *See id.* ¶ 6. But those plaintiffs do not join in any other claims by Plaintiffs

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" requiring a plaintiff to make "a clear showing" on four factors: "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008). "The balance of harms and the public interest factors merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021). A movant's evidentiary burden is "much higher" than a non-movant's burden at summary judgment and requires "substantial proof." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Additionally, when a plaintiff challenges a duly enacted statute, that statute is presumed constitutional. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). This presumption of constitutionality must be considered as a "factor" "in evaluating success on the merits" and "an equity . . . in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers); *see also, e.g.*, *Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 68, 72 (D.D.C. 2008); *Ams. for Prosperity Found. v. Albence*, 191 F.4th 169, 177 (3d Cir. 2026).

## ARGUMENT

### I. <u>Plaintiffs Fail to Establish a Likelihood of Success on the Merits.</u>

Plaintiffs are unlikely to succeed on any of their claims, and that "is alone sufficient to defeat their motion." *Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*, 187 F.4th 616, 625 (D.C. Cir. 2026). Plaintiffs bear a heavy burden because they bring a facial challenge and ask the Court to enjoin the RESALE Act in all its applications to Plaintiffs. *See* Pls.' Proposed Order

---

here. *See id.* The fact that the plaintiffs in these cases cannot agree on what parts of the Act need to be enjoined and why undercuts the persuasiveness of their arguments.

[10-31] at 2; *Doe v. Burlew*, 165 F.4th 525, 530 (6th Cir. 2026) (plaintiffs must meet the facial-challenge standard if they seek to "prohibit the government from enforcing the law against the plaintiff[s] *in any circumstance*—not just as applied to *specific conduct*"). "[S]uch challenges are quite difficult to make out" because Plaintiffs "must show that no set of circumstances exists under which the law would be valid or that the law lacks a plainly legitimate sweep." *Newman v. Moore*, 151 F.4th 472, 483–84 (D.C. Cir. 2025) (citation modified), *cert. denied*, 146 S. Ct. 2728 (2026). A different standard for facial challenges applies to First Amendment claims, but such challenges are still "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Namely, Plaintiffs must show that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citation modified). Plaintiffs fail to show that the Act is unconstitutional in any application, let alone all applications or a substantial number of them.

### A. Plaintiffs Are Unlikely to Succeed on Their Claim That the RESALE Act Violates the Dormant Commerce Clause by Regulating Extraterritorially.

Plaintiffs first invoke a supposed "extraterritoriality" principle of the dormant Commerce Clause. Pls.' Mot. at 14. The dormant Commerce Clause is a judicially created doctrine that recognizes just two "primary principles": "state regulations may not discriminate against interstate commerce" and "States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018). Plaintiffs bear a heavy burden to succeed because "extreme caution is warranted before a court deploys this implied authority," and the Court may invalidate the RESALE Act only if "the infraction is clear." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023) (citation modified).

Plaintiffs contend that the RESALE Act violates the dormant Commerce Clause because it regulates extraterritorially by reaching ticket resales occurring over the Internet between

resellers and buyers outside the District. Pls.' Mot. at 14–18. But in *Ross*, the Supreme Court rejected the theory that—in addition to discriminatory or unduly burdensome laws—the dormant Commerce Clause prohibits state laws with the "practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests." 598 U.S. at 371 (citation modified). To the contrary, the Court recognized that "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Id.*

To argue otherwise, Plaintiffs primarily rely on a plurality opinion in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982). Pls.' Mot. at 15. A plurality, of course, does not make law. Moreover, *Ross* explained that the *Edgar* plurality did not support a *per se* rule against statutes with extraterritorial effects. 598 U.S. at 376 n.1. *Ross* noted that the *Edgar* plurality "spoke to a law that *directly* regulated out-of-state transactions by those with *no* connection to the State," *id.* (citation modified), but "stopped short of recognizing this theory as a continuing strand of dormant Commerce Clause jurisprudence," *Ass'n for Accessible Meds. v. Raoul*, 805 F. Supp. 3d 854, 859 (N.D. Ill. 2025), *appeal docketed*, No. 25-2960 (7th Cir. Oct. 31, 2025); *see also R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 375 (1st Cir. 2026). Thus, Plaintiffs cannot rely on a freestanding rule from *Edgar*.

Even if there were a rule, the RESALE Act does not directly regulate out-of-state transactions with no connection to the District. As Plaintiffs recognize, the Act regulates the resale of tickets to events taking place in the District. *See* Pls.' Mot. at 15. District events certainly have a connection to the District. Moreover, resellers are selling a "license" for purchasers "to enter a place of entertainment" in the District. D.C. Code § 28-5501(6). As such, a ticket usually originates in the District because it is directly issued by District venues or by

entities contracting with District venues to handle sales on the primary market. And the consumer uses the ticket in the District and takes title to it there. The ticket's lifecycle thus starts and ends in the District, even if it is resold. All this surely provides more than "*no* connection" to the District. *See Healthcare Distrib. All. v. Boughton*, No. 25-3216, 2026 WL 3135340, at *3 (2d Cir. Oct. 20, 2026) (rejecting dormant Commerce Clause challenge to Connecticut drug price cap because it applied to "drugs where title is taken in Connecticut"); *R.I. Truck*, 180 F.4th at 376 (explaining that a law that regulates transactions that "start and end" in the regulating state survived scrutiny under the dormant Commerce Clause). Indeed, the purpose of the RESALE Act is to "protect artists, venues, and consumers *in the District*." RESALE Act, pmbl. (emphasis added). So the Act seeks to "remedy specific harms occurring in [the District]" and thus does not offend the Commerce Clause. *R.I. Truck*, 180 F.4th at 376 (citation omitted).

Plaintiffs resist this conclusion by arguing that some resales may occur between out-of-District resellers and buyers over the Internet. Pls.' Mot. at 16–17. But the sale is still for a ticket to a District event, so the sale has a connection to the District. "The fact that an ordinary commercial transaction happens to occur in cyberspace does not insulate it from otherwise applicable state consumer protection laws." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007). What is more, Plaintiffs' argument is at odds with other recent Supreme Court precedent and would call into question a host of state laws. For example, states may impose sales tax on out-of-state sellers even if the seller is not physically present in the state, if the seller has "a substantial nexus" to the state. *Wayfair*, 585 U.S. at 178. Plaintiffs do not dispute that the District can impose sales tax on the resales, but their theory would seem to question that power. At bottom, Plaintiffs' decisions to structure their businesses so that ticket sales for events in the District occur online should not constitutionally insulate them from regulation by the District.

*See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978) (the dormant Commerce Clause does not "protect[ ] the particular structure or methods of operation in a retail market").

Plaintiffs largely rely on cases decided prior to *Ross*. *See* Pls.' Mot. at 16–18. Two of those cases[2] derived an extraterritoriality principle from a handful of Supreme Court cases.[3] But the Supreme Court in *Ross* rejected that misreading of its cases. *Ross*, 598 U.S. at 371–75; *see Just Puppies, Inc. v. Brown*, 123 F.4th 652, 667 n.10 (4th Cir. 2024) (*Ross* "cast[ ] doubt" on *Frosh*). Rather, *Ross* recognized that "each typifies the familiar concern with preventing purposeful discrimination against out-of-state interests." 598 U.S. at 371.

Plaintiffs' only post-*Ross* case, *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957 (8th Cir. 2025), is unpersuasive and distinguishable. *Ellison* found that "discrimination is not required when a statute has the specific extraterritorial effect of controlling the price of wholly out-of-state transactions." *Id.* at 961. But this conclusion rests on an interpretation of *Baldwin* and *Healy* that the *Ross* court rejected. *See Raoul*, 805 F. Supp. 3d at 860–61 (discussing *Ellison*'s "misreading" of *Ross*). Regardless, in *Ellison*, the statute at issue concerned prescription drugs and could penalize an out-of-state manufacturer for selling drugs to an out-of-state distributor in violation of the statute if the drugs subsequently ended up in the state. 140 F.4th at 961. Here, on the other hand, the RESALE Act does not regulate the prices of fungible products that may end up in the District. The transactions at issue concern the resale of tickets for events in the District, *i.e.*, a license to enter a venue in the District that can only be used in the

---

[2] *Pharm. Research & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 67–71 (D.D.C. 2005), *aff'd on other grounds sub nom. Biotech. Indus. Org. v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 672–73 (4th Cir. 2018).

[3] *Healy v. Beer Inst.*, 491 U.S. 324 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935).

District. For that reason, none of Plaintiffs' cases is persuasive because none involves tickets—a unique commodity in its inherent connection to a physical place in the District.

Even if capping prices or fees for resales between out-of-District participants violated the dormant Commerce Clause, Plaintiffs could not succeed on their facial challenge. Plaintiffs do not dispute that the Act could validly be applied to at least resales between two District-based participants. Thus, they cannot show that the Act can never operate constitutionally.

In addition, Plaintiffs' evidence shows that they have a connection to the District. Members of Ticket Policy Forum have served "millions of fans attending District events for more than two decades," TPF Decl. ¶ 13, and "pay millions of dollars in taxes to the District every year," Pls.' Ex. B [10-9] at 3. Even accepting Plaintiffs' assessment of where their users are located, Plaintiffs facilitated a significant number of sales for District events that involved at least one person located in the District. *See* Decl. of Dave Zaragoza (Gametime Decl.) [10-2] ¶¶ 13–14; Decl. of John Bradford Tracy (SeatGeek Decl.) [10-3] ¶¶ 11–12; Decl. of Michele Rusnak (TickPick Decl.) [10-5] ¶¶ 11–12; Decl. of Jennifer Jackson (Vivid Seats Decl.) [10-6] ¶¶ 11–12 (note that this declaration is misnumbered). Because Plaintiffs do business in the District, applying the Act to them would not offend any extraterritoriality principle of the dormant Commerce Clause—even if one existed.

**B. <u>Plaintiffs Are Unlikely to Succeed on Their Home Rule Act Claim.</u>**

Plaintiffs claim that the RESALE Act's alleged extraterritorial regulation also violates the Home Rule Act's provision limiting the Council's authority to "[e]nact any act . . . which is not restricted in its application exclusively in or to the District," D.C. Code § 1-206.02(a). Pls.' Mot. at 18–19. As a threshold matter, Section 1-206.02(a)(3) is a District—not federal—law. *D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*, 930 F.3d 487, 492–93 (D.C. Cir. 2019). As such, the Court should decline to exercise supplemental jurisdiction over it because it "raises

a novel or complex issue of [District] law." 28 U.S.C. § 1367(c)(1); *see Pheenix Ush LLC v. Dist. Dep't of Transp.*, No. 25-7060, 2025 WL 3013527, at *3 (D.C. Cir. Oct. 24, 2025) (per curiam). Plaintiffs point to no case from the D.C. Court of Appeals stretching Section 1-206.02(a)(3) as far as they would. The claim is thus too novel for supplemental jurisdiction. *See Araya v. JP Morgan Chase Bank, N.A.*, 775 F.3d 409, 418 (D.C. Cir. 2014); *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 922 (D.C. Cir. 1996).

If the Court entertains the claim, it fails. The Home Rule Act granted the Council "broad authority to legislate." *Banks v. Hoffman*, 346 A.3d 665, 669 (D.C. 2025) (citation omitted). Congress added Section 1-206.02(a)(3) to ensure that this broad authority did not interfere with "the integrity of the federal domain as it relates to administration of federal legislation having nationwide implications." *District of Columbia v. Greater Wash. Cent. Lab. Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982). The RESALE Act does not violate the Home Rule Act because, as explained above, it regulates tickets for events solely in the District and does not interfere with the "administration of federal legislation." *Id.* Plaintiffs have not even tried to argue otherwise.

Further, as Plaintiffs admit, the D.C. Council has authority to regulate entities "doing business in the District." Pls.' Mot. at 19; *see Am. Council of Life Ins. v. District of Columbia*, 645 F. Supp. 84, 89 (D.D.C. 1986). Secondary ticket exchanges, including Plaintiffs, do business in the District by facilitating the resale of tickets to District events. Plaintiffs cannot argue otherwise because, as noted above, Plaintiffs do a substantial volume of ticket sales for District events and with District-based buyers and sellers. At the least, Plaintiffs have not shown that the Act applies extraterritorially in all its applications, so their claim fails.

### C. **Plaintiffs Are Unlikely to Succeed on Their Claim That the RESALE Act Violates the Dormant Commerce Clause by Discriminating Against Out-of-District Commerce.**

Plaintiffs claim that the RESALE Act also violates the dormant Commerce Clause because it discriminates against interstate commerce on its face and in its purpose. Pls.' Mot. at 19–24. For the facial claim, the question is whether the statute "discriminates on its face against interstate commerce" by imposing "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citation modified).

On its face, the RESALE Act does not distinguish between in-state and out-of-state actors. Nonetheless, Plaintiffs argue that the Act is facially discriminatory because it regulates "secondary marketplaces, all of which are located out of state" but exempts ticket issuers from price and fee caps. Pls.' Mot. at 20. This argument fails for either of two reasons. First, the Act's definition of "secondary ticket exchange" is not limited to out-of-state entities. So the Act does not discriminate *on its face* based on out-of-state status. *See Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 577 (D.C. Cir. 2023) ("[T]he [C]ourt 'must be careful not to go beyond the statute's facial requirements . . . .'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008))); *Electrolert Corp. v. Barry*, 737 F.2d 110, 113 (D.C. Cir. 1984) (no facial discrimination when a District statute banned all radar-detection devices). If a secondary ticket exchange were based in the District, the Act would apply to it just like it applies to Plaintiffs.

Second, secondary ticket exchanges and ticket issuers are not similarly situated. "[A]ny notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (internal footnote omitted). "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single

market there can be no local preference . . . ." *Id.* at 299. The two markets are "distinct" in their functions. Comm. Rep. at 3. The District does not discriminate by applying different policies to each. Ticket issuers on the primary market are not *reselling* tickets, so there is no markup to cap and no service fees associated with a resale.

Plaintiffs also take issue with the RESALE Act's exemption for sporting events organized by teams located in the District. Pls.' Mot. at 21. Plaintiffs contend that, because the RESALE Act exempts sporting events located in the District, the RESALE Act reflects economic favoritism. *Id.* This argument is puzzling. As Plaintiffs acknowledge, the RESALE Act regulates the resale of tickets for live events in the District. *Id.* Accordingly, Plaintiffs are not contending that events inside and outside the District are treated differently; they are contending that different types of events in the District are treated differently. Without such a comparison between competing in-state and out-of-state entities, however, Plaintiffs' claim fails. *See Tracy*, 519 U.S. at 298–99.

Despite the facial neutrality of the RESALE Act, Plaintiffs contend it is invalid because legislators had a discriminatory purpose. *See* Pls.' Mot. at 21–23. "[T]he Commerce Clause regulates effects, not motives." *Comptroller of the Treas. of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015); *see, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975) ("[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."). While courts may consider a discriminatory purpose in "evaluating whether state legislation constitutes economic protectionism," "[t]he principal focus of inquiry is the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Just Puppies*, 123 F.4th at 666 (citation modified); *see also Am. Trucking*

*Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27, 36–37 (1st Cir. 2024). Plaintiffs do not pair their purpose arguments with effects arguments, so their claim fails.

Even if Plaintiffs could rely on discriminatory purpose alone, the legislative record does not support them. The purpose of the RESALE Act is to "protect artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases." RESALE Act, pmbl.; *see also* Comm. Rep. at 1 (discussing the purpose of the RESALE Act "to govern the sale and resale of tickets to live entertainment events such as concerts and theatrical performances"); July 14, 2026 H'rg at 16:50–17:10, tinyurl.com/3jhsj8ba (Councilmember Allen discussing the consumer protection purpose of the bill). None of those articulations of the Act's purposes mentions or even suggests "burdening out-of-state competitors," so the Act is a far cry from "economic protectionism." *Metro. Wash. Chapter*, 62 F.4th at 576 (citation omitted).

Plaintiffs' arguments otherwise mischaracterize the record. To start, Plaintiffs point to an amendment that struck a provision that allowed the Mayor to regulate ticket fees in the primary market. Pls.' Ex. R [10-25] at 1. Rather than seek to privilege local venues, this amendment sought to avoid disadvantaging local venues. *See id.* at 2 (explaining that the amendment would ensure "DC's regulatory environment is consistent with every other major market and preserves the city's competitiveness"). Next, Plaintiffs suggest that the Committee Report "credited" certain testimony about keeping money in the local economy, Pls.' Mot. at 22, but the cited section is simply a summary of testimony by third parties, *see* Pls.' Ex. A at 11, 27. Last, Plaintiffs point to statements by Councilmembers about "big tech," "scalpers," and national businesses that would be regulated by the Act. *See* Pls.' Mot. at 21–22. But these statements do not show animus based on geography. *See Maplebear Inc. v. City of New York*, No. 25-cv-9979, 2026 WL 181637, at *11 (S.D.N.Y. Jan. 22, 2026) (rejecting argument that legislators' mention

of "companies like Instacart and its competitors" reflected a discriminatory purpose), *appeal docketed*, No. 26-172 (2d Cir. Jan. 27, 2026). It strains reason to think that simply because state or local legislators are motivated by abuses by national corporations that those legislators harbor animus toward out-of-state interests. Rather, councilmembers were concerned about secondary ticket exchanges' *practices*—not the fact that they operate outside the District.

Plaintiffs fare no better with their reliance on non-binding cases. *See* Pls.' Mot. at 22–23. In *DoorDash, Inc. v. City of New York* (*DoorDash NYC*), 692 F. Supp. 3d 268 (S.D.N.Y. 2023), the court found that plaintiffs had plausibly alleged a dormant Commerce Clause claim because of statements by legislators that showed favoritism of local businesses *at the expense of* out-of-state businesses, such as "it's more important that we protect [New York restaurants] instead of . . . Grubhub or the other providers," *id.* at 302 (alteration in original). In *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003), the court relied on statements that the amendment at issue would prevent "desperately needed profits [from being] skimmed out of local economies and into the pockets of distant corporations," *id.* at 594. The problem in both cases was that legislators seemed motivated by the out-of-state character of businesses and protectionism. But here, the Act regulates secondary ticket exchanges based on their practices—not because they are not located in the District—and it regulates all secondary ticket exchanges the same regardless of where they are based. Therefore, Plaintiffs' claim fails.

### D. Plaintiffs Are Unlikely to Succeed on Their Due Process Claims.

Plaintiffs argue that the fee and price caps violate due process because they are "confiscatory" and vague. Pls.' Mot. at 24–30. Neither claim succeeds.

#### 1. Plaintiffs' "Confiscatory" Theory Is Legally Wrong.

Plaintiffs contend that the fee cap violates a freestanding "rule" that "the government cannot limit businesses to 'confiscatory' rates that do 'not afford sufficient compensation' for

their services." Pls.' Mot. at 24 (quoting *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307–08 (1989)). But Plaintiffs derive their supposed rule from cases that do not apply here.

Plaintiffs largely rely on public utilities cases addressing permissible rates under the Takings Clause. As the Supreme Court explained in *Duquesne*, the "partly public, partly private status of utility property creates its own set of questions under the Takings Clause." 488 U.S. at 307. If the rate for property serving the public "does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth . . . Amendment[ ]." *Id.* at 308; *see Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 593 (6th Cir. 2001); *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 513 n.4 (9th Cir. 1990). Accordingly, courts recognize that the "confiscatory-rate doctrine" is limited to public utilities. *See, e.g.*, *335-7 LLC v. City of New York*, No. 21-823, 2023 WL 2291511, at *4 (2d Cir. Mar. 1, 2023); *Cytline, LLC v. Pub. Util. Dist. No. 2*, 849 F. App'x 656, 658 (9th Cir. 2021).

Here, Plaintiffs are not required to provide a platform for third parties to sell tickets for events in the District. "A property owner must be legally compelled to engage in price-regulated activity for regulations to give rise to a taking." *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993). "[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking." *Id.*

Plaintiffs also rely on substantive due process cases, in particular, two dubious, out-of-Circuit, motion-to-dismiss decisions addressing caps on commissions that food-delivery platforms could charge restaurants. *See DoorDash NYC*, 692 F. Supp. 3d at 299–300; *DoorDash, Inc. v. City & Cnty. of San Francisco* (*DoorDash SF*), No. 21-cv-5502, 2022 WL 867254, at *20 (N.D. Cal. Mar. 23, 2022). Plaintiffs cannot succeed on a substantive due process claim because they have not "been deprived of a protected interest in liberty or

property." *GE v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (citation modified); *see also George Washington Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003) ("[a]lthough [substantive due process] normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest"); *TCF Nat'l Bank v. Bernanke*, 643 F.3d 1158, 1164 (8th Cir. 2011) ("a protected property interest is also a condition precedent to . . . [a] confiscatory-rate analysis"). Here, Plaintiffs have not identified a protected property interest in charging a fee greater than 10% of the initial ticket price on optional, future transactions. In *DoorDash NYC*, the plaintiffs' claim survived a motion to dismiss because the plaintiffs had "adequately pleaded that the City's price caps deprived them of a reasonable income-producing use of their property in certain of their contracts with restaurants." 692 F. Supp. 3d at 300. Plaintiffs have not demonstrated any interference with contracts or that they will not be able to make income-producing use of existing property. *See* Pls.' Mot. at 25.

Even if Plaintiffs could identify a property interest, they have not shown that the fee cap violates due process. In certain contexts, the Supreme Court has held that "[p]rice control[s]" violate due process if they are "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (citation modified). At the outset, these cases do not apply here. These cases have mostly arisen in the inapposite context of rent control and public utilities. *See id.*; *Wonderful Nurseries LLC v. Agric. Lab. Rels. Bd.*, 789 F. Supp. 3d 855, 873 (E.D. Cal. 2025) (refusing to extend the confiscatory-rate doctrine outside of "public utility ratemaking and rent control"). Further, Plaintiffs only challenge the *fee* cap as confiscatory, and they do not explain why cases about *price* controls should be extended to caps on service fees. Plaintiffs can obtain revenue in other ways besides

charging fees or reducing expenditures, so the fee cap does not cap the profits that Plaintiffs can make. *See TCF Nat'l Bank*, 643 F.3d at 1164 (law limiting how much financial institutions could charge for processing debit-card transactions was not confiscatory because institutions could offset losses by charging customers for debit-card services).

Moreover, Plaintiffs have not tried to explain how the fee cap is arbitrary, discriminatory, or demonstrably irrelevant to a policy the legislature is free to adopt. The District is free to adopt price controls in "protection of consumer welfare," *Pennell*, 485 U.S. at 13, and the fee cap is related to protecting consumers. In passing, Plaintiffs argue that it is "arbitrary" to disregard "the relevant costs of providing the regulated service," Pls.' Mot. at 27, but Plaintiffs rely on one inapposite case involving an order issued pursuant to a statute with a requirement that providers be "fairly compensated," *see Global Tel*Link v. FCC*, 866 F.3d 397, 412–15 (D.C. Cir. 2017). Equally unhelpful is *DoorDash SF*, which misinterpreted *Pennell* to determine rationality just based on "whether the landlords were guaranteed a fair return on their investment." 2022 WL 867254, at *20 (citation omitted).[4]

**2. The Price and Fee Caps Are Not Vague.**

"A law may be vague in violation of the Due Process Clause" if, as relevant here, it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Act Now to Stop War & End Racism Coal. v. District of Columbia* (*ANSWER*), 846 F.3d 391, 409 (D.C. Cir. 2017) (citation modified). "Even as the vagueness inquiry refers to a law's meaning to the 'ordinary person,'" "a statute is unconstitutionally vague if, applying the

---

[4] Plaintiffs also ignore that the Act allows the Mayor to adjust the price and fee caps by rulemaking. *See* D.C. Code § 28-5507. Plaintiffs put forward no evidence to show that a 20% fee cap—the maximum adjustment allowable—would prevent them from making a profit.

rules for interpreting legal texts, its meaning specifies no standard of conduct at all." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation modified).

This is a "heavy burden" for Plaintiffs, *Crooks v. Mabus*, 845 F.3d 412, 418 (D.C. Cir. 2016), as "vagueness challenges are difficult to mount," *United States v. Griffith*, No. 21-cv-244, 2023 WL 1778192, at *3 (D.D.C. Feb. 6, 2023). Plaintiffs' burden is compounded because "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses . . . can be expected to consult relevant legislation in advance of action." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). In the end, the Court must find that "no construction can save the Act," and the rules of statutory interpretation "consistently favor that interpretation of legislation which supports its constitutionality." *Bronstein*, 849 F.3d at 1106 (quoting *Screws v. United States*, 325 U.S. 91, 98, 100 (1945)).

Plaintiffs first contend that the statute does not provide fair notice because the "initial price" of the ticket may be indiscernible in some instances. Pls.' Mot. at 28–29. A law is not vague simply because the practicalities of compliance can be difficult in some instances or because some marginal situations present an interpretive question as to whether the statute applies. *See United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) ("[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."); *United States v. McHugh*, 583 F. Supp. 3d 1, 21 (D.D.C. 2022) ("The need to examine statutory language, determine its meaning, and apply it to a specific factual situation is not evidence of a constitutionally defective statute—it is the ordinary work of judging in the age of statutes."). The Court is "not concerned with vagueness in the sense that the term requires a person to conform his conduct to an imprecise but

comprehensible normative standard, whose satisfaction may vary depending upon whom you ask. Rather, a statute is unconstitutionally vague if . . . its meaning specifies no standard of conduct at all." *Bronstein*, 849 F.3d at 1107.

The RESALE Act provides a sufficient standard. The Act limits the price a ticket reseller can resell a ticket for, and the fee a secondary ticket exchange can charge for its services, to "10% of the total price of the initial ticket." D.C. Code § 28-5506(b), (c). The "price" of the "initial ticket" refers to the *purchase* price. That follows from the plain meaning of "price," which is "the amount of money given or set as consideration for the sale of a specified thing," *Price*, Merriam-Webster Dictionary, tinyurl.com/mtjyurtn, and subsection (a) of the same section, which provides that secondary ticket exchanges must disclose "the original *purchase* price of the ticket, including all fees and taxes in connection with the initial *purchase* price of the ticket," D.C. Code § 28-5506(a)(2) (emphases added). Subsections (b) and (c) then use the shorthand "initial ticket," and the terms should be construed the same across the section. *See Price v. Bd. of Ethics & Gov't Accountability*, 284 A.3d 1019, 1025 (D.C. 2022) (statutory language must "be interpreted in context" not "isolation," and in light of "the language of surrounding and related paragraphs" (citation modified)). If the statute were not enough, the Department interprets the Act to refer to the initial purchase price, DLCP Decl. ¶¶ 9–10, and an agency's "narrowing, authoritative interpretation" can "fend off a vagueness challenge," *Dirks v. SEC*, 802 F.2d 1468, 1471 (D.C. Cir. 1986).

Thus, there will usually be an identifiable purchase price for a ticket—*i.e.*, the amount that was actually paid to purchase it. As a result, Plaintiffs' hypotheticals fall away. *See* Pls.' Mot. at 28–29. Even if a ticket's *advertised* price fluctuates with dynamic pricing, it will have a

static *purchase* price. Bundled tickets have a purchase price and can be divided. And no one can "resell" free tickets because they had no purchase price to begin with.

Moreover, if there are rare instances in which Plaintiffs feel that they cannot determine the initial purchase price, then Plaintiffs can decline to host the resale. The RESALE Act sets the conditions for ticket resales, and if regulated parties cannot satisfy those conditions, then they simply can forgo the resale. *See Hoffman*, 455 U.S. at 498 ("[B]usinesses . . . can be expected to consult relevant legislation in advance of action."). They have neither an obligation nor a right to engage in any and all resales. After all, the District could have banned ticket resales entirely. *See Ross*, 598 U.S. at 387–88 (op. of Gorsuch, J.) (discussing how states can ban a variety of goods).

Second, Plaintiffs argue that in some instances they will not be able to verify the initial ticket price because they did not participate in the original transaction. Pls.' Mot. at 29–30. But Plaintiffs admit they "can ask sellers to provide the information." *Id.* at 29. Nonetheless, Plaintiffs speculate that they will be liable if a seller lies to them or provides a ticket price that is incorrect. *Id.* at 29–30. Nothing in the statute suggests that the District would hold secondary ticket exchanges liable for using an initial ticket price that they reasonably thought to be true. Moreover, the Department has said that it will not, so Plaintiffs' concerns cannot support their claim. *See* DLCP Decl. ¶¶ 9–10; *Dirks*, 802 F.2d at 1471.

Thus, Plaintiffs' two arguments fail to show that the law is unconstitutionally vague. And they certainly fail to sustain a facial challenge in a pre-enforcement posture prior to the promulgation of the implementing regulations. At most, Plaintiffs have identified a few rare instances in which the Act's application may require some interpretation. That does not render the statute "impermissibly vague in *all* of its applications," as necessary for Plaintiffs to succeed.

*Hoffman*, 455 U.S. at 495 (emphasis added). Plus, Plaintiffs may seek guidance from the Department and will have the opportunity to participate in the statutorily mandated rulemaking process. "[V]agueness concerns are mitigated when regulated entities have the ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021) (citation modified).

Plaintiffs, nonetheless, analogize to *Connally v. General Construction Co.*, 269 U.S. 385 (1926), but it is distinguishable. The statute in *Connally* was flawed because it required payment at the current rate of wages—which could be several different amounts—at the current rate in the "locality," which could be interpreted in a multitude of ways. *Id.* at 393–95. Here, in contrast, Plaintiffs take issue with the term "initial," seemingly as part of the phrase "the total price of the initial ticket." *See* D.C. Code § 28-5506. Unlike the terms "current rate of wages" or "locality," the "total price of the initial ticket" is fixed in time as the purchase price and generally ascertainable.

### E. <u>Plaintiffs Are Unlikely to Succeed on Their First Amendment Claim.</u>

Plaintiffs allege that the price disclosure violates their free-speech rights under the First Amendment. Pls.' Mot. at 30. Plaintiffs concede that the price disclosure implicates only commercial speech. *See id.* Indeed, "[t]he speech at issue here—the advertising of prices—is quintessentially commercial." *Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 412 (D.C. Cir. 2012). "[C]ommercial speech receives a lower level of protection under the First Amendment, [and] burdens imposed on it receive a lower level of scrutiny from the courts." *United States v. Philip Morris USA Inc.* (*Philip Morris I*), 566 F.3d 1095, 1142–43 (D.C. Cir. 2009) (per curiam). More specifically, one of two standards applies to commercial speech. *United States v. Philip Morris USA Inc.* (*Philip Morris III*), 855 F.3d 321, 327 (D.C. Cir. 2017). Generally, regulations of or bans on commercial speech receive intermediate scrutiny under *Central Hudson Gas & Electric*

*Corp. v. Public Service Commission*, 447 U.S. 557 (1980). *Id.* However, laws that mandate the disclosure of commercial information receive more relaxed review under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). *Id.* The price disclosure is—as it sounds—a commercial disclosure, and it easily passes lenient *Zauderer* review. But even if *Central Hudson* applies, as Plaintiffs mistakenly argue, it satisfies that test, too.

### 1. *Zauderer* Applies to the Price Disclosure.

The threshold question in a commercial-speech case is whether *Central Hudson* or *Zauderer* applies. *See Philip Morris III*, 855 F.3d at 327. If the law prohibits speech, then *Central Hudson* applies. *Spirit*, 687 F.3d at 412–13. But if the law "simply require[s] a clarifying disclosure," then *Zauderer* applies. *Id.* at 413.

*Zauderer* applies here because the price disclosure does not impose "an affirmative limitation on speech." *Id.* at 412 (citation omitted). It does not prohibit anyone from saying anything. Rather, it simply requires secondary ticket exchanges to disclose the original ticket price. The original ticket price "is 'factual and uncontroversial' and directly relevant to 'the terms under which [the exchanges'] services will be available' to consumers." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020) (quoting *Zauderer*, 471 U.S. at 650–51). Secondary ticket exchanges facilitate and profit off ticket resales—that is the service they provide. The original ticket price is a "trait" of the ticket that is being resold. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc). Thus, the price disclosure is "a disclosure mandate [designed] to achieve a goal of informing consumers about a particular product trait." *Id.* Indeed, this Court explained that *Zauderer* applies to "regulations touching on the display of prices." *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 392 (D.D.C.) (Nichols, J.), *aff'd*, 983 F.3d 528 (D.C. Cir. 2020); *see Spirit*, 687 F.3d at 413–14 (rule requiring airlines to display total price of a ticket was subject to *Zauderer*). The price disclosure falls in that bucket.

Plaintiffs do not dispute that the price disclosure only requires disclosure of factual, noncontroversial information. *See* Pls.' Mot. at 30. So Plaintiffs are left to argue that *Zauderer* does not apply because "the original sale price 'in no way relates to the services' that Plaintiffs provide." *Id.* at 31 (quoting *Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 769 (2018)). Plaintiffs argue that the original ticket is not their product, and the original ticket price is "irrelevant information about an earlier transaction." *Id.* at 32. That argument strains credulity. Plaintiffs do not and cannot dispute that the original ticket price is a "trait" of the ticket that is being resold. *Am. Meat*, 760 F.3d at 26. And the original ticket price is hardly "irrelevant" to a consumer—without it, the consumer cannot fully understand the value of the resold ticket and make an informed decision about whether to buy it. At the very least, the original ticket price "*relate[s]* to the good or service offered by the regulated party," *id.* (emphasis added), because "[t]he phrase 'relating to' sweeps broadly," *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026).

As support, Plaintiffs rely on just two cases finding that a disclosure did not relate to a plaintiff's services, but neither had to do with prices. *See* Pls.' Mot. at 31–32. In one case, pregnancy clinics—which counseled against abortion—were required to tell patients that the state provided abortion services. *NIFLA*, 585 U.S. at 761, 769. But the RESALE Act does not require Plaintiffs to include a script referring consumers to state-sponsored services that Plaintiffs oppose. In the other case, food-delivery platforms (like DoorDash) were required to share customer data with restaurants, which were in many ways their competitors. *DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 355 (S.D.N.Y. 2025), *aff'd*, 185 F.4th 1, 7–8 (2d Cir. 2026). The RESALE Act does not force data sharing between competitors. It just requires Plaintiffs to provide *to consumers* "information [that] helps [them] make 'intelligent and well

informed' economic decisions about the product, service, or transaction before them." *DoorDash*, 185 F.4th at 8 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976)). So *Zauderer* applies. *See id.*

### 2. The Price Disclosure Satisfies *Zauderer*.

Under *Zauderer*, the price disclosure need only be "reasonably related to the [District's] interests and cannot be so unjustified or unduly burdensome that it chills protected speech." *Am. Hosp.*, 468 F. Supp. 3d at 392. "[C]areful evidentiary parsing . . . is hardly necessary." *Philip Morris III*, 855 F.3d at 327 (citation modified). "A common-sense analysis will do. And the disclosure has to advance the purpose only slightly." *Am. Hosp.*, 468 F. Supp. 3d at 395 (citation omitted).

The District has substantial—not just legitimate—interests in protecting consumers, increasing price transparency, and lowering costs for consumers. *See* RESALE Act, pmbl.; *Spirit*, 687 F.3d at 415 ("[T]he government's interest in ensuring the accuracy of commercial information in the marketplace is substantial." (citation modified)); *Am. Hosp.*, 468 F. Supp. 3d at 392, 395 n.25 (upholding, under intermediate scrutiny, a rule aimed at promoting price transparency and lowering healthcare costs); *Time Warner Ent. Co. v. FCC*, 56 F.3d 151, 184 (D.C. Cir. 1995) (government had substantial interest in "protecting consumers from monopoly prices"). In addition, the Council identified an interest in promoting and preserving the District's "music and arts scenes"—and consumer "access" thereto—which "contribute substantially to the District's tourism economy and cultural identity." Comm. Rep. at 2. The District has a substantial interest in "promoting a major industry that contributes to the economic vitality of the District." *Edwards v. District of Columbia*, 755 F.3d 996, 1002 (D.C. Cir. 2014); *see also Real Est. Bd. of N.Y., Inc. v. City of New York*, 182 F.4th 140, 157 (2d Cir. 2026).

The price disclosure serves these interests in common-sense ways. Making the original ticket price known to a consumer allows the consumer to assess whether a resale ticket is reasonably priced and how much it is being marked up or down. Indeed, the D.C. Circuit and this Court have recognized that disclosure of pricing can promote customer transparency. In *Spirit*, the D.C. Circuit held that "a regulation requiring that the total, final price [of airfares] be the most prominent" "clearly and directly advanced" the government's interest in "ensuring the accuracy of commercial information in the marketplace." 687 F.3d at 415. In *American Hospital*, this Court upheld a rule that hospitals publish the standard charges (*i.e.*, prices) for their items and services, which could be subject to further adjustments. 468 F. Supp. 3d at 378–79, 391. In upholding the rule, this Court explained the logic of "transparency measures generally": they "are intended to enable consumers to make informed decisions; naturally, once consumers have certain information, their purchasing habits may change, and suppliers of items and services may have to adapt accordingly." *Id.* at 394. The same is true here. If consumers know that they are getting ripped off by resales, they will be less likely to purchase inflated resale tickets, and resellers and secondary ticket exchanges will need to lower prices and fees. Thus, because the price disclosure is "a reasonably crafted disclosure mandate," "the government meets its burden of showing that the mandate advances its interest in making the 'purely factual and uncontroversial information' accessible to the recipients." *Am. Meat*, 760 F.3d at 26.

In addition, the price disclosure is not "so unjustified or unduly burdensome that it chills protected speech." *Am. Hosp.*, 468 F. Supp. 3d at 392. Plaintiffs "must demonstrate a burden on *speech*, and [they have] pointed to no such burden." *Am. Hosp.*, 983 F.3d at 541. The price disclosure "neither requires [Plaintiffs] to endorse a particular viewpoint nor prevents them from adding their own message on the same website." *Id.*

Plaintiffs' arguments to the contrary fail. First, Plaintiffs argue that there is no "'real' harm" that the District is trying to alleviate. Pls.' Mot. at 40 (quoting *NIFLA*, 585 U.S. at 776). The harms of high prices for ticket resales and anti-consumer practices in the secondary ticket market are undoubtedly real. *E.g.*, Comm. Rep. at 2, 4–5. Second, Plaintiffs argue the District needs to produce evidence that the price disclosure achieves its goals. Pls.' Mot. at 40. Such evidence is not required "where, as here, 'the government uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait.'" *Am. Hosp.*, 983 F.3d at 541 (quoting *Am. Meat*, 760 F.3d at 26). Plaintiffs' two cited cases, *NIFLA* and *National Association of Manufacturers v. SEC* (*NAM*), 800 F.3d 518 (D.C. Cir. 2015), are inapposite because they addressed laws requiring commercial entities to express a controversial message. *See Am. Hosp.*, 468 F. Supp. 3d at 391–92 (distinguishing *NIFLA* and *NAM* and upholding a price disclosure). Third, Plaintiffs argue that the sports exemption renders the price disclosure invalid, Pls.' Mot. at 40, but the Act was intended to remedy problems in live entertainment, not sports. *See* pp. 32–33, *infra* (explaining why the exemptions do not render the law underinclusive). Lastly, Plaintiffs argue that the District needed to consider less burdensome disclosures. Pls.' Mot. at 40. "*Zauderer*, however, imposes no such obligation." *Am. Hosp.*, 983 F.3d at 541.

### 3. Regardless, the Price Disclosure Satisfies *Central Hudson*.

Even if the price disclosure is subject to *Central Hudson*, it satisfies that test too. "That test requires that [the Court] ask three questions": (1) whether "the asserted government interest [is] substantial," (2) "whether the regulation directly advances the governmental interest asserted," and (3) "whether the fit between the government's ends and the means chosen to accomplish those ends is not necessarily perfect, but reasonable." *Spirit*, 687 F.3d at 415 (citation modified).

**a. The Price Disclosure Is Supported by Substantial Interests.**

As explained, the RESALE Act serves substantial interests. *See* pp. 27–29, *supra*. Nonetheless, Plaintiffs argue that the District lacks substantial interests in preventing consumer deception and reducing resale ticket prices because (1) the RESALE Act already requires Plaintiffs to disclose the total ticket price, (2) the District cannot use the price disclosure as an "adjunct" to the fee cap because the cap is invalid, and (3) the exemptions for sporting events and movies are arbitrary. Pls.' Mot. at 33–34. These are arguments about whether the price disclosure is a reasonable fit to accomplish the District's ends. Indeed, Plaintiffs repeat these same arguments under *Central Hudson*'s second prong, *id.* at 34–37, and the District addresses them next. The first question for *Central Hudson* is simply whether the identified interests rise to the level of substantial, and the answer here is "easy": they do. *Spirit*, 687 F.3d at 415.

**b. The Price Disclosure Directly Advances the District's Interests.**

On the second *Central Hudson* prong, the price disclosure "directly advances" the District's interests. *Cent. Hudson*, 447 U.S. at 566. The District need not provide "empirical data" to prove as much. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995). Rather, the District can rely on "common sense," *id.* (citation omitted), "anecdotes," *id.*, "various unprovable assumptions," *Nat'l Cable & Telecomms. Ass'n v. FCC* (*NCTA*), 555 F.3d 996, 1000 (D.C. Cir. 2009) (citation omitted), and "a straightforward line of reasoning," *ANSWER*, 846 F.3d at 408. For the reasons given above, pp. 27–28, *supra*, the price disclosure directly advances the District's interests. *See Am. Meat*, 760 F.3d at 26–27 (explaining how factual, noncontroversial disclosures relating to a product inherently satisfy "several of *Central Hudson*'s elements"); *Am. Hosp.*, 468 F. Supp. 3d at 395 n.25 (concluding that a price disclosure would satisfy *Central Hudson* for the same reasons it satisfied *Zauderer*). Plaintiffs resist this straightforward reasoning with four arguments, and none works.

First, Plaintiffs argue that the price disclosure does not "give consumers any *meaningful* information" because the RESALE Act already requires disclosure of the total all-in ticket price, and a total price is not "deceptive." Pls.' Mot. at 35; *see also id.* at 33. But consumers need the original ticket price to compare it to the total ticket price. Only then can consumers understand how much the ticket price is or is not being marked up. Accordingly, Plaintiffs' reliance on two out-of-Circuit district court cases that did not address the unique economics of ticket resales—and applied state consumer-protection laws—is misplaced. *See id.* at 33.

Second, Plaintiffs argue that there are "practical problems" with implementation. *Id.* at 35. They say there may be situations where they may not know or be able to ascertain the original ticket price. *Id.* But, as explained, Plaintiffs can ask resellers for that information and will not be liable for inaccuracies by a reseller. *See* p. 23, *supra*; *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (upholding ordinance on intermediate scrutiny by considering "[a]dministrative interpretation and implementation" that remedied the challengers' concerns). Next, Plaintiffs speculate that a consumer comparing two resales of dynamically priced tickets may misinterpret which is a better deal. *See* Pls.' Mot. at 35–36. But in Plaintiffs' hypothetical, the price disclosure still allows the consumer to see whether the ticket is marked up or discounted. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 453 (2015) (the state's "interest may be implicated to varying degrees in particular contexts"). All said, none of Plaintiffs' hypotheticals render the price disclosure invalid, and moreover, the Court cannot find the Act unconstitutional based on these "mere possibilit[ies]." *Wash. State Grange*, 552 U.S. at 455.

Third, Plaintiffs argue that the District has not proven with evidence that the price disclosure will reduce prices. Pls.' Mot. at 36. But the District does not need to because the reasoning behind a price disclosure is "straightforward" enough, *ANSWER*, 846 F.3d at 408, and

the District is entitled to make "predictive judgments," *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (citation modified). Plaintiffs also argue that the RESALE Act already caps ticket prices, so the District does not also need a price disclosure. Pls.' Mot. at 36. This argument fails because if consumers can see the original ticket price, they can see that the resale ticket is not being marked up by more than District law allows. Even within the 10% price cap, there is value to the price disclosure because the consumer can see if the ticket is marked up by 2% versus 10% or if it is marked down. In any event, the District's "existing restrictions on" prices is "no reason to find that the Act's [required disclosure] fail[s] intermediate scrutiny." *Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022).

Fourth, Plaintiffs argue that the RESALE Act is underinclusive because it does not apply to sporting events or movies. Pls.' Mot. at 37. A law "is not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective." *Blount v. SEC*, 61 F.3d 938, 946 (D.C. Cir. 1995). Instead, a law "is struck for *under* inclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 17–18 (D.C. Cir. 2009) (quoting *Blount*, 61 F.3d at 946). Here, the Act advances its interests as to live-entertainment events. Indeed, the Council was focused on live-entertainment events in music and the arts, Comm. Rep. at 1–2, so obviously the Act would not apply to sports or movies.

Moreover, the economics of ticket pricing differs in material ways for live-entertainment events versus sports or movies. *See* GAO Rep. at 6–12. For example, sporting events and movie screenings generally are less scarce than live-entertainment events. A sports team will play dozens of home games each season; and a movie will generally show at several times, at several theaters, for several weeks; but a concert tour will usually only stop once in the District.

"[L]imited supply combined with high demand drives prices upward." James Chen, *Understanding the Scarcity Principle: Definition, Importance, and Examples*, Investopedia (Mar. 2, 2026), tinyurl.com/2ze6h4t5. In addition, a high-demand-low-supply market can make consumers vulnerable to unscrupulous business practices. Accordingly, the Council could reasonably choose to specifically target live entertainment instead of sports and movies because high ticket prices and consumer exploitation are less frequent or severe in those sectors. *See Taylor*, 582 F.3d at 18 ("Careful legislative adjustment in a cautious advance, step by step, warrants considerable deference." (citation modified)).

**c. There Is a Reasonable Fit Between the Price Disclosure's Means and Ends.**

"[T]he government's burden on the final *Central Hudson* factor is to show a reasonable fit, or a reasonable proportion between means and ends," "[n]otwithstanding" that some older cases—and Plaintiffs—refer to this prong as a "narrow tailoring" requirement. *Am. Meat*, 760 F.3d at 26 (citation modified). As explained, the District has an interest in informing consumers of the original ticket price, *see* pp. 27–28, *supra*, so requiring that secondary ticket exchanges disclose that price will "self-evidently" achieve that interest, *Am. Meat*, 760 F.3d at 26; *see also, e.g.*, *SEC v. Musk*, 826 F. Supp. 3d 35, 49–50 (D.D.C. 2026). Further, "*Central Hudson*'s requirement that a speech regulation be no more restrictive than necessary appears to focus on whether speech will be burdened." *Am. Hosp.*, 468 F. Supp. 3d at 395 n.25. But the price disclosure just requires a factual, noncontroversial disclosure, so "Plaintiffs have not demonstrated that [it] will suppress or alter any expressive content." *Id.*

Plaintiffs' counterarguments are more of the same and no more persuasive. First, Plaintiffs argue that the price disclosure "provides consumers with *no* information." Pls.' Mot. at 38. The price disclosure provides consumers with the original ticket price—which is

information. Second, Plaintiffs argue that the price disclosure does not lower prices in the District because it "reaches many transactions outside the District." *Id.* The RESALE Act applies to transactions for District events and is intended to lower prices for those events. Third, Plaintiffs argue that the Act is undermined by the exemption for sporting events. The Act is not unconstitutionally underinclusive. *See* pp. 32–33, *supra*. Finally, Plaintiffs argue that the Council needed to consider and reject less restrictive alternatives. Pls.' Mot. at 38–39. But "[t]he government does not have to show that it has adopted the least restrictive means for bringing about its regulatory objective; . . . and it does not have to satisfy a court that it has chosen the best conceivable option." *NCTA*, 555 F.3d at 1002. Regardless, the best way to inform consumers of the original ticket price is to require that it be disclosed at the point of the sale. None of Plaintiffs' imaginative alternatives "accomplish the government's goals equally or almost equally effectively." *Taylor*, 582 F.3d at 19 (citation omitted).

## II. <u>Plaintiffs Fail to Establish Irreparable Harm in the Absence of an Injunction.</u>

Even if Plaintiffs have shown a likelihood of success on the merits, they fail to show irreparable harm, and that failure "is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (citation modified). The "standard" for irreparable harm is "high." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a preliminary injunction are not enough." *Clevinger*, 134 F.4th at 1234 (citation modified). Rather, the injury must be "certain," "great," "actual and not theoretical," "beyond remediation," and "of such *imminence* that there is a clear and present need for equitable relief." *Chaplaincy*, 454 F.3d at 297 (citation modified).

Moreover, "'[i]rreparable harm,' in this context, refers to harm within a specific timeframe." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025). It is harm that threatens a court's ability to "grant meaningful relief following trial." *Id.*; *see Coal. for Humane Immigrant Rts. v. Mullin*, 185 F.4th 1275, 1280 (D.C. Cir. 2026) (per curiam) ("[T]he very question is whether relief is needed now to preserve the court's ability to grant effectual relief later."). And so, "[c]ourts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 108 F.4th 194, 201 (3d Cir. 2024) (cited favorably in *Hanson* and *Coalition*), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025).

Plaintiffs fail to meet this standard because they do "not explain why [their] requested relief will be unavailable later." *Dotson v. District of Columbia*, No. 24-cv-1864, 2024 WL 5046282, at *7 (D.D.C. Dec. 9, 2024). Plaintiffs seek to enjoin enforcement of the RESALE Act and declare it invalid and unenforceable. Compl., Prayer. But that relief will be available in the ordinary course. *See Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (explaining that implementation of a statute would not prevent the Supreme Court from deciding a constitutional challenge later). A preliminary injunction is not supposed to be a "shortcut" to that relief. *Hanson*, 120 F.4th at 243 (quoting *DSSA*, 108 F.4th at 197).

Nor is there a "clear and present need for equitable relief" warranting this Court's intervention because any harms from complying with the price cap will occur even if the Court enjoins the District's enforcement. *Chaplaincy*, 454 F.3d at 297 (citation modified). The basis of Plaintiffs' alleged need for emergency relief is that unless "the Act is enjoined" before January 1, Plaintiffs will suffer harms from having to comply with the Act. Pls.' Mot. at 3–4, 40.

The problem for Plaintiffs is that they will have to comply with the Act even if the Court grants a preliminary injunction. The Act is enforceable not just by the District but by a private right of action. D.C. Code §§ 28-5508(b), 47-2890.05(b); 28-3905(k)(1). Yet a preliminary injunction here could only prevent the District's enforcement of the Act—not enforcement by individuals who are not parties to this case. That is because a federal court "may enjoin named defendants from taking specified unlawful actions" but cannot "enjoin the world at large," "challenged laws themselves," or "all unnamed private persons who might seek to bring their own" suits to enforce the Act. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (citation modified); *see* Fed. R. Civ. P. 65(d)(2) (limiting whom an injunction may bind).[5] Thus, even if the Court enjoins the District from enforcing the Act, Plaintiffs still will face liability come January 1 because private individuals could sue them. As a result, Plaintiffs cannot show irreparable harm because a preliminary injunction "would not actually remedy" their harms. *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011); *see also, e.g.*, *Navistar, Inc. v. EPA*, No. 11-cv-449, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (Wilkins, J.).

Nor is the District's enforcement of the Act imminent. *See* DLCP Decl. ¶ 11. Plaintiffs complain that they need immediate relief from compliance because "the stakes of guessing wrong are severe" as they will face liability from the District. Pls.' Mot. at 30. But, as mentioned above, the Department will engage in rulemaking, and Plaintiffs can seek guidance then or even before. DLCP Decl. ¶¶ 5, 12. Thus far, Plaintiffs have not even tried. *Id.* ¶ 12. Yet, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam).

[5] For that reason, Plaintiffs are wrong to request that the Court "enjoin[ ], stay[ ], and restrain[ ]" "the effective date, operation, and applicability of the Act." Pls.' Proposed Order at 2.

Plaintiffs overlook or ignore all the above. Instead, they offer a few theories of irreparable harm, but none shoulders their "considerable burden." *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 33 (D.D.C. 2020) (Nichols, J.) (citation omitted). Plaintiffs' lead argument is that constitutional violations establish irreparable harm. Pls.' Mot. at 41. That is not the law. Courts "do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights." *Hanson*, 120 F.4th at 244 (citing *Chaplaincy*, 454 F.3d at 302). Rather, the plaintiff must show that the purported constitutional violations and accompanying injuries meet the standard for irreparable harm: "injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants" judicial intervention now. *Hanson*, 120 F.4th at 244. In each case, "the Court must look to the nature of plaintiffs' claims" and "the specific context of the facts of this case" to determine if the constitutional harms are in fact "irreparable." *Ayele v. District of Columbia*, 704 F. Supp. 3d 231, 240 (D.D.C. 2023); *see, e.g.*, *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254–55 (D.C. Cir. 1991) (Thomas, J.) (no irreparable harm in a First Amendment case because plaintiffs had not shown that they "will cease speaking or writing before the district court resolves their constitutional challenges"). Accordingly, Plaintiffs' cases that involved different facts—or even different claims—do not establish that Plaintiffs have shown irreparable harm *here*.[6] Thus, "there is no *per se* rule that the violation of any constitutional right is inherently irreparable." *Ayele*, 704 F. Supp. 3d at 239.

---

[6] *See* Pls.' Mot. at 41; *Karem v. Trump*, 960 F.3d 656, 662–63 (D.C. Cir. 2020) (procedural due process—not vagueness; suspension of a press pass that prevented journalist from timely reporting); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 507–08, 511 (D.C. Cir. 2016) (ban on political speech—not a commercial disclosure); *Gordon v. Holder*, 721 F.3d 638, 645–46 (D.C. Cir. 2013) (minimum contacts and taxes—not vagueness or "confiscatory rates"); *Ellison*, 140 F.4th 957 (did not analyze irreparable harm; restrictions on sales of prescription drugs).

So the question becomes whether Plaintiffs' alleged harms meet the D.C. Circuit's high standard for "irreparable"—even if they hide inside a Trojan Horse of constitutional claims. Plaintiffs say that if the RESALE Act goes into effect, they face the following harms: "financial harm" from suppressed ticket prices or forgone ticket sales, compliance costs, harms to Plaintiffs' business "reputation" and "customer goodwill," and "[d]isruption of ongoing contractual and business relationships." Pls.' Mot. at 41–43 (citation modified). "These claimed harms are best characterized as economic in character." *Cmty. Oncology All. v. Becerra*, No. 23-cv-2168, 2023 WL 9692027, at *4 (D.D.C. Dec. 21, 2023) (Nichols, J.). Unfortunately for Plaintiffs, this Court, the D.C. Circuit, and the Supreme Court have held that the same or similar harms are not irreparable. *See, e.g.*, *id.* ("loss of business opportunities, market share, and customer goodwill" (citation omitted)); *Hines Immigr. L., PLLC v. Exec. Off. for Immigr. Rev.*, No. 26-cv-1018, 2026 WL 969020, at *13 n.1 (D.D.C. Apr. 10, 2026) (Nichols, J.) ("operational disruptions and inefficiencies" (citation omitted)); *Clevinger*, 134 F.4th at 1234 ("loss of customers"); *id.* at 1235 ("reputational injury"); *Petroleum Expl. v. Pub. Serv. Comm'n*, 304 U.S. 209, 220–21 (1938) (costs of complying with a law and litigation costs). Such economic injuries "are presumptively remediable through monetary damages." *Clevinger*, 134 F.4th at 1234. There is an exception "*only* where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis added). Yet Plaintiffs do not argue that the existence of their businesses is threatened.

---

Although irreparable harm is often presumed when speech is suppressed because speech can be time-sensitive and hard to value, *DSSA*, 108 F.4th at 204, "the First Amendment interests implicated by disclosure requirements"—like the price disclosure—"are substantially weaker than those at stake when speech is actually suppressed," *Zauderer*, 471 U.S. at 652 n.14. And the costs of complying with a price disclosure can be recovered.

Plaintiffs nonetheless argue that their "financial harm" cannot "be adequately remedied" because "quantifying [their] losses" would be "counterfactual" and "speculative." Pls.' Mot. at 41 (citation omitted). But Plaintiffs do not "substantiate that claim." *Clevinger*, 134 F.4th at 1234. Quite the opposite, Plaintiffs' declarations *do* include, or at least rely on, "estimates of compliance costs and expected revenue losses under the Act" as well as "transaction volume and revenue for District events." Gametime Decl. ¶ 26.[7] Moreover, "courts often find damages from the loss of customers to be calculable," and the loss of ticket resales should be no different. *Clevinger*, 134 F.4th at 1235. Although Plaintiffs complain that they would have to prove a "counterfactual," Pls.' Mot. at 41, civil plaintiffs regularly use expert witnesses to estimate damages in far more complex cases than this one, *see, e.g.*, *In re Nat'l Football League's "Sunday Ticket" Antitrust Litig.*, --- F.4th ----, ----, No. 24-5493, 2026 WL 3266788, at *2 (9th Cir. Oct. 30, 2026) ("Antitrust claims often depend on expert testimony to prove a crucial counterfactual: that injury and damages would not have occurred in a world without the claimed anticompetitive conduct."). Ultimately, the standard for irreparable harm is high and "even the '*possibility*'" of compensatory relief "'weighs heavily against a claim of irreparable harm.'" *Ayele*, 704 F. Supp. 3d at 241 (emphasis added) (quoting *Wis. Gas*, 758 F.2d at 674). It is certainly possible that Plaintiffs will be able to estimate losses from the Act in a damages phase, should they prevail.

Even if that were not true, irreparable harm is not "automatically" established "when financial losses are unrecoverable," as this Court recently explained. *Corewell Health William Beaumont Univ. Hosp. v. Kennedy*, No. 26-cv-3111, 2026 WL 3257581, at *6 (D.D.C. Oct. 29,

---

[7] *See also* Gametime Decl. ¶¶ 13, 17–18, 24(a), (c), 25(c); SeatGeek Decl. ¶¶ 11, 15–16, 21(a), 22; TickPick Decl. ¶¶ 11, 16–17, 24(b), 25(c); Vivid Seats Decl. ¶¶ 5–7, 2, 6–7, 11–12, 15–16, 17(b), 25(c), 27.

2026) (Nichols, J.). Plaintiffs must still show that their "losses are *certain, great and actual*" and "adequately describe and quantify the level of harm." *Id.* (citation modified). "[C]ritically," Plaintiffs do not "offer any evidence to show how" their losses "actually affect [their] bottom line, *e.g.*, what percentage of [their] annual revenues the losses constitute." *Id.*; *see also Cmty. Oncology All.*, 2023 WL 9692027, at *5. Plaintiffs are all national corporations, and one member of Ticket Policy Forum, StubHub, makes over a billion dollars in revenue. Even if Plaintiffs stand to face losses in one city, those losses are not so "significant" when judged against the rest of Plaintiffs' business. *Corewell*, 2026 WL 3257581, at *6 (citation omitted).

Plaintiffs' own conduct confirms as much. Several states have enacted similar laws. *See* p. 4, *supra*. Yet there is no evidence that Plaintiffs have pulled out of other states or that those states' laws have significantly affected Plaintiffs' bottom line. *See* Vanderbilt Rep. at 20–21. Plaintiffs have not, to the District's knowledge, even challenged any other ticket resale law. Such "willingness to put up with" ticket resale laws "serve[s] as an indication that [Plaintiffs'] injury is not as serious as alleged." *Ams. for Prosperity*, 191 F.4th at 175 (citation modified).

Then there is Plaintiffs' delay, which further "implies a lack of urgency and irreparable harm." *Miller v. Gruenberg*, No. 21-cv-3035, 2022 WL 20699638, at *1 (D.D.C. Aug. 24, 2022) (Nichols, J.) (citation omitted), *aff'd*, No. 22-5256, 2023 WL 6206247 (D.C. Cir. Sept. 25, 2023). Plaintiffs have known the final provisions of the RESALE Act since July 14, when the Council passed it. Although the Act required approval from the Mayor and Congress, Plaintiffs could have begun preparing their motion so they could file the day the Act went into effect. *See Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 25-cv-2214, 2025 WL 2996157, at *5 (D.D.C. Oct. 24, 2025) (Nichols, J.) ("When evaluating whether a delay implies a lack of irreparable harm, courts consider the date an action was authorized—not just when it takes

effect.”). But Plaintiffs waited nearly three weeks after the Act became effective to file their motion. Similar delays have undercut motions for a preliminary injunction. *E.g.*, *Douglas v. NPS*, 835 F. Supp. 3d 159, 169 (D.D.C. 2026) (two weeks).

**III. <u>The Balance of Harms and Public Interest Alone Support Denying an Injunction.</u>**

If the Court concludes that Plaintiffs made a clear showing on the merits and irreparable harm, it should nonetheless deny the injunction because the District's and the public's interests outweigh Plaintiffs'. *See, e.g.*, *Benisek*, 585 U.S. at 158 (holding that the balance of harms and public interest alone supported denial of an injunction); *Winter*, 555 U.S. at 31–32 (similar); *Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) (“[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims.”).

“On the District's side of the balance is the governmental interest in enforcing its duly enacted law.” *Hanson*, 120 F.4th at 246. “A ruling of unconstitutionality frustrates the intent of the elected representatives of the people” and “threaten[s] to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.” *Wash. State Grange*, 552 U.S. at 451 (citation modified). Thus, it is well settled that “[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.” *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring) (citation omitted).

Here, the elected branches of District government have determined that the RESALE Act serves the public interests in “protect[ing] artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases.” RESALE Act, pmbl. That is a determination entitled to respect while this litigation proceeds. *See Cmty. Oncology All.*, 2023 WL 9692027, at *6 (declining to “upset” Congress's “deliberate policy choice while the parties

litigate the merits"). And the fact that this law is aimed at "consumer protection" further adds to the public interest in respecting its enactment while litigation proceeds. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) (per curiam).

The will of the people plus their interests in protecting consumers and a vital, cultural industry far outweigh the pecuniary interests of a handful of corporations. Plaintiffs include multi-billion-dollar companies that can easily absorb any hypothesized losses from complying with one city's law while litigation proceeds. Plaintiffs may later be able to recover those losses, but the harms to the District and its people from a preliminary injunction are truly irreparable.

Further tipping the balance against an injunction is "the legal uncertainty" surrounding Plaintiffs' claims. *Benisek*, 585 U.S. at 160; *see Mass. State Grange v. Benton*, 272 U.S. 525, 527 (1926) (Holmes, J.) ("[N]o injunction ought to issue" in challenges to democratically enacted state laws unless the legal issues are "reasonably free from doubt."). Even if the Court finds that Plaintiffs are likely to succeed on the merits, that conclusion will require extending existing precedent because no case has held that regulations of online secondary ticket exchanges are unconstitutional. "Constitutionalizing new areas of American life is not something federal courts should do lightly"—and on a preliminary injunction—"particularly when 'the States are currently engaged in serious, thoughtful' debates about the issue." *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) (Sutton, C.J.) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)), *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025).

The states are indeed in a thoughtful debate about how to bring down ticket resale prices, as legislative activity across the country demonstrates. "Failure to allow these laws to go into effect would start to grind these all-over-the-map gears to a halt." *Id.* at 472. Yet, "sound government usually benefits from more rather than less debate, more rather than less input, more

rather than less consideration of fair-minded policy approaches." *Id.* Thus, a preliminary injunction is decidedly against the *national* public interest because it prematurely moves this healthy debate over ticket policy into court, instead of letting states and the District serve their constitutional roles as "laborator[ies]" of democracy. *Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) (citation omitted). And the harm to the national debate and democratic processes from a preliminary injunction cannot be undone if the Court later determines that the RESALE Act is constitutional. Until vacated, a preliminary injunction will cast legal doubt on other states' efforts and may cause them to forgo pro-consumer policy choices that are in fact constitutional.

True, "[o]n a complete record, the duty of the federal court sometimes includes correcting a state that goes beyond the U.S. Constitution's bounds. Without the clarity of a full trial on the merits, though, [courts] must err on the side of respecting state sovereignty." *DSSA*, 108 F.4th at 206; *accord L.W.*, 83 F.4th at 472. That rings especially true here because Plaintiffs' claims all depend on facts about the ticket industry, but none of their evidence has been tested, and the District has only had a few weeks to respond to their motion. The Court should not make constitutional rulings in this area without a full record of how the complex ticket market works.

Ignoring all these weighty considerations, Plaintiffs try to carry their burden with just three arguments. None suffices. First, Plaintiffs argue that they automatically establish that the equities and public interest weigh in their favor because enforcing an unconstitutional law is contrary to the public interest. Pls.' Mot. at 43. But "the mere fact" that Plaintiffs bring constitutional claims "does not decide [the Court's] balance-of-the-equities inquiry. To the contrary, this [C]ourt must balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law." *Hanson*, 120 F.4th at 247; *see Benisek*, 585 U.S. at 158 (affirming denial of an injunction only on the equities despite

constitutional claims). There is no rule that likelihood of success on a constitutional claim always establishes a right to a preliminary injunction. "[R]igid rules and equity principles mix like oil and water." *Clevinger*, 134 F.4th at 1234; *see Appalachian Voices v. FERC*, 139 F.4th 903, 930 (D.C. Cir. 2025) (Henderson, J., concurring) (criticizing courts that "roll[ ] each independent inquiry into a blanket 'likelihood of success on the merits' test"). And, even if Plaintiffs can show a likelihood of success on the merits, a decision on a preliminary injunction is "not in any sense intended as a final decision as to the constitutionality of the challenged statute." *Brown v. Chote*, 411 U.S. 452, 456 (1973). Especially in a case like this where Plaintiffs seek to extend doctrine, and on a fact-poor record in a factually complex area, a showing on the merits should not do much work in the balance of equities. *See Talbott v. United States*, 176 F.4th 720, 749 (D.C. Cir. 2026) (op. of Wilkins, J.) (concluding that the balance of equities did not support a preliminary injunction against certain applications of a policy, even though plaintiffs were likely to succeed, because "we must also consider that this is only a preliminary determination of the merits"), *pet. for cert. docketed*, No. 26-272 (Sept. 1, 2026).

Second, Plaintiffs argue that a preliminary injunction preserves "the status quo." Pls.' Mot. at 43. But it is *Plaintiffs* that want to upset the status quo by seeking to halt a law that is already on the books. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, J., in chambers) ("By seeking an injunction, applicants request that I issue an order altering the legal status quo."); *Taylor*, 549 F. Supp. 2d at 72 (finding that an injunction against a new law would upset the status quo); *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (same). The status quo is sometimes defined as "the last uncontested status before th[e] suit." *Singh v. Berger*, 56 F.4th 88, 96 (D.C. Cir. 2022) (citation modified). The RESALE Act was law for nearly three weeks before Plaintiffs sued.

Third, Plaintiffs use the public-interest prong to launch still more policy criticisms of the RESALE Act. Pls.' Mot. at 43–44. But, as this Court has explained several times, it is not the Court's role on a preliminary injunction to reweigh the pros and cons of government policies. *See Nat'l Immigr. Proj.*, 456 F. Supp. 3d at 34; *Cmty. Oncology All.*, 2023 WL 9692027, at *6; *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 25 (D.D.C. 2025) (Nichols, J.). And the Court "must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (citation modified).

## IV. Plaintiffs Are Not Entitled to a Preliminary Injunction Enjoining the Entire Act.

Even if Plaintiffs succeed on their motion, they have not shown entitlement to a preliminary injunction enjoining the *entire* RESALE Act. *See Diego v. HHS*, No. 26-cv-577, 2026 WL 1179706, at *12 (D.D.C. Apr. 30, 2026) (Nichols, J.) ("The scope of Plaintiffs' requested relief also augurs against an injunction."). For one, the allegedly unconstitutional provisions—the price cap, the fee cap, and the price disclosure—can be severed because the rest of the Act can "remain[ ] operative" without them. *Hooks v. United States*, 191 A.3d 1141, 1146 (D.C. 2018); *see* D.C. Code § 45-201(a) (all District statutes are severable); *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) (severability is a matter of state law). For another, "an injunction must be narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Hum. Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation modified). Accordingly, any injunction must be tailored to the only provisions that Plaintiffs attack: the price cap, fee cap, and price disclosure.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Date: November 9, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
HELEN M. RAVE [90003876]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendant District of Columbia*