**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TICKET POLICY FORUM, INC., *et al.*,

Plaintiffs,

v.

DISTRICT OF COLUMBIA,

Defendant.

Case No. 26-cv-3577-CJN

# PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Lucas C. Townsend (D.C. Bar No. 1000024)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
Morgan L. Ratner (D.C. Bar No. 1026987)
(admission application pending)
Aaron M. Smith (D.C. Bar No. 888314520)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500

Michael Holecek (*pro hac vice*)
Jonathan N. Soleimani (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7761

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. Plaintiffs Are Likely To Succeed On The Merits ........ 3

A. The Act Violates The Dormant Commerce Clause, Structural Principles, Or The Home Rule Act Because It Regulates Out-Of-State Transactions ........ 3

B. The Act Discriminates Against Interstate Commerce To Benefit Local Venues ........ 7

C. The Price And Fee Caps Likely Violate Due Process ........ 9

1. The Fee Cap Does Not Cover The Cost Of Plaintiffs' Services ........ 9

2. The Price And Fee Caps Deny Fair Notice ........ 12

D. The Original-Price Disclosure Likely Violates The First Amendment ........ 14

1. Intermediate Scrutiny Applies Because The Disclosure Concerns A Third Party's Transaction, Not Plaintiffs' Services ........ 14

2. The Original-Price Disclosure Fails Intermediate Scrutiny ........ 16

i. Substantial Government Interest ........ 16

ii. Direct Advancement ........ 17

iii. Tailoring ........ 19

3. Even If *Zauderer* Applies, The Act Is Unconstitutional ........ 20

II. Plaintiffs Will Suffer Irreparable Harm ........ 21

III. The Balance Of Equities And Public Interest Support An Injunction ........ 24

IV. The Court Should Enjoin The District From Enforcing The Act Against Plaintiffs And The Forum's Members ........ 25

CONCLUSION ........ 25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*44 Liquormart, Inc.* v. *Rhode Island*,
517 U.S. 484 (1996) .......... 17

*335-7 LLC* v. *City of New York*,
2023 WL 2291511 (2d Cir. Mar. 1, 2023) .......... 10

*Am. Hosp. Ass'n* v. *Azar*,
983 F.3d 528 (D.C. Cir. 2020) .......... 15, 17

*Am. Hosp. Ass'n* v. *Azar*,
468 F. Supp. 3d 372 (D.D.C. 2020) .......... 15, 17, 18

*Am. Meat Inst.* v. *Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) .......... 15, 16, 17, 20

*Am. Trucking Ass'ns* v. *City of L.A.*,
559 F.3d 1046 (9th Cir. 2009) .......... 23

*Ass'n for Accessible Meds.* v. *Bonta*,
766 F. Supp. 3d 1020 (E.D. Cal. 2025) .......... 4

**Ass'n for Accessible Meds.* v. *Ellison*,
140 F.4th 957 (8th Cir. 2025) .......... 3, 4, 5

*Ass'n for Accessible Meds.* v. *Frosh*,
887 F.3d 664 (4th Cir. 2018) .......... 5

*Association for Accessible Medicines* v. *Raoul*,
805 F. Supp. 3d 854 (N.D. Ill. 2025), *appeal docketed*, No. 25-2960 (7th Cir. Oct. 31, 2025) .......... 4

*Ayotte* v. *Planned Parenthood of N. New Eng.*,
546 U.S. 320 (2006) .......... 25

**Bacchus Imports, Ltd.* v. *Dias*,
468 U.S. 263 (1984) .......... 7, 8

*Baldwin* v. *G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935) .......... 3

*Bellion Spirits, LLC* v. *United States*,
7 F.4th 1201 (D.C. Cir. 2021) .......... 13

*Boehringer Ingelheim Pharms., Inc.* v. *HHS*,
150 F.4th 76 (2d Cir. 2025) .......... 11

*Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*,
251 U.S. 396 (1920)....................9

*Brown* v. *Entm't Merch. Ass'n*,
564 U.S. 786 (2011)....................19

*City of Cincinnati* v. *Discovery Network, Inc.*,
507 U.S. 410 (1993)....................19

*City of Philadelphia* v. *New Jersey*,
437 U.S. 617 (1978)....................8, 9

**Connally* v. *General Constr. Co.*,
269 U.S. 385 (1926)....................12

*Corewell Health William Beaumont Univ. Hosp.* v. *Kennedy*,
2026 WL 3257581 (D.D.C. Oct. 29, 2026)....................23

**CSX Transp., Inc.* v. *Williams*,
406 F.3d 667 (D.C. Cir. 2005)....................21, 22, 23

*Dirks* v. *SEC*,
802 F.2d 1468 (D.C. Cir. 1986)....................13

*District of Columbia* v. *Greater Wash. Cent. Lab. Council, AFL-CIO*,
442 A.2d 110 (D.C. 1982)....................6

*DoorDash, Inc.* v. *City & Cnty. of San Francisco*,
2022 WL 867254 (N.D. Cal. Mar. 23, 2022)....................10, 11

**DoorDash, Inc.* v. *City of New York*,
185 F.4th 1 (2d Cir. 2026)....................14, 15, 18, 20

*DoorDash, Inc.* v. *City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023)....................10

*Edenfield* v. *Fane*,
507 U.S. 761 (1993)....................16, 17

**Edgar* v. *MITE Corp.*,
457 U.S. 624 (1982)....................3, 5, 7

*Edwards* v. *District of Columbia*,
755 F.3d 996 (D.C. Cir. 2014)....................19

*Fla. Bar* v. *Went For It, Inc.*,
515 U.S. 618 (1995)....................17

*Garelick* v. *Sullivan*,
987 F.2d 913 (2d Cir. 1993)....................11

*Gen. Elec. Co.* v. *EPA*,
53 F.3d 1324 (D.C. Cir. 1995)....................12

*Gen. Motors Corp.* v. *Tracy*,
519 U.S. 278 (1997)....8

*Gordon* v. *Holder*,
721 F.3d 638 (D.C. Cir. 2013)....24

*Greater New Orleans Broad. Ass'n* v. *United States*,
527 U.S. 173 (1999)....19

*Guaranty Nat'l Ins. Co.* v. *Gates*,
916 F.2d 508 (9th Cir. 1990)....10

*Hanson* v. *District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)....21

*Healthcare Distrib. All.* v. *Boughton*,
2026 WL 3135340 (2d Cir. Oct. 20, 2026)....5

*Healy* v. *Beer Inst., Inc.*,
491 U.S. 324 (1989)....6

*Horne* v. *Dep't of Agric.*,
576 U.S. 351 (2015)....11

*Karem* v. *Trump*,
960 F.3d 656 (D.C. Cir. 2020)....21

*Kennedy* v. *Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....19

*Kimberly-Clark Corp.* v. *District of Columbia*,
286 F. Supp. 3d 128 (D.D.C. 2017)....19

*Larson* v. *Valente*,
456 U.S. 228 (1982)....23

*Maplebear Inc.* v. *City of New York*,
2026 WL 181637 (S.D.N.Y. Jan. 22, 2026), *appeal docketed*, No. 26-172 (2d Cir. Jan. 27, 2026)....9

*Mich. Bell Tel. Co.* v. *Engler*,
257 F.3d 587 (6th Cir. 2001)....9

*Mills* v. *District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)....21

*Nat'l Ass'n of Wheat Growers* v. *Bonta*,
85 F.4th 1263 (9th Cir. 2023)....20

**Nat'l Inst. of Family & Life Advocs.* v. *Becerra*,
585 U.S. 755 (2018)....14, 15, 19, 20

*Nat'l Shooting Sports Found.* v. *Bonta*,
718 F. Supp. 3d 1244 (S.D. Cal. 2024)....4

*Nat'l Treasury Emps. Union* v. *United States*,
927 F.2d 1253 (D.C. Cir. 1991) ....................21

**National Pork Producers Council* v. *Ross*,
598 U.S. 356 (2023) ....................1, 3, 4, 5, 7

**O'Donnell Constr. Co.* v. *District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992) ....................22

**Pennell* v. *City of San Jose*,
485 U.S. 1 (1988) ....................9, 10, 11, 12

*Pernell* v. *Fla. Bd. of Governors*,
641 F. Supp. 3d 1218 (N.D. Fla. 2022) ....................24

**Pharm. Rsch. & Mfrs. of Am.* v. *District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005) ....................5, 24

*Pursuing America's Greatness* v. *FEC*,
831 F.3d 500 (D.C. Cir. 2016) ....................21

*Rhode Island Truck Ctr., LLC* v. *Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026) ....................3

*Riley* v. *Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ....................17

*Sessions* v. *Dimaya*,
584 U.S. 148 (2018) ....................14

*South Dakota* v. *Wayfair, Inc.*,
585 U.S. 162 (2018) ....................5, 6

*Spirit Airlines, Inc.* v. *DOT*,
687 F.3d 403 (D.C. Cir. 2012) ....................15, 16

*Styczinski* v. *Arnold*,
727 F. Supp. 3d 821 (D. Minn. 2024) ....................4

*Susman Godfrey LLP* v. *Exec. Off. of the President*,
789 F. Supp. 3d 15 (D.D.C. 2025) ....................13

*TCF Nat'l Bank* v. *Bernanke*,
643 F.3d 1158 (8th Cir. 2011) ....................11

*TikTok Inc.* v. *Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ....................22

*TikTok Inc.* v. *Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) ....................23

*U.S. Chamber of Com.* v. *Sanchez*,
__ F.4th __, 2026 WL 3387373 (9th Cir. Nov. 9, 2026) ....................14

*Winter* v. *NRDC*,
555 U.S. 7 (2008) ........ 24

*Zauderer* v. *Off. of Disciplinary Couns.*,
471 U.S. 626 (1985) ........ 2, 14, 20

**Statutes**

28 U.S.C. § 1367(c)(1) ........ 6

D.C. Code § 1-206.02(a)(3) ........ 6

D.C. Code § 28-5501(6) ........ 19

D.C. Code § 28-5502 ........ 17, 19

D.C. Code § 28-5506(a)(2) ........ 18

D.C. Code § 28-5506(b) ........ 12

D.C. Code § 28-5506(c) ........ 11, 12

D.C. Code § 28-5507(b) ........ 12

D.C. Code § 28-5508 ........ 20, 23

D.C. Code § 47-2890.05 ........ 20

D.C. Code § 47-2890.05(a) ........ 24

Me. Stat. tit. 8, § 1301(2-A)(G) ........ 22

Vt. Stat. Ann. tit. 9, § 2479f(b)-(c) ........ 22

**Other Authorities**

Elliot Williams, *What the Legal Battle Over Ticket Resales Could Mean*, The 51st
(Nov. 12, 2026), https://51st.news/dc-concert-resale-act-lawsuit/ ........ 7

## INTRODUCTION

The District's opposition asks this Court to save the RESALE Act by adopting sweeping new limits on several constitutional protections.

First, the District contends that the Act's regulation of out-of-state transactions between non-D.C. sellers and non-D.C. buyers creates no extraterritoriality problems because there *is* no constitutional rule against extraterritorial legislation. The Supreme Court has said the opposite: a State may not "directly regulate[] out-of-state transactions by those with no connection to the State." *National Pork Producers Council* v. *Ross*, 598 U.S. 356, 376 n.1 (2023). The District dismisses that statement as a footnote and the decision it endorses as a plurality. But multiple courts of appeals have applied the same rule both before and after *Pork Producers*. So the District dismisses those too and asks this Court to align with a single outlier district-court decision that is currently on appeal. The weight of precedent and first principles require otherwise.

Even if the District could regulate extraterritorial transactions, it cannot discriminate against out-of-state actors to protect local interests. The legislative record, which the District ignores or mischaracterizes, shows that the Council did exactly that. The Act was "an effort to take the dollars from big platform international companies . . . and bring the dollars back to the [D.C.] venues themselves." June 30 Hr'g at 54:24-56:49; *accord* July 14 Hr'g at 9:11-10:55. The Act's structure matches those statements, capping the fees of out-of-state resale marketplaces while sparing the primary-market fees in which local venues share.

Second, the District contends that the Act creates no due process problems. In its view, confiscatory fee caps are permissible outside the public-utilities context. But courts have applied the protection against confiscatory rates to landlords, insurers, and online marketplaces. And the District does not rebut Plaintiffs' evidence that a fee capped at 10% of the price of an earlier sale often will not cover the cost of Plaintiffs' services. The District also says that the Act is clear

enough. But it does so only by rewriting the statute in its brief to supply new rules that themselves are unclear. A statute whose operative terms must be defined in litigation does not give fair notice.

Third, the District contends that the original-price disclosure creates no First Amendment problems under *Zauderer* v. *Off. of Disciplinary Couns.*, 471 U.S. 626 (1985). But that standard applies only to disclosures about "the terms under which [the speaker's] services will be available." *Id.* at 651. It does not extend to compelled disclosures about a product's *previous* sales. No court has applied *Zauderer* to encompass disclosures that are not about the current product on offer and indeed involve information that the seller cannot know without soliciting it from third parties. And the disclosure mandate fails under any standard. The ticket issuer knows the original price and Plaintiffs do not, yet nothing in the record suggests the Council considered the obvious alternative of requiring issuers to disclose the price before conscripting marketplaces to do so.

The remaining preliminary-injunction factors favor Plaintiffs. The District's primary response is that the possibility of private enforcement precludes a finding of irreparable harm. But that reasoning proves far too much: it would eliminate pre-enforcement review for any law with a private right of action. No court has adopted that reasoning. And while the District tries to downplay the harm from likely constitutional violations, such violations are dispositive or nearly so where, as here, the loss of constitutional rights is certain. Meanwhile, on the public interest and the equities, the District cannot claim an urgent need to enforce a law that is riddled with exceptions for preferred businesses and that does not target any actual fraud or consumer deception.

This Court should enjoin the District from enforcing the Act against Plaintiffs and the Ticket Policy Forum's members. At a minimum, it should enjoin the District from enforcing the price cap, fee cap, and original-price disclosure, or from enforcing those provisions as to resales with no D.C. buyer or seller.

## ARGUMENT

### I. Plaintiffs Are Likely To Succeed On The Merits

#### A. The Act Violates The Dormant Commerce Clause, Structural Principles, Or The Home Rule Act Because It Regulates Out-Of-State Transactions

A State cannot directly regulate commerce outside its borders. Mot. 15-19. Minnesota cannot control the price of drugs in Colorado, *Ass'n for Accessible Meds.* v. *Ellison*, 140 F.4th 957, 961 (8th Cir. 2025); Rhode Island cannot tell an Oregon car manufacturer to offer notice before granting a franchise to a Massachusetts dealer, *Rhode Island Truck Ctr., LLC* v. *Daimler Trucks N. Am., LLC*, 180 F.4th 365, 375 (1st Cir. 2026); and the District cannot cap prices on ticket resales between sellers and buyers in New York or any other State. The District makes three arguments to the contrary, but it is wrong on all three.

*First*, the District calls this extraterritoriality principle "made-up." Opp. 1. But the Supreme Court and lower courts have applied it for decades. *Edgar* v. *MITE Corp.* explained that a state statute "purport[ing] to regulate directly and to interdict interstate commerce, including commerce wholly outside the State, . . . must be held invalid." 457 U.S. 624, 643 (1982) (plurality opinion). While the District dismisses *Edgar* as "a plurality," Opp. 9, *Edgar* applied a well-established principle. Before *Edgar*, the Court had held that one State "has no power to project its legislation into [another State] by regulating the price to be paid in that state for [a product] acquired there," even if the product will later be resold in the regulating State. *Baldwin* v. *G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935). And most recently, the Court embraced *Edgar*'s reasoning in *National Pork Producers Council* v. *Ross*: A State may not "*directly* regulate[] out-of-state transactions" "involv[ing] individuals 'having no connection with [the State].'" 598 U.S. 356, 376 n.1 (2023) (quoting *Edgar*, 457 U.S. at 641-43). The First Circuit, Eighth Circuit, and multiple district courts have thus held that *Pork Producers* preserves an extraterritoriality principle. *R.I.*

*Truck*, 180 F.4th at 375; *Ellison*, 140 F.4th at 961; *Styczinski* v. *Arnold*, 727 F. Supp. 3d 821, 825 (D. Minn. 2024); *Ass'n for Accessible Meds.* v. *Bonta*, 766 F. Supp. 3d 1020, 1032 (E.D. Cal. 2025); *Nat'l Shooting Sports Found.* v. *Bonta*, 718 F. Supp. 3d 1244, 1256 & n.1 (S.D. Cal. 2024).

The District's lone authority to the contrary, *Association for Accessible Medicines* v. *Raoul*, 805 F. Supp. 3d 854 (N.D. Ill. 2025), *appeal docketed*, No. 25-2960 (7th Cir. Oct. 31, 2025), incorrectly believed that *Pork Producers* limited the dormant Commerce Clause to discrimination claims. *Id.* at 860. *Pork Producers* did no such thing. It rejected the broad theory that would invalidate any law regulating *in*-state conduct with *indirect* effects on out-of-state commerce. 598 U.S. at 364, 371, 374. But *Pork Producers* did not "trivialize the role territory and sovereign boundaries play in our federal system"; it reaffirmed the "usual 'legislative power of a State to act upon persons and property within the limits of its own territory.'" *Id.* at 375. This Court should not join the one outlier district-court decision that misread *Pork Producers* and is on appeal.

*Second*, the District claims that if there is a rule against extraterritorial regulation, the Act does not offend it. Opp. 9. But States may not directly regulate "transactions which took place wholly outside the State" between individuals with "no connection to the State." *Pork Producers*, 598 U.S. at 376 n.1 (quoting *Edgar*, 457 U.S. at 641-43 (alterations omitted)). Under that test, the Act is extraterritorial. The Act directly caps prices on online resale transactions that are located "wholly outside" the District, *see* Opp. 9, and that occur between individuals who may have "no connection to" the District, *see* Opp. 12. In fact, nearly 90% of covered resales are between out-of-state buyers and out-of-state sellers. Mot. 17.

The District responds that because the events take place in the District, there is *some* connection. Opp. 9-10. But some downstream connection is not enough. *Pork Producers* asked whether the out-of-state transactions regulated involve "*those* with no connection to the State."

598 U.S. at 376 n.1 (emphasis altered). The key question is thus whether the State is connected to the parties engaged in the out-of-state transaction—perhaps because they are citizens of the State. By contrast, this Court and others have held that States cannot regulate out-of-state transactions in goods, even when the good is bound for in-state markets. *Pharm. Rsch. & Mfrs. of Am.* v. *District of Columbia*, 406 F. Supp. 2d 56, 69 (D.D.C. 2005) ("*PhRMA*"); *see also Ass'n for Accessible Meds.* v. *Frosh*, 887 F.3d 664, 671 (4th Cir. 2018); *Ellison*, 140 F.4th at 961; Mot. 16. When it comes to price-cap laws that apply irrespective of state citizenship, the District invokes (at 10) inapposite laws regulating "solely . . . in-state drug sales." *Healthcare Distrib. All.* v. *Boughton*, 2026 WL 3135340, at *3 (2d Cir. Oct. 20, 2026) (distinguishing *Ellison* on that basis).

The District attempts to distinguish every comparable case on the ground that "none involves tickets," which are purportedly a "unique commodity" because of their "inherent connection to a physical place in the District." Opp. 12. But the Act does not regulate the physical event; it regulates only the price at which one person transfers the ticket to another (and communications around that transfer). And in the vast majority of covered resales, the seller, the buyer, the marketplace, and the systems that process the sale are all outside the District, and the ticket passes electronically from the (out-of-state) seller to the (out-of-state) buyer. *E.g.,* SeatGeek Decl. ¶¶ 9(k), 12; Gametime Decl. ¶¶ 14, 22. Indeed, the buyer may resell the ticket and so never set foot in the District at all. Mot. 16. In that respect, regulating the price of a ticket is no different from regulating the price of a drug that is sold out of state but "must eventually end up" in the regulating state. *Ellison*, 140 F.4th at 960. And it is *less* of a connection than the law rejected in *Edgar*, which regulated transactions in corporate shares of Illinois companies. 457 U.S. at 643.

*Third*, despite the District's warnings, Opp. 10, enforcing the extraterritoriality principle does not unsettle States' authority to tax online sales to state residents. *South Dakota* v. *Wayfair,*

*Inc.* concerned sales *to consumers in the taxing state*, which says nothing about a State's extraterritorial power over a sale between two nonresidents. 585 U.S. 162, 174, 188 (2018). *Wayfair* also declined to consider whether "some other principle in the Court's Commerce Clause doctrine might invalidate" state taxes on online retailers. *Id.*

Failing to enforce the extraterritoriality principle, by contrast, would have dramatic consequences. It could subject every ticket transaction to inconsistent regulatory regimes from an undefined set of States. *See Healy* v. *Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989); Mot. 18. Under the District's logic, every State that could claim a "connection" to the transaction, the event, or the parties could impose its own requirements. Indeed, if the District is right that *no* extraterritoriality principle exists, then even States without a connection could impose their own laws. The State with the most draconian price caps would set economic policy for the Nation.

For the same three reasons, the RESALE Act violates the Home Rule Act, which requires the Council to restrict the application of its laws "exclusively in or to the District." D.C. Code § 1-206.02(a)(3). The District argues that the Home Rule Act's text should yield to its purpose, *see* Opp. 12-13, but the case it cites deals with the purpose of a different clause. *District of Columbia* v. *Greater Wash. Cent. Lab. Council, AFL-CIO*, 442 A.2d 110, 115-16 (D.C. 1982) (construing the "functions of the United States"). The District's observation that the Council may regulate businesses operating in the District, Opp. 13, also does not help it, because (as explained) the Act regulates transactions and not businesses or events. Nor should the Court decline supplemental jurisdiction. Opp. 12. The claim presents a straightforward question that parallels constitutional principles, not a "novel or complex issue" of District law. 28 U.S.C. § 1367(c)(1).

Because the Act's price and fee caps directly regulate extraterritorial conduct, they are facially invalid. That is true even if the caps sweep in some domestic activity: 27% of the

shareholders in *Edgar* lived in Illinois, yet the law "must be held invalid." *Edgar*, 457 U.S. at 643. The Act here plainly lacks a legitimate sweep: While the District protests that the Act is constitutional "at least [for] resales between two District-based participants," Opp. 12, fewer than 1% of resales fit that bill, Mot. 2. In any event, if the Court concludes that the Act violates the extraterritoriality principle in only some applications, at a minimum the Court should preliminarily enjoin enforcement of the Act as to resales between counterparties outside the District. Mot. 19.

### B. The Act Discriminates Against Interstate Commerce To Benefit Local Venues

The Act is also unconstitutional because it is "driven by economic protectionism." *Pork Producers*, 598 U.S. at 364, 369 (ellipsis omitted); Mot. 19-24. The District's response mischaracterizes Plaintiffs' theory and ignores the mountain of evidence that the Act's animating purpose was to advantage local venues and promoters at the expense of out-of-state competition.

A facially neutral statute is still unconstitutional if it discriminates "either" in purpose "or" effects. *Bacchus Imports, Ltd.* v. *Dias*, 468 U.S. 263, 270 (1984). Here, it does both. The Council's statements about the Act's purpose are direct and discriminatory. One Councilmember described the Act as "an effort to take the dollars from big platform international companies . . . and bring the dollars back to the venues themselves." June 30 Hr'g at 54:24-56:49. Another explained that confining the Act to the secondary market would ensure that venue fees "generally go to our local venues," and that "dollars are put back into our local economy." July 14 Hr'g at 9:11-10:55. The goal was to regulate "in a way that doesn't penalize local businesses." June 30 Hr'g at 42:12-42:23. As local venues trumpeted, the "extra money" from each resale "heads straight out of the District and through national and international corporations." Elliot Williams, *What the Legal Battle Over Ticket Resales Could Mean*, The 51st (Nov. 12, 2026), https://51st.news/dc-concert-resale-act-lawsuit/. The District insists that the Council's statements show no "animus based on geography." Opp. 16. The Commerce Clause does not require animus.

It forbids legislation that protects local interests "by the illegitimate means of isolating the State from the national economy." *City of Philadelphia* v. *New Jersey*, 437 U.S. 617, 627 (1978).

The Act's structure and effects carry out these protectionist objectives. The Act caps the prices and fees of resale marketplaces, every one of which is located outside the District, and it spares the prices and fees that local venues earn either by issuing tickets themselves or by contracting with large primary-market platforms. Those fees "generally go to [D.C.] local venues," July 14 Hr'g at 9:11-10:55, which "usually share fee revenue" with their ticketing platforms and often collect it up front as an advance on a multiyear contract, GAO Report at 15 (ECF 24-2); Ex. R at 1 (ECF 10-25). And because resale listings compete with the primary market, capping only resale permits venues and their primary-market partners to raise prices and fees. The Committee thus warned that capping only resale could "further consolidat[e] monopoly power in the primary market." Committee Report at 8 (ECF 10-8). The Council's last act confirms the point. Before the final reading, the bill authorized the Mayor to limit primary-market platform fees. But the Council struck that authority at final reading, after "[l]ocal venues" told the Council that those fees "are not incidental" and that regulating them would threaten "the money needed to stay open." Ex. R at 1.

The District does not dispute that description of the market. Opp. 14-16. It argues instead that resale marketplaces and ticket issuers are not similarly situated because the former resell tickets and the latter sell them. Opp. 14-15. The question is not what the two groups are called but whether the favored and disfavored businesses are in competition. *Gen. Motors Corp.* v. *Tracy*, 519 U.S. 278, 298-99 (1997); *Bacchus*, 468 U.S. at 268-69. They are. A fan looking for a seat at a show can check both the primary and the secondary market for tickets to that event. That is why one Councilmember asserted that resale marketplaces were "cannibalizing" sales in the primary

market. June 30 Hr'g at 26:41-26:50. The Committee's warning that capping only resales could consolidate monopoly power in the primary market, Committee Report at 8, makes sense only if the markets compete. By contrast, the plaintiff in *Maplebear Inc.* v. *City of New York* knew of no New York business with a comparable model, so the law favored no local competitor. 2026 WL 181637, at *11 (S.D.N.Y. Jan. 22, 2026), *appeal docketed*, No. 26-172 (2d Cir. Jan. 27, 2026).

Because the Act discriminates, it is subject to "a virtually per se rule of invalidity." *Philadelphia*, 437 U.S. at 624; Mot. 23. And the District does not attempt to show that the Act serves a legitimate local purpose that nondiscriminatory means could not serve. Opp. 14-17.

### C. The Price And Fee Caps Likely Violate Due Process

#### 1. The Fee Cap Does Not Cover The Cost Of Plaintiffs' Services

Due process forbids a price control that denies the regulated party a "fair return on [its] investment" and that offers no mechanism to adjust prices based on "individual circumstances." *Pennell* v. *City of San Jose*, 485 U.S. 1, 13 (1988); *see Brooks-Scanlon Co.* v. *R.R. Comm'n of La.*, 251 U.S. 396, 397, 399 (1920); *Mich. Bell Tel. Co.* v. *Engler*, 257 F.3d 587, 596 (6th Cir. 2001). The fee cap does not meet that standard. It ties Plaintiffs' compensation to the price of an earlier ticket sale rather than to the cost of the services they provide: screening for fraud, processing payments, delivering tickets, and guaranteeing that buyers receive valid tickets or their money back. *E.g.*, Gametime Decl. ¶ 11; SeatGeek Decl. ¶ 9; TickPick Decl. ¶ 9; TPF Decl. ¶ 8. The District does not dispute that Plaintiffs provide those services or that buyers and sellers value them. Nor does it rebut the evidence that a fee capped at 10% of the initial price would not cover the cost of those services, and would leave Plaintiffs operating at a loss on many tickets and with little margin on others. Gametime Decl. ¶ 18; SeatGeek Decl. ¶ 16; TickPick Decl. ¶ 17. It asserts only that such claims are "hard to credit" based on general testimony opining on what a reseller's costs *should* be. Opp. 3. Such generalized evidence fails to rebut Plaintiffs' actual costs, and an

unrebutted showing that a price control denies a fair return establishes a due process violation.

The District's principal response is that only public utilities are protected from oppressive price controls. Opp. 17-19. But the Supreme Court reviewed a rent-control ordinance under the Due Process Clause and upheld it only after emphasizing that landlords were "guaranteed a fair return on their investment." *Pennell*, 485 U.S. at 11, 13. Other courts have applied the same principle to insurers, invalidating a rate rollback whose relief provision "guarantee[d] only that an insurer will break even," *Guaranty Nat'l Ins. Co.* v. *Gates*, 916 F.2d 508, 512, 515 (9th Cir. 1990); and to the fees that online marketplaces charge to connect buyers and sellers, *see DoorDash, Inc.* v. *City of New York*, 692 F. Supp. 3d 268, 299-300 (S.D.N.Y. 2023) ("*DoorDash NYC Cap*"); *DoorDash, Inc.* v. *City & Cnty. of San Francisco*, 2022 WL 867254, at *20-21 (N.D. Cal. Mar. 23, 2022) ("*DoorDash SF Cap*"). In the *DoorDash* cases, two courts held that platforms stated due process claims against caps on the commissions they charge, and neither court limited the doctrine to utilities. The District calls those decisions "dubious," Opp. 18, but it concedes elsewhere that the doctrine may reach "rent control," Opp. 19; *cf. 335-7 LLC* v. *City of New York*, 2023 WL 2291511, at *4 (2d Cir. Mar. 1, 2023) (takings claim against rent regulation).

The District also argues that Plaintiffs have no property interest in fees on "optional, future transactions." Opp. 19. Plaintiffs' interest is the one the landlords had in *Pennell*, the insurers had in *Gates*, and the platforms had in *DoorDash*: the revenue-generating use of the marketplaces they have built, which the cap would leave operating in substantial part below cost. Gametime Decl. ¶ 18; SeatGeek Decl. ¶ 16; *see DoorDash NYC Cap*, 692 F. Supp. 3d at 300. None of those entities had an entitlement to future rents, premiums, or food orders, and none was compelled to stay in business. Opp. 18. As the Supreme Court has explained in a similar context, "voluntarily choos[ing] to participate in" a market is not a "benefit that the Government may hold hostage, to

be ransomed by the waiver of constitutional protection." *Horne* v. *Dep't of Agric.*, 576 U.S. 351, 365-66 (2015). The District cites no contrary authority. Its only authority for a legal-compulsion requirement is a takings case about Medicare: physicians who choose to participate in that program cannot complain when it limits their fees, *Garelick* v. *Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993), because there the government acts as a market participant, *Boehringer Ingelheim Pharms., Inc.* v. *HHS*, 150 F.4th 76, 93 n.11 (2d Cir. 2025). Here, it acts as a pure regulator, *id.*, dictating the prices that private parties charge one another. The District's position would immunize every price control from challenge, because any regulated business can stop doing business.

On the merits, the District contends that the fee cap is not arbitrary and that it serves consumer welfare. Opp. 20. But a fee cap—even one that pursues consumer welfare—is arbitrary if it bears no relationship to the cost of the service it regulates. *Pennell*, 485 U.S. at 13; *DoorDash SF Cap*, 2022 WL 867254, at *21. Here, the cap is pegged to the price of a different ticket sale, not to what it costs to process, protect, and deliver a resale. Nor does it matter that the Act caps a service fee rather than a price. Opp. 19. A marketplace fee *is* the price of the marketplace's service.

The District also argues Plaintiffs "can obtain revenue in other ways," Opp. 19, but it does not say how. Its own authority shows why no such opportunity exists. In *TCF National Bank* v. *Bernanke*, the challenged law capped one transaction-processing fee but left banks free to charge *other fees*, so "no legal prohibition exist[ed] against TCF fully recouping the costs of its debit-card services." 643 F.3d 1158, 1164 (8th Cir. 2011). By contrast, the Act expressly caps the fee "for the service of providing a marketplace for the resale of a ticket." D.C. Code § 28-5506(c). The District identifies no comparable fee for that service that could be imposed, consistent with the RESALE Act, to "offset any losses." *TCF Nat'l Bank*, 643 F.3d at 1164.

Lastly, the District observes that the Mayor may increase the cap to 20%. Opp. 19, 20 n.4.

But the Mayor may not adjust the cap before 2028, a year after Plaintiffs must comply—and even then may leave the 10% fee cap in place or lower it to 5%, all without accounting for Plaintiffs' costs. D.C. Code § 28-5507(b). A blunt, across-the-board adjustment that may never happen is not the kind of "individual[ized]" protection that due process requires. *Pennell*, 485 U.S. at 13. The 10% cap the Council actually enacted is unconstitutional.

**2. The Price And Fee Caps Deny Fair Notice**

The caps also violate due process because Plaintiffs cannot determine the benchmark on which their liability depends—the "total price of the initial ticket," D.C. Code § 28-5506(b)-(c)—with "ascertainable certainty." *Gen. Elec. Co.* v. *EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). The District cannot fix the Act's lack of clarity by rewriting the statute in litigation.

First, many tickets have no single initial price. Bundled tickets have no individual purchase price, and complimentary tickets have no price at all. Mot. 28-30; *see* GAO Report at 46 (packages "do not itemize the price of the ticket"). For the former, the District's answer is that bundled tickets "can be divided." Opp. 23. But neither the Act nor the Opposition supplies a rule for dividing the price for, say, a season subscription covering both more valuable tickets (opening night) and less valuable tickets (a mid-week matinee)—equally, by relative value, or otherwise. The defect identified in *Connally* v. *General Construction Co.* thus persists: the law points to "one of several different amounts, without saying which." 269 U.S. 385, 394 (1926). The District's position on complimentary tickets is more striking. It says that "no one can 'resell' free tickets because they had no purchase price to begin with," Opp. 23, which means that a fan who receives a free ticket from an employer or a promotion may never sell it. The Act contains no such rule.

Second, even where an initial price exists, Plaintiffs usually cannot verify it. *E.g.*, Gametime Decl. ¶ 20; TickPick Decl. ¶ 19; GAO Report at 46. The District's first answer is that Plaintiffs can "ask sellers" for the information. Opp. 23. But that is no solution. The "initial ticket

price" is the price at which the ticket first sold. A seller who bought the ticket on the resale market may not know that price, and Plaintiffs cannot feasibly ask a first purchaser two or more steps removed from the resale. The District's next answer is a declaration from an enforcement official stating that the agency "does not interpret" the Act to hold an exchange liable for using an initial ticket price that it reasonably believed to be true. DLCP Decl. ¶¶ 9-10 (ECF 24-5); *see* Opp. 23. The Court should hold the District to that representation. But that does not supply the notice that due process requires. The declaration is not an "authoritative" binding rule, *Dirks* v. *SEC*, 802 F.2d 1468, 1471 (D.C. Cir. 1986), so Plaintiffs are left susceptible to an agency change of heart or private actions that ignore the agency's attempt in litigation to make the Act more reasonable.

Unable to cure either vagueness problem, the District says that Plaintiffs can "decline to host the resale" when they cannot determine the initial ticket price. Opp. 23. But the Council did not ban resales. It permitted them on certain conditions, and due process requires that those conditions be reasonably ascertainable. On the District's logic, any vague business regulation could be defended on the ground that regulated parties can stop doing business.

Nor is it an answer to tell Plaintiffs what the Act means in a hypothetical future rulemaking. Opp. 24. In contrast to an established process where regulated parties may "ask for a ruling about whether statements made on labels would violate" agency regulations, *Bellion Spirits, LLC* v. *United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021), the Act provides no process to seek definitive clarity. When the government "threatens penalties without sufficiently defining the conduct that triggers liability," it cannot defer to future "guidance" whose content "remains to be seen." *Susman Godfrey LLP* v. *Exec. Off. of the President*, 789 F. Supp. 3d 15, 52 (D.D.C. 2025).

Finally, the District contends that the Act is not "'vague in *all* of its applications,' as necessary for Plaintiffs to succeed" on a facial challenge. Opp. 23. But precedent "squarely

contradict[s] the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Sessions* v. *Dimaya*, 584 U.S. 148, 159-60 n.3 (2018). Regardless, Plaintiffs also challenge the caps as applied to tickets whose initial price is unknowable or unverifiable—which are the rule, not the exception. *E.g.*, Gametime Decl. ¶ 21.

### D. The Original-Price Disclosure Likely Violates The First Amendment

The Act compels marketplaces to publish the price paid in a third party's earlier transaction, a price that Plaintiffs did not set and ordinarily cannot verify. Because that original-price disclosure is not about the terms of Plaintiffs' own services, *Central Hudson* (at least) applies, and the District cannot satisfy it. The disclosure would fail under *Zauderer* in any event.

#### 1. Intermediate Scrutiny Applies Because The Disclosure Concerns A Third Party's Transaction, Not Plaintiffs' Services

Contrary to the District's suggestion, *Zauderer* does not apply any time a regulation "simply require[s] a clarifying disclosure," absent any "affirmative limitation on speech." Opp. 25. *Zauderer* applies only where the disclosure is "factual," uncontroversial, and "about the terms under which [*the speaker's*] services will be available." *Zauderer* v. *Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985); *see also Nat'l Inst. of Family & Life Advocs.* v. *Becerra*, 585 U.S. 755, 769 (2018) ("*NIFLA*"). The original-price disclosure falls outside *Zauderer*'s scope because it concerns the terms of a *third party's* earlier sale, not the terms of Plaintiffs' marketplace services. The Second Circuit drew exactly that line in *DoorDash, Inc.* v. *City of New York*, 185 F.4th 1 (2d Cir. 2026) ("*DoorDash NYC Speech*"), holding that *Zauderer* did not govern a law that compelled a marketplace to disclose "information about third parties who use [its] Marketplace, not information about [the] Marketplace itself," and treating that distinction as "important, indeed, dispositive." *Id.* at 7, 11; *see also NIFLA*, 585 U.S. at 769; *cf. U.S. Chamber of Com.* v. *Sanchez*, __ F.4th __, 2026 WL 3387373, at *13 (9th Cir. Nov. 9, 2026) (holding that mandatory disclosures

about suppliers' emissions did not implicate *Zauderer* because those disclosures were "insufficiently tethered to the reporting entity's own operations and capital transactions").

The District dismisses *NIFLA* and *DoorDash NYC Speech* because "neither had to do with prices." Opp. 26. But nothing suggests those cases would not apply to price disclosures; each declined to apply *Zauderer* because the disclosures did not concern the speaker's own service. In *NIFLA*, clinics were required to disclose information about "*state*-sponsored services," 585 U.S. at 769. The controversial nature of the abortion-related disclosures there does not distinguish *NIFLA*, because the Court first held the notice "in no way relates to the services that licensed clinics provide." *Id.* And in *DoorDash NYC Speech*, as explained, the law required companies to disclose data about third-party transactions.

The cases that apply *Zauderer* to price disclosures involve the speaker's *own* prices. In *American Hospital Ass'n* v. *Azar*, 468 F. Supp. 3d 372 (D.D.C. 2020), the rule "require[d] the publication of the payments that hospitals receive for *their* items and services." *Id.* at 391 (emphasis added). Those payments were "directly relevant to 'the terms under which [plaintiff-hospitals'] services will be available,'" *Am. Hosp. Ass'n* v. *Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020), because they were the rates the hospitals had negotiated with insurers and charged. Likewise, in *Spirit Airlines, Inc.* v. *DOT*, 687 F.3d 403, 413-14 (D.C. Cir. 2012), the rule required airlines to disclose the total price of their *own* tickets, and the D.C. Circuit treated it as a response to misleading price advertising. *Id.* at 412-14. Here, by contrast, Plaintiffs already disclose the prices of the transactions they offer. The Act requires them to disclose original prices they did not set, charge, or receive. Others did, in separate transactions that reveal nothing about what Plaintiffs charge or what their services entail.

*American Meat Institute* v. *Department of Agriculture* likewise involved facts "directly

informative of intrinsic characteristics of the product AMI is selling": "fiber content," "ingredients," "care instructions," and country-of-origin information that would have "utility" "in the event of any disease outbreak." 760 F.3d 18, 26-27 (D.C. Cir. 2014) (en banc). A prior transaction between other parties is not an intrinsic characteristic of Plaintiffs' service, which is a marketplace that connects buyers and sellers, screens for fraud, processes payments, and delivers tickets. SeatGeek Decl. ¶ 9. The District nonetheless calls the original price a "'trait'" of the resale "ticket." Opp. 26 (quoting *Am. Meat*, 760 F.3d at 26). That is a stretch. To a buyer of a resale ticket, the qualities of the actual good purchased include the artist, venue, and seat; to a buyer of meat, they include nutritional value and place of origin. *Am. Meat*, 760 F.3d at 20, 27. But people do not think that resold goods—whether it is a ticket, a lawn chair, or livestock—carry with them inherent ledgers of all previous transactions. Regardless, the ticket is not Plaintiffs' product or service. It belongs to the seller who lists it, and Plaintiffs do not issue or sell it.

### 2. The Original-Price Disclosure Fails Intermediate Scrutiny

The District fails to show that the disclosure serves a substantial interest, directly advances that interest, and is a reasonable fit for it. *Spirit*, 687 F.3d at 415.

#### i. Substantial Government Interest

The District invokes interests in protecting consumers, increasing price transparency, lowering costs, and promoting the arts. Opp. 27, 30. At that level of generality, those interests are hard to refute. But the District must "identify with care the interests the State itself asserts," *Edenfield* v. *Fane*, 507 U.S. 761, 768 (1993), and this disclosure in particular lets buyers "compare" the original price with the total price to see how much the ticket is "marked up." Opp. 31; *see* Opp. 28, 32. Neither of the District's disclosure cases recognized that interest.

*Spirit* upheld a rule serving the interest in "ensuring the accuracy of commercial information in the marketplace," 687 F.3d at 415—the accuracy of the price the customer would

pay. The Act already requires that price, D.C. Code § 28-5502, and the District does not claim a listing showing it is inaccurate or misleading. *American Hospital* likewise involved the prices of the hospitals' own services. 983 F.3d at 532, 540. A disclosure for judging a seller's markup based on a prior, unrelated transaction is different in kind. To the extent it is an interest in discouraging purchases at lawful, fully disclosed prices—by telling buyers they are somehow "getting ripped off," Opp. 28—that "generalized interest in unilaterally imposing [the government's] notions of fairness" is "constitutionally invalid." *Riley* v. *Nat'l Fed'n of the Blind*, 487 U.S. 781, 792 (1988). To the extent there is an interest in more information for its own sake, that is "plainly not enough." *Am. Meat*, 760 F.3d at 31 (Kavanaugh, J., concurring). And the only way the disclosure promotes "access" to the arts, Opp. 27, is by lowering resale prices, Opp. 28, so it fails for the same reason as the interest in discouraging purchases at lawful prices.

**ii. Direct Advancement**

The District must offer *something* more than "mere speculation or conjecture." *Edenfield*, 507 U.S. at 770-71. It does not. Its brief and exhibits show that the disclosure rests on an unverifiable figure. At most, such a disclosure provides "ineffective or remote support for [its] purpose." *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 505 (1996) (plurality opinion).

For starters, the District does not dispute that the Council's own equity assessment found "no data on the effectiveness" of a comparable price-disclosure and price-markup law. Ex. T at 4 (ECF 10-27, at 5). Governments typically take the time to gather concrete evidence before burdening speech. *Fla. Bar* v. *Went For It, Inc.*, 515 U.S. 618, 626 (1995) ("106-page summary of its 2-year study"); *Am. Hosp.*, 468 F. Supp. 3d at 395 n.25 ("numerous studies"). And "common sense," Opp. 28, 30, cuts the other way. The District's theory is that "transparency measures" "enable consumers to make informed decisions." Opp. 28 (quoting *Am. Hosp.*, 468 F. Supp. 3d at 394). But that logic rests on a critical premise: that the information disclosed is "'accurate.'" *Am.*

*Hosp.*, 468 F. Supp. 3d at 393. The District concedes it may be inaccurate here. Plaintiffs ordinarily cannot verify a resale ticket's original price. Gametime Decl. ¶ 20; TickPick Decl. ¶ 19; TPF Decl. ¶¶ 10-11. The District's own GAO report says as much: exchanges "would have difficulty verifying the value provided by the listing broker," in part because "the definition of 'face value' may not always be clear." GAO Report at 45-46. The District's answer is that Plaintiffs may list whatever price the reseller provides and "will not be liable for inaccuracies." Opp. 31; *see* DLCP Decl. ¶ 9. In other words, the original price can just be the seller's say-so, and marketplaces "cannot realistically check [the seller's] self-reported figure" for accuracy. TPF Decl. ¶ 10; *accord* Gametime Decl. ¶ 22. That does not enable "informed decisions" based on "accurate information"; it invites consumer deception. *Am. Hosp.*, 468 F. Supp. 3d at 393-94.

The legislative record confirms the absence of any evidentiary basis. The bill's sponsor described the requirement in one sentence—a reseller must "disclose the original price that you got it for"—and offered one reason: "Transparency is a great thing here." June 30 Hr'g at 24:54-25:05 (Allen). At neither legislative meeting did a Councilmember ask whether marketplaces could verify the figure, what verification would cost, or how consumers would use the information. The sponsor's description also does not match the Act, which places the duty on the exchange and refers to "the original purchase price of the ticket." D.C. Code § 28-5506(a)(2). On either reading, the figure is the price paid in a transaction in which the marketplace took no part. The Second Circuit rejected a comparable showing in *DoorDash NYC Speech*, where the City's common-sense assertions could not substitute for evidence under *Central Hudson*. 185 F.4th at 9.

With that premise gone, the District's remaining arguments all fail. The District says a consumer comparing two dynamically priced tickets can at least "see whether the ticket is marked up or discounted" or the extent of any markup. Opp. 31-32. But the consumer cannot reliably

know even that when the figure is a reseller's say-so. And a consumer choosing between tickets needs to know which costs less, which the all-in price already shows. *See* D.C. Code § 28-5502. Disclosing the price actually charged is not deceptive. Mot. 35.

Finally, the District's response on underinclusiveness fails to resolve the "serious doubts" about its interests. *NIFLA*, 585 U.S. at 774. The District does not even attempt to distinguish *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993), or *Greater New Orleans Broad.* v. *United States*, 527 U.S. 173 (1999), which rejected a regime "pierced by exemptions and inconsistencies," *id.* at 190. And the District's two explanations fail on their face. The Council's "focus[] on" music and the arts, Opp. 32, confirms that it "single[d] out" one kind of speech without any "persuasive reason why," *Brown* v. *Entm't Merch. Ass'n*, 564 U.S. 786, 802 (2011). The District's scarcity rationale, Opp. 32-33, should not be credited because it appears nowhere in the legislative record, *see Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022), and does not explain the exemption for certain sports tickets based on whether the team is "located in the District," D.C. Code § 28-5501(6). Even if scarcity were the driving concern, there would be no reason to cover plays, which run for weeks or months, while exempting a one-off playoff game. Such an exemption is "arbitrary." *Edwards* v. *District of Columbia*, 755 F.3d 996, 1007-08 (D.C. Cir. 2014).

**iii. Tailoring**

While the District need not have adopted the least restrictive means, Opp. 34, it still must have "*consider[ed]* whether some alternative might suffice." *Kimberly-Clark Corp.* v. *District of Columbia*, 286 F. Supp. 3d 128, 144-45 (D.D.C. 2017). Neither the legislative record nor the District's brief reflects that it considered *any* alternative, including the obvious one of imposing the obligation on the ticket issuer, who is best positioned to know and disseminate the original price. The existing face-value laws described in the District's own GAO exhibit place the duty on resellers. GAO Report at 45 n.97. The Second Circuit faulted the City for the same omission in

*DoorDash NYC Speech*. 185 F.4th at 8-9. Instead, the District merely proclaims without support that Plaintiffs' alternatives are not "equally effective." Opp. 34.

Nor does the disclosure "self-evidently" achieve the District's interests. Opp. 33 (quoting *Am. Meat*, 760 F.3d at 26). Particularly if the interest is the disclosure itself, that "circular formulation" would "drain the *Central Hudson* test of any meaning [for] compelled commercial disclosures." *Am. Meat*, 760 F.3d at 31 (Kavanaugh, J., concurring).

### 3. Even If *Zauderer* Applies, The Act Is Unconstitutional

Even if *Zauderer* applied, the original-price disclosure would fail. The government still must show that the disclosure requirement is not "unjustified or unduly burdensome" and that it addresses a harm that is "potentially real, not purely hypothetical." *NIFLA*, 585 U.S. at 776.

The District identifies no "real harm," Opp. 29, because it identifies no meaningful information that consumers lack when they are fully informed of the price they will pay. *See supra*, at 16-19. And "high prices," Opp. 29, are dealt with through the Act's direct regulation of ticket pricing without the need to burden speech. Mot. 36. A disclosure that duplicates a price cap the District says it will enforce is "unjustified." *Zauderer*, 471 U.S. at 651.

Finally, the District's own brief identifies the disclosure's "burden on speech." Opp. 28. Plaintiffs must publish a figure they ordinarily cannot verify, Gametime Decl. ¶ 25(a); GAO Report at 45-46, on pain of civil penalties and license revocation, D.C. Code §§ 28-5508, 47-2890.05. A mandate to publish a figure that the speaker cannot verify, and that resellers themselves often do not know or might misstate, risks misleading consumers. TPF Decl. ¶ 10; SeatGeek Decl. ¶ 17; *cf. Nat'l Ass'n of Wheat Growers* v. *Bonta*, 85 F.4th 1263, 1266-67 (9th Cir. 2023). And when the original price cannot be determined, the District says Plaintiffs "can decline to host the resale." Opp. 23. But a mandate that is so difficult to comply with that it sometimes requires regulated parties not to speak is "unduly burdensome" and chills speech. *Zauderer*, 471 U.S. at 651.

## II. Plaintiffs Will Suffer Irreparable Harm

The Act threatens multiple injuries that a final judgment could not repair.

First, a "prospective violation of a constitutional right constitutes irreparable injury." *Karem* v. *Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020); *see Mills* v. *District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (reversing denial of preliminary injunction because "loss of constitutional freedoms" was irreparable). That rule applies with special force to "[t]he loss of First Amendment freedoms, for even minimal periods of time." *Pursuing America's Greatness* v. *FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted). The District insists that "is not the law." Opp. 37 (citing *Hanson* v. *District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024)). But *Hanson* did not overrule *Karem*, *Mills*, or *Pursuing America's Greatness*. Instead, it observed that courts do not "axiomatically" find irreparable harm whenever a constitutional violation is alleged, 120 F.4th at 244, and explained why the plaintiff had not shown the law "would inflict irreparable harm on his [constitutional] rights": he offered only "remote conjecture" that he needed firearms prohibited by the law, *id.* at 245. A similar problem plagued plaintiffs who did not show that the challenged law would change their speech. *Nat'l Treasury Emps. Union* v. *United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991) (Opp. 37). By contrast, the loss of constitutional freedoms is certain here. Starting January 1, the Act compels Plaintiffs to publish the initial ticket price on every listing for a covered event—speech they do not want to make—and each publication is a completed injury that no final judgment can undo. *E.g.*, Vivid Seats Decl. ¶ 26(a).

Second, the District dismisses Plaintiffs' other injuries as "economic," but that does not mean damages will adequately remedy them. Opp. 38-39. To start, Plaintiffs' losses cannot reliably be measured. In *CSX Transportation, Inc.* v. *Williams*, a District law that would have forced a railroad to reconfigure its "national rail system" inflicted irreparable injury because it would be "exceedingly speculative" to value the difference between CSX's pre-existing network

and a compliant network. 406 F.3d 667, 673 (D.C. Cir. 2005). And in *O'Donnell Construction Co.* v. *District of Columbia*, reconstructing the contracts a business would have obtained was unnecessary because it was "inherently speculative." 963 F.2d 420, 428 (D.C. Cir. 1992). So too here. Professional sellers are likely to withdraw inventory from the District market. SeatGeek Decl. ¶ 21(d). Damages would require reconstructing the transactions, prices, and fees—all of which vary based on real-time conditions—in a market the Act eliminates. The fact that antitrust plaintiffs use experts to model counterfactuals, Opp. 39, does not show that damages are always an adequate substitute for preventing the loss; the same could have been said in *CSX* and *O'Donnell*.

Moreover, the Act will cost Plaintiffs customers and commercial partners that likely will not return even after Plaintiffs prevail. This Court found harm irreparable where users driven to competing platforms were "unlikely to return" and the restrictions eroded the company's "attractiveness as a commercial partner." *TikTok Inc.* v. *Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020). Here, a fan who opens a marketplace and finds little or no District inventory will conclude that the marketplace is unreliable and take her business elsewhere. Vivid Seats Decl. ¶ 17(c); Gametime Decl. ¶ 25(e). Distribution partners whose contracts are "negotiated at intervals" will restrict District inventory or demand new terms, and those relationships "would not be easily recovered." Vivid Seats Decl. ¶ 17(d); *see* SeatGeek Decl. ¶ 21(d)-(e). This is not conjecture. After a foreign jurisdiction imposed resale price restrictions, Gametime's market share and available inventory there fell. Gametime Decl. ¶¶ 17, 25(c). And the District gains nothing by pointing to other U.S. jurisdictions, Opp. 3, 40, none of which imposed the full combination of capped prices, capped fees, and compelled disclosure of the original price. *E.g.*, Me. Stat. tit. 8, § 1301(2-A)(G); Vt. Stat. Ann. tit. 9, § 2479f(b)-(c). Plaintiffs have sued D.C. because it is the only jurisdiction taking such a heavy-handed approach to regulation.

Further still, the Act will inflict "certain, great and actual" financial harm. *Corewell Health William Beaumont Univ. Hosp.* v. *Kennedy*, 2026 WL 3257581, at *6 (D.D.C. Oct. 29, 2026). The fee cap would force Plaintiffs to operate their District business at a loss because they cannot recoup the costs required to service and fulfill transactions. Gametime Decl. ¶ 18; TickPick Decl. ¶¶ 17, 24(b); SeatGeek Decl. ¶ 16; Vivid Seats Decl. ¶ 16. The District minimizes these injuries because Plaintiffs are "national corporations," Opp. 40, but the unrebutted evidence shows that Plaintiffs face devastating losses in the District. *See Am. Trucking Ass'ns* v. *City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009) (irreparable harm where part of "the carrier's business will evaporate, even if it does other things elsewhere"). And the harm begins now. Plaintiffs must pull engineers off other projects to rebuild national platforms, which imposes real opportunity costs that could not be unwound. *CSX*, 406 F.3d at 673; SeatGeek Decl. ¶ 20(c).

Unable to rebut Plaintiffs' irreparable injuries, the District suggests that enforcement is not "imminent." Opp. 36. If the District meant that, it would surely agree to a stay of enforcement pending this litigation—but it has not. In any event, Plaintiffs are incurring compliance costs now. Plaintiffs need not wait for "Damocles's sword" to "actually fall" on them before seeking preliminary relief. *TikTok Inc.* v. *Trump*, 507 F. Supp. 3d 92, 114 (D.D.C. 2020).[1]

Hypothetical enforcement by private plaintiffs, Opp. 35-36, also does not undercut Plaintiffs' irreparable injuries. A plaintiff "need not show that a favorable decision will relieve his every injury." *Larson* v. *Valente*, 456 U.S. 228, 243 n.15 (1982). Only the District can impose civil penalties, bring enforcement actions, and suspend Plaintiffs' licenses. D.C. Code §§ 28-5508,

---

[1] The District complains that Plaintiffs sued nineteen days after the Act became law on September 25. The District omits that for several days after September 25, the Council's website displayed a "Projected Law Date" of November 13. Plaintiffs promptly sought relief more than two months before the January 1 compliance deadline, unlike any of the cases the District cites.

47-2890.05(a). An injunction would remove those threats. Plus, Plaintiffs seek a declaration that the Act is unconstitutional and unlawful—a powerful disincentive to any private plaintiff. Compl. at 38, Prayer for Relief ¶¶ (a)-(b). Relief against government officials is thus meaningful even when private enforcement is theoretically possible. *PhRMA*, 406 F. Supp. 2d at 60, 72 (enjoining D.C. officials despite private right of action); *Pernell* v. *Fla. Bd. of Governors*, 641 F. Supp. 3d 1218, 1264 (N.D. Fla. 2022) (same to provide "at least partial redress"), *aff'd*, 181 F.4th 1135 (11th Cir. 2026). If it were otherwise, regulated parties could never file pre-enforcement challenges to laws with private rights of action, and that has never been the law.

## III. The Balance Of Equities And Public Interest Support An Injunction

The District's argument on the equities reduces to its interest in "enforcing its duly enacted law." Opp. 41. But the "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), so that interest reduces to zero if Plaintiffs are likely to succeed on the merits. Even on a full balancing, the District's side of the scale is light. The Act will apply for the first time beginning on January 1, 2027. Opp. 5. An injunction would preserve the market as it has operated for 25 years, which is the status quo no matter the few weeks the Act has been "on the books" yet not in effect. Opp. 44. Nor does the District explain why it has a pressing need to enforce an Act riddled with exemptions. Mot. 43.

To the extent the public's interest differs from the District's, it also favors an injunction. The report submitted by the District says that price caps may "send resale activity underground" and finds "no definitive evidence" that they lower prices. GAO Report at 36, 40-41. The Mayor's office also warned that the caps could "drive more activity to unregulated markets, resulting in higher rates of fraud and greater financial losses for consumers." Mot. 44; *see also* Committee Report at 7-8. The District writes off those warnings as "policy criticisms." Opp. 45. But this factor weighs the public consequences of an injunction. *Winter* v. *NRDC*, 555 U.S. 7, 24 (2008).

## IV. The Court Should Enjoin The District From Enforcing The Act Against Plaintiffs And The Forum's Members

The parties agree that an injunction should run against the District. As for the rest of the relief, the Court should enjoin enforcement of the Act in full against Plaintiffs and the Ticket Policy Forum's members. The District disputes two aspects of that relief.

First, the District objects that Plaintiffs bring a facial challenge. Opp. 7-8. Plaintiffs agree that the injunction is as-applied in some sense: it should run for the benefit of Plaintiffs and the Ticket Policy Forum's members. But the relief is facial in another sense: On Plaintiffs' marketplaces, the Act's defects are not confined to particular transactions. The caps were enacted for a protectionist purpose, the fee cap is confiscatory, and the caps and the disclosure mandate turn on a price Plaintiffs cannot determine or verify. The caps are likewise invalid across the board under the extraterritoriality principle. *Supra*, at 3-7. At a minimum, the Court should enjoin the District from enforcing the Act as to resales in which neither the buyer nor the seller is in the District, and as to resales where the initial ticket price is unclear. Mot. 19; *supra*, at 7, 14.

Separately, the District objects to an injunction covering the Act in full because the price cap, fee cap, and original-price disclosure can be severed. Opp. 45. But the caps and disclosure mandate are the Act's core, and the Council rejected a version of the bill that had removed the caps. Mot. 9-10. The Council thus would not "have preferred what is left of its statute to no statute at all." *Ayotte* v. *Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006). The Court should therefore enjoin enforcement of the Act as a whole. At a minimum, the Court should enjoin the District from enforcing the price cap, the fee cap, and the original-price disclosure.

## CONCLUSION

This Court should grant Plaintiffs' motion and preliminarily enjoin the District from enforcing the Act against Plaintiffs or the Forum's members.

Dated: November 16, 2026

Respectfully submitted,

/s/ *Lucas C. Townsend*
Lucas C. Townsend (D.C. Bar No. 1000024)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
Morgan L. Ratner (D.C. Bar No. 1026987)
(admission application pending)
Aaron M. Smith (D.C. Bar No. 888314520)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
LTownsend@gibsondunn.com
JLipshutz@gibsondunn.com
MRatner@gibsondunn.com
ASmith3@gibsondunn.com

Michael Holecek (*pro hac vice*)
Jonathan N. Soleimani (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7761
MHolecek@gibsondunn.com
JSoleimani@gibsondunn.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 16, 2026, the foregoing was filed with the Court's electronic filing system, which will send electronic notice of this filing to all counsel of record.

*/s/ Lucas C. Townsend*
*Attorney for Plaintiffs*